# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| **KENNETH EUGENE BARRETT,** | **)** |
| | **)** |
| *Movant,* | **)** |
| | **)** |
| **v.** | **)** |
| | **)** |
| **UNITED STATES OF AMERICA,** | **)** |
| | **)** |
| *Respondent.* | **)** |

---

## EXHIBIT 18

---

<u>**DECLARATION OF PAUL D. GORDON**</u>

Paul D. Gordon, a person over eighteen (18) years of the age and competent to testify and mindful of the penalties of perjury, deposes and says as follows:

1.  I am currently a Senior Instructor at SOR Training Center, and conduct CLEET re-certification and certification training for security officers and investigators.

2.  I am retired from the Oklahoma Highway Patrol ["OHP"]. I was assigned to the OHP Internal Affairs Division on April 1, 1999. On September 24, 1999, I was the on-call lead investigator and was assigned to investigate the shooting incident which resulted in Trooper Rocky Eales's death and charges of murder against Kenneth Barrett.

3.  At the time of the call to the shooting event, I lived in the Wellston area, which is approximately 25 miles northeast of Oklahoma City on I-44, or the Turner Turnpike.

4.  My experience and qualifications to conduct investigations for Oklahoma Highway Patrol Internal Affairs Division in September of 1999 are set out in my resume, which is attached hereto, Exhibit 1, and includes but is not limited to the following:

    a.  I was employed with the Oklahoma Highway Patrol from February 1, 1984 until my retirement in 2000. My primary duties in that employ included Supervisor of Firearms and Defensive Tactics for the State of Oklahoma and the training of the Governor's protective detail in a fifty (50) hour basic protection school and advanced protective efforts by solo officers.

    b.  Vocational Training during my tenure with the Oklahoma Highway Patrol

**DECLARATION OF PAUL D. GORDON -1**

PDG

included: the Oklahoma Highway Patrol Academy; Booby Trap Devices Recognition; Semi-Automatic Pistol Transition Course; Advanced Shooting Skills; Instructors Orientation Course; Hazardous Materials Awareness Training; CLEET Security Instructor Certification; Criminal Investigation Academy; Police Survival Course; CLEET Firearms Instructor School; Protective Security Operations Training Program; Bomb Threat Management; Narco-Terrorism Executive Protection Course; Incident Management Training; Defensive Tactics Instructor Training; C.E.R.T. Training, TTT, Sniper School; Hazardous Material Awareness; Advanced Material Awareness; Hazardous Materials- Operations; Hazardous Materials - Incident Commander; Physical Security Specialist Training Program; Fugitive Investigator Training Program.

5.      On the morning of the shooting on September 24, 1999, I took the call for 1st Lt. George Randolph, also of Internal Affairs. At approximately 0130, I received a call from the DPS Com Center in Oklahoma City. The Com Center dispatcher advised that there were two troopers down in a shooting incident in Sequoyah County. Both troopers were members of the Tactical (or Tact) Team, but it was unknown why they were at the location of the incident.

6.      At approximately 02:00, while driving to the location, Bob Ricks, the Highway Patrol Commissioner, called and told me that the Tact Team had been set up and he wanted me to go over the entire scene and find out exactly what happened.

7.      Upon arrival to the location I conducted several on-scene interviews that were

DECLARATION OF PAUL D. GORDON -2                    *PDG*

limited in nature and observed the scene as it was at the time of the event, as well as, much of the physical evidence that would later be collected.

8. When I arrived on the scene, I initially spoke to Lt. Kerry Pettingill, who was responsible for the mission. Pettingill advised me that when everything started he thought it was his men who started shooting at the Barrett cabin as they rolled up on it.

9. At the scene that morning, I was the fourth trooper to enter the Barrett cabin after the event and made a videotape recording of the scene and the interior of Mr. Barrett's cabin with my personal video camera because the OHP camera did not work. I have reviewed that videotape to refresh my recollection.

10. During the course of my investigation of this incident, three things were made clear to me: (1) that the East Tact Team of the Oklahoma Highway Patrol had failed to follow appropriate protocol in the execution of the warrants at the residence of Kenneth Barrett on September 24, 1999; (2) that neither the Oklahoma Highway Patrol nor the Oklahoma State Bureau of Investigation ["OSBI"] desired or pursued a thorough objective investigation of the incident and events following the incident; and, (3) my efforts to conduct a thorough objective investigation resulted in attempts by the State of Oklahoma to undermine that investigation and my ability to credibly conduct and report the same.

The facts supporting these conclusions are set out below.

11. There were a number of things that happened in my investigation which were not the usual Internal Affairs's investigatory practices.

**DECLARATION OF PAUL D. GORDON -3**

a.      First, I was not permitted to attend Rocky Eales's funeral by order of my captain. Captain Burris advised me that my attitude concerning the Eales's shooting investigation had caused bad feelings so I needed to stay in Oklahoma City and watch the office.

b.      Secondly, I was not allowed to talk to any of the Tact Team members involved for ten (10) days, even though the usual practice was 72 hours. This directive came from the top of the Highway Patrol per Captain Burris. By the time I was able to talk to the troopers involved, they had already met with a "counselor" and had legal counsel, Gary James, the Trooper's Association counsel.

c.      OHP brought the Troopers' Association legal counsel, Gary James, to the shooting scene.

d.      On the afternoon of September 24, 1999, with the exception of Trooper Ricky Manion who shot Barrett, all of the involved troopers denied firing their weapons and none were willing to give up their state-issued weapons for analysis and testing, despite being routine in any officer-involved shooting. The troopers ultimately had to be ordered to comply and surrender their weapons for analysis.

