# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

**KENNETH EUGENE BARRETT,**　　　　）
　　　　　　　　　　　　　　　　　）
　　　　　　　　　　*Movant,*　　　）
　　　　　　　　　　　　　　　　　）
**v.**　　　　　　　　　　　　　　）
　　　　　　　　　　　　　　　　　）
**UNITED STATES OF AMERICA,**　　　）
　　　　　　　　　　　　　　　　　）
　　　　　　　　　*Respondent.*　）

---

## EXHIBIT 28

---

# DECLARATION OF LEONARD POST

I, Leonard Post, a person over eighteen (18) and competent to testify, mindful of the penalties of perjury, declare as follows:

1. I am a licensed investigator retained by the Federal Defenders Office of the Eastern District of California to assist in a postconviction investigation on behalf of Kenneth Eugene Barrett, a person convicted of capital murder in the Eastern District of Oklahoma and currently under sentences of death and life without possibility of parole.

2. On December 14, 2014, I interviewed Casey Borders a person identified to me as a witness to matters relevant in the Kenneth Barrett case at his home in Stigler, Oklahoma.

3. The following is a true and correct accounting of Casey Borders' statements to me.

Casey Borders is a person over the age of eighteen (18) and competent to testify.

Mr. Borders was one of two emergency medical technicians (EMT) who transported Kenneth Barrett to the hospital after he had been shot multiple times in an incident in which an Oklahoma Highway Patrol (OHP) officer was killed at the residence of Mr. Barrett in Vian, Oklahoma in September 1999.

1

At the time of the incident, Mr. Borders was also a deputy sheriff in Haskell County, a position he held for approximately 15 years from which he had experience serving high-risk search warrants.

On that evening Mr. Borders was acting in his capacity as a certified EMT, employed by Jimmy Sutton who owned and operated Muldrow EMS, which was based in Muldrow, Oklahoma.

Mr. Borders took the call from Sallisaw Memorial Hospital who said there had been a shooting incident to which they had already dispatched two ambulances, but still required another. It was in the McKee Community of Vian off of Dwight Mission Road. Jimmy Sutton drove. They took the fastest route, highway 40.

When Mr. Borders and Mr. Sutton arrived, they were allowed through the gate, but no farther. They were held there by law enforcement for more than 20 minutes before they were allowed to attend the patient, who Mr. Borders later learned was Kenneth Barrett. It was the only time in Mr. Borders' career as an EMT that he was prevented from immediately attending a patient.

When they were finally permitted to attend to Mr. Barrett, they found him at the side rear of his shack. It appeared that not only had he been shot, but that he had been beaten. Mr. Barrett had pump knots on his head, one of which Mr.

Borders thought was made by the butt of a handgun. Mr. Borders recalls noting that in his run report, a report required by the state of Oklahoma that documents the emergency call from inception until completion.

Mr. Borders and Mr. Sutton put Mr. Barrett on a stretcher and were surrounded by highway patrol officers and others who were yelling and screaming at Mr. Barrett, Mr. Sutton and Mr. Borders. Mr. Borders felt threatened, as did Mr. Sutton. It only got worse when they were loading Mr. Barrett into the ambulance. OHP Trooper Manion, who Mr. Borders knew, was off the deep end and was one of the most vocal.

A law enforcement officer got into the rear of the ambulance with Mr. Borders. Mr. Borders was later told that it was a Philpot. Mr. Borders did not know either John or Gary Philpot, but he believes it was John by his uniform. At any rate, whoever it was had blond hair.

In the ambulance Mr. Borders cut off Mr. Barrett's pants, a leg at time. He noted approximately 11 bullet wounds that looked to him like they were made by an MP3.

When they arrived at the hospital, there must have been 50 OHP and other law enforcement vehicles at the hospital. The officers were screaming and hollering at the EMS team in a threatening manner. Mr. Borders did not feel

3

secure. He has never witnessed such unprofessional conduct by law enforcement officers, notwithstanding the fact that they had lost an officer.

At the hospital Mr. Borders turned his run report in at the desk. A minute or two later, after reporting to the doctors and completing Mr. Barrett's transition to hospital staff, Mr. Borders went back to the desk to complete his report and take his copy. Mr. Borders was told by multiple members of law enforcement, none of whom Mr. Borders knew, that he could not have the report back. Mr. Borders never saw the report again. Mr. Borders report had included a description of the bullet wounds Mr. Barrett received and the wounds he received after apparently being beaten. It included the precise time they were made to wait before attending to him. It also would have included the unprofessional conduct of law enforcement officers at the hospital had he been permitted to complete his report.

When Jimmy Sutton and Casey Borders got back to base, Mr. Sutton called Dale Bernhardt, the head of emergency medical services for the state and related what had happened to the run report. Mr. Barnhardt said that Mr. Borders should write a supplemental report and to call it that. Mr. Borders had to do that from memory. The supplemental report did include Mr. Barrett's wounds that he received subsequent to being shot and the unprofessional conduct of officers, including the fact that the EMS team was made to wait a very long time before

attending to Mr. Barrett. Mr. Borders gave that report to Mr. Sutton and has never seen it again.

Mr. Borders said that things were so bad at Mr. Barrett's house that it was apparent to Mr. Borders that what law enforcement wanted was for Mr. Barrett to die out there and not be taken to the hospital alive.

No one from law enforcement or Mr. Barrett's defense had ever spoken to Mr. Borders about this incident until December 14, 2014, when I went to Mr. Border's house in Stigler, OK and interviewed him.

4. I have no reason to believe that Mr. Borders, if called to testify, would not testify as set forth above.

I declare under penalty of perjury that this five-page declaration is true and correct.

Executed by me this 24th day of June 2015 in New York County, New York.

Leonard Post
NYS Investigator's License #110001455413

5