**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT, )
                                 )
               *Movant,* )
                                 )
v. )
                                 )
UNITED STATES OF AMERICA, )
                                 )
            *Respondent.* )

---

**EXHIBIT 29**

---

## DECLARATION OF LEONARD POST

I, Leonard Post, a person over eighteen (18) and competent to testify, mindful of the penalties of perjury, declare as follows:

1. I am a licensed private investigator licensed in the state of New York. NYS Investigator's License #110001455413. I am also an inactive member of the State Bar of California, Bar No. 84973.

2. I am retained by the Federal Defenders Office of the Eastern District of California to assist in the postconviction investigation on behalf of Kenneth Eugene Barrett, a person convicted of capital murder in the Eastern District of Oklahoma. Mr. Barrett is currently under sentences of death and life for the murder of an Oklahoma Highway Patrol Trooper during the service of search and arrest warrants on September 24, 1999.

3. I was requested by Joan Fisher, the Assistant Federal Defender handling Mr. Barrett's case, to travel to Oklahoma and continue the investigation that included interviewing law enforcement officials who had been at the Barrett residence on the night of the shooting. Those witnesses included both local law enforcement officers and state highway patrol troopers.

4. On February 15, 2016 I went to Trooper Mike Sharp's house in Sallisaw and asked him if he would talk to me. There was a surveillance camera and he did speak to me at the door. He said he couldn't talk then, and would call me later in

1

the week. He never called. When I left Trooper Sharp's house I made a U-turn and drove past his house. I was driving the same Hertz rental vehicle with the Texas plates that I was driving when I was pulled over by an OHP trooper four days later. On February 16, Trooper Knoke returned my call and agreed to meet with me the following morning. Early the next morning, Trooper Knoke called to say that he had made some calls the night before and that he decided he had nothing to say about the case and wouldn't meet with me. On February 18th, I sat in front of the locked gate of OHP Trooper Bill James house in Vian, near Tahlequah, hoping to talk with him. There was a pickup truck there but I did not make contact with Trooper James. In both of the attempted interviews of Troopers Sharp and James, I was driving the same Hertz rental vehicle with Texas plates.

5. On February 19, 2016, in the course of conducting that investigation in Eastern Oklahoma, at approximately 11:00 o'clock a.m., I was pulled over by the Oklahoma Highway Patrol, by a Trooper C. Rohr, Badge #344, who advised me that I was speeding. To the best of my knowledge I was travelling approximately three (3) miles, perhaps four miles over the posted speed limit, where I had set my cruise control

6. Approaching from the passenger side, Trooper Rohr immediately told me he was only giving me a warning and asked to see my driver's license, which I gave him. He asked if I owned the vehicle that had Texas plates and a Hertz

NeverLost system. I offered to show him my rental agreement, which was in the glove box, but he declined, which I thought unusual. Then he asked me to get in his vehicle, on the passenger side, front seat. No was not a permissible answer. It was a definite and firm taking of my freedom. I did not feel safe in my person, though he did nothing else that threatened me. I was extremely cooperative and polite.

7. On four separate occasions over the next half hour he asked if I was carrying a weapon. Each time I assured him that I was not.

8. The trooper started typing into his computer. He took an inordinately long time - at least five minutes - before I interrupted him to ask if he was running me. He asked if I had outstanding warrants or fines. When I said no, he said he wasn't running me, just typing the warning. He then started questioning me. I told him I was an investigator and showed him my license. I told him I was on my way to see a law enforcement officer. He asked why a law enforcement officer would ever talk to me, why would they want to help someone they put away. I told him that there were actually cops who sought the truth. He said that no PI had ever tried to talked to him, and I said that spoke to the sorry state of criminal defense in his state. He said he would never talk to an investigator from the defense. This went on for another 10 minutes or more. He asked me questions such as when I had picked up the car, where I had picked up the car and when and where I was

returning it, where I was staying, why I was staying in Ft. Smith. Every time I thought I ended the conversation, he would ask me another question and I would answer the best I could. Finally he printed the warning. Then he turned off the interior camera and told me that he had turned it off, as if he were doing me a favor. Then he asked me more questions.

9. After several more minutes, another black Bronco-type vehicle pulled up and a trooper came to my side of the vehicle. The trooper wore a nameplate that said "Hamilton." I do not know if it was the same Trooper Hamilton who was the partner to Trooper Eales, the trooper Mr. Barrett is convicted of killing. It was, however, unnerving. Trooper Hamilton asked Trooper Rohr if he had a problem and Rohr said no. Rohr then told Hamilton that I was an investigator and that I was not former law enforcement, another question Rohr had asked me. Then Trooper Rohr asked me who I was going to see. When I said I wouldn't tell him, he told me that I had already told him who I was going to see. I said that wasn't true and that I was not going to tell him.

10. Then Trooper Hamilton asked to search the car. I asked why and Rohr said it would make him feel better. I asked him when this incident had become about his feelings. He repeated that it would make him feel better. Hamilton asked me why I was sweating and I said it was sunny and 75 degrees and that I was in a hot vehicle. He said that he and his partner were wearing vests and uniforms and

4

they weren't sweating, and then he asked me what I was hiding, which he said was the reason I was sweating. They again asked to search my car. Here I was in custody and it seemed that that situation would not change unless I assented to the search, so I did.

11. I asked if they were going to plant anything in my car. One of them said no. I asked if they wanted me to pop the trunk. Rohr said they would do it themselves and told me to stay in the trooper's vehicle. They went to the car and I got out. Rohr said he told me to stay in the vehicle and I told him that it was too hot in there, and he said all right to just stay next to his vehicle. Rohr looked in the trunk and they both searched the vehicle, Hamilton taking the passenger side. When Hamilton picked up my briefcase, I told them that they were not permitted to open any files. The files were labeled with cities, not names, except for one that had my name on it.

12. There was a yellow pad on the passenger seat. On it was written a potential expert's phone number and a list of four items in this order: "Johnson, Sanders, Snitches, Friendly fire."

13. After the search, the troopers came back to the vehicle and Hamilton again accused me of hiding something, again referring to the fact that I was sweating. "I sweat," I said. Rohr handed me the ticket and told me to slow down and then they went on their way.

5

14. I called Assistant Federal Defender Joan Fisher and reported the incident to her. She asked me to write a detailed account.

15. After the incident, I reviewed the warning that Rohr had given me and it was full of factual errors including: showing the highway as I-44 instead of I-40; the wrong county (Craig rather than Sequoyah County); the wrong driver's license number (which contains 16 extra digits than mine and had no two correct consecutive numbers,); an incorrect weight by twenty pounds (my license reflects no weight). A true and correct copy of the warning is attached hereto.

16. I felt like I was in custody the entire time I was with the officer(s). After refusing permission to allow the search of my vehicle, I finally allowed it only because I felt intimidated by both officers, and while there was no explicit threat, the situation was implicitly threatening to me.

I declare under penalty of perjury that this six-page declaration is true and correct.

Executed by me this 8th day of May in New York County, New York.

Leonard Post
NYS Investigator's License #110001455413