# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,      )
           )
        *Movant,*    )
           )
v.           )
           )
UNITED STATES OF AMERICA,    )
           )
      *Respondent.*  )

---

## EXHIBIT 55

---

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF OKLAHOMA

**KENNETH EUGENE BARRETT**, )    **CAPITAL CASE**
)
Petitioner/Defendant, )    Case No. CV-09-105-JHP
)
v. )
)
**UNITED STATES OF AMERICA**, )
)
Respondent/Plaintiff. )

## DECLARATION OF WILLIAM A. TOBIN

I, William A. Tobin, under penalty of perjury pursuant to 28 U.S.C. § 1746, hereby declare as follows:

**Table of Contents**

A.  Case-Specific Documents and Request for Scientific Review

B.  Background Overview as Materials Scientist / Metallurgist

C.  Specific Qualifications Applicable to Forensic Firearms Identification

D.  Forensic Individualization Defined and Acceptance in Scientific and Scholarly Forensic Communities

E.  Metallurgical Origins of Toolmarks; Relevant Considerations of Formation, and Forensic Practice

F.  National Academy of Sciences and AFTE Practice

G.  Uniqueness & Misleading Implications of Individualization

H.  Differentiating 'Individual' From Subclass Characteristics & Likelihood of Adventitious Hits

I.  Unfounded Assumption, Uniqueness & 'Individual' Characteristics

1

**J. Subjectivity of Forensic Firearms/Toolmarks Practice**

**K. Geographic Distribution of Highest Likelihood Coincidental Match Firearms**

**L. Known Misattributions (Type I Errors: False Positives) & Error Rates**

**M. Unfounded Expressions of Individualization, Certainty, and Implications of Case-Specific Opinions**

**N. Summary**

## A. Case-Specific Documents and Request for Scientific Review

1. I have been provided, and reviewed relevant portions of, the following documentation in captioned matter:

    a. Oklahoma State Bureau of Investigation (OSBI) Criminalistics Examination Report of Terrance Higgs, dated "1-20-2000", OSBI Lab #99-11543 (6 pages);

    b. Partial transcript of Sequoyah County District Court trial testimony of Terrence [sic] Higgs on October 15, 2002 (3 pages including cover, from Volume XIX);

    c. Transcript of trial testimony October 26, 2005, USDC, EDO, of Terrance Higgs, pages 3512 to 3549, of Volume 15;

    d. Transcript of trial testimony October 27, 2005, USDC, EDO, of Terrance Higgs, pages 3556 to 3605 of Volume 16;

    e. Unlabeled transcript of Terrance Higgs, pages 3697 to 3829;

2. I was asked to provide my opinion on the scientific foundations, *vel non*, underlying the forensic practice of firearms/toolmarks identification for the case *sub judice*, and as to how the true [mainstream] scientific community views the forensic practice. My opinions are based on extensive research and reviews of relevant domain literature, scores of judicial proceeding transcripts, and personal observations of expert testimonies, in addition to my scientific and forensic credentials discussed in the following paragraphs. For the opinions expressed herein, it is not necessary for a forensic metallurgist/materials scientist to have

examined actual case-specific items of evidence in order to opine on the scientific foundation of forensic work product and testimony of an expert witness in firearms identification. If called to testify, I would testify as follows:

**B. Background Overview as Materials Scientist / Metallurgist**

2. I have a Bachelor of Science degree in Metallurgy from Case Institute of Technology[1] in Cleveland, Ohio, and graduate studies in metallurgy and materials science at Ohio State University and the University of Virginia. While in graduate school, I accepted an offer of employment by the Federal Bureau of Investigation (FBI) as a Special Agent in 1971. After serving approximately 3½ years as an investigative ("street") Agent, I was assigned to the FBI Laboratory in Washington, D.C., as a forensic metallurgist/materials scientist because of my prior academic and professional experience, where I remained until my retirement in 1998 as manager of forensic metallurgy operations. During my career at the FBI Laboratory, I undertook additional graduate studies in materials science (metallurgy) at the University of Virginia, and also studies for a Master of Arts in Special Studies at George Washington University (GWU), a program sponsored and instructed by both the Forensic Science Department and Law School at GWU.

By congressional mandate, the FBI Laboratory is charged with providing assistance "to all duly-authorized law enforcement agencies" throughout the U.S. Because no forensic metallurgy component existed in any state, local, or other federal law enforcement entity in the United States, or even in most federal regulatory (non-law enforcement) entities such as the Occupational Safety and Health Administration (OSHA), Food and Drug Administration (FDA), or Department of State, *inter alia*, the FBI Metallurgy Unit provided requested assistance for all federal, state and local criminal, civil and non-litigious matters,

---

[1] Case Institute of Technology is now known as Case Western Reserve University.

and periodically for the international community in foreign police cooperation matters. From the retirement of the former FBI Chief Forensic Metallurgist in 1986 until my own retirement in 1998, my unit was personally responsible for virtually all forensic metallurgical examinations requested of the FBI by all local, state, federal, and foreign agencies. Such assistance included my participation with the National Transportation Safety Board (NTSB) in determination of the cause(s) of the TWA 800 midair explosion disaster over Long Island, N.Y., the nation's worst rail disaster (the "Sunset Limited" in Mobile, AL), the nation's second worst environmental disaster (oil spill by the "Emily S./Morris J. Berman"), and numerous other high profile incidents. Because of the volume of high profile cases for which I was responsible, my scientific work product has been subject to substantial public and Congressional scrutiny in the United States and internationally throughout my career as a forensic metallurgist/materials scientist.

Included in my academic background are various courses typical of a metallurgy/materials science curriculum, at both an undergraduate (U) and graduate (G) level. Most directly or indirectly relate to production and functioning of the entire spectrum of metal and non-metal products and components, including firearms, bullets, and cartridge cases. The following list of courses, not all inclusive and generally in reverse chronological order, are included in my academic background:

   a. Manufacturing Processes & Materials (G)
   b. Statistics for Scientists & Engineers (G)
   c. Structure & Properties of Materials (G)
   d. Shaping & Forming of Metals (G)
   e. Engineering Metallurgy (G)
   f. Physical Metallurgy (1 G, 1 U)

g. Advanced Materials Laboratory (U)

h. Properties of Materials (U)

i. Engineering & Mechanical Properties of Materials (U)

j. Relaxation Properties of Solids (U)

k. Engineering Applications of Materials (U)

l. Foundry Metallurgy (U)

m. Diffusion Processes Laboratory (U)

n. Diffusion Principles (U)

o. Plastic Flow Laboratory (U)

p. Dislocation & Plastic Flow (U)

q. Metallurgical Processes Laboratory (U)

r. Fundamental Metallurgical Processes (U)

s. Behavior of Materials (U)

t. Production Metallurgy (U)

u. Thermodynamics (U)

v. Heat & Mass Transfer (U)

w. Structure of Crystals (U)

x. Introduction to Materials (U)

It should be noted that the term 'plastic' in the above listing does not refer to the common usage as the synthetic amorphous polymer solid, but rather describes the non-reversible behavior (deformation) of metals and materials reacting to applied stresses, such as occurs during the cycling of a firearm leaving striations and impressions that are eventually used by firearms identification practitioners in their pattern-matching forensic practice. It should also be noted that the forensic domain of firearms identification is a less-complex subset of toolmark identification.

During my metallurgy studies and my tenure as an FBI forensic metallurgist, I visited many metal manufacturing and processing plants throughout the United States and Taiwan, to study, in detail, a wide variety of industrial manufacturing practices for a wide variety of products, including firearms and cartridge cases, that exhibit toolmarks resulting from production processes. I have been employed as a plant metallurgist in both the copper and aluminum industries, as a nuclear research metallurgist in the field of aerospace, and as a consultant to an ammunition manufacturer. My *curriculum vitae* is appended to this declaration as Exhibit A. I have authored or coauthored numerous papers on forensic matters, the latest two of which relate to firearms/toolmarks identification issues similar to those in the case at bar. The scientific principles and issues articulated in both recent papers directly apply to the premises underlying firearms identification forensic practice in general, and to the unfounded claims of individualization of the firearms examiner in the *Barrett* matter. The two papers are, "Hypothesis Testing of the Critical Underlying Premise of Discernible Uniqueness in Firearms-Toolmarks Forensic Practice", W. Tobin and P. Blau, 53 *Jurimetrics J.* 121-142 (Winter 2013), and "Analysis of Experiments in Firearms/Toolmarks Practice Offered as Support for Low Rates of Practice Error and Claims of Inferential Certainty", C. Spiegelman and W. Tobin, 12 (2) *Law, Probability & Risk* 115-133 (2013), doi:10.1093/lpr/mgs028. Both papers can be downloaded free of charge from the public website on the Social Science Research Network (SSRN) at: http://ssrn.com/author=1521077.

I was asked, and accepted, to serve as a scientific editorial reviewer for the draft final report of the 2004 National Research Council of the National Academy of Sciences (NAS) Committee on Bullet Lead Analysis.

As indicated in my *curriculum vitae*, I have testified as an expert in 265 judicial proceedings in 45 states/jurisdictions (including D.C.), in two testimonies before U.S. Senate Subcommittees on the Judiciary and Court Oversight, and have testified in firearms/toolmarks matters more than 23 times throughout the U.S.

## C.   Specific Qualifications Applicable to Forensic Firearms Identification

3.   The domain of metallurgists and materials scientists includes material behavior in virtually every phase in the life of a metal, regardless of form, from its extraction as an ore to the use and functioning of a finished product. Each stage of product development, including for consumer tools, involves important metallurgical considerations, from material selection and process design to bulk metal forming, shaping, heat treatment, finishing, and related production processes. In <u>scientifically</u> evaluating the characteristics (striations and impressions) used by toolmarks examiners in 'toolmark identification' practice as it is called, it is imperative that the underlying scientific phenomena affecting material behavior and tribological[2] interactions with, for example, forming tools and dies, in various conditions and environments of both production and consumer use, are understood. The need to understand the scientific principles governing material behavior and their interactions extends beyond production processes. Clearly, interactions of both the product with its environment, and of the product components with each other in service (ultimate consumer use) such as occur in the cycling of a firearm, are important metallurgical design considerations. Knowledge of the material behavior resulting from the effects of an applied system(s) of stresses (primarily compressive, tensile, and shear) and of friction, lubrication, and wear, is fundamentally important to evaluating the significance of the manifestations of

---

[2] Tribology is the science and engineering of friction, lubrication, and wear, of two solids in contact and in relative motion.)

tribological interaction (the striations and impressions used by toolmarks identification examiners for their pattern-matching practice), for efficacy of product function, and for failure analysis both in production and in user service. It is particularly important in evaluating the scientific foundations, *vel non*, underlying the pattern-matching methodology of toolmarks examiners in their forensic comparisons as engaged for the case at bar.

