# IN THE UNITED STATES DISTRICT COURT FOR THE

# EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,    )
    )
        *Movant,*    )
    )
v.    )
    )
UNITED STATES OF AMERICA,    )
    )
        *Respondent.*  )

---

# EXHIBIT 57

---

BEFORE THE GRAND JURY OF THE

UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA


IN THE MATTER

OF

KENNETH BARRETT


TESTIMONY OF DARREN LANE

TAKEN IN MUSKOGEE, OKLAHOMA

ON NOVEMBER 9, 2004

# ORIGINAL

APPEARING:                          D. MICHAEL LITTLEFIELD
                                    Assistant U.S. Attorney
                                    EASTERN DISTRICT OF
                                    OKLAHOMA
                                    1200 West Okmulgee
                                    Muskogee, OK  74401


REPORTED BY:  BRIAN P. NEIL, CSR-RPR

00000510

KEB300698

Tuesday, November 9, 2004

* * * * *

DARREN LANE,

after having been first duly sworn, says in reply to the questions propounded as follows, to-wit:

EXAMINATION

BY MR. LITTLEFIELD:

Q. State your name for the record, please, sir.

A. Darren Lane.

Q. And, Mr. Lane, how are you employed?

A. I'm a special agent with the Drug Enforcement Administration.

Q. Okay. And where are you assigned currently?

A. McAlester, Oklahoma.

Q. How long have you been an agent with the Drug Enforcement Administration, sir?

A. Almost four years.

Q. Okay. When this incident occurred about which we're here today, were you working for the DEA?

A. I was not.

Q. Okay. Have you reviewed the files, records, and talked to individuals regarding the incidents about which we are here today?

A. Yes, I have.

00000511

KEB300699

Q. Tell the Grand Jury about the circumstances that led to the entry to the property of Kenneth Barrett.

A. Okay. District attorney's drug task force in Sequoyah County -- I believe it's Task Force No. 27 -- obtained a search warrant for --

Q. Which agent?

A. Clint Johnson. Clint Johnson obtained a search warrant for the residence of Kenneth Barrett there in Sequoyah County, Oklahoma.

Q. Okay. What kind of drug -- search warrant was it?

A. It was a drug search warrant.

Q. Okay. In regards to it being a search warrant, were there any unusual conditions or directions to the law enforcement officers who were executing the warrant given by the judge?

A. Yes. The search warrant specified that it could be -- entry could be made at night, and it was also called a no-knock warrant.

Q. Typically when a search warrant is to be done, what obligation or requirements do law enforcement have to have in regards to announcing presence, etcetera?

A. Well, they have to announce the presence when

D & R Reporting & Video, Inc.

00000512

KEB300700

executing the search warrant, state that they're police officers to serve a search warrant, and they're to give the occupants of the building that they're searching a reasonable amount of time to respond to the door.

Q. And now, a no-knock warning, what is done in regards -- what obligations does the law enforcement have prior to entry if it is a no-knock warrant?

A. A no-knock warrant, I mean, that's kind of our terminology for it, but it means you're not under any -- the law enforcement officer is not under any obligations to announce his or her presence during the execution.

Q. Just go in -- go in immediately?

A. Go in immediately.

Q. Don't knock on the door, don't announce your presence, just enter?

A. There's probably going to be a big knock on the door --

Q. Maybe to --

A. -- to breach the door but not a knock in the common sense, knock, police officers, search warrant, police officer, search warrant type of thing.

Q. Typically to obtain a no-knock warrant, what kind of special circumstances do the officers advise

00000513
KEB300701

the court of?

A. A couple of things. Number one is the presence of weapons or some other factors that would lead you to believe that it would be a high-risk entry. High-risk meaning a dangerous entry.

Q. Okay. Do you know, based upon conversations with Mr. Johnson, what you have reviewed in regards to reports that have been obtained in regards to this case, and conversations as to individuals, as to whether or not there was a perception that Kenneth Barrett would constitute a threat to law enforcement if they went onto his property and announced their presence?

A. Yes. They believed that based on --

Q. Have you talked to Clint Johnson?

A. Yes.

Q. What did he advise you in regards to threats from law enforcement that he was aware of?

A. Per his conversations with the confidential source that was providing him with information about Mr. Barrett, Mr. Barrett had told the confidential source who then told Mr. Johnson -- Agent Johnson that Mr. Barrett had said that if police officers came onto his property, he would try to kill them.

Q. Okay. Have you spoken to any individuals who

D & R Reporting & Video, Inc.

00000514

KEB300702

had been at Kenneth Barrett's residence prior to this warrant being executed?  Have you personally spoken to anybody?

A.  Yes, I have.

Q.  And did that individual say anything about Kenneth Barrett's intent to do harm to people who came upon his property?

A.  Yes.

Q.  What did that person say?

A.  This individual said that Mr. Barrett had also made explanations to him or her that he would shoot to -- he would shoot anybody that came onto his property.

Q.  Okay.  Did the person advise you of whether or not Mr. Barrett maintained firearms on his property?

A.  Yes, they did.

Q.  And what did that person say in regards to firearms?

A.  They said that they had -- Mr. Barrett had several firearms on his property, and they specifically told me that whenever somebody came to the property or that Mr. Barrett didn't know, that he would retrieve a firearm.  They indicated it was a long gun-type weapon, a rifle, that had a sling that

00000515

KEB300703

you would walk around with it.  This person further told me that Mr. Barrett during that period of time was never without a firearm.

Q.   Okay.  Was there any kind of warning that had been placed on Mr. Barrett's property about individuals entering the property?

A.   Yes, sir.

Q.   What was that?

A.   There was a sign on the gate.  He had an aluminum gate -- fence gate at the edge of his property.  There was -- it was a homemade sign in which somebody had written -- it was somebody had written --

Q.   What did the sign say?

A.   It said if you -- words to the effect of if you -- I don't care who you are --

Q.   Did it say, I don't care who you are?  What did it say?

A.   It says, "I don't give a shit who you are. If you come on my place, I will shoot your ass," words to that effect.

Q.   I'm not sure the "ass" is in there.

A.   Well, it may not be.  I'm paraphrasing.

Q.   Based upon the type of warrants they had received, it was a no-knock warrant, entry day or

00000516
KEB300704

night, and the information that law enforcement -- was that -- was Mr. Johnson the only individual with law enforcement who had received information that Mr. Barrett might constitute a threat to individuals that come onto his property?

A. No, sir.

Q. Who else had?

A. Another agent with the task force, Agent Lloyd.

Q. Okay. And what was the nature of Mr. Lloyd's information?

A. He had also received information from confidential sources indicating that Mr. Barrett -- Mr. Barrett had an arrest warrant for him as well. Agent Lloyd had received information that Mr. Barrett was going around telling people that he would not be going back to jail, that he would take -- if he was -- if they tried to arrest him, he would take somebody with him and that he intended on shooting a police officer.

Q. Based upon that information, after they obtained the warrant -- after Agent Johnson obtained the warrant, what did Mr. Johnson do to attempt to cause the warrant to be executed?

A. He and Agent Lloyd contacted the Oklahoma

00000517
KEB300705

Highway Patrol tactical team.

Q. Directly?

A. No, sir.

Q. Who did they contact?

A. They contacted Danny Oliver.

Q. And who was Mr. Oliver? Or who -- what was Mr. Oliver's position at that time?

A. At that time, he was the deputy with the Cherokee County Sheriff's Office.

Q. And was -- as Mr. Oliver is a deputy with the sheriff's office, was he assigned to any other entity to perform law enforcement functions at that time?

A. He was. My understanding is he was assigned to the same task force as Agent Johnson and Agent Lloyd and he was also assigned as a task force officer to the DEA office in McAlester.

Q. So he was working as a drug task -- he was a deputy from Cherokee County assigned to the DEA drug task force or drug task force agent?

A. That's correct.

Q. Had Mr. -- what was Mr. Oliver's prior law enforcement experience?

A. He was retired from the Oklahoma Highway Patrol.

Q. And did he have any special job as an OHP

D & R Reporting & Video, Inc.

00000518
KEB300706

trooper?

A. Yes, sir. While he was with the highway patrol, he was also assigned to the tactical entry team, tactical team.

Q. Okay. Were Mr. Johnson and Mr. Lloyd aware that Danny Oliver had been with the OHP "tac" team?

A. Yes, sir.

Q. Okay. And how long had Mr. Lloyd been retired from OHP and from the -- I think I said Lloyd Oliver -- how long had he been retired approximately from OHP, the tac team, as a trooper when they went to him and said that we got this no-knock nighttime search warrant?

A. Just a -- just a few months. Not long at all.

Q. As a result of being able to -- or making contact with Mr. Oliver, were Mr. Lloyd and Mr. Johnson put ultimately in touch with the OHP tac team?

A. They were.

Q. And was it determined whether or not the tac team -- the OHP tac team would accept this assignment and make initial entry onto Mr. Barrett's property for the purpose of executing this drug warrant?

A. Yes. The OHP tac team accepted that.

D & R Reporting & Video, Inc.

00000519
KEB300707

Q. Okay. Where did they plan the operation to enter Mr. Barrett's property?

A. At Camp Gruber outside of Muskogee here.

Q. Okay. How many individuals were working on the tac team or with the tac team -- did Mr. Oliver also enter into Mr. Barrett's property with the OHP tac team?

A. Yes, sir, he did.

Q. How many individuals from OHP made the entry onto Mr. Barrett's property in performance and the execution of the search warrant?

A. Well, actually made it onto his -- well, I guess the --

Q. How many were involved in the operation to execute the warrant?

A. Eleven.

Q. Okay. And how many vehicles were there -- were there that were involved in making entry onto Mr. Barrett's property from OHP?