12.     I did not interview Mr. Barrett; I was advised, however, that 1st Lt. Randolph did interview Mr. Barrett at St. Francis Hospital in Tulsa, Oklahoma where Mr. Barrett was taken after the shooting for gunshot wounds and apparent injuries sustained in a beating by later-identified law enforcement officers at the scene. In the course of my investigation, I asked Lt. Randolph for the Barrett interview tapes and any notes he might have taken during the interview but Lt. Randolph ignored my request. I was never given the information, recordings or notes.

**DECLARATION OF PAUL D. GORDON -4**                              PDG

Recording interviews and taking notes is called "locking them into their statement," and was standard practice for Internal Affairs.

13.     When I arrived at the scene on the morning of the shooting, I interviewed or attempted to interview DA Diane Barker-Harold, who was among the group of dignitaries or observers that tagged along with the Tact Team. I asked her who the informant on the warrant was to which she replied that "we" know the identity of the informant, but she was not going to disclose this to me. I did not expressly inform DA Barker-Harold that I was tape recording the interview; however, as I spoke to her, I was holding the tape recording device in my hand without trying to hide it.

14.     I routinely used a recorder in all of my investigations with the full knowledge and approval of my supervisors. Despite that fact, I was advised by my superior, Captain Burris that Ms. Barker-Harold had filed a complaint against me for recording her and that I should not have used the recorder. Captain Burris told me to give him the tape recording of Barker-Harold. I refused, stating the recorder was an accepted investigation tool and that it was part of my investigation. Burris forbade me from any further contact with Dianne Barker-Harold or other local law enforcement who filed complaints against me because no contact is to be attempted by the trooper to the complaining party until the complaint was resolved. I never saw any written complaint and I was never advised to address the complaint in writing which would have been the first step in the complaint process. The original of the tape recording of Dianne Barker-Harrold and tapes of interviews of other parties involved in the Barrett shooting were given to Lt. George Randolph when I retired from the patrol under pressure in 2000.

**DECLARATION OF PAUL D. GORDON -5**                                    PDG

15. At the shooting site on September 24, 1999, I asked Lt. Pettingill and others on the scene who was responsible for the planning of the mission. I was admittedly vocally critical of the lack of appropriate surveillance and planning before attempting to execute a High Risk Fugitive warrant. As a result, I was advised by Captain Burris and several others there that I was not a "team player" and that I should adjust my attitude.

16. Despite the fact that as the primary investigator I was responsible for the investigation, I was denied any access to the state troopers on the morning of the shooting. The troopers had written statements which were collected by the Troopers Association attorney Gary James. I was never given access to those statements from me throughout my investigation.

17. I was not given any access to the troopers for a number of weeks. When I was given access to them, I was permitted to ask only questions which were pre-screened and approved by Lt. George Randolph. Those questions are reflected in the recorded statements which I provided to Mr. Barrett's counsel identified below.

18. In interviewing the troopers who were involved in the shooting incident, I was prevented from asking questions which would have been routine in any officer-involved shooting incident, specifically a drug or fugitive warrant service like the Barrett raid. Those questions are set out below and are questions which I specifically remember wanting to ask and others which are found in the 1988 U.S. DEPARTMENT OF JUSTICE DRUG ENFORCEMENT HANDBOOK that I had received in a class prior to the shooting incident and which I would normally have consulted in preparation for the interviews.

    a. Number of suspects confirmed by real time eyes on surveillance
    b. The group makeup of persons involved (male or female)

PDG

c. Were children at the arrest site?

d. What were the approximate ages of the occupants?

e. Did you have current photographs of your target?

f. Number of suspects at the targeted location at any given time.

g. The full name and background of the target.

h. The capabilities of the suspect, considering the following:

    *i.* What type of criminal violations had Barrett committed?

    *ii.* What target classification did the OHP Tact team assign to Barrett?

    *iii.* What was Barrett's previous police record involving physical violence?

    *iv.* Likelihood of resistance by Barrett;

    *v.* Physical and mental condition of Barrett;

    *vi.* Was Barrett a user of drugs?

    *vii.* Was Barrett suffering from mental problems?

    *viii.* Was Barrett known to assault police?

    *ix.* Did Barrett have a record of resisting arrest or using firearms against law enforcement?

    *x.* Was Barrett usually armed at all times and if so, with what kind of weapon

    *xi.* Did Barrett have a military background?

    *xii.* Was Barrett knowledgeable about explosives?

    *xiii.* What was Barrett's mode of transportation?

i. What type of safety equipment were you provided with?

j. What was the exact geographical location of the Barrett Cabin?

k. Who provided the interior layout of Barrett's cabin?

l. Please provide me with a picture of the cabin or sketch of the property?

m. How were the doors and windows of the cabin secured?

n. Please provide me with an aerial map with the Barrett cabin marked on it?

o. What was your primary and secondary approach and escape routes to and from Barrett's cabin?

p. What type of material is Barrett's cabin constructed of?

q. What type of alarm systems were present?

r. What type of guard animals were on the property?

s. What type of utilities were at the Barrett cabin?

t. What were the written rules of engagement?

u. What was the mission abort signal?

19.     The trooper interviews which were ultimately permitted took place in late October to early November of 1999 in my office. They were recorded and followed the script which was required and pre-approved by Captain Burris. Even then, if any trooper had a complaint about

 

the manner in which I handled the investigation, he could go directly to my superior, Captain Burris and file a complaint. I am unaware of any complaints.