The heart of virtually every metal forming/shaping operation for all firearm components is the tool(s)/die(s) responsible for changing the shape of the metal work piece under pressure (forced contact). This is true regardless of the actual product produced, such as firearms, bullets, ammunition cartridge cases, screwdrivers, aerospace components, wire, tubing, *etc.*, or of the function that the product is intended to serve in the consumer market.

A critical aspect of production continuity, and a seminal issue for forensic toolmarks comparisons, is the material response (behavior) of both the metal product/component to the tool(s)/die(s) during metal-to-metal contact under pressure during production. Material responses to applied stresses during fabrication frequently result in formation of striations and/or impressions on the work piece component surface from forced contact with the forming tool (die). These features are called "subclass characteristics" within the domain of firearms identification and are features often incorrectly characterized by forensic examiners as "individual", such as the firearms examiner assuredly has assumed during the course of examinations for the *Barrett* matter. They are assumed to be purportedly "individual" characteristics and are used by practitioners (examiners) as the basis for firearm identification comparisons and consequent specific source attributions. The formation of these striations and impressions during firearm component production depends on numerous parameters including, but not limited to: manner of fabrication, lubrication regime of tribological interaction, cleanliness

of lubrication system operative, component (work piece) alloy, mechanical properties (*e.g.*, tensile and yield strengths, ductility, toughness, *etc*.), temper, speed of processing, temperature of process, *inter alia*. Surprisingly, even seemingly unrelated influential factors, such as macroeconomic conditions in the U.S. and global economies, which affects what are known as "feeds and speeds," can affect formation of striations and impressions on a metal work piece (product or component) during fabrication *that can appear, unknown to the forensic examiner, on* <u>all</u> <u>components</u> *in a given production lot of unknown (to the forensic examiner) size.* It is for this reason that some crime labs do not allow firearms identification examiners to opine an elimination or individualization (specific source attribution) as "same gun" for cartridge cases without recovery of a firearm suspected as having been the firing platform, because the suspect firearm is not available for examination to ostensibly eliminate the possibility of "subclass carryover" where the striations and impressions acquired during manufacture are exhibited by firearms in the entire production lot, or even larger, possible sample pool.

Tribology is the science of friction, lubrication and wear, of [primarily] metals in contact and in relative motion.[3] It is such an important consideration during all metal-to-metal contact that it is a sub-discipline of metallurgy/materials science and is included in various academic metallurgical, materials science and mechanical engineering studies/courses. Metal-metal contact involving tribological considerations is patently unavoidable during production and/or consumer use of most wrought[4] metal products. Such forced contact in relative motion occurs both

---

[3] See *McGraw Hill Dictionary of Scientific and Technical Terms*, Fourth Edition, Sybil P. Parker, Ed.-in-Chief, McGraw Hill Book Company (1989), ISBN 0-07-045270-9, at 1965.
[4] Generally, a metal alloy or product that was not formed to final shape by casting. The term 'wrought' is used to denote a metal that has been mechanically worked/shaped after the alloy was originally cast into raw form. See *McGraw Hill, ibid*, at 2071.

in production (in the metal forming and shaping processes for firearm and tool components), and in service use (a bullet traveling under pressure against the lands and grooves of a barrel, a cartridge case against a breech face, firing pin contact with primer cup, extractor and ejector contact with the cartridge case, *inter alia*). The most appropriate and relevant true (mainstream) scientific discipline to address issues of metal-to-metal interactions, such as occur during formation and transfer of striae and impressions during production of such products and tools, and as also occur during actual product use (such as cartridge cases, bullets or bullet fragments in the current case), is metallurgy/materials science.

Part of my responsibilities as a plant metallurgist included evaluating tribological regimes operative during production, and toolmarks imparted by tools and dies during fabrication and production, in efforts to insure efficacy of operations and production continuity, while reducing product variability and breakdown of production tooling. I am very familiar with the current practice and methodology of forensic firearm/toolmark examinations inasmuch as I also frequently conducted toolmark comparisons using the same methodology and comparison microscopy instrumentation in my capacity as a forensic metallurgist at the FBI Laboratory, and would periodically be consulted to assist firearms identification examiners by explaining phenomena and material behavior they encountered during their examinations.

**D. Forensic Individualization Defined and Acceptance in Scientific and Scholarly Forensic Communities**

4. The guiding principle used by toolmarks examiners nationwide is the "AFTE Theory of Identification", regardless of whether or not the examiner is an AFTE member. AFTE is the acronym for the Association of Firearms and

Toolmarks Examiners.  It is not a scientific body, but rather is a trade association[5], and the AFTE Theory does not constitute an acceptable scientific protocol but rather only a guideline for forensic practice.  It should also be noted that forensic firearms/toolmarks identification practice is not a science, contrary to repetitive self-described claims by toolmarks identification authors in numerous domain publications. Such claims imply an unwarranted perception of infallibility to a trier of fact or law. Some courts have recognized this fact[6], and the fact that the forensic practice is not a science is a position supported by both the National Institute of Science & Technology (NIST) and the U.S. Department of Justice.[7]  There are numerous reasons why firearms identification pattern-matching practice cannot be considered a science, to include that it has no falsifiable hypothesis (premise), no scientifically acceptable protocol articulating parameters of detection, no rules of application of such parameters, is missing the critical cornerstones of repeatability of properly designed experiments, reproducibility of properly designed experiments, and is virtually a 100% subjective practice once the possible sample

---

[5] See *Dougherty v. Haag*, No. 05CC06993, at 1 (Cal. Super. Ct. Dec. 6, 2006), where AFTE confirmed its status as a trade association.

[6] For example, see *U.S. v. Chaz Glynn*, 578 F.Supp. 2d, 104 (D.Mass., 2005); 60 Cr 580 (JSR) (S.D.N.Y. 2004) (Rakoff, J.) (Sept. 22, 2008), where The Court '…very quickly concluded that whatever else ballistics identification analysis could be called, it could not fairly be called "science." The Court also concluded testimony that a bullet or casing 'match' to a particular gun "to a reasonable degree of ballistic certainty" would "seriously mislead the jury as to the nature of the expertise involved."  The *Glynn* Court also limited expression of certainty on the inference proffered. See also, *People v. Ambriz*, No. BA376570, (L.A. Super. Ct. 2012) (ruling that the firearms examiner's opinion would be limited: she would not be allowed to call firearms/toolmarks practice a "science" and must append the conclusion statement with "in my opinion." See also, *United States v. Monteiro*, 407 F. Supp. 2d 351, 372 (D. Mass. 2006) (finding that "there is no reliable . . . scientific methodology which will currently permit the expert to testify that . . . [a casing and a particular firearm are] a 'match' to an absolute certainty, or to an arbitrary degree of statistical certainty."); and *Williams v. United States*, 13-CF-1312 (D.C. Cir. Jan. 21, 2016). (Easterly, J., concurring), available at http://www.dccourts.gov/internet/documents/13-CF-1312.pdf.

[7] See NIST & U.S. Department of Justice position statement available online at: http://www.justice.gov/ncfs/file/641331/download.

pool is narrowed by class characteristic elimination (*e.g.*, caliber, number of lands and grooves, direction of twist, *etc.*). There is no science that allows for 100% subjectivity in support of a non-falsifiable hypothesis.

5. Forensic individualization, also known as specific source attribution, is the process by which a questioned item, such as a cartridge case or bullet, is purportedly associated with a specific source such as a specific firearm. Source attribution may or may not be enhanced with probabilistic language like "to the exclusion of all others," "infinitesimal chance" of a coincidental match, "unique signature," "100% certainty", "to a reasonable degree of certainty", or "to a reasonable degree of [ballistic, practical] certainty", *inter alia*. With or without this enhancing language, however, for all worksheet observations, conclusions, reports, and testimonies of toolmarks identification examiners with claims or assumptions that striations observed are purportedly "individual," the examiner is still engaging in specific source attribution ("individualizing"). In doing so, the forensic examiner intuitively rules out - - by purely subjective belief as it turns out - - all other possible sources for the combination of characteristics ('striations' or 'striae', and/or 'impressions') observed in the questioned markings, including the vast universe of possible sources he or she has never examined.

6. Individualization in forensic firearms/toolmarks practice is rejected by a unanimous consensus of my colleagues and collaborators from the true (mainstream) scientific community with scientific backgrounds and/or specializing in forensic evidence. Some of the individuals expressly rejecting the practice as scientifically invalid, listed with permission, with their areas of specialty are:

> **David L. Faigman**, Distinguished Professor of Law, UC-Hastings, Consortium on Law, Science & Health Policy, specializing in scientific evidence, coauthor of the 5-volume *Modern Scientific Evidence: The Law and Science of Expert Testimony;*

**Clifford Spiegelman**, Distinguished Professor of Statistics, Texas A&M and former forensic committee member of the National Academy of Sciences;

**William C. Thompson**, Professor of Criminology, UC-Irvine, criminal justice & decision making, specializing in forensic science and statistical treatment;

**Alicia Carriquiry**, Distinguished Professor of Statistics, Iowa State University, and former member of the National Academy of Sciences' "Ballistic Imaging" Committee (2008);

**Michael J. Saks**, Professor of Law, Arizona State University, Ph.D in experimental psychology, reviews empirical research methodology and statistics in forensic science, doctoral background in evaluating design of experiments;

**Jonathan J. Koehler**, Professor of Law and Ph.D, Arizona State University, specializing in statistical treatment of forensic evidence and the role of hypothesis in forensic science evidence;

**Pradip N. Sheth**, Associate Professor of Mechanical Engineering, deceased; based on long-term personal interactions and declaration furnished in criminal matter of *U.S. v. Willie Gayden*, D.C. Superior Court., Criminal Case No. 2006 CFI 27899;

**Adina Schwartz**, Associate Professor of Law and Ph.D, John Jay College of Criminal Justice, evidence law, law and science.

**H. David Sheets**, Ph.D, Professor of Physics, Canisius College, SUNY at Buffalo; specializing in the measurement of shape and in the process of shape-based inference;

**Peter J. Blau**, Ph.D, Fellow-ASM International, Fellow-ASTM International, Fellow-Society of Tribologists and Lubrication Engineers (STLE), and consultant in tribology. Has held research and project management positions at the Air Force Materials Laboratory (1973-76), the National Bureau of Standards (1979-1987), the Office of Naval Research (1986-87), and the Oak Ridge National Laboratory (1987 – present).

This list is by no means exhaustive. Further, these individuals endorse the National Research Council (NRC) Committee of the National Academy of

Sciences (NAS)[8] findings (*infra*) regarding the unvalidated and scientifically unsupported nature of individualization opinions, which I address in more detail later in this declaration.