A. Five in the convoy; three that actually made it onto his property.

Q. Okay. Describe -- which was the first vehicle going in?

A. It was an Oklahoma Highway Patrol unmarked Ford Bronco.

00000520

KEB300708

Q.   Who was -- who were the occupants of the first vehicle to go onto Barrett's property?

A.   The first vehicle contained two Oklahoma Highway Patrol troopers.  The driver was John Hamilton.  He goes by the nickname of Buddy.  So if you hear me call him "Buddy," that's John Hamilton.  And in the passenger seat, that was David Eales.  He also goes by the nickname of Rocky Eales.

Q.   Okay.  Prior to their making entry -- going to make entry onto Mr. Barrett's property, what had -- what had the OHP tac team done to gather information about the terrain and determine an entry plan onto the property?

A.   Well, they interviewed people familiar with Mr. Barrett; in other words, Agent Lloyd and Agent Johnson, but --

Q.   Did they fly over?

A.   More specifically, they did a fly-over of the place in an airplane and did some aerial reconnaissance.  And after that, they did a drive-by where they drove by in one of their unmarked Suburbans and visually inspected the property and routes of entry.

Q.   When they drove by, did they notice anything about the gate entry to the drive to the front of the

00000521
KEB300709

house?

A. Yes, sir. They noticed it was locked with a chain.

Q. Okay. Gate open or closed?

A. Gate was closed and it was -- it was securely closed.

Q. Okay. Now, the road that goes by Mr. Barrett's residence of where he resided September of 1999, what -- do you know what direction that road goes? Do you recall?

A. I don't.

Q. Do you recall which way the front of the house --

A. It goes east and west. I'm sorry. East and west.

Q. And the house faces?

A. The house faces south.

Q. And how did they plan to make entry and, in fact, enter the property of Mr. Barrett when they were executing the warrant?

A. They planned on -- the first three vehicles driving past the gate, which would have been the driveway on the south side of the residence --

Q. Okay. So they would go past his house on the east/west road?

00000522

KEB300710

A.   Past his house on the east/west road to another driveway that ran north and south along the Barrett property.

Q.   So there was a driveway on the east side that went north or northeast --

A.   That's --

Q.   -- to make a left-hand turn off the east/west road?

A.   That's correct.

Q.   Then what was to be done?

A.   They would go north on that driveway, skirting the east side of Mr. Barrett's property until they came to -- it's not really a drive, but it was something they had identified from aerial photographs. They could see the tire tracks and that those tire tracks crossed a ditch and into the side and front yard of Mr. Barrett's property.

Q.   Okay.  Let me make sure I got it clear.

They're heading east and you go past, you turn left on a driveway and go down that driveway?

A.   That's correct.

Q.   And from the aerial photos, you can see where the -- where there's a trail or area beaten down, turn in there, back to the left, which would be to the west, cross a ditch, and then come up into the yard of

D & R Reporting & Video, Inc.

00000523
KEB300711

Kenneth Barrett's house?

A. That's correct.

Q. Okay. And what time was it approximately -- what date was it that the -- they actually went to execute the warrant?

A. The date that they actually went was September the 24th.

Q. Of?

A. Of 1999.

Q. Okay. And approximately what time of day was it when entry -- when they made entry to execute the warrant?

A. Approximately 12:30 in the morning. So --

Q. Okay. A little after midnight?

A. A little after 12:30.

Q. Now, you had said that three vehicles were going to go up that driveway, go across the ditch, and pull into Mr. Barrett's front yard?

A. Yes, sir.

Q. Okay. The first vehicle you said was a Bronco driven by Mr. Hamilton and the passenger was Mr. Eales?

A. That's correct.

Q. What was the second vehicle?

A. The second vehicle also -- it was another OHP

00000524

KEB300712

Bronco without markings. It was a plain white Bronco.

Q. The third vehicle?

A. The third vehicle was an Oklahoma Highway Patrol cruiser, a black-and-white cruiser not unlike what you still see driving on the highways today.

Q. Did the cruiser have a light bar on the top of it?

A. Yes, sir.

Q. And have you read and reviewed the reports from the officers who were there that night?

A. Yes, I have.

Q. And were the lights on the cruiser, the black-and-white, turned on during this operation?

A. The overhead lights were, yes, sir.

Q. At what point?

A. At approximately where they turned off of the east/west road running in front of Mr. Barrett's property. When they turned off to that secondary drive that went north and south, somewhere in that area approximately is where they turned on the overhead lights of vehicle No. 3.

Q. Okay. The fourth vehicle, what kind of vehicle was it?

A. The fourth vehicle was another Oklahoma

00000525

KEB300713

Highway Patrol cruiser.

Q. Marked unit?

A. Marked unit.

Q. And where did it go?

A. It parked somewhere in the area of the front gate or it stopped somewhere in the area of the front gate of Mr. Barrett's property, that locked gate that I referred to earlier.

Q. On the east/west road?

A. On the east/west road.

Q. Okay. And the fifth vehicle was what?

A. The fifth vehicle was -- I believe it was a Chevy Suburban.

Q. Okay.

A. It was, again, an unmarked highway patrol vehicle.

Q. And where did it go?

A. It went -- it pulled off the east/west drive at a residence just immediately -- if you're driving -- give me a second.

Q. If the driveway's on the east side that they pulled into, which side was it that the Suburban pulled into?

A. It pulled -- it pulled into the west -- western -- western driveway.

00000526

KEB300714

Q. There's another --

A. There's another driveway on the west side of Mr. Barrett's property which actually belonged to his mother, if I have my information correct, and they pulled into that driveway and that's where they parked.

Q. Did they turn their lights on -- did an occupant of that vehicle turn the lights on the Suburban, the flashing lights, when they pulled into the driveway on the west side?

A. Yes, sir.

Q. What happened when Mr. Hamilton entered the property of Mr. Barrett about the time he hit the ditch between the driveway and the residence?

A. Okay. They hit the ditch, and shortly after their coming out, somewhere right in the area of that ditch, they started receiving rifle fire, or fire -- gunfire from somewhere in the area of the front porch of the residence.

Q. How was it described?

A. It was described as fully-automatic fire.

Q. Rapid fire?

A. Rapid fire.

Q. And where were the bullets -- what were the bullets that were coming from the front porch area of

00000527

KEB300715

the residence hitting?

A. They were impacting the windshield of their vehicle.

Q. Only the windshield?

A. No. They impacted the wind -- they initially starting impacting the windshield. Vehicle No. 1, Buddy and Rocky's vehicle, Trooper Hamilton and Trooper Eales' vehicle, were driving -- continued to drive. They started taking fire about the ditch. Those initial rounds, as reported by Trooper Hamilton, were impacting the windshield. As they continued to come closer, they took many more rounds in the windshield and in the radiator. I think some of them hit the transmission underneath and disabled the vehicle and in the passenger side door and in the passenger side window. They took numerous rounds as they traversed across the yard and came to rest in front of the house.

Q. Okay. Do you recall approximately where the Hamilton/Eales Bronco came to rest?

A. Yeah. It -- pretty much adjacent to the front -- the south porch, the front porch of the residence, just immediately to -- if you're facing the residence, immediately to the left of the front door.

Q. Okay.

00000528
KEB300716

A. In an angle approximately about like that.

Q. How many shots hit that Bronco?

A. Approximately 18.

Q. And was either occupant struck by any of that gunfire?

A. Both occupants were struck by that gunfire.

Q. Mr. Hamilton was hit where?

A. Mr. Hamilton was hit --

Q. He was the driver?

A. He was the driver. He was hit in the eye, the left eye, around the orbit of the eye, and he was also hit in the left shoulder.

Q. Mr. Eales?

A. Mr. Eales was -- received three gunshot wounds. Trooper Eales received one gunshot wound to the left flank, one gunshot wound to the right -- it was a deep -- medical examiner called it a deep, grazing wound -- to his right arm, and the --

Q. You're holding right above --

A. Right above the elbow.

Q. But on the bottom part of the arm?

A. Yeah. Around the tricep muscle here. And the other shot -- and I'm not listing these in any particular order -- the other shot hit him just below the armpit slightly to the back and traversed across

00000529
KEB300717

his chest cavity.

Q. Okay. And did both passengers of the first vehicle, Mr. Eales and Mr. Hamilton, exit the vehicle?

A. They did.

Q. Okay. Was anything done to try and stop the gunfire when they exited the vehicle?

A. Yes. Prior -- as I understand it, prior to Trooper Hamilton exiting the vehicle, he threw what's called a flash bang. Flash bang is a -- the best way to describe it is like a grenade that doesn't explode. It creates a large -- a large sound, shockwave of sound, and it also creates a very bright flash. It's used as an entry tool to stun dangerous people to give us an opportunity to take them into custody.

Q. When Mr. Hamilton tossed the flash bang and it went off, where did Buddy Hamilton go?

A. It went --

Q. Where did he go?

A. When he went out, he left his vehicle and looked -- I think at first he went to the front of his vehicle in a position of cover behind the engine block, but he eventually made it to the rear of his vehicle with Trooper Eales.

Q. Okay. Where did Trooper Eales go?

A. Trooper Eales exited the passenger door and

00000530

KEB300718

retreated to -- behind --

Q. Did he make it all the way behind?

A. He made it almost all the way behind but I don't -- I don't know if he was actually -- if he fell to the ground, fell facedown on the ground, and I don't recall whether it was at the back right quarter panel or whether he actually made it behind the tailgate.

Q. At that point, what was Mr. Eales' condition?

A. He had been -- he -- at that point, he received three gunshot wounds that I described earlier.

Q. Okay. The location of the fire was coming from where? You said the area of the front porch. Where was it coming from?

A. It was coming from the area of the front door from around the threshold of the front door.

Q. Were there shells, empty casings, that when -- what kind of gun -- ultimately was a gun discovered inside the residence?

A. Yes, sir.

Q. What kind?

A. It was an AR-15-type weapon, Colt AR-15, .223 caliber weapon.

Q. Was it automatic or semiautomatic?

00000531
KEB300719

A. Semiautomatic.

Q. Where do the casings from an AR-15 eject?

A. On the right side and they generally eject back and to the right.

Q. Okay. Where were -- were casings matching that AR-15 found at the scene?

A. Yes, sir.

Q. Where?

A. They were found -- there were numerous casings found. Two casings were found on the front porch and there were numerous casings --

Q. Which side of the front porch? As I'm looking at the house, Mr. Hamilton's vehicle came from -- if I'm standing looking at the house, Mr. Hamilton's vehicle came from the right to the left and stopped essentially in the center, a little left of center.