20. One of the routine steps I took in this investigation was to try to acquire the procedural handbook for the East and West Tact Teams. When I asked for the handbook from Lt. Kerry Pettingill at his office, he told me it was not available. I told him if it needed to be printed I would come back and pick it up. He then told me "you'll never see this book." At that time, I went to my supervisor Captain Burris and advised him of Lt. Pettingill's statement. Burris told me he would get a copy of the Tact Team manual or handbook for me. About twenty minutes later, Burris refused to get me a copy of the manual, telling me it was a restricted document. About an hour later, Asst. Chief Jerry Cason walked into my office and asked me why I wanted the Tact Team book. I told him it was investigative protocol to obtain whatever manual was being used by the officer or unit at the time of the event. Cason told me I would never see the book as it was a restricted document. The lack of cooperation within the OHP upper ranks made the Internal Affairs investigation difficult, to say the least.

21. Within a few days of the refusal to give me the manual, however, when I went to my office, IASI secretary Carol Rawlings told me that there was a bunch of papers lying on the floor inside my office. When I went into my office, I found the papers and among them was the Tact Team handbook that Pettingill had refused to give me. I asked Carol who had been in my office. She said she did not know; that the papers were there when she put a message on my desk.

**DECLARATION OF PAUL D. GORDON -8**                    PDG

22. The manual recited that when a raid was being conducted on a suspected drug house, the Tact Team was not to conduct the raid without clearly identifying themselves as law enforcement officers. Otherwise, the suspected drug dealer would think that he was being "ripped off," setting the stage for a violent confrontation. The copy of the Tact Team Manual which appeared mysteriously in my office was left with Lt. Randolph when I retired.

23. My investigation made clear that the OHP East Tactical Team failed to follow the handbook protocol, at the very least, in this regard: the Broncos were unmarked and the troopers did not activate their emergency lights to warn Barrett he was dealing with the police. When I arrived at the shooting scene on September 24th, the vehicle that was fired upon had its visor flip and emergency lights in the up position as were Lt. Pettingill's, the team leader. When I talked to Trooper Hamilton later, I asked him specifically about the lights. At first, Hamilton said the emergency lights were down. I told him that the flip lights would have been shot up if they had been down. After the recording had been turned off, Hamilton admitted to me that did not activate the lights; in fact, that they did not have any lights on at all. Under the circumstances admitted to me and observed by me, Mr. Barrett would not have known the incoming vehicles were law enforcement.

24. Among other things, my investigation also revealed the following:

a. On the night of the shooting, there was good visibility because there was a full moon with no clouds of any kind.

b. Mr. Barrett's residence was a homemade cabin with no electricity and no running water, undermining any fear of destruction of evidence by announcing law

DECLARATION OF PAUL D. GORDON -9

PDX

enforcement's presence. Mr. Barrett did run an electric cord from his mother's residence which was next door to both his garage and cabin.

c. There had been a "drive by" earlier in the day, with four troopers participating. The troopers used one of their unmarked tactical vehicles. The tell-tale antennas, which could identify the vehicles as law enforcement vehicles, had been removed.

d. At the time of the drive-by, Mr. Barrett and an unknown individual were standing in the yard and reportedly witnessed by the drive-by troopers. Because the road fronting Mr. Barrett's property dead-ended to the east, the vehicles had to turn around and drive back past the property. There was nothing about the vehicles to convey to Mr. Barrett or anyone else present that the vehicle was law enforcement.

e. There had been a fly-over of the property, which only lasted 15-20 seconds the day before the execution of the warrant.

f. No real time surveillance had been conducted up to the start of the raid to ensure intelligence integrity of the mission.

g. The gate to Mr. Barrett's property was open at the time of the drive-by but on the night of the raid, the gate was closed and locked.

h. Earlier in the night before the raid, Mr. Barrett and his son, Toby, had reportedly been working on a vehicle in the garage on the property. In my professional opinion, if proper real time surveillance had been conducted, Mr. Barrett could have been approached and taken by surprise at that time and taken into custody without incident.

i. The information relayed to the troopers prior to the execution of the

**DECLARATION OF PAUL D. GORDON -10**

warrant regarding Mr. Barrett's dangerousness was that Mr. Barrett's likely response to law enforcement was to run away. Among other things, this was supported by Trooper Manion's interview, Mr. Hise's interview and the placement of OHP manpower at the two adjoining residences to prevent Mr. Barrett's safe escape to either residence.

25. Based on my observations at the Barrett residence the night of the incident, review of the physical evidence, and interviews with the surviving troopers and other people present or in the area, it was clear that none of the vehicles which approached the residence were driving with their emergency lights activated but that they had, in fact, rolled in dark, not even using headlights initially because of the full moon.

26. The task force investigator, identified to me at the scene as Frank Lloyd, who was in the lead vehicle of the caravan of state agents, which was supposed to arrive after the state troopers secured the scene, stated that as they approached the scene, Lloyd could see the Tact Team's brake lights when they turned into the Barrett drive. Mr. Lloyd did not mention to me at the scene that morning seeing overheads, rear deck lights or any emergency lighting as they came on the scene which was over by the time they arrived.

27. The physical evidence supported the conclusion that the officers did not have their emergency vehicle lights on. For example, Hamilton's unmarked Bronco's windshield was damaged by bullets but the emergency lights, which if in use would have been in the line of fire were undamaged.

28. Though Trooper John "Buddy" Hamilton, who was driving the lead vehicle, initially advised me that his emergency lights were on, when confronted with the physical

evidence, he admitted to me that he was not running his lights. Though the admission came after I turned the tape recorder off, it would most likely be reflected in my notes of the interview. Those notes were left with Lt. Randolph.

29. Trooper Hash, who was in a marked unit, also claimed he drove onto the property with his lights and his flashing bar on, but ultimately admitted that somebody just flipped the lights on after the shooting to give needed light during the wounded troopers' evacuation. I have a clear recollection of Trooper Hash's admission regarding the emergency lighting to me, which came after I turned the tape recorder off and Trooper Hash continued to talk. The statement is likely reflected in my notes of the interview which were left with Lt. Randolph when I retired.