7.   The underlying premise of "uniqueness", required by logical necessity for conclusions of individualization rendered by firearms examiners, has never been established to exist, as confirmed by the National Academy of Sciences.  The notion that forensic toolmarks examiners are trained to recognize a phenomenon that has never been scientifically established is nonsensical. Individualization in firearms/toolmarks is without scientific basis, but rather is "based on anecdote, intuition and speculation rather than on a scientific foundation.  Consequently, individualizations in casework rely on a 'leap of faith'."[9,10]  In fact, the belief by firearms/toolmarks examiners that their practice can render specific source attributions with any scientific basis is considered a fallacy in the relevant [true] scientific community.[11]

8.   The fallacy of individualization "…arises when the forensic scientist rules out all other possible sources for the unknown marking, including the multitude he has not examined, once he has found a single object or person that matches the features of the unknown marking.  The fallacy is deeply entrenched in

---

[8] The National Academy of Sciences is considered the most respected and authoritative voice of the true (mainstream) scientific community. It is a private, non-profit society of distinguished scholars, established by an Act of Congress, and is charged with providing independent, objective advice to the nation on matters related to science and technology. See http://www.nasonline.org/about-nas/mission/.

[9] Saks, Michael J., Koehler, Jonathan J., "The Individualization Fallacy in Forensic Science Evidence", *Vanderbilt LR* 6:1, at 10.

[10] See also *Williams, supra*, at Fn. 6, where Judge Easterly observed that firearms identification pattern matching "…has the same probative value as the vision of a psychic" with regard to its scientific foundations, at 26

[11] *Ibid*.  *See also* Koehler, Jonathan J., and Saks, Michael J., "Individualization Claims in Forensic Science: Still Unwarranted", *Brooklyn LR* 75:4.

forensic science practice, where most examiners say that their knowledge, training, and experience enable them to make the inferential leap from observed consistencies between markings and their putative source to a conclusion that no other object in the world could have produced those markings."[12] Additionally, Koehler and Saks indicate, "In our view, the existing and foreseeable scientific knowledge falls far short of providing criminalists with enough scientific support to claim that the objects that they study are either unique or discernibly unique. Certainly the uniqueness question cannot turn on the beliefs that forensic scientists have about this issue based on their training and experience."[13] Yet that is exactly the *sole* basis by which firearms/toolmarks expert witnesses can realistically cite as the foundation for their proffered opinions, inasmuch as there exist no scientifically valid studies supporting claims of uniqueness, discernible uniqueness, or individualization.

### E. Metallurgical Origins of Toolmarks; Relevant Considerations of Formation and Forensic Practice

9.  The nature, quality, and number of characteristics imparted to a metal product are dependent upon the type(s) and magnitude(s) of stresses (among many other parameters such as process speed, tooling material, product material, lubrication regime, *inter alia*) during the fabrication process. For plant metallurgists, tribological considerations are important to production continuity, production costs, quality control, safety, and quite subtly in some cases, potential civil litigation against a metal product manufacturer. Accordingly, they are significant considerations for fabrication tool and die design, the heart of most metal manufacturing operations, and are the very tools (known in the industry as

---

[12] Koehler and Saks, *ibid.*

[13] *Ibid.*

'tooling') used to form the various components of a firearm and which impart the striations and impressions used by firearms and toolmarks examiners for source attributions.

10. In their evaluations of forensic evidence submitted for examinations, firearms examiners rely on the markings ('toolmarks') imparted to objects during the forced contact described above (during production) and while in relative motion in forced contact during consumer use, such as firing pin and breech face markings on cartridge cases. For conclusions of individualization (specific source attribution), one of two crucial premises upon which toolmarks examiners rely is that each forming tool imparts individual characteristics (generally striations or striae, and impressions) to objects against which they are in contact that are purportedly unique to that tool.[14] Scientific acceptance of the uniqueness premise is problematic for reasons that will be discussed below.

11. First, based on exhaustive literature research and review, *I find no body of data, collective studies, or even single study, which is sufficiently meaningful and comprehensive as to warrant the premise of uniqueness status as a universal assumption in the field of either forensic firearms or toolmarks practice.* A relatively recent report issued by the National Research Council of the National Academies of Science has also concluded that the premise of uniqueness has not been scientifically established, stating:

> A significant amount of research would be needed to scientifically
> determine the degree to which firearms-related toolmarks are unique
> or even to quantitatively characterize the probability of uniqueness.[15]

---

[14]  I will refer to this premise herein as the "premise of uniqueness."
[15] *Ballistic Imaging*, Report of the National Research Council; National Academies Press, Wash., D.C. (2008), p3.  I will refer to the report herein as the Ballistic Imaging report.

12. As previously indicated, the Association of Firearms and Toolmarks Examiners (AFTE) is a membership-supported <u>trade</u> association formed to represent the interests of its members who are generally without significant scientific background.[16] AFTE is the principal, and realistically sole, source of guidance for firearms and toolmark examiners in the conduct of their forensic practice. Given that it is not a scientific body, AFTE does not establish scientifically validated standards or protocols comporting to rigors of the scientific method.

13. AFTE's "Theory of Identification" is the criterion by which examiners declare purported association between a particular firearm and a recovered cartridge case(s) and/or bullet(s). There is little agreement in the forensic community of firearms/toolmarks examiners as to number, type, quality,[17] and characteristics of striae/impressions that must match before a source attribution can be claimed. Within the firearms/toolmark examiners' community, the AFTE Theory of Identification is the only guideline that examiners follow even though the theory has no operational meaning and provides no practical guidance. Instead, the AFTE theory provides only the vague and subjective benchmark of "sufficient agreement." In more expanded form it states:

---

[16] Fn 5, *supra*, where AFTE confirms its status as trade association, not a scientific body.

[17] Probably the most subjective aspect of the entirely subjective practice is that of characteristic (striation) 'quality.' Difficulty of striation 'quality' assessment can be demonstrated in side-by-side partial overlay comparisons of randomly selected SKU UPCs ("bar codes") of unrelated products. As in firearms/toolmarks practice, concordance of line alignment will quite commonly be found, but arbitrary assessment as to whether the 'quality' (*e.g.*, width, precise alignment) of each pair of aligned lines merits declaration as a 'match' is without benchmark, protocol, or even guideline, and is completely up to the discretion of the human observer. This is a subtle, but critical, consideration rendering examiners significantly more vulnerable to observer bias. It has been observed in AFTE literature that misattributions are most typically caused by examiners "ascribing too much significance to a small amount of matching striae that is actually achievable in known non-matches." See Biasotti, Murdock & Moran, "Scientific Issues", in 4 David L. Faigman, *et al.*, *Modern Scientific Evidence*, at 562.

> Agreement is significant when it exceeds the best agreement demonstrated between toolmarks known to have been produced by different tools and is consistent with the agreement demonstrated by toolmarks known to have been produced by the same tool. The statement that "sufficient agreement" exists between two toolmarks means that the agreement is of a quantity and quality that the likelihood another tool could have made the mark is so remote as to be considered a practical impossibility."[18]

These are <u>subjective</u> criteria, as the AFTE concedes.[19] In its most recent report, the National Research Council (NRC) of the National Academy of Sciences (NAS) was critical of the AFTE theory because its methodology is based on such subjective and nonspecific criteria:

> A fundamental problem with toolmark and firearms analysis is the lack of a precisely defined process. As noted above, AFTE has adopted a theory of identification, but it does not provide a specific protocol. It says that an examiner may offer an opinion that a specific tool or firearm was the source of a specific set of toolmarks or a bullet striation pattern when "sufficient agreement" exists in the pattern of two sets of marks. It defines agreement as significant "when it exceeds the best agreement demonstrated between toolmarks known to have been produced by different tools and is consistent with the agreement demonstrated by toolmarks known to have been produced by the same tool." The meaning of "exceeds the best agreement" and "consistent with" are not specified, and the examiner is expected to draw on his or her own experience. This AFTE document, which is the best guidance

---

[18] *See* AFTE Criteria for Identification Committee, "Theory of Identification, Range of Striae Comparison Reports and Modified Glossary Definitions – an AFTE Criteria for Identification Committee Report." *AFTE Journal*, Vol. 24, No. 2, April 1992, 336-340.

[19] See "principle" 3 in the AFTE Theory of Identification: "The current interpretation of individualization/identification is subjective in nature, founded on scientific principles and based on the examiner's training and experience", available online at: http://www.ojp.usdoj.gov/nij/training/firearms-training/module13/fir_m13_t05_07.htm. Just what constitutes "scientific principles" asserted as foundation have never been articulated in any scientifically acceptable and discoverable domain papers, or transcripts reviewed by affiant.

available for the field of toolmark identification, does not even consider, let alone address, questions regarding variability, reliability, repeatability, or the number of correlations needed to achieve a given degree of confidence.[20]

14. In the pattern-matching process of evaluating toolmarks used as a basis for purported individualizations (specific source attributions),[21] the forensic toolmark profession defines three groups of characteristics: class, subclass and individual. Class characteristics are considered common to every member of a relatively large universe (group) of items or product, typically originate in the design stage of a product, and are deliberately imparted as part of the manufacturing process. Class characteristics include, for example, caliber, the number and direction of twist of lands[22] and grooves on a bullet, and other general characteristics that are common to numerous weapons of similar or different models. Comparisons of class characteristics as an early stage of forensic evaluation serve to filter the universe of all possible products to a manageable population with general comparability.

Subclass characteristics are fortuitously produced during the manufacturing process by a tool that can leave *virtually identical markings on an unknown (to the forensic examiner) number of products produced, including firearms, during the tool's useful life in which it typically produces lots (production lots, groups or "batches") over many hours, days, weeks, and even months, depending on the process and product.* The number of products bearing the subclass characteristics can be very large and can exist across many production lots spanning months,

---

[20] "*Strengthening Forensic Science in the United States: A Path Forward*," National Research Council, National Academy of Science; National Academies Press (2009), p.155. I will refer to the report herein as the NAS Forensic Science Report.

[21] In the context herein, individualization is the purported association of a cartridge case(s) or bullet(s) or, most relevantly, merely a bullet fragment with a specific firearm.

[22] Lands are the raised areas between grooves in the rifling of a firearm barrel.

resulting in huge quantities of marketable product, as will be discussed below. That number is a subset (smaller) population of items or product within the class defined, hence the term 'subclass.'

Individual characteristics are unique to one firearm or tool.