A. Uh-huh.

Q. Where were the two casings on the front porch as I'm looking at the house?

A. If you're looking at the house the way you described it, the casings would be to your right approximately -- well --

Q. They're on the right side of the porch?

A. They're on the right side of the porch.

D & R Reporting & Video, Inc.

00000532

KEB300720

Q. The other casings were found where?

A. Scattered throughout the living -- scattered throughout the interior of the residence in the living room, the kitchen.

Q. Okay. This residence, what's the dimensions of it; do you recall?

A. No, I don't recall the exact dimensions. I can find it quick enough.

Q. Is it a big, palatial mansion?

A. No, sir. It's pretty much a shack. It's -- the dimensions of this is 20-foot by 20-foot.

Q. Okay. And when one entered the front door, what -- what's there?

A. When you enter the front door, it's -- I guess you can describe it as a living room, a living area, small living room.

Q. Okay. And then after I step through the front door, do you recall other rooms in the house?

A. Right. Immediately to -- as you step in the front door, immediately to the right there would be what -- I guess you can describe it as a bedroom, albeit small, but a bedroom to your right, and above that bedroom was a loft. There's a makeshift staircase leading to a loft-type area.

00000533

KEB300721

Q. And was there another room on the ground floor of the house?

A. Yes, sir. Again, as you're stepping into the residence through the front door of the residence, if you look past the living room that I just described, you'll see a kitchen area.

Q. Okay. And you said most of the shells that matched the AR-15 were found in what room?

A. Most of the shells were found in the living room.

Q. Okay. How was Mr. Barrett taken into custody during this -- all these shots being fired?

A. Okay. During the firefight, he was taken into custody by Trooper --

Q. What happened?

A. What happened is, the shots were being fired. Trooper Eales and Trooper Hamilton had exited their vehicle. Both of them had been shot. The other members of the entry team were directly behind them. Trooper Manion, Rick Manion, and Trooper Greninger were in vehicle No. 2 immediately behind Trooper Eales and Trooper Hamilton.

Q. They were in the second Bronco?

A. They were in the second Bronco. During the course of this gunfight, Trooper Manion had gone back

00000534
KEB300722

to examine the condition of Trooper Eales at the rear of vehicle 1. Upon doing so, he was able to see inside the front of the residence, saw a subject there holding a rifle, saw that subject go into the east bedroom. When he saw the subject go into the east bedroom, Trooper Manion ran around to the east side of the house. On the east side of the house, as you're facing the east side of the house, there's a window. When Trooper Manion made it to the window, he saw a shadow.

Q. Well now, did he -- have you read his trial testimony --

A. Well --

Q. -- or his preliminary hearing testimony?

A. Actually, there's some conflicting things.

Q. Did he say at preliminary hearing he saw the curtain move or a towel that was hanging over the window move?

A. That's what he said in the preliminary hearing, yes, sir.

Q. And when he saw the towel over the curtain move, what did he do?

A. He fired what he described as two short bursts from his -- his issued MP-5.

Q. That's an automatic weapon?

00000535

KEB300723

A. That's an automatic weapon, .9mm automatic weapon.

Q. So he fired two bursts through the window --

A. That's correct.

Q. -- that east window?

Where was Buddy Hamilton? At the time that Manion went around the east side and fired the two bursts into the window, where was Mr. Hamilton?

A. I believe he was still with Trooper Eales, although he might have -- he might have been up at the front of his Bronco.

Q. Did anyone see Barrett go down?

A. Trooper Hamilton did.

Q. Okay. And when he saw Barrett go down, what did Trooper Hamilton do?

A. Trooper Hamilton made entry into the house, grabbed a person later identified as Kenny Barrett, drug him outside, and took him into custody.

Q. Okay. Was the house -- was entry made into the house to make certain that it was clear and there were no other individuals inside the house?

A. Yes, sir.

Q. And other than Ken Barrett -- Kenneth Eugene Barrett, was anyone in the house when the troopers went in to clear it?

00000536
KEB300724

A. No. They didn't find anybody else in the house.

Q. So that the sole occupant of the house from which the shots were fired was Kenneth Eugene Barrett?

A. That's correct.

Q. Okay. Now, his son was there -- Toby was there -- is that correct? -- at the scene?

A. At the scene but not in the house, yes, sir.

Q. Where was Toby Barrett located?

A. Toby was -- during the course of these events, Toby was taken into custody by --

Q. Where was he located?

A. He was located in the front yard of the residence.

Q. And he was seen by the troopers at the time that they made entry onto the property in the front yard?

A. Yes, sir.

Q. In the direction east or west? Towards his grandmother's house or away from it?

A. Towards his mother's house on the west side of the property.

Q. Toward Toby's mother's house or Kenneth

00000537

KEB300725

Barrett's mother's house?

A. Kenneth Barrett's mother's house.

Q. So be Toby's grandma?

A. Yes.

Q. When Mr. Hamilton made entry into the house and found Mr. Barrett, where was he in relation to the front room of that bedroom/sitting room off to the east side?

A. Where was --

Q. Where was Mr. Barrett?

A. He was lying somewhere around the threshold of that east room that I described previously.

Q. Okay. The one into which Manion shot?

A. The one into -- the room into which Manion shot, yes, sir.

Q. Were there any firearms around his person, around Barrett's person?

A. Yes, sir.

Q. What kind?

A. There was that AR-15-type weapon that I described earlier and there was also a double-barreled shotgun.

Q. Okay. And was that AR-15-type weapon taken into custody?

A. Yes, sir.

00000538

KEB300726

Q. And where the casings were found in the living room area and on the porch, was there a shot fired with that AR-15 to determine if the fire -- the mark of the firing being on the casings matched his -- that AR-15?

A. Yes, sir. Firearms examiners from the OSBI eventually did that and they were -- they were able to match the casings that we've described to that AR-15-type weapon.

Q. Okay. Mr. Eales was taken from the scene to where?

A. To the hospital in Sallisaw, Oklahoma.

Q. Okay. And at the Sallisaw hospital, what did they -- what did they advise his condition was?

A. He was pronounced dead.

Q. From there, he was taken to the medical examiner in Tulsa?

A. Yes, sir.

Q. And was an autopsy performed?

A. Yes, sir.

Q. And it was determined that the cause of Mr. Eales' death was what?

A. The gunshot wound under his armpit that I described earlier had traversed his chest cavity and had, for lack of a better term, clipped his descending

00000539

KEB300727

aorta and that was the cause of death.

Q. Were there efforts to give him CPR and mouth-to-mouth performed at the scene and on the way to the hospital?

A. Yes, sir.

Q. And the people that were trying to give him mouth-to-mouth, what were they getting?

A. They were getting negative response.

Q. Okay. Blood?

A. Yes.

Q. Were there any fragments of shells found in the body of David Eales by the medical examiner which were provided to the Oklahoma State Bureau of Investigation?

A. Yes, sir. There were two projectiles found.

Q. Were there any attempt to match the projectiles that were removed from Mr. Eales' body by the medical examiner and provided to the OSBI, was there any attempt to match those portions of -- those fragments to the AR-15 that was found right there on -- next to Mr. Barrett?

A. Yes, sir.

Q. What was the result of that?

A. The result of that is one of the fragments

00000540

KEB300728

tested -- matched the AR-15-style weapon that we've been discussing here.

Q. By the way, you mentioned the AR-15 and you mentioned a shotgun.

A. Yes, sir.

Q. Did Mr. Barrett have any other firearms on his person?

A. On his person?

Q. Yeah.

A. He had access to numerous firearms.

Q. Did he have anything in his waistband after he was removed from the house?

A. I apologize. Yes, he did. When he was taken into custody in the front yard, in his waistband they found a .9mm pistol.

Q. Okay. Mr. Hamilton recover?

A. Mr. Hamilton has recovered.

Q. Okay. After the investigation of the scene was conducted by the OSBI, was the search warrant subsequently executed?

A. Yes, sir.

Q. Okay. Before I get there, when Kenny Barrett was taken into custody, where was he transported initially?

A. He --

00000541

KEB300729

Q. Where was he transported --

A. He was transported --

Q. -- initially?

A. I believe he was taken to the Sallisaw hospital.

Q. Okay. Was he -- did he -- why was he taken to the Sallisaw hospital?

A. Because he had received gunshot wounds when Trooper Manion shot into the -- into the east room.

Q. Okay. And did anyone pat him down after the pistol was removed from his waistband -- or the handgun was removed from his waistband, did anyone pat him down?

A. Yes, sir. Officers patted him down.

Q. Who?

A. I believe it was Stanley Philpott.

Q. Do you know if Sheriff Philpott did any patting down? Do you recall?

A. I believe he did as well.

(Short break)

A. That was Sheriff Johnny Philpott.

Q. (BY MR. LITTLEFIELD) Okay. And what did he find? What did he -- where did he find something on Barrett's person?

A. In his back pocket, back pocket of his

pants.

Q.   What did he do with it?

A.   He left it there.

Q.   Did he put back in?

A.   Put it back in his pocket.

Q.   Okay.   Were Mr. Barrett's clothing -- were his clothes retrieved, bagged up, and taken by the OSBI?

A.   Yes, they were.

Q.   And was anything found on his person that is related to activities regarding violations of the Controlled Dangerous Substance Act?

A.   Yes, sir.

Q.   What?

A.   From his -- from his jeans' pocket, there was a prescription pill bottle.   Inside of that prescription pill bottle, there were three items.   One was the plastic baggy containing 15 grams of what later tested for red phosphorus, another was a paper filter that contained 2.8 grams of red phosphorus, and then there were two other moist paper filters that tested positive for red phosphorus.