30. Lt. Pettingill's lights, which if activated would have been obvious to Barrett if he looked in that direction, were, in my professional opinion, in the up position because the flipped down lights would have impaired Assistant Team Leader McBride's vision for observation of the raid from their vantage point in the yard next door, which was Kenny Barrett's mother's home.

31. Mr. Barrett would not have seen the other vehicles approaching from the side in any case, because even when he reportedly was outside the residence, he was on the porch looking where his son was yelling for help. Troopers Darst and Hise had tackled the son in the yard by the garage after they came across the gate in the dark.

32. The physical evidence and interviews made it clear that Mr. Barrett never left the porch and never went into the yard and that he only responded to the first tactical vehicle when it was accelerating towards the front of the residence, after making a circle in the yard from the side of the cabin.

PDG

33. When Trooper Hamilton was driving up to the cabin after turning off the main road, he bottomed out hard in a depression on the east side of the cabin, an incident which would have made considerable noise and made him slow down and then gun the vehicle to get out of the deep depression.

34. The vehicle then ran or slid into the front of Mr. Barrett's cabin, stopping with engine still running. Barrett was on the porch, shooting at the vehicle from a 45 degree angle, slightly elevated position and hit the vehicle's transmission lines which, under engine power, caused a major transmission fluid leak that emptied the transmission fluid onto the ground exactly where the vehicle originally stopped and the shooting occurred.

35. With appropriate expert testing, this transmission fluid may still be detectable on the Barrett property and able to establish the precise location of the lead Bronco during the shooting incident.

36. According to Lt. Pettingill, the Hamilton vehicle was backed out away from the house to be used to transport Trooper Eales. Because the vehicle would not drive forward due to transmission fluid loss, another vehicle was selected for the transport.

37. As a result, on the evening of September 24th, OSBI with the assistance of OHP Vernon Phillips, inappropriately processed the Eales /Hamilton vehicle at the place where the vehicle had been moved, rather than where it had been positioned during the shooting.

38. I advised my supervisors Lt. George Randolph and Captain Rodney Burris that the vehicle was being processed in the wrong place and would give the wrong evidentiary information about location and bullet angle. They both advised me this was an OSBI

**DECLARATION OF PAUL D. GORDON -13**

_PDG_

investigation and to stay out of it. I filmed the process showing where the processing effort took place for further review.

39. My recollection of these events are substantiated by the statements of the surviving troopers that when Trooper Eales exited his vehicle with the ballistic shield he turned towards Barrett and then turned and walked to the rear of the vehicle where he collapsed. The troopers retrieved the trauma kit by knocking out the rear window of the vehicle and cared for Eales at the rear of the vehicle where he had collapsed. The troopers and others then loaded Eales into the vehicle and moved the vehicle back to where OSBI later processed it.

40. The video clearly shows that the Hamilton vehicle is behind the ballistic shield and trauma kit, indicating an obvious movement.

41. When I first arrived on the scene in the early morning hours of September 24, 1999, 1st Lt. Pettingill told me that everything was laying where it was dropped during the event including the transmission fluid in front of the porch.

42. Trooper Hamilton claimed to me that his brakes failed, but when I had the brakes tested at the DPS garage, they were found to be in good operating order and that nothing was lodged under them.

43. Since the vehicle was unmarked and no other vehicles were running their lights, and without any announcement that law enforcement was on the property, Mr. Barrett, or any person like Mr. Barrett, who was paranoid as a result of his-off-the-grid lifestyle, would reasonably have believed that he was shooting at criminal intruders.

44. Most of the rounds fired by Mr. Barrett were fired from inside the house which are

**DECLARATION OF PAUL D. GORDON -14**              *PDG*

also visible in the video I made that morning. Trooper Manion shot Mr. Barrett in the legs in the residence.

45.     When the shooting stopped, Mr. Barrett was handcuffed behind his back in the house and dragged out onto the porch by Trooper Hamilton and searched by Trooper Manion for weapons. Mr. Barrett was searched at least a total of two times while at the scene, once by Trooper Manion and again when taken into custody by the Sheriff. His clothing would have been thoroughly searched at that time. Neither Trooper Manion nor the sheriff reported that anything other than the S&W semi-automatic handgun was found on Mr. Barrett's person found by Trooper Manion.

46.     I know that Sheriff Philpot and his deputies searched Barrett before they beat him as a result of my interview with the sheriff. I observed the sheriff walking across the Barrett yard on the morning of the 24th. I asked him who he was and he told me that he was the sheriff. I asked him if he had any contact with Barrett and he advised me that he and his deputies searched Barrett when they took custody of him. I asked the sheriff specifically at that time if they found any guns or anything else dangerous on Barrett and he said no.

47.     Every trooper, and certainly drug task force members, would have answered the question of whether anything dangerous had been found would have responded "yes" if Barrett had red phosphorus on his person because of the inherent dangers of inhalation, absorption and ingestion associated with red phosphorous, not to mention flammability problems.

48.     At the time of our conversation, outside of my OHP vehicle, I asked the sheriff if he would let me conduct a formal interview while we were there at the scene and he consented.

**DECLARATION OF PAUL D. GORDON -15**

During this tape-recorded interview inside my OHP vehicle on September 24, 1999, Sheriff

Philpot admitted to me on tape that he and his deputies beat Barrett badly, saying they had done

all they could and would have done more if there had not been so many people around.  Sheriff

Philpot never mentioned red phosphorus to me at that time or I would have notified all of the

troopers involved to take necessary decontamination procedures.  Anyone with any

understanding of red phosphorous who found anything which had come into contact with red

phosphorous would immediately have reported it because of the danger of contact transfer from

hands to your face within 5 minutes and in your eyes requiring immediate medical attention.