15. It should be kept in mind that: examiners are seeing only a relatively small portion of a bullet surface in the field of view of between 5X and 48X stereomicroscopy; comparisons are typically based on combinations of non-unique characteristics (primarily lines); there is significant concordance in characteristics among known non-matches (as will be discussed below); human cognitive pattern retention (from previous cases and training) is limited, particularly of a mundane geometric pattern (lines) not lending itself to description or 'memory/recollection tags'; and <u>significant</u> concordance occurs in characteristics imparted from different firearms (or tools) of the same manufacturer.[23] As an example, tests on six 'consecutively machined' rifle bolts found a "startlingly" high correspondence of microscopic characteristics, according to one study.[24] In another, 51.7 percent of 'matching lines' was observed in known non-matches.[25] The issue of cognitive retention is particularly significant in view of the highly subjective nature of toolmarks examinations and the AFTE guideline that 'match' pronouncements are based exclusively on *recollection* of previous cases and training, for similarities to "known non-matches."

---

[23] *See* Biasotti, "A Statistical Study of the Individual Characteristics of Fired Bullets," 4:1 *J.For.Sci*. 34, 34-50 (1959), *inter alia*. *See also* Rivera, Gene C., "Subclass Characteristics in Smith & Wesson SW40VE Sigma Pistols," *AFTE Journal*, Vol. 39 No. 3 (Summer 2007) for more examples.

[24] See "All we want you to do is confirm what we already know": A *Daubert* Challenge to Firearms Identifications," Lisa J. Steele, 38 *Crim.L.Bull.* 465 (2002), citing "Consecutively Machined Ruger Bolt Faces," *AFTE J*.19 (Winter 2000).

[25] Miller, J., and Neel, M., "Criteria For Identification Of Toolmarks Part III: Supporting The Conclusion," *AFTE Journal*, Winter 2004, Vol. 36 No. 1. at p.9.

**F.   National Academy of Sciences and AFTE Practice** [26]

16.    Unrealized by firearms/toolmarks examiners, as will be discussed, *infra*, specific source attributions such as claimed in the *Barrett* matter, are inherently probabilistic. Probabilities are expressed in a range from zero (impossibility) to one (certainty).  An individualization implies a probability of 1 (certainty): that no other firearm could have been the firing platform for certain cartridge cases or bullets, and implies an error rate of zero, an implication denounced by the National Academy of Sciences.[27]    Forensic firearms identification expert witnesses most frequently express their specific source attribution opinions in judicial proceedings with various claims of certainty, to include "100% certainty," "to a [reasonable, practical, ballistic] certainty", *inter alia*.  There is no scientific foundation whatsoever for such claims.  In the 2008 Ballistic Imaging Report, the NAS stated:

> Forensic individualization sciences that lack actual data, which is most of them, have no choice but to either intuitively estimate those underlying probabilities and calculate the coincidental match probability from those subjective probabilities, or simply to <u>assume</u> the conclusion of a miniscule probability of a coincidental match (and in fact they do the latter).

> In the specific context of firearms and toolmark examination, derivation of an objective, statistical basis for rendering decisions is hampered by the fundamentally random nature of parts of the firing process. The exact same conditions—of ammunition, of wear and cleanliness of

---

[26] To reiterate, AFTE is the Association of Firearms and Toolmarks Examiners, a trade association that established guidelines for forensic practice that virtually all examiners follow, whether AFTE members or not.

[27] See Fn. 15, *supra*, where the NAS states that, "Such comments cloak an inherently subjective assessment of a match with an extreme probability statement that has no firm grounding and unrealistically implies an error rate of zero", at 82.

firearms parts, of burning of propellant particles and the resulting gas pressure, and so forth—do not necessarily apply for every shot from the same gun. Ultimately, as firearms identification is currently practiced, an examiner's assessment of the quality and quantity of resulting toolmarks and the decision of what does or does not constitute a match comes down to a subjective determination based on <u>intuition</u> and experience. By comparison, DNA analysis is practically unique among forensic science specialties as having a strong objective basis for determination and as being amenable to formal probability statements.

[Two authors of a study]   rank various forensic science subfields on a continuum of relative subjectivity. On the low end of that scale is DNA analysis, along with serology (blood type determination) and drug and narcotic identification. They identify firearms and toolmark identification as having relatively high subjectivity, on par with fiber identification. They identify blood spatter interpretation, voiceprint analysis, and bite-marks as a group of forensic science specialties just slightly more subjective than toolmark identification, and handwriting and hair identification as a cluster slightly more subjective yet.[28] [emphasis added]

17. The nation's most prestigious voice of the scientific community and authority in matters of science, the National Academy of Sciences, confirmed that the basic premises of firearm/toolmark identifications had not been scientifically established. Two separate NAS committees have rejected the notion that individualization in firearms/toolmarks practice has gained acceptance in the true (mainstream) scientific community.  In one report, the NAS concluded, "the needs for research are extensive" and "[a] significant amount of research would be needed to scientifically determine the degree to which firearms-related toolmarks are unique or even to quantitatively characterize the probability of uniqueness.…Very early in its work the Committee found that this question

---

[28] *Ibid* at 55.

[whether toolmarks are unique] cannot now be definitively answered."[29]  The final report of the second NAS Committee observed that "the scientific knowledge base for firearms  and toolmarks analysis is fairly limited", and,

> "Because not enough is known about the variabilities among individual tools and guns, we are not able to specify how many points of similarity are necessary for a given level of confidence in the result. Sufficient studies have not been done to understand the reliability and repeatability of the methods. The committee agrees that class characteristics are helpful in narrowing the pool of tools that may have left a distinctive mark. Individual patterns from manufacture or from wear *might*, *in some cases*, be distinctive enough to *suggest* one particular source, but additional studies should be performed to make the process of individualization more precise and repeatable."[30] [emphasis added]

18. Notwithstanding that the premise of uniqueness has not been scientifically established, the ability to differentiate between class, subclass, and individual characteristics is *critical* to support claims of specific source attribution (individualization),  yet, there is no guidance whatsoever, domain-authoritative or in mainstream scientific literature, articulating how forensic examiners are to discern subclass (characteristics from manufacturing and belonging to a potentially large lot or 'batch' of unknown (to the forensic examiner) size) from purportedly individual characteristics. In Declarant's experience, the large majority (and most often overwhelmingly, as will be demonstrated herein later) of characteristics observed in purported "matches" by firearms identification examiners on barrels, breech faces, extractors, and ejectors, are <u>subclass</u> in nature (from the

---

[29] *Ibid* at 3, available at http://books.nap.edu/catalog/12162.html.

[30] *Strengthening Forensic Science in the U.S.-A Path Forward* (National Academies Press, 2009), at 154, available online at: http://www.nap.edu/openbook.php?record_id=12589&page=154

manufacturing process), not 'individual', and examiners merely <u>assume</u> all the striae that they observe under the microscope are 'individual' characteristics. When asked to identify which striations are subclass and which are purportedly individual, they are unable to do so, but assert in judicial testimonies that they eliminated the possibility of 'subclass carryover' without any proof. The forensic examiner in this case has summarily dismissed the possibility that the purported "individual" characteristics upon which he based his claims of specific source attribution are from the manufacturing (subclass) process(s) and are not "individual." It is simply not credible to claim characteristics are "individual" without any knowledge whatsoever as to the likelihood of how many other firearms may exist from the same production lot, for example, with confusingly similar characteristics, especially given that only a subset of striations/impressions in the field of view are used to claim an identification and most frequently, the majority of dissimilar characteristics are rationalized away as irrelevant. It is particularly egregious when the examiner has no idea whatsoever as to how the firearm component that was the source of the striae used for forensic comparison was manufactured, which is generally the case during forensic examinations. However, even if an examiner suspects a particular manufacturing method for a specific component, without examination and comparison with other components in the same production lot, the examiner cannot reliably characterize striations or impressions used as a basis for purported identification as "individual" because the examiner is not in a position to credibly eliminate the possibility, indeed likelihood, of "subclass carryover" among firearms in the same production lot.

## G.   Uniqueness & Misleading Implications of Individualization

19. The NAS/NRC cautioned that "[a] significant amount of research would be needed to scientifically determine the degree to which firearms-related

toolmarks are unique or even to quantitatively characterize the probability of uniqueness." Thus, "[c]onclusions drawn in firearms identification should not be made to imply the presence of a firm statistical basis when none has been demonstrated."[31] An opinion that a bullet(s) or cartridge case(s) was fired from or in a specific firearm implies a probability of one, a certainty. As discussed in Paragraphs 6, 8, 16, 17, 19, and 40-43, *infra*, both the scientific community (represented by the NAS) and the U.S. Department of Justice (as proxy for the FBI Laboratory) reject such opinions as scientifically unfounded. In the *Barrett* matter, the firearm identification expert further exaggerated scientifically unfounded and unacceptable premises of uniqueness and inferences of specific source attribution (identification to a specific weapon) by employing dramatic phraseology "[a]ll breech faces are unique. Meaning, there are no two breech faces that are made on the face of this planet that are identical"[32], "…fired from a particular firearm to the exclusion of all guns that are made or that will be made",[33] and "…fired from a particular weapon to the exclusion of all guns that are made or that will be made",[34] respectively.

20. When asked about the statistical basis for claims of specific source attributions (individualizations), examiners have responded in court testimonies that the NAS finding of no basis is irrelevant because "statistics isn't involved" or because they "don't use numbers."[35] Largely from lack of scientific ethos, firearms and toolmarks identification experts are generally unaware that expressions of

---

[31] See "*Ballistic Imaging*" (National Academies Press, 2008), p. 3 and 82, at Fn. 15, *supra*.
[32] Higgs' T.tr. 3527 at 3 (KEB 102386).
[33] Higgs' T.tr. 3532 at 4 (KEB 102391).
[34] Higgs' T.tr. 3704 at 1 (KEB 102564).
[35] See *State of Maryland v. Alfred William Rattler*, Criminal No. 83403, Montgomery County Circuit Court, Rockville, MD., post-conviction hearing testimony of Lyndon Ray Watkins, Sr., November 9, 2010, at 97, and again at 98, where witness confirms prosecutor's leading question that an examiner's opinion of individualization "[doesn't] use statistics."

certainty are inherently probabilistic. The NAS/NRC also noted that "[i]n most forensic science disciplines, no studies have been conducted of large populations to establish the uniqueness of marks or features. Yet, despite the lack of a statistical foundation, examiners make probabilistic claims based on their "training and experience." A statistical framework that allows quantification of these claims is greatly needed."[36] Even without expressly asserting "100% certainty," claims of specific source attribution <u>alone</u> imply a probability of 100 percent. There is no scientific basis for such claims.