And in a separate pocket, there was a plastic bag -- separate pant's pocket, there was a plastic bag which contained 33.2 grams of what tested positive for

00000543
KEB300731

red phosphorus.

Q. Okay. What -- in eastern Oklahoma, what methods -- or what is the typical method used for cooking methamphetamine?

A. It's called a red phosphorus method.

Q. Okay. And what are the primary items necessary for the first step of a red phosphorus cook?

A. Red phosphorus, iodine, pseudoephedrine, and you're also going to need an acid and a base. Muriatic acid is typical of the bases, usually Red Devil lye.

Q. Okay. But you got to have red P, or red phosphorus, iodine, and pseudoephedrine?

A. That's correct.

Q. Okay. Now, the red phosphorus that was found in two different pockets of Barrett's -- in Barrett's clothing, was there anything else detected in regards to that red phosphorus other than it was phosphorus?

A. Yes, sir.

Q. What?

A. One of them tested -- part of the 15 grams in the plastic baggy, which was contained in the pill bottle, that red phosphorus also tested positive for methamphetamine. Along with the 33.2 grams of phosphorus that was found in that separate pocket,

00000544

KEB300732

that tested positive for trace amounts of methamphetamine. The other two items of red phosphorus tested positive for trace amounts of phenol acetone.

Q. Phenylpropanolamine?

A. Phenol acetone is actually what the lab report said, but that's a component of -- I'm not even going to try to pronounce it. It's called P2P.

Q. What I just said.

A. Right. It's called P2P. Which in speaking with our lab chemist, when the red phosphorus is used during the manufacturing process of methamphetamine, trace amounts of P2P or phenol acetone will be created.

Q. Okay. In regards to the cooking of methamphetamine, the clandestine manufacture, when you combine the pseudoephedrine and the iodine and the red phosphorus, is the red phosphorus consumed? Does it go away in that process or is it still -- is it a catalyst and it's still available?

A. No. Red phosphorus can be reused.

Q. So if I'm a meth cook and I got me some virgin red phosphorus and I combine it with iodine and pseudoephedrine, I'll be able to use that red phosphorus again in my next cook?

D & R Reporting & Video, Inc.

37

A. Should be able to, yes, sir.

Q. Okay. And if I use that virgin, previously unused, to cook meth red phosphorus in my first cook and somebody tests it, are they going to detect that there's some meth in it from that first cook?

A. Yes, sir. Typically, once you've used it once, there will oftentimes be trace amounts of methamphetamine.

Q. Okay. Now, the red P was found in his pocket?

A. Yes, sir.

Q. And how much total red P was there, red phosphorus?

A. Approximately 51 grams.

Q. Okay. The other two items that you mentioned were iodine and pseudoephedrine?

A. Yes, sir.

Q. Was the drug search warrant ultimately executed after the crime scene for the homicide and the shootings were investigated?

A. Yes, sir.

Q. By whom, what agency?

A. The drug search warrant was conducted by the DEA.

Q. Okay. And was any pseudoephedrine found?

D & R Reporting & Video, Inc.

00000546

KEB300734

A.   Yes, sir.

Q.   Where?

A.   It was found in a white trash sack in the ceiling around the loft area.

Q.   Okay.  That room upstairs?

A.   Yes, sir.

Q.   And how much pseudoephedrine was found in the loft area?

A.   181.6 grams.

Q.   Okay.  And was iodine found?

A.   Yes, sir.

Q.   Where?

A.   That was in an old camera case which further contained two bottles and that was approximately 144 grams of iodine.

Q.   Okay.  Do you know how much methamphetamine -- pure meth 180 -- how much -- how many?

A.   181.6 is what the lab report said.

Q.   How much pure meth would 181.6 grams of pseudoephedrine give a typical cook in eastern Oklahoma?

A.   Well, the general rule of thumb is -- is however much pseudoephedrine you have, half of that you'll make methamphetamine out of it.  That's if

00000547

KEB300735

you're a pretty good cook. But the general rule of thumb, safe rule of thumb, is half of it.

So if you have 181 grams, roughly 90 grams, you might be able to make 90 grams of methamphetamine out of that.

Q. Okay. What's the typical sale price for a gram of meth on the street?

A. It depends on who you're dealing with but maybe 50 to 100 bucks.

Q. Do you recall if Mr. Barrett had any money on him?

A. He did.

Q. Do you recall what? And I know I'm springing this one on you.

A. You're springing this one on me. Give me just a second. It was somewhere around $2,000 but I'll be able to tell you exactly in just a second.

It was contained in one black wallet with $2,120.

Q. To your knowledge, did Mr. Barrett have gainful employment?

A. No, sir.

Q. What have you learned that he was doing legally to make money, if anything?

A. A person that I've spoken to said that once

00000548
KEB300736

in a while they knew Mr. Barrett to do odd jobs such as construction jobs.

Q. What about working on cars and engines?

A. That's another -- other reports that I've read state that Mr. Barrett was, for lack of a better description, maybe a shade-tree mechanic and possibly made some money that way.

Q. Were -- typically how's methamphetamine used?

A. There's several routes of ingestion, but it can be injected, it can be snorted. Those are the typical ones, injection with hypodermic needles or snorting it as you would see with cocaine with a straw.

Q. Was there any trash search done?

A. Yes, sir.

Q. And what was found in the trash?

A. In the trash bin on the property, there was a paper towel containing methamphetamine residue, there was a clear baggy and that contained red phosphorus residue, and there were a couple bottles. They were labeled "Durex iodine crystals" and "multiple vitamins." They were empty but the lab results were negative on those.

Q. Okay. But when you cook meth, do you use the liquid iodine? Or what form is the iodine in when you

00000549

KEB300737

cook it?

A.  It should be crystal.

Q.  And these were empty Durex iodine crystal jars?

A.  One of them was.  One of them was marked "multiple vitamins."

Q.  Okay.  How would multiple vitamins be used in the manufacture of meth?

A.  Well, it probably wouldn't unless the container would be used --

Q.  Do you ever cut meth?

A.  Well, you can -- yeah, you can use -- if it's vitamin B, you can use it to cut methamphetamine.  You can use it as a cut, which means you can add it to pure or relatively pure methamphetamine to increase the bulk and thus increase your profits because you'd sell it.

MR. FOREMAN:  May I ask a question?

MR. LITTLEFIELD:  Yes.

MR. FOREMAN:  How much longer is this line of questioning going to go?  We've been here about three hours without a break.  I need to ask my people if they need to --

MR. LITTLEFIELD:  I'd say probably not more than half an hour.

00000550

KEB300738

MR. FOREMAN: Does anybody need --

GRAND JUROR: Yes.

MR. FOREMAN: Just a five-minute break.

(Short break)

Q. (BY MR. LITTLEFIELD) I think we were talking about means by which one could ingest or take meth.

A. Yes, sir.

Q. And you indicated snorting or --

A. Or injection.

Q. -- injection.

Was there indications of snorting in any location discovered?

A. Yes, sir.

Q. What's that?

A. Inside of an address book that was recovered from a travel trailer on the property was later discovered a straw and there was residue inside the straw and that tested positive -- that residue tested positive for methamphetamine.

Q. Was there tubes located in the residence as you recall?

A. Yeah. I don't think it was in the residence but it was on the property. There was three pieces of plastic tubing and they were located in a workshop.

Q. Okay.

00000551

KEB300739

A. I don't think that's the kind of tubing --

Q. You wouldn't use that to snort?

A. No. My understanding -- although I haven't seen this piece of evidence directly, my understanding from the way that was written --

Q. Do you think that was tubing from the cooking process?

A. Tubing, yes. Not -- otherwise probably been called a straw.

Q. Okay. Was there indication of used syringes at any location on the property?

A. Yes, sir.

Q. Where?

A. Again, in that workshop that I just mentioned, there was a syringe with residue and that syringe later tested positive for methamphetamine.

Q. Were there means by which an individual -- did he have some clean syringes, unused syringes?

A. He had many -- well, he had 46. They found 46 clean syringes.

Q. And where were they located?

A. They were located inside that residence, inside the residence, I think, in the east room on some shelving.

00000552

KEB300740

Q. Okay. Have you spoken to anybody that may occasionally went to Ken Barrett's place?

A. Yes, sir.

Q. And did that individual advise you of whether Mr. Barrett would make methamphetamine available to individuals to take?

A. Yes, sir. That individual said that Mr. Barrett did, in fact, make methamphetamine available to individuals and specifically provide methamphetamine to that person.

Q. How old is Mr. Barrett?

A. He's 43.

Q. Today?

A. Well, today is not his birthday but --

Q. He's 43?

A. He's 43 years old.

Q. I didn't ask you if today was his birthday. Well, that's true. Be 43 tomorrow too.

A. I'm sorry. I'm being too literal. As of now, he's 43 years old.

Q. How old was Mr. Eales?

A. He -- just a second. He was 49.

Q. Got a family?

A. Yes, sir.

Q. He did?

00000553

KEB300741

A. Yes, sir.

Q. What?

A. He had a wife and I believe it was two kids.

Q. Were there any -- you mentioned the firearms. There are firearms listed in the indictment in both Counts 1 and 2. There is a Ruger-M77 Mark II, with scope, serial number 78233413.

Was that firearm located in Mr. -- in Mr. Barrett's residence or at Mr. Barrett's property on September the 24th, 1999?

A. Yes, sir.

Q. Was an Ithica Deerslayer, 12 gauge shotgun, serial number 371425235, was that firearm located on Mr. Barrett's property on September the 24th, '99?

A. Yes, sir.

Q. I'm going to ask you the same date -- probably the same date as to all of them.

Was there a Fabrigue National, 16 gauge shotgun, serial number 65701 on his property?

A. Yes, sir.

Q. Was a Savage 24H-DL Over Under .22 caliber/20 gauge shotgun on his property?

A. Yes, sir.

Q. Was there a Ruger 77/22 and scope, serial number 720-10989 on his property?

D & R Reporting & Video, Inc.