Sheriff Philpot did not mention either the pill bottle or the baggie in the pill bottle with red

phosphorous residue in it.

49.     The tape of this interview was kept with all of my investigative tapes related to

this matter and turned over to Lt. Randolph when I retired.

50.     OHP divides the state into Western and Eastern Tact Teams; the raid on Mr.

Barrett's property was undertaken by the East Tact Team.  Assistant Team Leader Lt. McBride,

who was assigned to the West Tact Team, was temporally assigned to the East Tact Team.  I

interviewed Lt. McBride.  After the formal approved questions had been asked and answered and

the tape recorder turned off, Mr. McBride became very emotional and told me that he had

recommended that East Tact Team abort the mission because the raid was going to be undertaken

with inadequate information and planning and no real surveillance had been conducted, but his

advice was not taken.  McBride was advised by the East Team to go back to the West Team if he

did not want to participate.  McBride was so upset over what happened that he began crying by

**DECLARATION OF PAUL D. GORDON -16**



the end of the interview. Though the recording does not reflect this portion of the conversation, my notes would most likely reflect it. Those notes were given to Lt. Randolph when I retired.

51.     Mr. Barrett's property was thoroughly searched the morning of the shooting. This included agents going layer by layer through the ashes in his burn barrel behind the cabin. There was nothing found that I observed which indicated drug activity nor was I ever advised that anything had been found by anyone.

52.     I was never advised that there was any information to support an anticipated finding of drug manufacturing at Barrett's residence but rather was informed that Mr. Barrett was believed to be an enforcer, *i.e.,* he facilitated sales of drugs between buyers and sellers who might not want to deal directly with each other.

53.     There was no air monitoring device at the scene and I did not see any of the investigators wearing special gear consistent with an active meth lab.

54.     Prior to entering the premises to videotape the inside of the cabin, the property was cleared by Vernon Phillips, who was also an OHP Tact Team member and Explosive Ordinate Disposal ["EOD"] expert and per meth lab requirements, would have alerted everyone to any possibility of booby traps or dangerous drug activity in the residence.

55.     I entered the premises without any special personal protective equipment, such as eye protection, vinyl rubber gloves, special protective clothing, or rubber boots. Where exposure levels are unknown, persons entering a potentially dangerous area would wear a full-face, positive-pressure, and air-supplied respirator. I was not instructed to discard contaminated clothing or shoes, which would have been the case if a meth lab was present in any one of its



**DECLARATION OF PAUL D. GORDON -17**

three forms: boxed; set-up not functional; or, set up functional cooking.

56. The Manual and Training Videos available to the East Tact Team at the time make clear that on September 24, 1999, the manner of serving or executing the High Risk Warrant/s on Kenneth Barrett was against protocol, grossly unprofessional and created far greater risk of injury or death than the situation would have presented if appropriate planning and measures had been taken. I have provided these videotapes to Mr. Barrett's counsel and can attest that they were available to the East Tact Team for training prior to the execution of the warrant at Mr. Barrett's residence on September 24, 1999. Exhibit 2 (DEA Dangers of Drug Labs), Exhibit 3 (The Meth Lab), Exhibit 4 (Kitchens of Death). In 1989, three sections of Exhibit 4 "Kitchens of Death" were required viewing by the OHP.

57. As my investigation continued, I was advised by at least two state troopers to watch my back and that the Highway Patrol was after me.

58. At one point in my investigation, Lt. Randolph, Captain Burris, and Jerry Cason came into my office with others, whose identity I do not recall, and aggressively accused me of putting the wrong serial number for Rocky Eales' gun in my report. I was told that the Widow Eales had noticed it and brought it to their attention while she was reading my un-released report. I told them that I had taken the number from the OSBI report and pulled that report out to show them that OSBI had recorded the number incorrectly. I corrected the serial number on the report. More importantly, I inquired, why anyone from outside the division had access to my on-going investigation. I was advised that they wanted to nominate Rocky for a medal of honor and had sent the report to Dallas and that they had let Mrs. Eales review the report. I again pointed out

**DECLARATION OF PAUL D. GORDON -18**

that the investigation summary report was taken from my computer without my permission, authorization or even notification. I told them that my office had been locked on a weekend when no one was present to allow access to the report. They told me I needed to relax; that we all needed to be on the same team. At that point, I became very concerned about what was happening in the Internal Affairs Division and began to make copies of some of the recordings I had made. I did not have access to all of my recordings at that time.

59. Because I believed the work environment to be hostile, in February of 2000, I began the employment process with Dyn Corps, a private overseas contractor, with the intent to vest my retirement and get away from the problems which I felt were only going to worse. I was contacted in March by DYN Corps and advised that I was good to go for a mission in Bosnia with processing classes forming in May and June. I advised them I needed to talk with my wife and give them a firm answer by May.

60. In April, 2000, I attended a High Risk Fugitive training course given by the U.S. Marshals' Service at FLETC in Georgia. While there, I discussed the manner in which the Barrett raid had been conducted and was advised that it was everything that shouldn't happen.

61. When I returned from the training, I decided to go ahead and vest my retirement from the Highway Patrol rather than to continue in the openly hostile work environment. I knew that as soon as I took the stand in the Barrett case, I would be in a position adverse to the Highway Patrol and thus, decided to retire from the Patrol and wait to see what happened in the Barrett case.

**DECLARATION OF PAUL D. GORDON -19**

62.     In June of 2000, I took a position with DYN Corps, an International Police Task Force, as CO-locator and patrol officer in small villages in and around Sarajevo, Bosnia, where my assignment was expanded to assist in Haz Mat training and evaluating Tactical Teams in controlled use of force in training situations.