A scientifically acceptable reporting, at this stage of firearms/toolmarks practice development, would be similar to that adopted by The Centre of Forensic Sciences in ending use of the term 'match' in reporting DNA results and testimonies[37]: that 'source A' [a particular firearm] cannot be excluded as the source of a particular fired bullet or cartridge case. This is both accurate and, unlike a word like "match" or phrase like "fired from the [X] pistol" does not have inherent meaning that is at odds with its evidentiary value. Further, "cannot exclude" can be scaled up and down based on efforts by the individual examiner and by advances in the field. For example, right now it is generally accepted that firearms examiners can narrow the "pool of tools" that cannot be excluded down to those that share class characteristics (*e.g.* direction of twist and number of rifling grooves).[38]

---

[36] *Strengthening Forensic Science in the United States: A Path Forward*, National Research Council (2009), ISBN 0-309-13131-6, at 6:189.

[37] Memorandum from R.J. Prime, Director of The Centre of Forensic Sciences for the province of Ontario to Crown attorneys for the province, cited by Koehler, J.J., Saks, M.J., "Individualization Claims in Forensic Science: Still Unwarranted," *Brooklyn LR* 75:4 at pre-publication page 4, actual page unknown at this time.

[38] See *Strengthening Forensic Science in the United States: A Path Forward* (NRC) at 154.

## H. Differentiating 'Individual' From Subclass Characteristics & Likelihood of Adventitious Hits

21. As the firearms/toolmarks examination community has started collecting and storing images of bullet and casing markings, there is evidence that confidence in the premise of discernible uniqueness necessary for source attributions is being undermined by the availability of more data. It is logical, based on current firearms identification forensic practice, that as a database sample size increases, the likelihood of an adventitious 'cold hit' from an indistinguishably similar firearm increases when comparing unknown or questioned specimens with 'knowns' of a sample from the population. The phenomenon has been demonstrated in a study of the Integrated Ballistic Identification System (IBIS), which "…is used successfully with numerous regional… "open case file" databases…[and] performs automated comparisons between bullets and cartridge cases from different crime scenes and is the cornerstone of the National Integrated Ballistics Information Network (NIBIN) deployed by BATF."[39] This study noted that "…the situation [correlation, or rankings, of firearms considered likely candidates] worsens as the number of firearms in the database is increased"[40] and "…increasing the database size, the ranking of a cartridge case decreases substantially."[41] Likewise, a federal Alcohol, Tobacco, and Firearms toolmark examiner noted that "[a]s the [computer] database grew within a particular caliber, 9mm for instance, there were a number of known non-match test-fires from different firearms that were coming up near the top of the candidate list. When

---

[39] *See* Review: AB1717 report, "Technical Evaluation: Feasibility of a Ballistics Imaging Database for All New Handgun Sales," Dr. Jan De Kinder, Ballistics Section Head, National Institute for Forensic Science, Department of Justice, Vilvoordsesteenweg 98-100, B-1120 Brussels, Belgium.

[40] [De Kinder, *ibid* at 3]

[41] [De Kinder, *ibid* at 21]

retrieving these known nonmatches on the comparison screen, there were numerous two dimensional similarities."[42] These striking similarities persisted even when the examiner looked at the bullets themselves. "When using a comparison microscope, these similarities are still present and it is difficult to eliminate comparisons even though we know they are from different firearms." *Id*. The phenomenon is not bullet-specific; it logically encompasses all firearm and toolmark component comparisons including firing pin and breech mark characteristic transfers on cartridge cases, and is logically not restricted to purely automated comparisons.

22. This confirmed phenomenon is assuredly attributable to mischaracterization of subclass characteristics (deriving from production processes and that exist in production lots of unknown sizes) as purportedly 'individual' characteristics.

## I. Unfounded Assumption, Uniqueness & 'Individual' Characteristics

23. Firearms/toolmarks examiners' repetitive assertions of various forms of uniqueness, such as "unique signature", "particular weapon/tool", "fired from [a specific] firearm", and "no other weapon/tool in the world", *inter alia*, as repeated *ad nauseam* (more than 30 times) in the *Barrett* testimony by Examiner Higgs, are unfounded assertions. They are unfounded because, as previously discussed, the assumption of uniqueness has not been scientifically established and constitutes nothing more than subjective belief (speculation).[43] They are also misleading because the tools and dies involved in many fabrication processes involving

---

[42] Joseph Masson, "Confidence Level Variations in Firearms," *AFTE Journal* 29(1) (Winter 1997).

[43] See Para. 11, *supra*, citing the NAS that, "…A significant amount of research would be needed to scientifically determine the degree to which firearms-related toolmarks are unique or even to quantitatively characterize the probability of uniqueness."

primarily compressive, tensile, and shear stresses are not sufficiently volatile over time as to change so quickly due to wear that most toolmarks transferred to firearms components are "individual." In reality, the overwhelming majority of toolmarks imparted in various production processes are <u>subclass</u> in nature, belonging to a production batch (lot) of unknown (to the forensic examiner) size, not "individual" characteristics. The underlying premises of discernible uniqueness and repeatability (repeatability not in the true scientific sense but rather in forensic practice to mean that bullets or cartridge cases fired from or in, respectively, the same firearm even years apart would exhibit essentially the same characteristics), required by logical necessity for the forensic practice, is paradoxical because it would appear that the position of practitioners is that fabricating tools (many of which use tungsten carbide inserts; tungsten carbide is one of the hardest materials known) must change so quickly (be 'volatile' from wear) as to leave primarily "individual" toolmarks on each work piece fabricated, but that the component surfaces of barrels, breech faces, firing pins, ejectors, and extractors (significantly more vulnerable to wear than tungsten carbide and most tool steels) virtually never change. That position is an irrational dichotomy.

24. Characteristics claimed as "individual" and observed on a cartridge case or bullet, the basis by which toolmarks examiners claim specific source attributions (individualizations), are considered to derive from any of several sources: during manufacturing, subsequent materials handling/processing, and/or during service (use). Even assuming that discernible extraneous ("individual") characteristics are introduced in the fabrication process, it is difficult to understand, even as a former plant metallurgist, how a forensic examiner far removed from the production process can reliably assess the difference between "individual" characteristics and subclass characteristics imparted during production for the majority of metallurgical processes available. Without personal knowledge of the individual

and subclass characteristics produced by a <u>particular</u> manufacturing run, an examiner cannot generally tell the two apart for most forming processes. Except possibly for certain processes (such as grinding), such knowledge must be specific to a particular production run and/or even to aftermarket events. While some examiners have a general knowledge of how firearms or tools are produced, such general knowledge does not provide any information in most cases about whether striations on a bullet or cartridge case are individual or subclass in nature.[44] As a plant metallurgist, I frequently observed that some of the characteristics imparted by a tool or die were intermittent between and/or among production runs, and often even during a single work piece run, such that even if a firearm or tool does not share particular subclass, or what would likely be interpreted as individual, characteristics with another consecutively manufactured firearm or tool, it may share the characteristics with earlier or later work pieces (firearms or tools) manufactured with the same production tooling.

## J.    Subjectivity of Forensic Firearms/Toolmarks Practice

25.    Firearms and toolmark examiners do not have objective criteria for declaring a match, a fact that the Association of Firearms and Toolmark Examiners (AFTE) organization and toolmarks examiner community concede. The focus of a firearms/toolmark examiner is generally on finding *similarities* and dismissing or rationalizing non-matching (dissimilar) characteristics (generally lines) as irrelevant, without compelling objective evidence or scientific explanation to support rejection, in effect selecting the data they wish to use to support

---

[44] Some class characteristics are similarly difficult to distinguish from subclass or individual characteristics. However, many class characteristics are reliably identifiable, such as the caliber of a bullet or the direction and number of lands and grooves.  These are useful pieces of data and can dramatically narrow the range of possible firearms that could have been used to fire a particular bullet or casing. However, these characteristics cannot be used to support the absolute individualization identification claims made by firearm examiners.

identification. They do not employ the 'single dissimilarity exclusion rule' employed in other forensic areas, such as DNA, fingerprints, and even the now-defunct comparative bullet lead analysis (CBLA), where a single dissimilarity required exclusion ("non-ident").[45] The <u>quality</u> of both agreements and disagreements are difficult to assess, particularly given that the characteristics used for comparison are a generally low combination (3 to 5 in many cases) of non-unique geometric form (lines/striations). Firearms and toolmark examiners generally do not make exclusions based on dissimilarity of individual characteristics within a field of view under the theory that bullets or casings fired from the same gun, or tools used against metal objects, may acquire a number of dissimilar individual characteristics. It should be noted that, according to one study, the firearm/toolmark examiner typically encountered 15-20 percent matching striations between bullets fired from <u>different</u> firearms of the same manufacturer and type, and 36-38 percent on bullets fired from the same firearm.[46] A more recent work indicates that "…up to 25% of the striae in a non-match and more than 75% of the striae in a match will show concordance."[47] Inasmuch as firearm and toolmark examinations are largely subjective in nature, each examiner must decide whether the non-matching characteristics viewed should preclude declaration as a match. As noted by one scholar of forensic science, "[disagreements among toolmarks examiners] stem from one examiner ascribing too much significance to a small amount of matching striae and not appreciating

---

[45] Even with its numerous flaws, the forensic practice of CBLA had that aspect correct: if any single analyte in one sample was considered dissimilar in quantitative presence to that in another sample, an exclusion was warranted.

[46] *See* Biasotti, "A Statistical Study of the Individual Characteristics of Fired Bullets," 4:1 *J.For.Sci*. 34, 34-50 (1959).

[47] *See* Heard, *Handbook of Firearms & Ballistics: Examining and Interpreting Forensic Evidence* (1997).

that such agreement is achievable in known non-match comparisons."[48] Notwithstanding the number of AFTE studies for firearms, and even if control samples acquired contemporaneously to fabrication were made available to each examiner for a specific examination, inferences of specific source attribution (individualization) would not be generally accepted without qualification among materials scientists and forensic scholars given the lack of objective criteria for declaring a match.