00000554

KEB300742

A. Yes, sir.

Q. Was there a Remington Model 700, 30-06 rifle with scope, serial number C6717537 on his property?

A. Yes, sir.

Q. Was there a Remington Model 7400, 30-06 rifle, scope, mag and case, serial number 8582164 on his property?

A. Yes, sir.

Q. Was there a .22 caliber rifle, no brand name with case, serial number 1370 on the property?

A. Yes, sir.

Q. Was there a Browning Arms Company, .22 caliber rifle with scope, serial number 05577NP242 on the property?

A. Yes.

Q. And was there a .223 Colt Model Sporter Match H-Bar rifle, serial number MH043631 on the property on the date in question?

A. Yes, sir.

Q. Which of the -- those is the -- do you know -- the AR -- what you've been calling an AR-15-type model?

A. That was the last one you read, that .223 Colt Model Sporter Match H-Bar rifle.

Q. Approximately how many shots did it appear

00000555

KEB300743

that Mr. Barrett fired?

A.    Approximately 18 or 19.

Q.    Okay.   And how many of those hit the vehicle occupied by Mr. Eales and Mr. Hamilton?

A.    According to the trajectory analysis, approximately 18.

Q.    And primarily whereupon that vehicle were those shots directed?

A.    Primarily on the passenger side door and the passenger side window.

Q.    Okay.   And assuming those shots would have been fired from the front door of the residence, where was the trajectory taking those shots in regards to the occupants of the vehicle?

A.    In regards to the occupants of the vehicle, the trajectory would have been taking them from the front slightly down -- as you follow the path of the bullet, slightly down and slightly to the left.

Q.    Okay.   Was it in the direction of the two front-seat -- were the shots in the direction of the two front-seat passengers?

A.    Yes, sir.

MR. LITTLEFIELD:   I don't have anymore questions.   Does anyone have any questions?

GRAND JUROR:   Yeah.   I've got actually

00000556
KEB300744

three questions.

One, if they had a no-knock warrant, why was the third -- why did the third vehicle turn his lights on as they pulled in?

A. That's a good question.

GRAND JUROR: Because that would have --

A. Right.

GRAND JUROR: It was parked out in the road.

A. It -- the answer to that is they wanted -- because of the information that they had received about the threats that Mr. Barrett potentially posed and I guess eventually did pose in retrospect, they turned on their lights to let him know that they were law enforcement.

The no-knock, what that prevented from a tactical perspective, what that kept them from having to do was stand around on his front porch. Do you understand?

GRAND JUROR: Would they have been just able to walk on his porch and enter?

A. Yes. Yeah. Once they got there. When you have a normal search warrant, it's going -- from a tactical perspective, if you're making entry on a house, you're going to have to stand there for a

00000557
KEB300745

certain amount of time and knock on the front door.

I haven't talked to any of the members of the entry team. Just from my own experience, in trying to answer this question, my own experience would be with a person with Mr. Barrett's potential violence, going from their mind-set what they thought his potential violence would be, the last thing you want to do is stand around on his front porch. But that doesn't necessarily mean you don't want him knowing that you're law enforcement because you also don't want him to think he's being robbed.

Do you understand?

GRAND JUROR: Why would they have had to stand around on his front porch if they had a no-knock entry? They could have just gone right in --

A. Well, yeah. I'm sorry --

GRAND JUROR: -- without letting him know they were even there.

A. Right. That's the point I'm trying to make. They turned on the lights -- and I'm not explaining it very well -- they turned on the lights to let him know they were law enforcement. Because they had a no-knock entry, had things gone according to plan, they could have immediately gone to the front porch and immediately through the front door.

00000558

KEB300746

Do you understand?

GRAND JUROR: Well, yeah.

A. Obviously, things didn't go according to plan. But if they didn't have a no-knock warrant, what they would had to have done is to stand on the front porch for a certain amount of time to knock on the door and potentially receiving gunfire. I mean, that's the fear. And, of course, in this instance --

GRAND JUROR: But they did have a no-knock warrant?

A. They did have a no-knock warrant. I'm probably not explaining that well. How can I make you understand?

GRAND JUROR: You're explaining it well. I just don't understand why they turned on --

GRAND JUROR: Why they turned their lights on when he was potentially dangerous and they knew that and they had a no-knock, that they didn't really have to let him know they were there.

MR. FOREMAN: Well, they were hoping he was asleep and wouldn't wake up even though the lights were on.

Q. (BY MR. LITTLEFIELD) When they arrived, were the lights on in the house?

A. Yes. When they arrived, the lights were on

00000559

KEB300747

in the house. And that's something we hadn't covered before. All I can really tell you is that you really don't want in certain circumstances -- and I think the -- this is just my opinion --

GRAND JUROR: The element of surprise is not always good.

A. The element of surprise -- I mean, you don't want to have to stand around on a front porch. I'm trying to second-guess these guys without having interviewed them on this point. But you really don't want to stand around on the porch, thus the no-knock warrant.

But by the same token, you don't necessarily want this guy not knowing exactly who's out in the front yard because there's a potential, especially in dope-related things, that he could think that he might be robbed, thus the overhead lights. That's why they turned on their overhead lights, to let him know that this was a law enforcement transaction, they were there in official capacity.

Does that make sense?

GRAND JUROR: It does.

MR. LITTLEFIELD: I'm sorry. I'm interrupting.

Q. (BY MR. LITTLEFIELD) Were they wearing body

00000560
KEB300748

protection?

GRAND JUROR: That was my next question. Did Mr. Eales have on a bulletproof vest?

A. He had on two actually. He had on his standard issue, then he had on a ceramic thing. A ceramic -- they call it a turtle vest but it's an increased level of protection. My understanding --

Q. (BY MR. LITTLEFIELD) Where the bullets entered, did the vest offer protection?

A. Yeah. The vest where the bullet entered, especially here, it went where there was no protection. That's my understanding of it.

I will tell you that from my own personal training, when you're talking about a .223 caliber weapon, it's a high enough velocity that a vest probably isn't going to do you any good anyway. You just -- a vest isn't -- it isn't a catchall that you see on TV. With that type of a weapon, the vest is more than likely not going to stop that round anyway.

GRAND JUROR: When they took Mr. Barrett to the hospital, Mr. Philpott found something in his back pocket and he put it back in his back pocket. Why did he do that? He took it out and put it back, I believe you said.

A. Yes. I don't --

00000561

KEB300749

GRAND JUROR: Was it methamphetamine?

A. No. That -- that's what later tested positive -- the contents later tested positive for red phosphorus, had trace amounts of methamphetamine, which are indicative that it had been used -- could be indicative that it had been used in a prior methamphetamine cook. As to why he put it back --

Q. (BY MR. LITTLEFIELD) Was he aware his clothes were being seized because he was entered as a patient at the hospital?

A. Yes, yes. And I believe -- well, I won't testify to that because I haven't read the testimony but I think that same question came up during some prior testimony with him.

But yes, he would have been aware that those clothes -- his clothing was going to be seized at the hospital and every piece of clothing and every article in those clothes would later become evidence as they did.

GRAND JUROR: Did I understand you to say there was a kid there and he opened fire with his own kid there at the house on people he knew had guns to shoot back with?

A. Yeah. Toby -- Toby Barrett was his son.

GRAND JUROR: How old is this kid

00000562

KEB300750

that --

A.   Toby is -- I think at the time --

MR. FOREMAN:  Nine years old is what he said.

A.   No, no.  I'm sorry.  If I said that, I spoke erroneously.

MR. FOREMAN:  I thought he said nine.

A.   He's -- I thought he was 18.  He was not -- well, let me put it to you this way:  He was not a juvenile.  He was 18, 18 years old.

GRAND JUROR:  That's still his son and he's starting a gunfight with his son there.

A.   Right.  Not on the porch.  When the troopers first saw Toby he was out in the front yard.

GRAND JUROR:  Where did he come from? He just appeared out in the front yard?

GRAND JUROR:  He was on the south side of the property is what he said.

A.   My understanding is when they first saw Toby -- I don't know exactly where he came from -- when they saw Toby he was in the front yard area. Some people say he was running away from the house. Another trooper said he was backing away from the house.  That's when they first encountered him.  He was standing or moving somewhere along the south side

00000563

KEB300751

of the house on the west side of the yard there.

GRAND JUROR: What caliber was the Ruger-M77 Mark II?

A. I don't know that. I'm sorry. I don't know the answer to that. Sorry.

GRAND JUROR: Well, you listed every caliber except for that one right there.

A. Yeah. And --

GRAND JUROR: Did they test the -- Barrett's personal clothing for residue to see if he had -- see if he had shot the -- you know, as far as the rifle in hand, gun powder all over his clothes?

A. Right.

Q. (BY MR. LITTLEFIELD) Do you know the answer?

A. Yes.

Q. Okay.

A. As far as whether they tested his clothing, well, I don't know the answer to whether they tested the clothing. But I do know they tested --

Q. Well, go ahead.

A. You're talking about gunshot residue?

GRAND JUROR: Gunshot residue.

A. They tested gunshot residue on him, but they weren't able to complete the test because the swabs that they took were more than four hours old. The lab

00000564

KEB300752

report that I read said that if it's more than four hours old, it's determined to be inconclusive. So --

(Short break)

Q. (BY MR. LITTLEFIELD) Where was Toby coming from -- according to what Toby told law enforcement, Toby was coming from where when the officers began arriving in the yard?

A. He was coming from working on a Chevy Camaro somewhere around the workshop area.

Q. And the workshop was located at what location in relation to the house? The house sits on the property facing the south --

A. It was located on the west side of the house.

Q. Okay. And is it behind to the side and rear or a little bit in the front or --

A. It's to the side and, I think, slightly to the rear.

Q. Okay. So he was coming back toward the house from that garage or shed area?

A. Yes, sir.

GRAND JUROR: Where did Officer Manion's bullets hit Barrett?

A. It hit him in the -- on the backside in the thigh and his bottom.

GRAND JUROR: Hit him twice?

D & R Reporting & Video, Inc.