63.     While in Bosnia, my wife, Susan Gordon received subpoenas for records from the Oklahoma Attorney General's Office.  I was investigated for, and later charged with, what amounted to misappropriation of state funds and property for taking "unapproved" comp time and for using a state telephone while working on the side as a private investigator.

64.     I was advised by the Attorney General's Office that if I did not return to face the charges, they would come and get me.

65.     The comp time and use of the state phone and other equipment had been explicitly approved by my superiors, Lt. Randolph and Captain Burris when I was assigned to the Internal Affairs Unit.  While I was assigned to the Internal Affairs Division, there existed a "hidden 32-hour comp time" policy which applied to everyone assigned to Internal Affairs.  If you were on-call, you automatically got 32 hours comp time, whether or not you were called out.  A person was on-call for two weekends and thus was supposed to claim sixteen hours comp time for each weekend.

66.     In the investigation of the charges against me, which were primarily the abuse and/or misuse of government property, services and compensation investigation, Burris and Randolph gave false statements to the Attorney General's office investigator, Larry Andrews,

**DECLARATION OF PAUL D. GORDON -20**



when they told him that they did not get comp time as a result of their job responsibilities which included being "on call." They also gave false statements to the grand jury.

67.    While the charges were pending against me, I was advised by Lt. John Matlock that he had been requested to perform an internal audit by Commissioner Bob A. Ricks, as suggested by the Grand Jury, and the audit revealed that the policies regarding comp time and use of state property for personal business were not clearly set out and that it was clear that Captain Burris and Lt. Randolph had misrepresented the fact that they, too, claimed comp time for weekend on-call time.

68.    Lt. Matlock told me that he advised both OHP Commissioner Bob Ricks and his Captain Jerry Simpson of the audit teams findings and that he had heard recorded telephone conversations with me and agency personnel, including Assistant OHP Chief Jerry Cason, who complained about the leadership of the agency, and defended use of the 32 hours on-call comp time as a standard practice. Cason confirmed to Matlock that I was entitled to the comp time like everybody else and that he expected subordinates to drive their units all the time to enable immediate response to investigations. Cason stated he would testify for me. I also allowed Matlock to hear tapes of Captain Burris stating that recording on-call time as comp time had been approved and was standard practice. Burris gave me permission on many occasions to leave DPS because I had "lots of comp time" coming. On those occasions, I was expected to drive my unit and was assured by Burris that I shouldn't worry because he "had my back."

69.    According to Lt. John Matlock, one of the OHP troopers assigned to conduct an audit of comp time policies in Internal Affairs, Diana McKnight, the Deputy Attorney General

**DECLARATION OF PAUL D. GORDON -21**



who prosecuted my case, became aware in the course of the investigation that Randolph and Burris committed perjury in the grand jury proceeding and advised OHP auditors that both Burris and Randolph compromised themselves in the grand jury. John Matlock also told me that Deputy AG McKnight advised Lt. Don Stockton, a member of the OHP audit team, that I was the only trooper to be prosecuted. When Ms. McKnight discovered that Lt. Stockton kept notes of the meeting with McKnight, she requested that he give her all of the notes concerning the grand jury testimony.

70. Deputy AG McKnight nonetheless vigorously pursued the prosecution in my case after being told about Burris and Randolph and the hidden illegal 32 hours of comp time by OHP auditors.

71. In my criminal case, I was represented by attorney Miles Zimmerman. Deputy AG McKnight did not notify Mr. Zimmerman that Burris and Randolph committed perjury in the grand jury. She did not advise him of the results of the audit which showed that the accumulation of comp time in the manner for which I was being prosecuted was an approved method used by all Internal Affairs personnel or that I was the only person being prosecuted for it.

72. Mr. Zimmerman worked out a plea deal where I could keep my retirement. I was allowed to enter a plea of *nolo contendere* to misuse of a state telephone, and received a five (5) year deferred sentence which has now been expunged after successful completion of the sentence. After the agreement to permit a *nolo* plea had been made, Ms. McKnight advised Mr. Zimmerman that they would only accept a guilty plea. Mr. Zimmerman asked to talk with

**DECLARATION OF PAUL D. GORDON -22**



someone else, and Mrs. Goodspeed, who was McKnight's supervisor, approved the original agreement for a *nolo* plea which preserved my retirement.

73. I entered the plea on August 16, 2001 because I was tired and extremely paranoid of the prosecution which was occurring. I was out of money and every effort to subpoena material witnesses was being quashed. I knew that the Commissioner of the Department Of Public Safety, Bob Ricks, was advised by the audit team about the conspiracy but had decided not to intervene or take any action against any of my superiors other than to transfer them to other units. He did not refer their conduct to the AG's office for review even though both Burris and Randolph committed a felony when they blatantly lied to the Attorney General investigator, Larry Andrews. Both officers then attempted to keep the investigation on me in the Internal Affairs unit so attention was not called upon them.

74. The audit, the results of which were not disclosed to me prior to my plea, shows that I did not engage in any act which had not been specifically authorized by my superiors and which was not common practice in the division.

75. Despite having entered a specific plea agreement, the terms of my probation were constantly changed by the prosecuting deputy attorney general, Diana McKnight, in significant ways, changing the conditions of my probation and making it more and more difficult to comply with those conditions. Additionally my police certification was revoked by the Council on Law Enforcement Education and Training despite the plea agreement to suspend the certification for the deferred sentence and not to contest my re-certification as a peace officer once my deferment was set aside.