26. As critical as the skill is in discerning between subclass and individual characteristics, there is no articulated technique purporting to guide examiners in that regard. To rationalize the absence of articulated protocol, literature, and research, practitioners repeatedly claim that the purported skill derives from 'training and experience' and that it cannot be explained, hence no articles in the public domain, peer reviewed or otherwise, articulating how to discern purported 'individual' characteristics from subclass characteristics (those from manufacturing). Such an explanation raises the question as to how toolmark trainers communicate behind closed doors with trainees to recognize the difference between subclass and allegedly individual characteristics if instructors cannot articulate such differences in published articles, particularly in a domain where examiners are eager to publish. This is particularly problematic given the numerous acknowledgements by experienced examiners in the literature that "subclass characteristics can be easily mistaken for individual characteristics"[49] and "…features that produce markings on bullets which may be mistaken as

---

[48] Faigman, D.L., Saks, M.J., *et al.*, *Modern Scientific Evidence: Forensics*, 5:10 at 426: Thomson-West (2008), ISBN 978-0-314-18415-3.
[49] Sutton, Gerald, "Assignments and Exercises – Advanced Comparative Macroscopy," training materials in Australia on the technique of CMS (consecutively matching striae).

individualizing marks when in fact they are really a more restrictive form of class characteristics."[50]

27. In my reviews of underlying benchnotes and/or worksheets of firearms/toolmarks examiners, I most frequently see no acknowledgement, discussion, or reference to, subclass characteristics or "subclass carryover", considered to be the most critical consideration in eliminating the contribution of manufacturing characteristics ("subclass" characteristics) that are virtually analytically indistinguishable and repeat over hundreds, if not thousands, of firearms but, rather, observe a direct leap from class characteristics to presumed "individual" characteristics. In virtually every case I've reviewed of firearms/toolmarks benchnotes and testimony, an "all or nothing" approach is clearly evident, where the examiner presumes that the fabrication process left no subclass characteristics whatsoever and that all the characteristics used for comparison are "individual" characteristics. This presumption is also consistent with the history of firearms/toolmarks examination methodology: in the many decades of firearms identification admissibility, the firearms identification community *did not memorialize recognition of the existence of manufacturing characteristics carrying over to the retail product* until 1989, when it was incorporated into the AFTE guidelines. Thus, for the multiple decades' acceptance of firearms identification forensic practice, striations observed under the microscope were commonly presumed to be "individual", as the examiner likely did in the case *sub judice*. However, that presumption (of discernible existence of only class and purportedly 'individual' characteristics) remains in virtually all of firearms/toolmarks identification practice today. Firearms and toolmark

---

[50] Moran, Bruce, "Firearms Examiner Expert Witness Testimony: The Forensic Firearms Identification Process Including Criteria for Identification and Distance Determination," *32(3) AFTE Journal*, 231 (2000), at 239.

identification examiners from several different state crime laboratories during my career in the FBI have confided to me that they cannot distinguish subclass characteristics from purportedly individual characteristics and <u>presume</u> that all observed striations that they view under the comparison microscope and used to declare 'matches' are 'individual' in nature. It is metallurgically nonsensical to assume that characteristics of manufacture never exist in the final firearm products available to consumers and/or that the characteristics present in the final product are either "all or nothing" related to subclass (manufacturing). Such a leap of faith is not unexpected in view of the fervent belief by practitioners in the unproven premise of uniqueness. Subclass carryover is particularly critical to probative value because of the likely inhomogeneity of product distribution (in other words, geographical concentrations of indistinguishable product) known to exist, for example in retail marketing of bullets, a phenomenon confirmed to an alarming extent by researchers.[51]

28. In fact, most firearms components (such as a breech face) almost always exhibit subclass carryover (manufacturing characteristics imparted sometimes to relatively large production lots) that transfer when tribologically interacting with other items during consumer use, such as the breech face with a cartridge case. However, most firearms and toolmarks examiners are almost never intimately acquainted with the specific metallurgical process used to manufacture each relevant component in any specific case, and assuredly not when a specific firearm has not been recovered and submitted for forensic examination, or has been recovered and is not submitted forensic comparison as is true in the *Barrett* case. For one, plant "tours" frequently cited as credentials by a prospective firearms identification expert witness, do not provide the level of intimate familiarity or

---

[51] See Cole and Tobin, *infra*, at Fn. 53 and 54.

technical understanding/basis for what is occurring on the surfaces of each of the firearm components during production, for reasons to be presented below in this paragraph. It has been stated in the domain literature that knowledge of the specific manufacturing process used to produce each relevant component is an absolute necessity.[52] There are varying metallurgical methods of producing firearms barrels, breech faces, and other firearm components, *even within the same manufacturer's realm of production processes*. For example, all firearms manufacturers do not use broaching to form the internal surface of their barrels. The same holds true for the manufacture of other components such as a breech face. In fact, even the same manufacturer may use different production techniques at different plant locations, and/or even over time. It is [now] well-known in the firearms/toolmarks identification community that it is essential for a firearms identification examiner to know how a *specific* firearm involved in a case was manufactured before rendering an opinion as to individualization. That information is most often unknown to the firearms identification examiner. A noted toolmark author observed, "The difficulty of addressing subclass [affiant note: manufacturing] characteristics is not in debate."[53] The necessity of determining the manner in which the critical surface of a gun or tool was manufactured before rendering conclusions of specific source attribution is such common knowledge within the firearm/toolmark identification community that some crime laboratories do not allow firearms examiners to opine an individualization unless the firearm to which bullets or cartridge cases are attributed has been recovered and made

---

[52] See, *e.g*., Biasotti & Murdock*, "Criteria for Identification" or "State of the Art" of F/TM ID*, 16(4) AFTE Journal (Oct. 1984), where the authors state that examiners must be familiar with forming and finishing processes to be able to distinguish sub-class characteristics.

[53] Nichols, Ronald G., "Defending the Scientific Foundations of the Firearms and Toolmark Identification Discipline: Responding to Recent Challenges," *J.For.Sci*, May 2007, Vol. 52 No. 3, at. 587.

available for examination.  However, to this day, it is the experience of the affiant that very few witnesses testifying as firearms or toolmarks identification experts knew the specifics of how the relevant specific firearm components or tools under examination were manufactured at the time their opinions of a 'match' were formed.  Although some examiners research the manufacturing processes on the Internet immediately prior to testifying, that does not alter the fact that they did not know the manufacturing process at the time their opinions were formed and underscores the mistaken belief that all the characteristics observed must be 'individual' in nature. Notwithstanding that examiners claim numerous "tours" of firearm manufacturing operations, such "tours" are not an effective source of information transfer relating to the most seminal aspect of firearms identifications: pattern matching of striations resulting from tribological interactions. Manufacturing personnel do not observe in detail what is occurring on workpiece surfaces at the microscopic level; there are generally no comparison microscopes in firearm production facilities.  As an example of the lack of effective information transfer from plant "tours" and sample selection for purported "validation" studies colloquially known as "10-gun studies", there has been no correlation in the domain literature as to the state of lubrication at the time of the plant "tour" or sample selection for the studies.  Lubrication regime at the time of sample selection is a critical, but an ignored, influential parameter in development and interpretation of microscopic striae on firearm components in the "tours" and purported "validation" studies. Manufacturing production and forensic laboratory pattern-matching are two disparate skillsets. 'Touring' production facilities provides little critical information relevant to 'matching' striae on a microscopic level.  Further, manifestations of tribological interaction of tools (and firearms) are almost never exclusively purportedly "individual" in nature, but rather are primarily subclass (manufacturing characteristics) or, at most, a combination of

purportedly "individual" and manufacturing characteristics. It is unreasonable to expect that, during forced contact in the manufacturing/forming process, somehow the tool and object in contact managed to selectively transfer only purportedly "individual" characteristics and ignored contiguous, and almost always more prominent, regions of manufacturing characteristics. However, even if the examiner committed a Type III error (obtained the right answer but for the wrong reason), the strongest inference currently defensible <u>scientifically</u> (as opposed to forensically) is that a single  firearm  could not be eliminated as the same firing platform for all the 'match'-relevant bullets and/or cartridge cases or, that in her opinion (a caveat necessary to convey to the trier of fact that the forensic practice is not science, is subjective in nature, and is not as infallible as lay observers generally perceive),  the characteristics exhibited by the [relevant] bullets and/or cartridge cases are consistent with having been fired by the same firearm. Although <u>scientifically</u> defensible, such an opinion is problematic from a forensic perspective, to be discussed below.

29. A subtle, and easily overlooked, consideration rendering the practice of firearm/toolmark associations even more subjective than is immediately apparent is the issue of line (striae) quality to which I previously alluded in a footnote herein. Line quality is quite significant but is also unquantifiable and inherently subjective.[54] Because of the lack of scientifically acceptable parameters and descriptors to describe 'lines,' toolmark examiners frequently resort to ascribing

---

[54] This is true notwithstanding efforts by the AFTE community to reduce subjectivity in toolmark associations by introducing an element of quantifiability.  For example, a methodology prevalent on the West coast of the U.S. known as "consecutively matching striae" (CMS) promotes line counting and additionally requires that the 'matching' lines be consecutively occurring. However, notwithstanding that the firearms identification examiner in the *Barrett* matter likely did not use CMS for the comparisons, claims or implications that six (or any number of) lines matched is deceptive in that it is perceived as specific, objective, unambiguous and inarguable. Additionally, whether each line is of sufficient quality to be included in the count or aggregate of matching striae also remains a subjective determination.

nebulous and unquantifiable terms in frustrated efforts to give lines some 'character.' Demonstrative of just how subjective the pattern-matching practice of firearms/toolmarks identification is, in one trial, the firearms/toolmarks examiner described how he matched lines: "Just one or two fine lines is never going to make it, but if they have some character to them, there is some design to them, and there are no significant differences between those two areas, then - - [sic]."[55] From the perspective of a metallurgist/materials scientist, representations that a line can have 'character' or 'design' are ludicrous as without operational meaning. They are subjective descriptors with meaning only to the observer. They are not quantifiable, reproducible, data that can be conveyed for peer review, nor are they falsifiable, a critical element of the true scientific method.

30. To demonstrate the unreasonableness of drawing on subjective recollection of samples presented in *temporally remote* settings (and by implication the increased risk in isolated examination), the following cartridge case and bullet comparisons, respectively, were presented in the AFTE literature as having been fired from *different* firearms which were contemporaneously fabricated.[56] The cartridge cases (left photo) and bullets (right photo) are virtually indistinguishable within each pair of photos and quite vulnerable to false positive associations if not presented for forensic examinations <u>contemporaneously</u> and/or the characteristics were the only ones used for identification (the most common occurrence). In my experience and opinion, it is likely they would be declared to be matches under either classical pattern-matching (likely used in the *Barrett* case) or consecutively

---

[55] Testimony of firearms/toolmarks examiner Jon Kokanovich, Dec. 3, 1992, in *re State of Arizona v. Anthony Spears*, Maricopa County Superior Court Case CR92-90457, T.tr. at 855.