00000565

KEB300753

A.  Three or four times is my understanding.

GRAND JUROR:  Okay.  Where's Barrett now?

A.  He is -- as of this moment, he's sitting over in the Muskogee County Jail in the custody of the U.S. Marshals.  He is a prisoner -- a state prisoner of the State of Oklahoma and when the marshals picked him up he was incarcerated at the McAlester penitentiary.

GRAND JUROR:  How long has he been there?

A.  April, whenever his conviction was.  I think it was April.  I may be mistaken about that.  Not long.  It was earlier this year.

GRAND JUROR:  How long was he sentenced? How long will he be there?

A.  My understanding was he was sentenced to thirty years on a state crime.  But as far as how long he's actually going to be there, I don't know that because there's a whole lot of variables that go into that, into whether or not a person is paroled, so forth, and so on.  Thirty years does not necessarily mean he'll do day-for-day thirty years there, but I can't really answer how long he'll actually be there.

GRAND JUROR:  Probably 80 percent of

00000566

KEB300754

that, though?

A. You know, probably -- I don't know that. I don't know. I mean, I just -- I don't know how long he'd actually do state time. I know they have certain formulas for it and I'd testify wrongly if I tried to even take a wild guess.

GRAND JUROR: When was his sentencing, in 2004 or '99? There's two conflicting dates in this. Count 3 states the 4th day of September 2004; Counts 1 and 2 state '99.

MR. LITTLEFIELD: That should be corrected. That should be corrected. I'm glad you picked it up. And I haven't read it yet, but where does it say that, in Count 3?

GRAND JUROR: Count 3.

MR. LITTLEFIELD: Yeah. That should be 1999. That's when the incident occurred. Yeah, he didn't -- he didn't do this crime -- this incident last week or last month.

Thank you. Any other questions?

GRAND JUROR: I believe you said that he also had a .9mm in his waistband?

A. Yes, sir.

GRAND JUROR: It's not -- it wasn't listed here.

D & R Reporting & Video, Inc.

00000567

KEB300755

A. It's --

GRAND JUROR: That I seen.

MR. FOREMAN: Maybe that's what the Ruger was.

A. Except I think it was a Smith & Wesson.

MR. LITTLEFIELD: It's not listed.

A. Well, I don't know.

GRAND JUROR: All that's listed is shotguns and rifles in there.

MR. LITTLEFIELD: I was wondering that myself. In regards to the '9mm, let me say two things: One is, the list doesn't have to be all inclusive as far as what's in the indictment. I mean, you know, if there were more guns there, the list -- the indictment doesn't have to list every firearm that was there, number one.

Number 2 is, that in all likelihood a case of this nature will be declared a complex case and as a consequence will not be on the same schedule as far as the trial which means we would have time should we choose to -- should you all indict, should we choose to want to add that, we could come back and supersede and add with that particular firearm.

So, I mean, it's -- probably would want to put it in but it's not defective from the perspective

D & R Reporting & Video, Inc.

00000568

KEB300756

of right now.

(Short break)

Q. (BY MR. LITTLEFIELD) According to the evidence, what was the .9mm?

A. It was a .9mm, Smith & Wesson, serial number VAV3270, Model 915.

MR. LITTLEFIELD: My preference would be that I'd want to look at it, make sure we're right on the serial number and stuff, rather than amend it or change it right now on the fly. We could do that.

GRAND JUROR: The reason why I was asking is, since we're breaking them down in individual firearms, doesn't that add to what potentially could be -- does that make sense?

MR. LITTLEFIELD: No, it really doesn't. I mean, you know, one more -- no, it really doesn't. At this point, if he has one gun or ten guns, it really is the same --

GRAND JUROR: Yeah.

MR. LITTLEFIELD: -- as far as the violation from a legal perspective.

GRAND JUROR: Right.

MR. LITTLEFIELD: From a practical perspective, should you all choose to indict, at trial we would want to put that on and we would want that in

00000569
KEB300757

the indictment.  But I want to make sure we're right on the serial number at the point -- before we -- I don't want to amend it right now or call back and do it on the fly.  And we can come back and, say, present a superseding indictment adding that one firearm should we choose to do so.

GRAND JUROR:  And the proper date?

MR. LITTLEFIELD:  I'm sorry?

GRAND JUROR:  On the proper date on it?

MR. LITTLEFIELD:  No.  I'm going to change the date.  I'm going to change the date.  But the firearm, that -- there's no question in my mind on the date.

GRAND JUROR:  Yes.  Did I misunderstand that the firearm that was used to shoot the officers was automatic or semiautomatic?

A.  It -- that's because I -- the initial reports that the troopers told the OSBI agents is they thought it sounded like automatic gunfire.  What they actually found was that the AR-15-style weapon that we've been talking about, that was a semiautomatic gun.  So in answer to your question, it was a semiautomatic gun.

I had testified earlier that they described it sounding like it was a very rapid gunfire.  It sounded to them as -- at least what they said it

00000570

KEB300758

sounded like automatic gunfire but it was not.

GRAND JUROR: So he did not have an automatic weapon in his --

A. To my knowledge, no, sir.

Q. (BY MR. LITTLEFIELD) The one that had the slug was --

GRAND JUROR: The .223.

Q. (BY MR. LITTLEFIELD) -- the .223. The slug that came out of Rocky, which matched the firearm, was that .223 Colt Sporter; is that correct?

A. That's correct.

Q. And it matched the casings -- the firing pin mark matched the casings that were found on the front -- the two on the front porch and the ones in the living room area of the residence?

A. Yes, sir. That's correct too.

Q. And that was the firearm that was by his body when Buddy Hamilton went in and removed him from the residence?

A. Yes, sir.

Q. Okay.

GRAND JUROR: I still want to go back to the third vehicle turning his lights on.

A. Sure.

GRAND JUROR: Okay. How many officers

00000571

KEB300759

besides Hamilton and Eales were -- how many were in the second vehicle?

A. Okay. Two.

GRAND JUROR: And how many were in the third vehicle?

A. Two.

GRAND JUROR: Okay. And this is a small 20-by-20 establishment they're going up to with a no-knock warrant?

A. Right.

GRAND JUROR: So what you're saying is, why didn't they sneak up on them instead of going in --

GRAND JUROR: Why did they just not -- I mean, this is a small, dilapidated building. Of course I know they don't know if he's in there by himself, but they have the no-knock warrant, it's night, and there's six of them that can barge in the door. I mean, the lights gave him the opportunity to be prepared and obviously did shoot and kill an officer.

A. Yes, ma'am.

GRAND JUROR: I mean, they have to take a little bit of responsibility for that --

Q. (BY MR. LITTLEFIELD) Let me bounce a couple

00000572

KEB300760

questions at you.

This residence -- if you draw on past that residence, what do you come to? Is it a through road or does it dead end?

A. I believe it's a dead-end road.

Q. Okay.

A. I believe.

Q. And in the troopers' mind when they went to that residence to serve the search warrant, what were they going to do?

A. They were going to make entry and serve it.

Q. Okay. Had -- with Mr. Barrett being apparently awake, had they driven on and not served the warrant that night, what would they have anticipated that Mr. Barrett would have known about the potential for law enforcement coming to serve a search warrant or some kind of warrant?

A. Well, obviously he would have known. It was -- with that type of a convoy in that rural of an environment and --

GRAND JUROR: Was he where he would have heard the vehicles go by?

A. He would have seen --

GRAND JUROR: He would had to be looking out to see them go by.

00000573

KEB300761

GRAND JUROR: How far is the driveway from the house -- I mean, the gate from the house?

A. You know, not far, not far. I'm not going to guess as to how far because I haven't seen the measurements.

GRAND JUROR: About a thousand yards?

A. No, no, no. Not a thousand yards. It's a normal distance, maybe 20 to 50 feet. And that's -- please understand that's just a guess based on photographs that I've seen, not to scale.

GRAND JUROR: Okay.

GRAND JUROR: But the way I see it, if they didn't turn on their lights, he could say, well, I didn't know it was a police officer, I thought drug dealers was coming in to kill me.

A. That's --

GRAND JUROR: I mean, I can see them warning that they were the police. I mean, because when you -- I do a lot of hunting in McCurtain County and there's some areas that you walk out in and you see things, you better get away real quick because you're walking into a spot that I guarantee when you see it growing, you don't want to be there.

The bad thing is, see, him knowing that he's a drug dealer and knowing that a lot of other drug

00000574

KEB300762

dealers knows he's got drugs, money, they could be coming to rob him, too, and that's known to happen too.

MR. LITTLEFIELD: Let me ask him another question.

GRAND JUROR: It's at nighttime, okay? We just don't understand. These are policemen. They're out there. They're wanting to bust this guy. They're out there to bust him, just go in there and bust him. Why give him --

A. Why give him a heads-up?

GRAND JUROR: -- a heads-up seeing the lights coming?

GRAND JUROR: Was he already firing when the lights came on?

A. I'm sorry. What?

GRAND JUROR: When the third car got there, wasn't he already firing off the porch by then?

A. When the third car arrived?

MR. LITTLEFIELD: No. When the third car turned its lights on, had shots already been fired?

A. No.

MR. FOREMAN: Is there any evidence -- is there any evidence when the policemen

00000575
KEB300763

pulled in his mother's yard with his lights on that she saw lights and called him?  Was there any evidence?  I don't want to read the whole testimony.

GRAND JUROR:  How does this bear on us finding probable cause?

MR. FOREMAN:  Nothing.

GRAND JUROR:  We just want to know why they gave him warning --

A.  In answer to your question, I have not seen any evidence that would indicate that Mr. Barrett called his mom, and I'm not even sure --

Q.  (BY MR. LITTLEFIELD)  Or that his mom called Mr. Barrett?

A.  Or that his mom called Mr. Barrett.  I'm not even sure Mr. Barrett had a phone, to be honest with you, but I don't know the answer to that.  But no, I have not seen any evidence to that.