**DECLARATION OF PAUL D. GORDON -23**



76. After the plea, and while I was on probation pursuant to a deferred adjudication, I received from Lt. John Matlock a copy of the Report on the Multi-County Grand Jury, Partial Report SC-99-56 prepared for Commissioner Bob A. Ricks, dated September, 2001. A true and correct copy of the Internal Audit including the Response to the Chief's Inquiry which I received from Lt. John Matlock is attached hereto and marked Exhibit 5.

77. In that report, findings included a response to the Chief's Inquiry which had downplayed the significance of the audit requested by the Grand Jury.

78. Included in the Internal Audit completed by OHP Auditors John Matlock, Jerry Simpson and Don Stockton is a section entitled "Audit's Response to Chief's Inquiry Re: OIA-01-04." The audit team attempted to resolve "some disturbing discrepancies found in the Internal Affairs and Special Investigation Units handling of the case involving 2d Lt. Paul Gordon that were not explained or addressed in the Chief's Inquiry." That response points out that when the investigation resulting in the felony charges against me were referred to the Attorney General's Office, "no mention was made of the application or accrual of comp time or the fact that [I] was or may have been authorized comp time when [I] was alleged to have been working for the State Insurance Fund." The report concluded that had that fact or an internal memo or other notice of the accrual of comp time and its use inside IASI been made, "it is highly likely this incident would have never escalated beyond that point. Failing to do so casts a dim light on the motivation to omit that information by the management of IASI." Exhibit 5.

79. Additionally the Response found that the DPS and IASI management "violated a basic rule of ethics and segregation of duties by proceeding with an investigation of serious

**DECLARATION OF PAUL D. GORDON -24**



wrongdoing by an employee within that division, a decision which casts doubt upon the objectivity of the investigator and his motives for not referring the matter to outside investigators." Exhibit 5.

80. After addressing other matters including the calculations of comp time taken by both Burris and Randolph, the Response concluded that the circumstances . . .

> . . . imply that conspiracy to commit fraud has been perpetrated by certain individuals who were over-reporting time worked. In the course of concealing their behavior, they withheld information regarding the accrual and usage of compensated time and provided a misleading report to the Commissioner and Attorney General's Office. The individuals continued the practice even after a fellow trooper resigned [footnote omitted] and was subsequently indicted by a multi-county grand jury. There were no indications they would have stopped until the practice was revealed by an audit."

Exhibit 5.

81. Shortly after I entered the plea *nolo contendere* and received the 5-year deferred sentence, I was contacted at my residence by Lt. John Matlock. He asked me if I had read the newspaper articles about the testimony being given by the state troopers against Mr. Barrett in his state trial which, if reported correctly, was a lie. I contacted Mr. Barrett's state trial counsel, John Echols by telephone and voiced my concern. I answered all of the questions he had about the ill-fated execution of the warrant on Mr. Barrett and the investigation of it.

82. The felony charges against me were career-ending and I was emotionally distraught and suffering from a high degree of anxiety as a result of the prosecution against me. Though subpoenaed for both state trials and willing (though nervous) to honor those subpoenas, I did not testify for either the state or the defense.

**DECLARATION OF PAUL D. GORDON -25**

83.     At some point, while the Barrett state court proceedings were ongoing, a second copy of the Tact Team manual was anonymously hand-delivered to me through the mail slot at my school in Moore, Oklahoma.   The first copy had been left with Randolph and reportedly was no longer in existence.  I contacted by telephone Oklahoma Indigent Defense Services ("OIDS") investigator Jack Stringer and informed him that I had received another copy of the Manual.  I was asked to bring the manual to Judge Garrett's chambers.  I met with Judge Garrett, Mr. Echols, the prosecutor, and representatives of OSBI.  When Judge Garrett asked me what was important about the manual, I related the critical passage about the Tact Team protocol  when serving a drug search/arrest warrant requiring positive identification as law enforcement to avoid the suspect from believing he was being ripped off, procedures which were not followed in this case.  I gave the manual delivered to me to Judge Garrett and did not make a copy for myself.

84.     I was subpoenaed by both the Government and the Defense for the federal trial. One of the federal prosecutors, who I believe is Mr. Littlefield, called me and was very aggressive, threatening and intimidating.  He basically told me that he was going to tear me up on the witness stand over the deferred sentence I received and challenged my credentials because I was not a SWAT officer and was in no position to second-guess the Tact Team.  I told my wife about the conversation and she reminded me that I had been trained by the U.S. Marshalls's Service on how to execute high risk warrants.  I called the prosecutor back and left a message about this training because I did not want him to think I was sandbagging him.  The prosecutor called my residence the next morning and left a message with my wife, Susan, that I did not need to come to Muskogee to testify at the federal trial.



**DECLARATION OF PAUL D. GORDON -26**

85. I talked to defense counsel in the federal case, who I believe to be Roger Hilfiger, only once on the telephone for a very short period of time in a call initiated by me because I had been subpoenaed and wanted to know the questions he was going to ask. I believe an investigator from the defense did make a short visit before that but I do not specifically recall the details of the conversation other than that the investigator did not ask me any substantive questions. Defense counsel told me that it was his understanding that I had a relationship with Mr. Barrett. I advised him that there was no such relationship and told him that if called to testify, I would simply tell the truth. I emphasized a couple of times during the interview that I had no affection for Mr. Barrett because he killed a state trooper but that if he asked me the questions, I would give him the answers. I told him that it depended on the questions he asked whether or not my testimony would help Mr. Barrett. Hilfiger did not ask me any questions and I was not called to testify. If called and asked the questions, I would have testified to everything to which I attest herein.