[56] <u>*Left*</u>: Rivera, Gene C., "Subclass Characteristics in Smith & Wesson SW40VE Sigma Pistols", *AFTE J*. 39(3), Summer 2007, at 247. <u>*Right*</u>: Tulleners & Hamiel, "Sub Class Characteristics of Sequentially Rifled 38 Special S&W Revolver Barrels", *AFTE J*. 31(2), Spring 1999 at 118.

matching striae (CMS) methodology (generally used on the West coast of the U.S.):



Overwhelming concordance of striae between cartridge cases (left pair with split screen image) and bullets (right pair in split screen image) fired in/from different consecutively manufactured firearms. (See Footnote 51)

What is also demonstrative in the comparison photographs, above, is the absurdity of the assumption by most firearms identification examiners that the characteristics they observe under the microscope during forensic comparisons are purportedly 'individual' in nature (or, conversely, that they have "eliminated the possibility of subclass carryover"), and that they are not from the manufacturing process ('subclass' characteristics). It is illogical and untenable to claim that the characteristics exhibited in the photographs are 'individual' in nature and do not also exist in the other firearms of the production lot of unknown size. It was quite fortuitous that both sets of firearms were available contemporaneously for comparison; otherwise, a false positive could easily have ensued, as implied by the author. Similar to the basis for the eventual demise of the forensic practice of comparative bullet lead analysis (CBLA), the possibility and number of similarly

manufactured firearms or tools distributed in a local or regional community exhibiting characteristics that are confusingly similar unquestionably affects probative value of a claimed "match."  As previously alluded, this is the principal reason why some crime laboratories do not allow examiners to opine "same firearm" based on comparisons of recovered bullets or cartridge cases absent recovery of a questioned firearm for direct comparisons.[57]

## K.  Geographic Distribution of Highest Likelihood Coincidental Match Firearms

31.  Particularly given that the assumption of uniqueness has not been scientifically established and that individualization is considered a fallacy in the true scientific community, a major determinant of possible probative value, of even <u>acceptably</u> founded evidentiary product associations, is the issue of product density and distribution.  Notwithstanding frequent claims by firearms identification examiners to the contrary, firearms are likely not uniformly dispersed throughout the U.S.  Instead, there are likely geographic clustering effects, similar to those found by bullet lead researchers, where groups of firearms produced at the same time and in the same manufacturing process cluster in one particular geographical

---

[57] For a revealing demonstrative example of the folly of sample enumeration and, consequently, risk to probative value of claiming probative value from isolated examinations, see Michael J. Saks & Jonathan J. Koehler, *The Individualization Fallacy in Forensic Science Evidence*, 61 VAND. L. REV. 199, 212–14 (2008), at 213, which demonstrates one of the fallacies of inferring uniqueness from relative frequency in a population by their example of 100 pairs of guns, each pair hypothetically discernibly indistinguishable from each other, in a population of 100,000 guns. If a police department had 100 firearms/toolmarks examiners, and each examiner examined 10 guns (or tools) per day every day for the next 10 years, even after 3.65 million pairwise examinations (comparisons), there remains a 93% chance that *none* of the 100 pairs were ever examined. This is one reason why an accumulation of positive instances from a population (called simple enumeration) is inadequate as scientific "proof" of an hypothesis as a universal assumption or law.  Making a claim of "uniqueness" from merely a single sample is absurd.

area or region.[58]  In assessing probative value of the significance of matching characteristics on a bullet, cartridge case, or tool, one should take into account the density and distribution patterns of the particular type of firearm or tool and, indeed, even the prevalence of other similar tool or firearm types, in a particular region. Firearms/toolmarks examiners have apparently never determined, or even attempted to validate (test), claimed probative value of purported source attributions. Avoiding the burden required by scientific necessity for such foundations, examiners routinely and <u>summarily</u> <u>claim</u> the ability to discern purportedly "individual" characteristics (notwithstanding that discernible uniqueness has never been established, according to the National Academy of Sciences).  However, a reliable foundation for such  claims is a scientific and statistical necessity. Exhaustive literature searches also reveal no studies of the geographic density and distribution patterns of firearms, either from the same production lot or from other production lots but with confusingly similar characteristics, to assess probative value of claimed 'matches'. This is assuredly attributable to their intuitive belief in the unvalidated premise upon which they rely - - that each firearm exhibits and transfers 'unique' ("individual") toolmarks.  It should be noted that proponents of comparative (compositional) bullet lead analysis (CBLA) had a similar belief as an underlying premise (that of 'uniqueness') for CBLA practice for almost 40 years, and also of assumed

---

[58]  *See* "A Retail Sampling Approach to Assess Impact of Geographic Concentrations on Probative Value of Comparative Bullet Lead Analysis," S.A.  Cole, W.A.  Tobin, L.  Burgess, H. Stern, *Law, Probability and Risk*, Vol.  4, No.  4 (2005), Oxford University Press (probabilities of 1 were found in some geographic areas for some product lines, meaning that consumers had no choice but to purchase the same packing coded (composition) bullets even if they wanted others).

probative value, until relatively recent research proved CBLA invalid, misleading as proffered, and forensically meaningless (without probative value).[59]

## L.    Known Misattributions (Type I Errors: False Positives) & Error Rates

32.   Realizing that the courtroom is not a laboratory, even the "test of time," also known as "implicit testing," as suggested by the lengthy admissibility of toolmarks testimony and conclusions, is not a valid measure of scientific validity of the practice, or rate of error, in part because of the absence of effective feedback loop for expert witnesses testifying to exclusive source attributions. The most recent forensic committee of the NAS has observed,

> For years in the forensic science community, the dominant argument against regulating experts was that every time a forensic scientist steps into a courtroom, his work is vigorously peer reviewed and scrutinized by opposing counsel. A forensic scientist might occasionally make an error in the crime laboratory, but the crucible of courtroom cross-examination would expose it at trial. This "crucible," however, turned out to be utterly ineffective…
>
> Unlike the extremely well-litigated civil challenges, the criminal defendant's challenge is usually perfunctory. Even when the most vulnerable forensic sciences—hair microscopy, bite marks, and handwriting—are attacked, the courts routinely affirm admissibility citing earlier decisions rather than facts established at a hearing. Defense lawyers generally fail to build a challenge with appropriate witnesses and new data. Thus, even if inclined to mount a *Daubert*

---

[59] *See* "Comparative Bullet Lead Evidence (CBLA): Valid Evidence or *Ipse Dixit*?," E.J. Imwinkelried and W.A. Tobin, *Okla. City Univ. LR*, Vol. 28 No. 1 (2003). *Cf.,* "A Retail Sampling Approach to Assess Impact of Geographic Concentrations on Probative Value of Comparative Bullet Lead Analysis," S.A. Cole, W.A. Tobin, L. Burgess, H. Stern, *Law, Probability & Risk*, Vol. 4, No. 4 (2005), Oxford University Press, and FBI Press Release (where FBI concedes lack of probative value) dated Sept. 1, 2005, available at http://www.fbi.gov/pressrel/pressrel05/bullet_lead_analysis.htm.

challenge, they lack the requisite knowledge and skills, as well as the funds, to succeed.[60]

33. There have been numerous indications of disagreements, misidentifications, and various rates of error exceeding the oft-quoted "0.1 percent," "zero," "0 to 1%", "1-2%", or "near zero," rates of error. It has been indicated in the field literature that disagreements typically arise from an examiner[s] ascribing too much significance to small amounts of matching striae that are achievable in known non-matches.[61] This observation is not surprising given that up to 51 percent matching lines have been found in known non-matches, that examiners have differed by 39 "matching" lines for the same comparisons, and other similar findings.[62] Further, it is known that not every manufacturing tool is unique.[63] With regard to error rates, scholars have noted that with modern statistics, forensic examiner decision-making could be, but to date has not been, subjected to quantitative analysis.[64]

34. The forensic community does not engage in error detection except in irrelevant proficiency testing. Most errors in case work are discovered fortuitously. In spite of claims by the AFTE community that errors are rare, there are numerous references discussing the existence and frequencies of examiner error in the firearms/toolmarks literature. Several are by individuals formerly in capacities as crime lab directors and/or heads of firearms/toolmarks units, both in positions of

---

[60] *Strengthening Forensic Science in the United States: A Path Forward*, National Research Council, National Academy of Science (2009), at 107, available online at: http://www.nap.edu/openbook.php?record_id=12589&page=106

[61] For an example, see Faigman, D, Kaye, D., Saks, M., *Modern Scientific Evidence: The Law and Science of Expert Testimony* (2002),

[62] "Criteria for Identification of Toolmarks, Part II: Supporting the Conclusion," Miller and Neel, *AFTE Journal*, Winter 2004, Vol.36 No.1.

[63] *Faigman, et al., supra*, at 500-501.

[64] *Ibid*, at 508, *inter alia*.

being requested to adjudicate or arbitrate differences of opinion in the field of firearms/toolmarks. One states that there have been an "appalling number of misidentifications" in the firearms ID field, and discusses one American Association of Forensic Scientists (AAFS) funded study by the Law Enforcement Assistance Administration (LEAA) that found 24 percent of labs turning in unacceptable results.[65] The second, a former Unit Chief of the FBI Laboratory's Firearms/Toolmarks Unit, speaking in an AFTE training seminar, indicated that "most of us know someone who has committed serious error" and that examiners "might not be allowed to forget such error if it becomes public knowledge."[66] He proceeded to describe a false positive identification on a 1911A1 .45 caliber semiautomatic and mentions that although "[his] FBI" was not the only entity that did referee work (reviewing cases), it did enough to know that the described false positive case was "only one of many we have seen over the years."[67]

35. One study has indicated that 9.1 percent of firearms/toolmarks examiners responding to a proficiency test were "clearly in error" and noted that even more examiners gave unacceptable results.[68]

36. An account of one of the false positive identifications against a law enforcement officer serves as an overview summary of the problematic nature of the subjective forensic practice of firearms/toolmark identifications. In the prosecution of a sheriff's deputy, similarities were observed between marks on casings and bullets by a Los Angeles Police Department forensic examiner claiming a "match" but, according to independent experts, undue significance was

---

[65] Bradford, Lowell, "Forensic Firearms Identification: Competence or Incompetence?," *AFTE Journal*, Vol. 11 No. 2 (April 1979).

[66] Hodge, Evan, "Guarding Against Error," 20(3) *AFTE Journal* (July 1988).

[67] *Ibid*.