Q.  You mentioned a drive-by that was done earlier in the afternoon prior to conducting the search.

A.  Yes, sir.

Q.  When they initially did the drive-by, what was the plan in regards to entry and setting up around the location?

A.  The initial -- the initial plan for the tac

unit was to set out a sniper team on the residence.

Q. What did they call it? Was there a term? Do you recall a term, creep team?

A. A creep team, yeah. That's another name for a creep team. Basically set up a sniper spotter unit to cover that residence should something like this happen.

Q. Why didn't they follow through and utilize the creep team?

A. Because dogs. To be quite blunt, there were a lot of dogs in the area. That's my understanding. And dogs have this nasty habit of burning creep teams.

Q. Additionally, the neighbors -- what relationship were the neighbors around Barrett's residence, if any, to Kenny Barrett?

A. Most of them were related to him. Most of them were relatives. His mother lived adjacent to him, I think he had a great-aunt, and I think there was some other relatives around there. So it was -- what you're getting at is, this is not exactly what we would call a friendly neighborhood, a law-enforcement friendly neighborhood.

Rightly or wrongly, we don't know exactly how these people are going to react when law enforcement comes in to do this type of thing. So we have to

00000577

KEB300765

assume they would have had to assume that it's an unfriendly environment.

Go ahead.

GRAND JUROR: Did all six vehicles go on the drive-by?

A. No, ma'am. No. Just one.

GRAND JUROR: So he would not have thought anything was going on particularly in the afternoon because one unmarked Bronco drove down his road?

A. Well, that's the hope. That's what we hope is when you do stuff like this -- and I've done it myself -- that you hope you don't get -- we call it burned. We hope that we don't get burned. Whether or not they got burned in this instance, I don't really know, but that's a possibility that they did as well.

Q. (BY MR. LITTLEFIELD) Do you recall reading anything about him setting off a siren after Buddy drove by?

A. There was an interview done by OSBI after the shooting of -- they interviewed everybody that lived around there, and one individual -- one of his neighbors that they interviewed had seen the highway patrol do a drive-by earlier that afternoon to look at the place and the routes of entry. According to this

D & R Reporting & Video, Inc.

gentleman's testimony, after the drive-by was done, or as they were driving out, it's my understanding he ran over somewhere on the property and set off a --

Q. Who's he?

A. I'm sorry. Mr. Barrett ran over and set off a siren. Apparently had a siren there that he liked to sound off.

Q. So there's some indication?

A. That is a possible indication that he knew that the highway patrol was at least looking at the place or law enforcement. I said the highway patrol because that's who it was, but law enforcement.

GRAND JUROR: So they had something that -- indication that something might go on?

Q. (BY MR. LITTLEFIELD) Well, is there any indication that the officers in the unit that did the drive-by were aware that Mr. Barrett did the siren?

A. No, no. To their knowledge, he had not -- to their knowledge, they were not burned.

GRAND JUROR: At that point, did they know whether he was home or not when they drove by?

A. I don't -- I don't know. But I don't -- I think there's probably an assumption that he was because typically there's always -- you have to assume somebody is home because that's the safe thing to

00000579

KEB300767

do -- course to do. I don't know if the people that were involved in the drive-by specifically said that he was home. I just don't recall.

But from personal experience, I can tell you that it's safe for us to assume that somebody's home, you know. We want to assume somebody's home.

MR. FOREMAN: Is there any other questions that will make a bearing on whether we indict or not?

(Short break)

MR. LITTLEFIELD: I've got to read it too. Give me a second. I'm trying to find an answer to the last question.

(Discussion held off the record)

MR. LITTLEFIELD: Are there anymore questions or are we ready to --

GRAND JUROR: We're ready.

MR. FOREMAN: We're ready.

GRAND JUROR: Well, no. I still have one more question. And I'm sorry to keep going back to this.

MR. LITTLEFIELD: That's all right.

GRAND JUROR: But had they not turned on the lights, you know -- I want to get this clear -- do they think that they could have gone in and gotten him

00000580

KEB300768

without maybe the results that they got?

A. Had they just kind of snuck up and done it?

GRAND JUROR: Well, they had the no-knock warrant. Had they just all converged on him, you know, when they got there --

MR. LITTLEFIELD: Let me ask a question.

Q. (BY MR. LITTLEFIELD) When the officers pulled up, did anyone in the yard yell anything?

A. Yes.

Q. What -- who?

A. Toby, his son, was overheard yelling. He was yelling "Dad, Dad" as they were taking him into custody.

GRAND JUROR: As they were taking him -- it had already happened then when his son was yelling?

A. Well, it was happening. It was --

GRAND JUROR: Before the lights came on?

Q. (BY MR. LITTLEFIELD) Was he yelling before the cops -- before the shots started being fired?

A. No. I think it was during the shots is my understanding of it.

Q. Okay.

A. I'm sorry. I don't mean to be confusing.

00000581

KEB300769

Q. Let me see it again.

A. I don't think -- what you're -- what you're describing is a tactical dilemma, is whether or not --

GRAND JUROR: But they had made the decision as they went in, when the third vehicle pulled in, he was going to flip his lights on. Had they made that decision as they were going in?

A. Yes. My understanding is that --

GRAND JUROR: To warn him that they were there?

A. Well, no. Not necessarily to warn him that they were there, but to indicate that they were law enforcement is --

GRAND JUROR: They were already there.

A. Am I making sense?

MR. FOREMAN: The lights were for identity purposes.

A. Right.

MR. FOREMAN: Not to wake him up.

A. Right.

MR. FOREMAN: Hopefully, he would have been asleep. They could have gone up there and done it.

A. We don't think he was asleep.

GRAND JUROR: I guess the thing I'm not

00000582

KEB300770

understanding --

MR. FOREMAN: That would be hopeful.

A. That would have been a better thing.

GRAND JUROR: -- is that why should they have had to identify themselves when they had a no-knock warrant and they could have pulled right up there and gone in full force without him knowing that they are law enforcement or anyone else? They had that no-knock warrant.

A. The best way I can describe it is, yes, they could.

GRAND JUROR: Okay. You answered my question right there.

A. They could have done that. The question -- that begs the question whether or not that was the smart thing to do.

MR. FOREMAN: If he has a lot of dogs around there, regardless of what they do, he's probably going to know because the dogs are going to wake him up.

GRAND JUROR: But they're --

A. My understanding of the authority that type of warrant gives you, to answer your question, is yes, they could, they could sneak right up. They can make an entry and it all would have been fine. Now,

D & R Reporting & Video, Inc.

whether or not they would have changed the outcome of this, I mean, who knows. I don't know.

GRAND JUROR: That's all I needed to hear.

GRAND JUROR: I think that was my --

A. I'm sorry if I haven't explained it.

GRAND JUROR: Had they maybe had gone in with that no-knock warrant in full force without alerting him to the fact that they were there, the result ending could have been different, I wonder?

A. Well, I mean, yeah. I mean, I don't -- I don't know.

GRAND JUROR: Okay.

A. We'll never --

GRAND JUROR: We'll never know.

A. We'll never know the answer to that question, really.

Q. (BY MR. LITTLEFIELD) Are they obligated to go in with lights off, with no cop lights on?

A. Are they obligated? No.

Q. And is it unlawful for them to make entry during the execution of a no-knock warrant with the lights on?

A. No.

Q. In either event, that is a tactical decision

00000584
KEB300772

made by the officers as to how they were going to execute the plan?

A. That's -- exactly.

Q. Does either, whether they did or didn't, change their lawful authority to execute the warrant in either event?

A. No.

GRAND JUROR: Okay.

MR. LITTLEFIELD: Does that answer it at all?

GRAND JUROR: Yes.

MR. LITTLEFIELD: I understand where you're coming from but, you know, the --

A. Going back to the previous question, I think that's what he was looking for there is where -- exactly when Toby yelled "Dad, Dad" in relation to the shots, probably the safer answer is, I don't recall exactly when he yelled that. It was sometime during this chain of events. Whether or not it was before the first shot or after, I just don't recall.

Q. (BY MR. LITTLEFIELD) Okay. Let me read the proposed indictment.

In the United States District Court for the Eastern District of Oklahoma, United States of America, plaintiff, v. Kenneth Eugene Barrett,

00000585

KEB300773

defendant.

The indictment, Federal Grand Jury charges: Count 1. Title 18, United States Code, Sections 924(c)(1)(A)and(j), Use and Carry a Firearm During and Relation to Drug Trafficking Crimes and Possess a Firearm in Furtherance of Such Drug Trafficking Offenses, Resulting in Death.

Oh, by the way, let me ask one more question I did forget. You mentioned an arrest warrant for Mr. Barrett?

A. Yes, sir.

Q. What was the charge of that arrest warrant?

A. It was State of Oklahoma drug trafficking charges.

Q. And what had he done in regards -- what was his conduct in regards to that charge?

A. He sold methamphetamine to an undercover Oklahoma Bureau of Narcotics and a confidential source.

Q. Okay. He had sold drugs, methamphetamine, to an OBN agent?

A. That's -- yes, sir.

Q. Okay. On or about the 24th day of September, 1999, in Sequoyah County, Eastern District of Oklahoma, Kenneth Eugene Barrett, the defendant

00000586

KEB300774

herein, did knowingly use and carry, during and in relation to, and possess in furtherance of drug trafficking crimes, to-wit: possession of 181.6 grams of pseudoephedrine, a list I chemical, and 144.3 grams of iodine, a list II chemical, knowing or having reasonable cause to believe that the pseudoephedrine and iodine would be used to manufacture methamphetamine, in violation of Title 21, United States Code, Section 841(c); possession of red phosphorus, a precursor chemical, knowing, intending, and having reasonable cause to believe that it would be used to manufacture methamphetamine, in violation of Title 21, United States Code, Section 843(a)(6); attempting to manufacture methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a); and maintaining a place for the purpose of manufacturing, distributing, and using methamphetamine, in violation of Title 21, United States Code, Section 856, the following firearms, to-wit: one Ruger-M77 Mark II, with scope, serial number 78233413; one Ithica Deerslayer, 12 gauge shotgun, serial number 371425235; one Fabrigue National, 16 gauge shotgun, serial number 65701; one Savage 24H-DL Over Under .22 caliber/20 gauge shotgun; one Ruger 77/22 and scope, serial number 720-10989;

00000587

KEB300775

one Remington Model 700, 30-06 rifle with scope, serial number C6717537; one Remington Model 7400, 30-06 rifle, scope, mag and case, serial number 8582164; one .22 caliber rifle, no brand name with case, serial number 1370; one Browning Arms Company .22 caliber rifle with scope, serial number 05577NP242; and one .223 Colt Model Sporter Match H-Bar rifle, serial number MH043631, and in the course of this violation, caused the death of David Eales, through the use of a firearm, such killing being murder as defined in Title 18, United States Code, Section 1111, in that it was an unlawful, willful, deliberate, malicious and premeditated killing committed with malice aforethought.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)and(j).