86. I was interviewed on this matter by Mr. Barrett's present counsel, Assistant Federal Defender Joan Fisher, Attorney David Autry and the Federal Defender's investigator, Paul Mann on November 3, 2011. Since that time, I have cooperated with them, answering any questions posed and attempting to provide whatever documentation or recordings I have been able to locate to support the truth of this Declaration.

87. After my discussion with the attorneys and investigator for Mr. Barrett, I remembered that once I became aware of the removal of my report from my computer and was worried for my professional security, I began making copies of interviews that were then

available to me. I put the copies in a box and took them to my mother-in-law's residence where they remained until she died. Prior to my mother-in-law's death, I was responsible for cleaning her house and removing her property so the house could be sold. While removing the property, I came across the box of tapes which was then put in storage at my school in Moore, Oklahoma. After talking with Barrett's defense team, I searched for them and gave copies of those tapes that I have been able to find to Ms. Fisher and Mr. Autrey on December 8, 2011.

88.     I did not advise either Mr. Echols or Mr. Hilfiger that I had these recordings because I did not remember that I had them and nothing in the my conversations with them reminded me of them.

89.     I also had copies of training videos which I later copied and sent to Ms. Fisher.

90.     Among the documents upon which I have relied to refresh my recollection and to support my assertions which I have provided to counsel are the following:

     a.     Memorandum for 27th District Attorney Richard Gray regarding the Subpoena;

     b.     The Subpoena issued by the prosecutor;

     c.     Release from the subpoena dated September 19, 2002;

     d.     May 7, 2001 Request by John Matlock "for monthly time sheets for the last three years or while assigned to IASI of Captain Rodney Burris, Captain Rick Adams, 1 Lt. Eddie Davenport, 1 Lt. George Randolph, 2 Lt. Paul Gordon, 2 Lt. Leanne Spears, 2 Lt. Deryckere;"

     e.     State of Oklahoma Office of Attorney General Grand Jury Investigation

**DECLARATION OF PAUL D. GORDON -28**



Unit, June 9, 2000 report by Larry W. Andrews regarding interviews with Captain Rodney Burris and Lt. George Randolph;

f.    October 16, 2001 statement by 1 Lt. John Matlock #44 regarding an April 17, 2001 meeting with 1 Lt. Don Stockton, Capt. Jerry Simpson #18, Asst. Atty. Gen. Diana McKnight and B. J. Schmidt wherein McKnight stated that 1 Lt. Randolph and Capt. Burris of Internal Affairs compromised themselves testifying in front of the Grand Jury to events regarding Paul Gordon;

g.    Correspondence between Miles C. Zimmerman to Diana McKnight, Assistant Attorney General, dated April 21, 2001;

h.    Report on Multi-County Grand Jury Partial Report SC-99-56 (September 2001), including comparative comp days claimed, taken and calculated cost by Burris and Randolph in 1999;

i.    October 21, 2001 leave Request by 1 Lt. Matlock to Captain Jerry Simpson resulting from treatment in response to his efforts in conducting the Internal Audit "[a]long with [his] knowledge of Atty General Behavior and DPS involvement".

j.    OSCN copy of the Docket Sheet in State of Oklahoma vs. Paul D. Gordon, Oklahoma County No. CF 2001-2226

k.    Application for Clarification of Terms and Conditions of Probation, State v. Gordon, Case No. CF 2001-2226;

**DECLARATION OF PAUL D. GORDON -29**    PDG

l.     Order of Expungement and Vacation of Previously Entered Plea dated 13th day of October 2006, filed October 18, 2006 in State v. Gordon, Case No CF-2001-2226

m.    Current Resume of Paul Donahue Gordon (Exhibit 1)

91.    Among the recorded statements upon which I have relied to refresh my recollection and to support my assertions which I have provided to Mr. Barrett's counsel are the following:

a.    Tape by Paul Gordon - 09/24/1999

b.    TRP Eales Shooting - 09/24/1999

c.    Danny Oliver [mislabeled Scott Jenkins]- 09/24/1999

d.    Gene Hise - 11/08/1999

e.    Rick Manion - 11/09/1999

f.    John Matlock - 07/21/2001

g.    Matlock - 08/01/2001

h.    Terry Morris- 06-24-03

i.    Steve Hash - November 19, 1999

j    Training Videos

    *i.*    DEA- DANGERS OF DRUG LABS (EXHIBIT 2).

    *ii.*    THE METH LAB (EXHIBIT 3)

    *iii.*    COPS SURVEILLANCE "DRUGS"

    *iv.*    KITCHENS OF DEATH (EXHIBIT 4)

PDG

v.. RAID PLANNING

92. After I spoke with Mr. Barrett's counsel and before signing this Declaration, Ms. Fisher provided me with copies of the typewritten transcripts of the interviews I conducted with Troopers Darst (Exhibit 6), Greninger (Exhibit 7), Hamilton (Exhibit 8), Hash (Exhibit 9), Hise (Exhibit 10), McBride (Exhibit 11), Manion (Exhibit 12), and Poe (Exhibit 13), as well as, Lt. Pettingill (Exhibit 14) and DEA Liaison Danny Oliver (Exhibit 15). I reviewed those transcripts and they confirmed my recollection of the those interviews.

93. Prior to and during the federal capital trial of Kenneth Barrett, I was able and willing to testify under oath to all of the matters discussed in this Declaration including the statements made to me in all of the interviews indicated above as well as to the conversations with the interviewees which occurred after I completed the scripted interviews and turned the recorder off. I am willing to testify to same now.

94. I declare under penalty of perjury that, to the best of my recollection as refreshed in part by my review of the documents identified above, the foregoing twenty-nine (31) page declaration is true and correct.

Executed by me this *14* day of March, 2012 in *LiNCoLN* County, Oklahoma.

Paul D. Gordon