[68] Jonakait, Randolph N., "Forensic Science: The Need for Regulation," *4 Harvard Journal of Law & Technology*," 109 & n.8 (1991).

attributed to those similarities. The marks were eventually determined to be coincidental and insufficient to support an identification (and, in fact, reportedly showed an exclusion). One of the independent examiners noted that, "It was clearly an exclusion. It was not an identification at all. It was flat-out error on the part of LAPD."[69] According to noted firearms/toolmarks authority John Murdock, "Firearms identification is an area that is somewhat problematic in forensic science because the determinations that are made are mostly subjective in nature and they're based on the experience of the examiner. Let's face it, an examiner can be around for a number of years and not have the right kinds of experience."[70]

37.    A relatively recent audit of the Detroit Crime Laboratory in Detroit, Michigan, reportedly revealed a shocking 10 percent rate of error attributable to human error, not malfeasance. "Firearms work at the city police lab…first was halted in the spring [2008]…" after suspicion of an unacceptable rate of error in firearms/toolmark examinations. In one case, the lab had reportedly opined that 42 shell casings from a May 2007 shooting were fired by the same weapon.  State police later determined that two different weapons were used.[71]

38.    Other significant misattributions have been fortuitously discovered. In *Trotter v. State*, a Missouri police officer was killed at the scene of a shooting. Investigators originally believed that the officer was shot with his own weapon, but the weapon was not found at the scene. A suspect involved in a completely different criminal matter was arrested and a firearms/toolmarks examiner "matched" the suspect's weapon to the bullet recovered from the deceased officer. The suspect was convicted of killing the officer. Sometime later, the deceased

---

[69] "Review of LAPD Ballistics Unit Set After Botched Test in Murder Case: Charges Dropped Against LA Sheriff's Deputy," *Law Enforcement News*, Vol. XV, No. 295 (June 30, 1989) at 7.
[70] *Ibid*.

[71] "Error Prone Detroit Crime Lab Shut Down," *USA Today*, 9/25/2008, available online at: http://www.usatoday.com/news/nation/2008-09-25-crime-lab_N.htm, *inter alia*.

officer's weapon was eventually found and it was confirmed to have been the weapon used to kill the officer, as admitted by the same <u>(original)</u> firearms/toolmarks examiner.[72] Yet another misattribution was revealed in the matter of *Williams v. Quarterman*, where a firearms/toolmarks examiner testified *to an absolute certainty* that a bullet was fired from a certain .25 cal. pistol. It was eventually determined to have been fired from a .22 caliber pistol owned by another individual.[73]

39. As discussed in my latest paper, coauthored with a nationally known tribology research scientist at Oak Ridge National Laboratory, the forensic practice of firearms/toolmarks identification, for numerous reasons, is not a science and is virtually entirely subjective. There exist no comprehensive or meaningful studies validating the ability of a firearms identification examiner to reliably opine source attributions.[74] Additionally, it has already been determined by a variety of empirical studies and incidents, that rates of firearms identification practice error significantly exceed the often claimed "0.3 to 1%" and "1-2%" rates of error. Such claims are vacuous in that they are without scientific foundation. Ironically, for decades, firearms identification experts claimed "0% error" (infallibility) in opining specific source attributions until true (mainstream) scientists began calling such absurd claims into question.

**M. Unfounded Expressions of Individualization, Certainty, and Implications of Case-Specific Opinions**

---

[72] *Trotter v. State* , 736 S.W.2d 536 (Mo. Ct. App. 1987).

[73] *Williams v. Quarterman*, 551 F.3d 352 (5th Cir. 2008).

[74] Tobin, W.A. and Blau, P.J., "Hypothesis Testing of the Critical Underlying Premise of Discernible Uniqueness in Firearms/Toolmarks Forensic Practice", 53 *Jurimetrics J.*, 121-142 (Winter 2013). The paper is attached as Appendix B.

40. The U.S. Department of Justice also concurs that conclusions of specific source attribution in firearms identification are objectionable as scientifically unjustifiable. In a May 6, 2013, letter to the District Attorney of Oktibbeha County, Mississippi and the governor of Mississippi, regarding the pending execution of a man convicted largely on ballistics "match" testimony, *In re Manning v. Mississippi,* 2013-DR-00491-SCT, the USDOJ stated, "The science [*sic*] regarding firearms examinations does not permit examiner testimony that a specific gun fired a specific bullet to the exclusion of all other guns in the world." The same caveat is equally valid for similar inferences and claims likely to be proffered in the case *sub judice*.

41. I have personally and/or collaboratively reviewed virtually all of the purported "validation studies" existing in the firearms/toolmarks identification domain, and of the findings of the National Research Council of the National Academy of Sciences with regard to such studies undertaken in recent years, to determine the validity of conclusions drawn from firearms and toolmark identification examinations. Additionally, I have coauthored several scientific papers addressing our observations and conclusions as to the scientific foundations, *vel non*, of the purported "validation studies" in the domain.[75] As discussed below, those studies have led the true (mainstream) scientific community to conclude that firearms/toolmarks examinations and the conclusions drawn from them *lack meaningful indicia of scientific validation or reliability*. The letter from the Department of Justice dated May 6, 2013, reflects the mainstream scientific community's rejection of claims that bullets or cartridge cases can be matched to

---

[75] See "Hypothesis Testing of the Critical Underlying Premise of Discernible Uniqueness in Firearms/Toolmarks Forensic Practice", 53 *Jurimetrics J.* 121-142 (Winter 2013). See also, "Analysis of Experiments in Forensic Firearms/Toolmarks Practice Offered as Support for Low Rates of Practice Error and Claims of Inferential Certainty", *Law, Probability & Risk* (Oxford University Press), doi:10.1093/lpr/mgs028 (forthcoming).

specific guns using the methodology employed by the analyst in the *Barrett* matter, or any other method existing in the forensic firearm/toolmark community at the current state-of-the-art.

42. Claims that certain bullets or cartridge cases "were identified as having been fired in [the same][a specific] firearm" based on current forensic pattern-matching methodology are not scientifically supportable. From both probabilistic and pragmatic perspectives, this constitutes a statement of certainty (probability of 1) which I, the unanimous consensus of my scientific colleagues, the U.S. Department of Justice, and the National Academy of Sciences conclude to be objectionable as unfounded.[76]

43. In virtually every hearing and trial in which I have participated or for which I have reviewed testimony transcripts, that opinion is additionally expressed "to a reasonable [scientific, practical, or ballistic] certainty". That expression is also vacuous and constitutes nothing more than *ipse dixit* as pure speculation. It is not only without scientific foundation, but also has been identified in the scholarly community as "a phrase in search of a meaning."[77] Additionally, the National Institute of Standards and Technology (NIST) and the U.S. Department of Justice have published a position statement regarding testimonial opinions expressed "to a reasonable degree of [discipline] certainty" indicating that the phrase "has no place in the judicial process" and cites numerous problems with its use, including an inaccurate implication that the forensic practice is a science.[78] Although Examiner Higgs did not opine to any express degree of certainty, his repetitive claims of uniqueness, specific source attributions, and the dramatic phraseology used in

---

[76] See Paras. 13, 16 and Fn. 25, *supra*, for NRC/NAS statements.

[77] See Giannelli, Paul C., "Reasonable Scientific Certainty: A Phrase in Search of a Meaning", 25 (1) Criminal Justice 40 (2010).

[78] Available at: http://www.justice.gov/ncfs/file/641331/download.

expressing those opinions, implicitly convey such unfounded certainty in his opinions.

44. Based on the current state of the art of firearms identification, the only <u>scientifically</u> defensible opinion for declaring an association between bullets/cartridge cases and a firearm is either that the characteristics exhibited by the specimens are consistent with having been fired from the specific firearm or, in the alternative, that the firearm could not be eliminated as the firing platform.

45. However, the former opinion (one of 'consistency'), although being <u>scientifically</u> acceptable, is not <u>forensically</u> acceptable for judicial application in that neither the opinion itself nor the foundation for the opinion (*i.e.*, the [nonexistent] validation studies underlying the conclusion) do not convey to a trier of fact the size of the possible sample pool in which the suspect firearm might be an element. In other words, the characteristics exhibited by the evidentiary specimens might be "consistent with" having been fired from the suspect firearm, but they might also be consistent with many hundreds, or even thousands, of other firearms produced in the same production lot, for example, that could well have been distributed in the same geographical region of a crime. The opinion does not convey sufficient information by which probative value of the claimed association might be judged.

46. Therefore, the only <u>scientifically</u> *and* <u>forensically</u> defensible opinion justified by the current state of the art is that a specific firearm could not be eliminated as the firing platform for the evidentiary bullets and/or cartridge cases.

**N.  Summary**

47.  Before presenting a summary statement, what is particularly troubling from a scientific perspective is the domain-wide mantra, invoked in the case *sub judice*, that only "training and experience" constitute appropriate validation of an

"identification." Examiner Higgs refused to produce any photodocumentation of his purported identifications. Science does not accept "training and experience" as the sole basis for validation of an experiment or hypothesis. The claim that only "training and experience" establishes effective knowledge base for firearms identification is an effective bar to scientific confrontation and comprises one of the classic hallmarks of how infamous junk science such as N-rays, polywater, and cold fusion, *inter alia*, were perpetuated for varying periods of time throughout history. The effective bar to scientific confrontation or scrutiny exists where an experimenter claims to be trained, or otherwise have the ability, such as a psychic, to observe a claimed phenomenon that no one else can. Even after repeated requests and inquiry from defense counsel, Examiner Higgs declined to produce photographs to demonstrate the characteristics on which he based his identifications, claiming that it was OSBI policy not to produce such photographs at trial.[79] This constitutes a "Trust me, I know it when I see it, and take my word for it" position, antithetical to true (mainstream) scientific endeavor. The rationalization in Examiner Higgs' testimony that it takes "training" to be able to match striae, and that photographs "don't help" untrained observers (targeting jurists and jurors) or even trained observers (such as Declarant) assess the validity of claimed 'matches', perpetuates the "Trust me…" mantra and effectively insulates the witness from scientific scrutiny and cross examination. Assessing the validity of a pattern match is basically common sense and does not require "years of training and experience" any more than does assessing the validity of blank (non-pictorial) jig-saw puzzle matches. Any lay observer can assess whether a claimed "match" is reasonable, tentative or compelling. Rejecting access to photodocumentation denies both lay and expert observers scrutiny of work product and experimental results, respectively.

---

[79] Higgs' T.tr. 3778 at 13, 3779 at 20, 3820 at 14, and 3824 at 13 through to 3827.

48.    In summary, the forensic practice of firearms/toolmarks identification lacks the rigor of science and should not be represented to a finder of fact as a science.  In addition, it should not be permitted to render inferences of specific source attribution (individualization), unfounded expressions of certainty of any kind (such as "to a reasonable degree of [ballistic, practical, *inter alia*] certainty"), or other conclusions implying an aura of precision generally associated with scientific endeavor, without comprehensive or meaningful scientific foundation. Based on the state of the current art (not science), the strongest opinion that is <u>scientifically</u> *and* <u>forensically</u> defensible is that, *in the examiner's opinion*, [a, the] specific firearm could not be eliminated as the firing platform for the [bullet(s), cartridge case(s)] examined.

I state under penalty of perjury pursuant to 28 U.S.C. § 1746 that the foregoing is true and correct to the best of my current understanding and belief.


/s/_____

William A. Tobin