Count 2. Title 18, United States Code, Section 924(c)(1)(A)and(j), Use and Carry a Firearm During and Relation to a Crime of Violence and Possess a Firearm in Furtherance of Such Crime of Violence.

On or about the 24th day of September, 1999, in Sequoyah County, Eastern District of Oklahoma, Kenneth Eugene Barrett, the defendant herein, did knowingly use and carry, during and in relation to, and did knowingly possess in furtherance of, a crime

00000588

KEB300776

of violence, to-wit: Title 21, United States Code, Section 848(e)(1)(B), the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties, a firearm, to-wit: one -- and I'm not going to read them again. It's the same list. I'm going to pick it up right off the last serial number -- and in the course of this violation, caused the death of David Eales through the use of a firearm, such killing being murder as defined in Title 18, United States Code, Section 1111, in that it was an unlawful, willful, deliberate, malicious and premeditated killing committed with malice aforethought.

All in violation of Title 18, United States Code, Sections 924(c)(1)(A)and(j).

Notice of special findings for Counts 1 and 2.

The allegations of Counts 1 and 2 of this Indictment are hereby realleged as if fully set forth herein and incorporated by reference. With regard to each such count of this indictment, the Grand Jury makes the following Special Findings:

1. The defendant, Kenneth Eugene Barrett, was 18 years of age or older at the time of the offenses alleges in Counts 1 and 2. 18 U.S.C. Section

00000589
KEB300777

3591(a).

2. The defendant, Kenneth Eugene Barrett, intentionally killed the victim, David Eales, as alleged in Counts 1 and 2, which counts are realleged and incorporated herein as if fully set forth. In the alternative, the defendant, Kenneth Eugene Barrett, intentionally inflicted serious bodily injury that resulted in the death of the victim, David Eales, as alleged in Counts 1 and 2, which counts are realleged and incorporated herein as if fully set forth. In the alternative, Kenneth Eugene Barrett, intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, David Eales, died as a direct result of the act, as alleged in Counts 1 and 2, which counts are realleged and incorporated herein as if fully set forth. And in the alternative, the defendant, Kenneth Eugene Barrett, intentionally and specifically engaged in an act of violence, knowing that the act created a great risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, David Eales, died as a direct

00000590

KEB300778

result of the act, as alleged in Counts 1 and 2, which counts are realleged and incorporated herein as if fully set forth, 18 U.S.C. Section 3591(a)(2).

3. The defendant, Kenneth Eugene Barrett, in the commission of the offenses identified in Counts 1 and 2, and in escaping apprehension for the violation of the offenses, knowingly created a grave risk of death to one or more persons, to-wit: John Mark Hamilton, Jr., in addition to the victim of the offense, David Eales, as alleged in Counts 1 and 2, which counts are realleged and incorporated herein as if fully set forth, 18 U.S.C. Section 3592(c)(5).

4. The defendant, Kenneth Eugene Barrett, intentionally attempted to kill more than one person, David Eales and John Mark Hamilton, Jr., in a single criminal episode, as alleged in Counts 1 and 2, which counts are realleged and incorporated herein as if fully set forth, 18 U.S.C. Section 3592(c)(16).

Count 3. Title 21, United States Code, Section 848(e)(1)(B), Intentionally Killing, During the Commission of a Drug Trafficking Crime, a State Law Enforcement Officer, Engaged in the Performance of His Official Duties.

The Grand Jury realleges and incorporates the allegations of Counts 1 and 2 of this Indictment as if

00000591
KEB300779

fully set forth herein.

On or about the 24th day of September, 2004 -- it says 2004; I'm going to change it to 1999 -- in Sequoyah County, Eastern District of Oklahoma, Kenneth Eugene Barrett, the defendant herein, during the commission of, in furtherance of, and attempting to avoid apprehension and prosecution of, a felony violation of, Title 21, United States Code, Sections 841(a), 841(c), 843(a), 846 and 856, did intentionally kill David Eales, an officer of the Oklahoma Highway Patrol, a state law enforcement officer, while David Eales was engaged in and on account of the performance of David Eales' official duties, and such killing resulted.

All in violation of Title 21, United States Code, Section 848(e)(1)(B).

Notice of special findings for Count 3.

The allegations of Count 3 of this Indictment are hereby realleged as if fully set forth herein and incorporated by reference. With regard to such count of this Indictment, the Grand Jury makes the following Special Findings:

1. The defendant, Kenneth Eugene Barrett, was 18 years of age or older at the time of the offenses alleged in Count 3, 21 U.S.C. Section

00000592
KEB300780

848(1).

2. The defendant, Kenneth Eugene Barrett, intentionally killed the victim, David Eales, as alleged in Count 3, which count is realleged and incorporated herein as if fully set forth. In the alternative, the defendant, Kenneth Eugene Barrett, intentionally inflicted serious bodily injury that resulted in the death of the victim, David Eales, as alleged in Count 3, which count is realleged and incorporated herein as if fully set forth. In the alternative, Kenneth Eugene Barrett intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, David Eales, died as a direct result of the act, as alleged in Count 3, which count is realleged and incorporated herein as if fully set forth. And in the alternative, the defendant, Kenneth Eugene Barrett, intentionally and specifically engaged in an act of violence, knowing that the act created a great risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, David Eales, died as a direct

D & R Reporting & Video, Inc.

00000593

KEB300781

result of the act, as alleged in Count 3, which count is realleged and incorporated herein as if fully set forth, 21 U.S.C. Section 848(n)(1).

3. The defendant, Kenneth Eugene Barrett, in the commission of drug trafficking offenses as alleged in Count 3, which count is realleged and incorporated herein as if fully set forth, and in escaping apprehension for a violation of said offenses, knowingly created a grave risk of death to one or more persons, to-wit: John Mark Hamilton, Jr., in addition to the victim of the offense, David Eales, 21 U.S.C. Section 848(n)(5).

It shows a true bill signed by the foreman of the Grand Jury.

(Short break)

MR. LITTLEFIELD: You can ask me a legal question. I may or may not be able to answer it and I may tell you an answer and tell you you shouldn't consider it.

GRAND JUROR: Okay. How do they consider it premeditated, the fact that he did not know that they were coming? I'm asking him, okay?

MR. LITTLEFIELD: In instructions, premeditation can be instantaneous. I mean, you know, if I pick up a fork and look at it and take a bite, I

00000594

KEB300782

premeditated taking that bite. I don't have to contemplate for any set period of time to premeditate an act.

GRAND JUROR: When it's premeditated, does that give them the authority to be more likely to ask for the death penalty?

MR. LITTLEFIELD: I don't know the answer to that question. Under the policies of the Department of Justice, we are obligated to submit capital cases to the powers that be to determine whether or not it -- permission will be given to seek it. And, in fact, were we to recommend that it not be sought, they would still make the final call, although I think they give some consideration to the attitude of the local U.S. attorneys who handle it. Ultimately, the final determination is made by authorities within the department, not us. I don't know if that answered your question or not.

And specifically what factor they consider or -- it's not -- I wouldn't think it's just one factor. I think it's a combination of factors they look at. Certainly being the statutory factor of it being -- the act, a premeditated act, is one that we have to be able to demonstrate.

I don't know if I answered your question or

00000595

KEB300783

not.

GRAND JUROR: (Nods head)

MR. LITTLEFIELD: Any other questions?

MR. FOREMAN: You're dismissed.

MR. LITTLEFIELD: There's one back there.

GRAND JUROR: Can you just clarify for me. On -- I know we got three counts and the first two we've got special findings, five special findings, I believe it is. So for each of the special findings does that add to Counts 1 and 2? Does that make sense? Do we have just three counts --

MR. LITTLEFIELD: The special findings are separate and apart from the counts in and of themselves.

GRAND JUROR: Right. So we're actually looking at a bunch of counts?

MR. LITTLEFIELD: You're looking at each of the counts, all of the special findings.

GRAND JUROR: Okay. All right.

MR. LITTLEFIELD: You know, you could say, yeah, we find sufficient facts to justify our determination on Count 1 but not on Count 2 or vice versa or whatever on each one of the counts and each one of the special findings.

00000596

KEB300784

For example, if -- and I don't even know what it says -- but if you look at the third special finding on the 848, which is the death of a law enforcement officer in his official duties during a drug trafficking crime, you look at the third special findings and say, I'll find that one, you could -- the Grand Jury could reject that special finding and accept the others.

Any other questions? Okay. We'll step out.

(Short break)

MR. LITTLEFIELD: Let the record reflect that a true bill is returned with 23 grand jurors concurring.

(The testimony was concluded)

D & R Reporting & Video, Inc.

00000597
KEB300785

C E R T I F I C A T E

I, Brian P. Neil, a Shorthand Reporter and Notary Public, do hereby certify that the foregoing witness was duly sworn on the date indicated, and that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the testimony given by the foregoing witness.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 7th day of March 2005.

_____
BRIAN P. NEIL, CSR-RPR

Brian Neil
Oklahoma Certified Shorthand Reporter
Certificate No. 0312
Exp. Date: December 31, 2006

D & R Reporting & Video, Inc.

00000598
KEB300786