
496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

⚐

United States Court of Appeals,
Tenth Circuit.
**UNITED STATES** of America, Plaintiff-Appellee,
v.
Kenneth Eugene **BARRETT**, Defendant-Appellant.
**No. 06-7005.**

July 25, 2007.

**Background:** Defendant was convicted in the United States District Court for the Eastern District of Oklahoma, James H. Payne, J., of using and carrying firearm during and in relation to drug-trafficking crimes, resulting in death of state law enforcement officer. Defendant appealed conviction and death sentence.

**Holdings:** The Court of Appeals, Briscoe, Circuit Judge, held that:
(1) original search warrant was properly issued;
(2) indictment was sufficient and proper;
(3) victim impact evidence was properly admitted;
(4) discharge of juror for contact with officer was not required;
(5) government exercised peremptory challenges in race-neutral manner;
(6) federal death penalty scheme was constitutional;
(7) defendant's culpable mental state was properly considered in sentencing phase;
(8) evidence was sufficient to support verdict that defendant possessed intent to kill; and
(9) government was properly allowed to delay production of witnesses' names and addresses.

Affirmed.

West Headnotes

**[1] Criminal Law 110 🗝1031(1)**

110 Criminal Law
  110XXIV Review
    110XXIV(E) Presentation and Reservation in

Lower Court of Grounds of Review
      110XXIV(E)1 In General
        110k1031 In Preliminary Proceedings
          110k1031(1) k. In general. Most Cited Cases
Trial court's determination that original search warrant issued for drug crime defendant's residence satisfied conditions required under Oklahoma law for nighttime-service warrants was not plain error; underlying affidavit set forth facts indicating that only time drug evidence would be found at residence was at night. 22 Okl.St.Ann. § 1230(1).

**[2] Searches and Seizures 349 🗝101**

349 Searches and Seizures
  349II Warrants
    349k101 k. In general. Most Cited Cases
Under Oklahoma law, state magistrate may properly issue search warrant to federal law enforcement officer. 21 Okl.St.Ann. § 99; 22 Okl.St.Ann. § 1225(A).

**[3] Searches and Seizures 349 🗝101**

349 Searches and Seizures
  349II Warrants
    349k101 k. In general. Most Cited Cases

**Searches and Seizures 349 🗝141**

349 Searches and Seizures
  349III Execution and Return of Warrants
    349k141 k. In general. Most Cited Cases
Generally, warrant does not have "federal character" if no federal agents participated in obtaining warrant or in conducting search. Fed.Rules Cr.Proc.Rule 41, 18 U.S.C.A.

**[4] Controlled Substances 96H 🗝142**

96H Controlled Substances
  96HIV Searches and Seizures
    96HIV(C) Search Under Warrant
      96Hk141 Issuance, Requisites, and Valid-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

ity of Warrant in General

96Hk142 k. In general. Most Cited Cases

Drug Enforcement Agency (DEA) agents' involvement in obtaining and executing search warrant as to drug crime suspect was insufficient to render warrant "federal" in character; warrant was requested by state law enforcement officer, was issued by state magistrate judge, and original plan had been for only state law enforcement officers to execute warrant. Fed.Rules Cr.Proc.Rule 41, 18 U.S.C.A.

**[5] Criminal Law 110 ⚷1032(5)**

110 Criminal Law
    110XXIV Review
        110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
            110XXIV(E)1 In General
                110k1032 Indictment or Information
                    110k1032(5) k. Requisites and sufficiency of accusation. Most Cited Cases

Trial court's determination that superseding indictment of drug crime defendant sufficiently set forth elements of predicate offenses was not plain error; counts of indictment clearly gave defendant fair notice of charges he had to defend against, and were sufficient to enable him to assert double jeopardy defense. U.S.C.A. Const.Amend. 5; 18 U.S.C.A. § 924; Fed.Rules Cr.Proc.Rule 7(c), 18 U.S.C.A.

**[6] Indictment and Information 210 ⚷127**

210 Indictment and Information
    210VI Joinder
        210k126 Joinder of Counts; Multiplicity
            210k127 k. In general. Most Cited Cases

"Multiplicity" refers to multiple counts of indictment which cover same criminal behavior.

**[7] Double Jeopardy 135H ⚷26**

135H Double Jeopardy
    135HII Proceedings, Offenses, Punishments, and Persons Involved or Affected
        135Hk26 k. Simultaneous proceedings; mul-

tiplicity. Most Cited Cases

**Indictment and Information 210 ⚷127**

210 Indictment and Information
    210VI Joinder
        210k126 Joinder of Counts; Multiplicity
            210k127 k. In general. Most Cited Cases

Although multiplicity is not fatal to indictment, multiplicitous counts which may result in multiplicitous convictions are considered improper, since they allow multiple punishments for single criminal offense, in violation of Double Jeopardy Clause. U.S.C.A. Const.Amend. 5.

**[8] Indictment and Information 210 ⚷127**

210 Indictment and Information
    210VI Joinder
        210k126 Joinder of Counts; Multiplicity
            210k127 k. In general. Most Cited Cases

Test for multiplicity is whether individual acts alleged in counts at issue are prohibited or course of conduct which they constitute; if former, then each act is punishable separately, while if latter there can be but one penalty. U.S.C.A. Const.Amend. 5.

**[9] Criminal Law 110 ⚷1032(1)**

110 Criminal Law
    110XXIV Review
        110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
            110XXIV(E)1 In General
                110k1032 Indictment or Information
                    110k1032(1) k. In general. Most Cited Cases

Trial court's determination that superseding indictment of drug crime defendant was not multiplicitous was not plain error, since three counts alleged in indictment were based on single unit of prosecution. U.S.C.A. Const.Amend. 5.

**[10] Criminal Law 110 ⚷1032(1)**

110 Criminal Law
    110XXIV Review

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
110XXIV(E)1 In General
110k1032 Indictment or Information
110k1032(1) k. In general. Most Cited Cases

Trial court's determination that superseding indictment of drug crime defendant did not improperly join offenses was not plain error; three counts alleged in indictment were based on same incident where Drug Enforcement Agency (DEA) team attempted to serve search warrant on defendant's property and defendant responded by firing multiple gunshots at team members. Fed.Rules Cr.Proc.Rule 8(a), 18 U.S.C.A.

**[11] Constitutional Law 92 ☞4744(2)**

92 Constitutional Law
92XXVII Due Process
92XXVII(H) Criminal Law
92XXVII(H)6 Judgment and Sentence
92k4741 Capital Punishment; Death Penalty
92k4744 Matters Considered
92k4744(2) k. Evidence and witnesses. Most Cited Cases

**Sentencing and Punishment 350H ☞1763**

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)2 Evidence
350Hk1755 Admissibility
350Hk1763 k. Victim impact. Most Cited Cases

**Sentencing and Punishment 350H ☞1789(3)**

350H Sentencing and Punishment
350HVIII The Death Penalty
350HVIII(G) Proceedings
350HVIII(G)4 Determination and Disposition
350Hk1789 Review of Proceedings to Impose Death Sentence
350Hk1789(3) k. Presentation and reservation in lower court of grounds of review. Most Cited Cases

Trial court's admission of victim impact evidence in capital sentencing phase of drug crime prosecution was not plain error; such evidence was not required to focus on characteristics of defendant, testimony and child's drawings at issue properly described victim's uniqueness as individual human being, and evidence was not so unduly prejudicial as to violate defendant's due process rights. U.S.C.A. Const.Amend. 5.

**[12] Jury 230 ☞149**

230 Jury
230VI Impaneling for Trial, and Oath
230k149 k. Discharge of juror or jury pending trial. Most Cited Cases

Trial court did not abuse its discretion in refusing to discharge juror in prosecution of drug crime defendant for purported contact with highway patrol officer; juror greeted officer by first saying his name and then shaking his hand, no discussion of any substance occurred, and juror testified that his contact with officer would not interfere with his ability to be fair and impartial. Fed.Rules Cr.Proc.Rule 24(c)(1), 18 U.S.C.A.

**[13] Jury 230 ☞33(5.15)**

230 Jury
230II Right to Trial by Jury
230k30 Denial or Infringement of Right
230k33 Constitution and Selection of Jury
230k33(5) Challenges and Objections
230k33(5.15) k. Peremptory challenges. Most Cited Cases

Trial court's determination that government, in prosecution of drug crime defendant, exercised its peremptory challenges in race-neutral manner was not clearly erroneous; although last of only two African-Americans in sixty-four person venire were stricken, government indicated that it had taken into account juror attentiveness, decisiveness, intelli-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

gence, patience, honesty, and other non-race based factors.

**[14] Sentencing and Punishment 350H ⌾1625**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(A) In General
            350Hk1622 Validity of Statute or Regulatory Provision
                350Hk1625 k. Aggravating or mitigating circumstances. Most Cited Cases

**Sentencing and Punishment 350H ⌾1626**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(A) In General
            350Hk1622 Validity of Statute or Regulatory Provision
                350Hk1626 k. Procedure. Most Cited Cases
Federal death penalty scheme under which drug crime defendant was sentenced did not violate defendant's constitutional rights under Fifth, Sixth and Eighth Amendments; penalty phase properly weighed aggravating and mitigating factors, did not unconstitutionally delegate legislative authority, required proportional review, did not permit relaxed evidentiary standard, and did not allow impermissibly vague aggravating factors. U.S.C.A. Const.Amends. 5, 6, 8; 21 U.S.C.(2000 Ed.) § 848 (g-p).

**[15] Sentencing and Punishment 350H ⌾1670**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(D) Factors Related to Offense
            350Hk1670 k. Intent of offender. Most Cited Cases

**Sentencing and Punishment 350H ⌾1789(3)**

350H Sentencing and Punishment
    350HVIII The Death Penalty
        350HVIII(G) Proceedings

            350HVIII(G)4 Determination and Disposition
                350Hk1789 Review of Proceedings to Impose Death Sentence
                    350Hk1789(3) k. Presentation and reservation in lower court of grounds of review. Most Cited Cases
Trial court's inclusion of "intent to kill" aggravating factor in capital sentencing phase of drug crime prosecution was not plain error; scheme did not result in statutory factor of defendant's culpable mental state artificially inflating aggravating evidence or impermissibly skewing weighing process toward death. 21 U.S.C.(2000 Ed.) § 848(k), (n)(1-12).

**[16] Weapons 406 ⌾17(4)**

406 Weapons
    406k17 Criminal Prosecutions
        406k17(4) k. Weight and sufficiency of evidence. Most Cited Cases
Evidence was sufficient to support jury's verdict that defendant possessed requisite intent to kill to support conviction for using and carrying firearm during and in relation to drug-trafficking crimes; defendant had been aware of outstanding warrant for his arrest, had anticipated that law enforcement officials would come to his house to arrest him, and had posted sign on his property expressing intent to shoot. 18 U.S.C.A. § 924(c)(1)(A), (j).; Federal Death Penalty Act of 1994, §§ 330003(e), 330009(d), 21 U.S.C.A. § 848(e)(1)(B).

**[17] Criminal Law 110 ⌾1035(2)**

110 Criminal Law
    110XXIV Review
        110XXIV(E) Presentation and Reservation in Lower Court of Grounds of Review
            110XXIV(E)1 In General
                110k1035 Proceedings at Trial in General
                    110k1035(2) k. Preliminary proceedings. Most Cited Cases
Trial court's decision to allow government to delay production of witnesses' names and addresses in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

drug crime prosecution was not plain error; defense counsel expressly acquiesced in disclosure schedule proposed by government and at no time thereafter complained about timing of disclosure. 18 U.S.C.A. § 3432.

**[18] Double Jeopardy 135H ⟜183.1**

135H Double Jeopardy
    135HV Offenses, Elements, and Issues Foreclosed
       135HV(C) Identity of Parties
          135Hk183 Offenses Against Different Sovereignties or Governmental Units
           135Hk183.1 k. In general. Most Cited Cases

Under "dual sovereignty doctrine," Double Jeopardy Clause is no bar to serial prosecution and punishment undertaken by separate sovereign entities. U.S.C.A. Const.Amend. 5.

**[19] Double Jeopardy 135H ⟜183.1**

135H Double Jeopardy
    135HV Offenses, Elements, and Issues Foreclosed
       135HV(C) Identity of Parties
          135Hk183 Offenses Against Different Sovereignties or Governmental Units
           135Hk183.1 k. In general. Most Cited Cases

In analyzing whether sequential prosecutions are undertaken by separate sovereign bodies, for purposes of dual sovereignty exception to Double Jeopardy Clause, courts must determine whether prosecuting entities draw their authority to punish offender from distinct sources of power. U.S.C.A. Const.Amend. 5.

**[20] Criminal Law 110 ⟜29(4)**

110 Criminal Law
    110I Nature and Elements of Crime
       110k29 Different Offenses in Same Transaction
          110k29(4) k. Offenses against different

sovereignties. Most Cited Cases

"Petite policy" provides that, following state prosecution, there should be no federal prosecution for same transaction in absence of compelling federal interests.

**[21] Criminal Law 110 ⟜1186.1**

110 Criminal Law
    110XXIV Review
       110XXIV(U) Determination and Disposition of Cause
          110k1185 Reversal
           110k1186.1 k. Grounds in general. Most Cited Cases

"Cumulative error analysis" aggregates all errors found to be harmless and analyzes whether their cumulative effect on outcome of trial is such that collectively they can no longer be determined to be harmless.

**[22] Criminal Law 110 ⟜1186.1**

110 Criminal Law
    110XXIV Review
       110XXIV(U) Determination and Disposition of Cause
          110k1185 Reversal
           110k1186.1 k. Grounds in general. Most Cited Cases

In conducting cumulative error analysis, court considers whether defendant's substantial rights were affected by cumulative effect of harmless errors; only actual errors are considered in determining whether defendant's right to fair trial was violated. U.S.C.A. Const.Amend. 6.

**\*1082** Mark Henricksen, Henricksen & Henricksen Lawyers, Inc., El Reno, OK (Roger Hilfiger, Cook & Hilfiger, Muskogee, OK, with him on the briefs), for Defendant-Appellant.

Sheldon J. Sperling, United States Attorney (D. Michael Littlefield, Assistant United States Attorney, with him on the brief), Muskogee, OK, for Plaintiff-Appellee.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

Before TACHA, BRISCOE, and MURPHY, Circuit Judges.

BRISCOE, Circuit Judge.

Defendant Kenneth Barrett was convicted of using and carrying a firearm during and in relation to several drug-trafficking crimes, resulting in the death of a state law enforcement officer, in violation of 18 U.S.C. §§ 924(c)(1)(A) and (j), using and carrying a firearm during and in relation to the killing of a state law enforcement officer engaged in or on account of the performance of such officer's duties, in violation of 18 U.S.C. §§ 924(c)(1)(A) and (j), and intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). In accordance with the jury's verdict, Barrett was sentenced to life imprisonment without the possibility of release for the first two convictions, and to death for the third conviction. Barrett now appeals his convictions, as well as his death sentence. We exercise jurisdiction pursuant to 28 U.S.C. § 1291 and affirm.

I.

*Factual background*

On January 28, 1999, the District Court of Sequoyah County, Oklahoma, issued a warrant for Barrett's arrest on charges of unlawful delivery of a controlled drug and failure to appear for jury trial. Although Barrett managed to avoid arrest during the ensuing months, state law enforcement officials were aware of his presence and continued to investigate his activities. In September of 1999, Clint Johnson, the supervising agent and field supervisor for the District Twenty-Seven Drug Task Force (Task Force), which encompassed Cherokee, Wagoner, Adair and Sequoyah Counties in Oklahoma, received information from a confidential informant (CI) that Barrett was manufacturing and distributing methamphetamine at his residence. Johnson, using the information provided by the CI, prepared an affidavit for a search warrant. On September 20, 1999, the District Court of Sequoyah County issued the requested search warrant for Barrett's residence. The warrant authorized law enforcement officers to conduct the search "at any time of the day and/or night," and to enter Barrett's residence "without the normally required knocking and announcing ... due to the violent and unstable nature of ... BARRETT and the danger posed to law enforcement **\*1083** personnel by ... BARRETT and/or other unknown persons who may be present." Aplee. Supp.App. at 3. The items to be seized included methamphetamine or other controlled dangerous substances, paraphernalia, drug manufacturing equipment and supplies, and written records and documents pertaining to drug manufacturing and distribution.

Johnson considered the search warrant to be "high risk" in nature. Tr. at 308.[FN1] In particular, Johnson was aware that Barrett routinely carried firearms and had threatened to kill law enforcement officers if they "showed up at his residence." *Id.* at 333. Further, Johnson was aware that Barrett's residence was accessible only by a dead-end road, that several of Barrett's relatives lived in residences nearby, and that there was little cover around the residence from which the search team could perform surveillance. Accordingly, Johnson contacted the Oklahoma Highway Patrol's Tactical Team (Tact Team) for assistance in serving the warrant. The Tact Team was "highly trained and specialized in [serving] ... high risk search warrants...." *Id.* at 307. Johnson and another Task Force leader met with Tact Team members to discuss the execution of the warrant. It was determined that the Tact Team would enter and secure the area first, and that the Task Force would then perform the actual search of Barrett's residence.

> FN1. The trial transcript consists of twenty-seven volumes, numbered Volumes 32 through 59 of the record on appeal. For

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

citation purposes, we will refer to the trial transcript collectively as "Tr.," and will not cite to the individual volume numbers.

The Tact Team met during the daylight hours of September 23, 1999, and developed a plan for entering and securing Barrett's residence. As part of this planning process, three members of the Tact Team drove by Barrett's residence in an unmarked Ford Bronco during the early evening hours. Travis Crawford, Barrett's cousin, was in the vicinity at the time of the drive-by and observed Barrett walk to the area of the front gate after the Bronco drove by his residence. Crawford spoke to Barrett and Barrett indicated he had seen the Bronco and knew it belonged to law enforcement officers. When Crawford told Barrett that the law enforcement officers would likely return to serve the warrant, Barrett responded by saying "D.G.F.," which, according to Crawford, meant "Don't give a fuck." *Id.* at 466. Further, Barrett told Crawford that "he was going out in a blaze of glory." *Id.*

Using the information they observed during the drive-by, together with information provided by the Task Force, the Tact Team decided to execute the search warrant during the night with the hope that Barrett and any other occupants of the residence would be asleep. The Tact Team further decided that, because the front gate to Barrett's property was locked, three of the Tact Team vehicles, two Ford Broncos and a marked highway patrol unit, would enter Barrett's property by first driving north on a private driveway that lay to the east of Barrett's property, and then driving west across the land and through a ditch onto Barrett's property. The occupants of those three vehicles, six Tact Team members in total, would then get out of their vehicles, walk on foot to the house, and enter through the front door. The Tact Team decided that a fourth unit, a marked highway patrol car, would stop at the locked front gate of the property and that one of the occupants of that vehicle would remain in that position to provide cover for the other team members, while the second and third occupants of that vehicle

would climb over the gate, enter the property on foot, and watch the west side of Barrett's house to prevent him **\*1084** from escaping to his mother's residence, which was located adjacent to Barrett's house. Finally, the Tact Team decided that a fifth unit, a white Ford Bronco, would enter the driveway of Barrett's mother's home.

At approximately 12:30 a.m. on the morning of September 24, 1999, the Tact Team met members of the Task Force at a highway intersection near Barrett's residence. From there, the five Tact Team vehicles headed towards Barrett's residence. The Task Force vehicles waited approximately two minutes before heading towards Barrett's residence in order to give the Tact Team a chance to secure the area.

As the lead Tact Team vehicle, a white Ford Bronco, drove eastward on the gravel road that passed in front of Barrett's residence, the driver, Trooper John Hamilton, observed a white male standing in the front yard of Barrett's residence. Hamilton continued to observe the man, who was later determined to be Barrett's son Toby, as he drove past Barrett's residence and entered the private driveway to the east of Barrett's residence. Hamilton then turned his vehicle westward towards Barrett's house and entered a deep ditch that lay between Barrett's residence and the property to the east, and approximately twenty to twenty-five yards away from Barrett's residence.

Meanwhile, Troopers Gene Hise and Robert Darst, who arrived at the scene in the fourth Tact Team vehicle, climbed over the locked front gate, entered the yard in front of Barrett's house, and yelled at Toby Barrett to get on the ground. Toby Barrett initially failed to comply, but ultimately got on the ground. Trooper Darst then took custody of Toby Barrett and determined he was unarmed. While Toby Barrett was on the ground being handcuffed, he turned his head towards the house and screamed "Dad!" *Id.* at 1263.

As Hamilton's vehicle exited the ditch and headed

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

towards Barrett's house, it began to receive gunfire that hit the middle of the windshield, at approximately "head level" of Hamilton and his passenger, Trooper David Eales. [FN2] *Id.* at 538. The gunfire intensified as Hamilton drove closer to Barrett's residence, and Hamilton was hit in the face with some object, either bullet fragments or flying glass from the windshield. As a result of the continuous gunfire, neither Hamilton nor Eales were able to turn on the vehicle's emergency lights, as the Tact Team had originally planned for them to do.

> FN2. According to the record, Toby Barrett did not begin yelling "Dad" until after the gunfire began. *Id.* at 1357.

The second Tact Team vehicle, a Ford Bronco occupied by Troopers Raymond Greninger and Ricky Manion, was less than a car length behind the first Tact Team vehicle. Unlike the first vehicle, the second vehicle had its emergency lights on, including a flashing strobe-type light on the sun visor and wig-wag headlights. The third Tact Team vehicle, a marked highway patrol unit driven by Trooper Hash, also had its emergency lights on, including a full light bar on top. The lights from the light bar were bright enough to light up the entire area of Barrett's residence. This third vehicle was traveling less than a car length behind the second vehicle.

Hamilton's vehicle ultimately came to a stop at or near the southeast corner of Barrett's residence, and the second and third vehicles stopped slightly behind Hamilton's vehicle. Hamilton fell between the front seats of his vehicle in an attempt to avoid the gunfire. Hamilton's passenger, Eales, opened the front passenger **\*1085** door, got out of the vehicle, and began moving towards the rear of the vehicle. At some point before he arrived at the rear of the vehicle, Eales was struck by three gunshots.

Meanwhile, Hamilton threw a diversionary device out of the driver's side window of his vehicle, causing a noticeable flash and loud bang. The flash and bang created a stoppage of gunfire, during which Hamilton got out of the driver's side of his vehicle.

Hamilton then moved towards the rear of his vehicle. As he did so, he was shot in the back of the left shoulder. When he reached the back of the vehicle, Hamilton observed Eales face down on the ground, with Manion attempting to assist him.

From the rear of the vehicle, both Hamilton and Manion were able to observe a man, later identified as Barrett, standing in the interior doorway of the residence holding a rifle. Hamilton fired two rounds at Barrett, but did not hit him. Manion moved from the rear of Hamilton's vehicle to the east side of Barrett's house. From a position behind a parked truck, Manion fired two short bursts of gunfire through the east window of Barrett's home. Some of the shots fired by Manion struck Barrett in the lower body. Hamilton observed Barrett fall face down through the front doorway and drop his rifle. Hamilton approached and entered the house, told Barrett to get up, and Barrett responded that he could not because he had been shot. Hamilton, with the assistance of Troopers Manion and Hash, dragged Barrett out of the house and into the front yard. As the three troopers were dragging Barrett, another trooper, Danny Oliver, yelled at them that Barrett had a pistol tucked in the front of his waistband. Manion pulled Barrett's arms out from underneath him, handcuffed him, and performed a quick pat-down. During the pat-down, Manion found the pistol that Barrett had tucked into the right side of his waistband. Hamilton, Manion and Greninger entered the house and confirmed there were no other persons inside.

After unsuccessfully attempting to provide first aid to Eales, Tact Team members transported him to a local hospital, where he was pronounced dead. An autopsy indicated that Eales suffered gunshot wounds to his chest, his left flank, and his right arm, all of which appeared to have occurred while Eales was facing away from Barrett. The gunshot wound to the chest entered the left side of Eales' upper back, broke four of Eales' ribs, perforated the left upper lung lobe, and ultimately struck Eales' aorta, causing a quarter-inch hole. The injury to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Eales' aorta was determined to be irreparable and the cause of Eales' death.

Investigation of the crime scene by law enforcement officers determined that Barrett fired approximately nineteen shots at law enforcement officers using a Colt Sporter .223 rifle. The rifle, which had a lethal range of approximately 541 to 595 yards, was equipped with three magazines that Barrett had taped together, giving him a total of ninety-one rounds available for use at the time the shooting incident began. A search of Barrett's property, including his house and outbuildings, produced a variety of other firearms, including a fully loaded 12 gauge shotgun and a fully loaded .22 caliber pistol. The search also resulted in the seizure of a variety of materials related to the production and use of methamphetamine (e.g., coffee filters, hypodermic needles, digital scales, pseudoephedrine, ephedrine tablets, iodine, plastic tubing, toluene). A search of Barrett's person produced a plastic baggie containing red phosphorous, a lighter, and approximately $2100 in cash.

**\*1086** *Procedural background*

*a) State criminal proceedings*

On September 24, 1999, Barrett was charged by information in the District Court of Sequoyah County with one count of first degree murder and three counts of shooting with intent to kill. The information was subsequently amended to charge Barrett with one count of first degree murder, one count of shooting with intent to kill, and two counts of discharging a firearm with intent to kill. The case proceeded to trial in the fall of 2002, but ended in a hung jury on October 18, 2002. Barrett was retried in January and February of 2004. The jury rejected the first degree murder charge and instead found Barrett guilty of the lesser-included crime of first degree manslaughter. The jury also rejected the shooting with intent to kill charge and instead found Barrett guilty of the lesser-included offense of assault and battery with a dangerous weapon. The jury acquitted Barrett on the two charges of discharge of a firearm with intent to kill. On April 19, 2004, Barrett was sentenced to a term of imprisonment of twenty years on the manslaughter conviction and ten years on the assault and battery conviction, with the two terms to run consecutively. Barrett did not appeal his convictions or sentences.

*b) Federal criminal proceedings*

On September 23, 2004, a criminal complaint was filed against Barrett in the United States District Court for the Eastern District of Oklahoma charging him with eight criminal counts, including intentionally killing a state law enforcement officer engaged in the performance of the state law enforcement officer's official duties, in violation of 21 U.S.C. § 848(e)(1). On November 9, 2004, a federal grand jury returned a three-count indictment against Barrett. *Id.,* Doc. 9. Count 1 of the indictment charged Barrett with using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 2 charged Barrett with using and carrying a firearm in relation to a crime of violence, i.e., the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties, and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). Count 3 charged Barrett with intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). With respect to Count 3, the grand jury made the following "Special Findings": (a) Barrett was 18 years of age or older at the time of the offense; (b) Barrett intentionally killed Eales, intentionally inflicted serious bodily injury that resulted in the death of Eales, intentionally participated in an act, contemplating that the life of a person would be taken and intending that lethal force would be used in connec-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

tion with a person, other than one of the participants in the offense, and Eales died as a direct result of the act, or intentionally and specifically engaged in an act of violence, knowing that the act created a great risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and Eales died as a direct result of the act; and (c) Barrett, in the commission of the drug trafficking offenses alleged in Count 3, and in escaping apprehension for a violation of said offenses, knowingly created a grave risk of death to one or more persons, to wit: John Hamilton, Jr., in addition to Eales. ROA, Vol. 1, Doc. 9 at 5-6.

**\*1087** On February 9, 2005, the grand jury returned a superseding indictment against Barrett. Although the superseding indictment included some amendments, it contained the same three basic counts as the original indictment. On February 15, 2005, the government filed notice of its intent to seek the death penalty with respect to all three counts with which Barrett was charged.

The case proceeded to trial on September 26, 2005. On the twenty-first day of trial, November 4, 2005, the jury found Barrett guilty of all three counts. In response to special interrogatories propounded by the district court, the jury found beyond a reasonable doubt that Barrett committed murder in connection with Counts 1 and 2 (i.e., that he committed the unlawful killing of Eales with malice aforethought). After a short break in the trial proceedings, the second-stage proceedings began on November 9, 2005. On November 17, 2005, at the conclusion of all the second-stage evidence, the jury found, in pertinent part, that Barrett was at least eighteen years old at the time of the offenses of conviction, and that, with respect to each of the three counts of conviction, he intentionally killed Eales. As for the statutory aggravating factors, the jury found, with respect to Counts 1 and 2, that Barrett killed or attempted to kill more than one person, i.e., John Hamilton, Jr., and David Eales, in a single criminal episode, and committed the of-

fenses after substantial planning and premeditation to cause the death of a person. [FN3] With respect to Count 3, the jury found that Barrett, in the commission of the offense or in escaping apprehension for the offense, knowingly created a grave risk of death to one or more persons in addition to Eales, and that Barrett committed the offense after substantial planning and premeditation. As for the non-statutory aggravating factors, the jury found, with respect to all three counts of conviction, that Barrett caused injury, harm, and loss to the victim's family, but rejected the government's assertion that Barrett was likely to commit criminal acts of violence in the future which would be a continuing and serious threat in an institutional correctional setting to the lives or safety of other persons. As for mitigating factors, some or all of the jurors found the existence of the following factors with respect to all three counts:

> [FN3.] The jury rejected the statutory aggravating factor that Barrett knowingly created a grave risk of death to persons other than Hamilton and Eales.

• Barrett had accepted responsibility for the death of Eales from his previous conviction (found by five jurors with respect to each count);

• Barrett had been convicted and punished for the death of Eales (found by five jurors with respect to each count);

• Barrett, at the time of the shooting incident, had no prior felony convictions (found by all twelve jurors with respect to each count);

• Barrett was a father (found by all twelve jurors with respect to each count);

• Barrett was a loved son and stepson (found by all twelve jurors with respect to each count);

• Barrett was a good neighbor and friend (found by seven jurors with respect to each count);

• Barrett's death would impact his child, family and

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

friends (found by all twelve jurors with respect to each count);

• Barrett would not present a future danger to society by being imprisoned for life without possibility of release as demonstrated by his incarceration since September 24, 1999 (found by two jurors with respect to each count);

*1088 • That other factors in Barrett's childhood, background or character mitigated against imposition of the death sentence (found by one juror with respect to Counts 1 and 2, and by two jurors with respect to Count 3);

• That Barrett never left his residence during 1999 (found by one juror with respect to each count); and

• That Sequoyah County Sheriff Johnny Philpot had mistreated Barrett when Barrett was seventeen years old (i.e., Philpot had an altercation with Barrett during which Philpot broke Barrett's jaw) (found by six jurors with respect to each count).

*Id.* at 20-27.[FN4] Ultimately, the jury found that sentences of life imprisonment without the possibility of release should be imposed with respect to Counts 1 and 2, and that a sentence of death should be imposed with respect to Count 3.

> FN4. All of the jurors rejected the alleged mitigating factor that Barrett had expressed remorse for the crimes.

On December 19, 2005, the district court conducted a sentencing proceeding during which it imposed the sentences recommended by the jury. Judgment was entered in the case on December 29, 2005.

II.

*1. Did the district court err in denying the motion to suppress?*

Prior to trial, Barrett moved to suppress evidence

seized from his residence and surrounding property following the shooting, as well as all statements he made to law enforcement officers following his arrest. The district court denied Barrett's motion to suppress, "except as to the guns seized under but not specified in the drug search warrant...." ROA, Vol. 1, Doc. 124 at 2. On appeal, Barrett contends the district court erred in denying his motion to suppress.

"In reviewing a district court's denial of a motion to suppress, we consider the totality of the circumstances and view the evidence in a light most favorable to the government, accepting the district court's factual findings unless clearly erroneous." *United States v. Trotter,* 483 F.3d 694, 698 (10th Cir.2007) (internal quotation marks omitted). "We review de novo the ultimate question of the reasonableness of a search." *Id.* Although violations of state law may be relevant in making this determination, such violations do "not, without more, necessarily [result] in a federal constitutional violation." *United States v. Mikulski,* 317 F.3d 1228, 1232 (10th Cir.2003).

The following factual findings were made by the magistrate judge after conducting an evidentiary hearing on Barrett's motion to suppress, and Barrett has not challenged those findings on appeal:

> Clint Johnson, an Oklahoma drug task force agent, secured a state court warrant to search the Defendant's home for drugs. Agent Johnson had information that the Defendant had threatened "to kill the first cop through the door," and that there were guns around the house, so he sought the assistance of the Oklahoma Highway Patrol with entering and securing the Defendant's home. The federal drug task force of the Drug Enforcement Agency also was notified because Agent Johnson anticipated there would be a methamphetamine lab to clean up at the scene, although the federal agents were not expected to participate in the raid itself. * * *
>
> The Oklahoma State Bureau of Investigation was

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

called in to investigate the shooting. Agency Vicky Jones (now Lyons) obtained another state court warrant to search the Defendant's home **\*1089** as part of the crime scene. After that search was completed, Agent Beal [a Pittsburg County Sheriff's Deputy who was on detail with the Drug Enforcement Administration's drug task force] and two other DEA task force agents executed the original drug search warrant because they arrived at the scene after the shooting and were considered to be less affected by it than the state agents.

ROA, Vol. 1, Doc. 105 at 2.

*a) Failure of warrant to satisfy Oklahoma standards for nighttime warrant*

Barrett first contends that the original search warrant issued for his residence (i.e., the one that prompted the utilization of the Tact Team) was invalid because it failed to satisfy the conditions required under Oklahoma law for service of a nighttime warrant. More specifically, Barrett argues that, although Oklahoma law required the judge who issued the warrant to find a "likelihood that the property named in the search warrant w[ould] be destroyed, moved or concealed," Okla. Stat. tit. 22 § 1230(3), it "is unreasonable to argue that all of the drug evidence which the officers anticipated finding would be destroyed or moved, especially considering the anticipation that besides drugs, ingredients and utensils for manufacturing would be found on the premises, and considering that there was an on-going investigation with no indication whatsoever that drug activity had or would cease." Aplt. Br. at 20.

As a threshold matter, we note that Barrett never raised this issue below. Accordingly, the issue is subject to review only for plain error. *United States v. Teague,* 443 F.3d 1310, 1314 (10th Cir.2006). Under the plain error doctrine, "we will reverse the judgment below only if there is (1) error, (2) that is plain, which (3) affects substantial rights, and

which (4) seriously affects the fairness, integrity, or public reputation of judicial proceedings." *Id.* (internal quotation marks omitted).

[1] Turning to the merits of the issue, we conclude there was no error on the part of the district court, let alone plain error. At the time the search warrant for Barrett's residence was issued and executed, Oklahoma law required search warrants "for occupied dwellings" to be "served between the hours of six o'clock a.m. and ten o'clock p.m., unless the judge f[ound] the existence of at least one of" three enumerated exceptions.[FN5] Okla. Stat. tit. 22 § 1230. Barrett focuses exclusively on the third such exception, which encompasses cases in which the affiants are "positive that the property is ... in the place to be searched and ... there is likelihood that the property named in the search warrant will be destroyed, moved or concealed...." Okla. Stat. tit. 22 § 1230(3). He ignores, however, the first exception, which encompasses cases in which "[t]he evidence is located on the premises only between the hours of ten o'clock p.m. and six o'clock a.m. ...." *Id.* § 1230(1). Notably, the magistrate judge in this case found in his report and recommendation, and Barrett has not disputed below or on appeal, that "[t]he underlying affidavit set forth facts indicating that the only time drug evidence would be found [at Barrett's residence] was at night." ROA, Vol. 1, Doc. 105 at 11. Thus, it is clear that the first statutory exception was applicable in this case and allowed the judge who issued the search warrant to allow the warrant to **\*1090** be served at night time. In other words, there was no violation of Oklahoma state law, let alone a federal constitutional violation that would justify suppression of the evidence seized from Barrett's residence. *See Mikulski,* 317 F.3d at 1232.

> FN5. The Oklahoma legislature has since added an additional exception for cases in which "[t]he search to be performed is a search for evidence relating to the illegal manufacture of methamphetamine or other controlled dangerous substance." 22 Okla.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

Stat. tit. 22 § 1230(4) (2006).

*b) Failure of warrant to satisfy Oklahoma standards regarding executing officers*

Barrett next complains that the search of his residence was improper because the original search warrant was executed by federal law enforcement officers (i.e., DEA task force members) rather than by Oklahoma state law enforcement officers. In support of his argument, Barrett points to Okla. Stat. tit. 22 § 1225(A), which provides, in pertinent part, that a search warrant must be issued "to a peace officer of this state...." Because Barrett failed to raise this issue below, it is subject to review only for plain error.

[2] At the outset, we conclude that Barrett has failed to properly interpret § 1225(A). Specifically, the term "peace officer," as used in the Oklahoma criminal statutes, is expressly defined to "mean[ ] any sheriff, police officer, *federal law enforcement officer,* or any other law enforcement officer whose duty it is to enforce and preserve the public peace." Okla. Stat. tit. 21 § 99 (emphasis added). Applying that definition to § 1225(A), it is clearly permissible for an Oklahoma state magistrate to issue a search warrant to a federal law enforcement officer. Indeed, that is precisely what occurred here; the search warrant for Barrett's residence was issued to not only state law enforcement officers, but also to "Special Agents and Task Force Officers of the Drug Enforcement Administration, Special Agent[s] with the Bureau of Alcohol, Tobacco and Firearms, or any other ... federal peace officer." Aplee. Supp.App. at 2. In turn, Oklahoma law provides that "[a] search warrant may in all cases be served by any of the officers mentioned in its direction...." Okla. Stat. tit. 22 § 1227. Thus, we conclude it was permissible under Oklahoma law for the federal law enforcement officers mentioned in the search warrant to be involved in the execution of the warrant. In turn, we conclude there was no constitutional violation arising out of the federal officers' involvement that would justify suppression of evidence seized during execution of the warrant.

*c) Failure of warrant to comply with Fed.R.Crim.P. 41*

Lastly, Barrett contends that, should we determine that the search was federal, rather than state, in character, then the warrant was invalid because it failed to comply with the requirements of Federal Rule of Criminal Procedure 41 "designed to protect the integrity of the federal courts or to govern the conduct of federal officers." *United States v. Millar,* 543 F.2d 1280, 1283-84 (10th Cir.1976). Specifically, Barrett complains that the warrant was not requested by or issued to a federal officer, and failed to designate a federal magistrate to whom it should be returned. Again, there is no indication in the record that Barrett raised this issue below, and thus it is subject to review only for plain error.

[3][4] "Generally, a warrant is not federal in character if no federal agents participated in obtaining the warrant or in conducting the search." *United States v. Gobey,* 12 F.3d 964, 967 (10th Cir.1993). We have also suggested that a warrant will retain its "state character" if there was only "minimal ... federal involvement...." *Millar,* 543 F.2d at 1283. A review of the record on appeal indicates that is precisely the situation here. As noted, the warrant was requested by a state law enforcement officer, was issued **\*1091** by a state magistrate judge, and the original plan had been for only state law enforcement officers to execute the warrant. However, as a result of the shooting and its impact on the officers who had intended to execute the warrant, DEA task force agents were asked to actually perform the search. Notwithstanding this involvement of DEA task force agents, there was no evidence that a federal prosecution was envisioned at the time of the search. *See United States v. Fort,* 478 F.3d 1099, 1106 (9th Cir.2007) (holding that strictures of Rule 41 apply to local officials only if "from the beginning it was assumed a federal prosecution would result") (internal quotation marks omitted). In light of these unique circumstances, we are not per-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

suaded that the DEA agents' involvement was sufficient to render the warrant federal in character.

### d) Suppression on double jeopardy grounds

At the end of his discussion of the district court's denial of his motion to suppress, Barrett suggests, in passing, that the evidence seized during the search of his residence should be suppressed because there was no compelling reason for the Department of Justice to file and prosecute this case after he was charged and convicted in Oklahoma state court. Aside from the fact that this issue was not raised in Barrett's motion to suppress, a successful double jeopardy claim would require dismissal of the entire case, not just suppression of certain evidence, and, for the reasons discussed below, we conclude there is no merit to Barrett's double jeopardy arguments.

### 2. Challenges to the indictment

Barrett attacks the indictment on three general grounds, i.e., that it "[1] was insufficient, [2] improperly charged multiple crimes and [3] improperly joined offenses." Aplt. Br. at 35. We proceed to address these general grounds, along with the specific arguments included therein.

### a) Sufficiency-failure to set forth elements of predicate offenses

Barrett contends "[t]he Indictment was insufficient as it did not set forth the elements of the predicate offenses [on Counts 1 and 2], and further there was no predicate offense charged for which Count 1 could be based." *Id.* at 36-37. In addition, Barrett argues, "[t]he jury did not find [him] guilty of any predicate offense [with respect to any of the counts in the indictment], and the jury was not instructed to find [him] guilty of a predicate offense." *Id.* at 37.

Generally speaking, we review the sufficiency of an

indictment de novo. *United States v. Todd,* 446 F.3d 1062, 1067 (10th Cir.2006). Barrett did not, however, present his sufficiency challenges to the district court. Thus, we must determine what standard of review to apply to those challenges. In previous decisions, we have held that such claims are jurisdictional in nature, can be raised at any time during the pendency of the proceedings, and therefore that application of the plain error standard is inappropriate. *E.g., United States v. Gama-Bastidas,* 222 F.3d 779, 785 n. 4 (10th Cir.2000). However, in *United States v. Cotton,* 535 U.S. 625, 122 S.Ct. 1781, 152 L.Ed.2d 860 (2002), the Supreme Court made clear that defects in an indictment are not jurisdictional, and that challenges to such defects are thus subject to plain error review if not properly raised in the district court proceedings. *Id.* at 631, 122 S.Ct. 1781 ("Freed from the view that indictment omissions deprive a court of jurisdiction, we proceed to apply the plain-error test of Federal Rule of Criminal Procedure 52(b) to respondents' forfeited claim."). Thus, in accordance **\*1092** with *Cotton,* we review Barrett's sufficiency claims only for plain error.

Barrett first asserts that the superseding indictment was insufficient because it failed to list the elements of the underlying offenses identified in Counts 1 and 2. Counts 1 and 2 of the superseding indictment charged Barrett with violating 18 U.S.C. §§ 924(c)(1)(A) and (j). Section 924(c)(1)(A) states, in relevant part:

[A]ny person who, during and in relation to any crime of violence or drug trafficking crime ... for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime ... be sentenced to a term of imprisonment of not less than 5 years.

18 U.S.C. § 924(c)(1)(A). In turn, § 924(j) states, in relevant part:
(j) A person who, in the course of a violation of subsection (c), causes the death of a person

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

through the use of a firearm, shall-

(1) if the killing is a murder (as defined in section 1111), be punished by death or by imprisonment for any term of years or for life....

18 U.S.C. § 924(j).

Count 1 of the superseding indictment alleged that on or about September 24, 1999, Barrett knowingly used and carried eleven different firearms, each identified by type and serial number, in furtherance of four specific drug trafficking crimes, i.e.,

possession of 181.6 grams of pseudoephedrine, a list I chemical and 144.3 grams of iodine, a list II chemical, knowing or having reasonable cause to believe that the pseudoephedrine and iodine would be used to manufacture methamphetamine, in violation of Title 21, United States Code, Section 841(c); possession of red phosphorous, a precursor chemical, knowing, intending, and having reasonable cause to believe that it would be used to manufacture methamphetamine, in violation of Title 21, United States Code, Section 843(a)(6); attempting to manufacture methamphetamine, in violation of Title 21, United States Code, Sections 846 and 841(a); and maintaining a place for the purpose of manufacturing, distributing, and using methamphetamine, in violation of Title 21, United States Code, Section 856....

ROA, Vol. 1, Doc. 52 at 1-2. In addition, Count 1 alleged that in the course of this violation, Barrett "caused the death of David Eales through the use of a firearm...." *Id.* at 2. Similarly, Count 2 alleged that on or about September 24, 1999, Barrett knowingly possessed eleven different firearms, each identified by type and serial number, in furtherance of "a crime of violence, to-wit: Title 21, United States Code, Section 848(e)(1)(B), the killing of a state law enforcement officer engaged in or on account of the performance of such officer's duties," and "in the course of this violation, caused the death of David Eales, through the use of a fire-

arm...." *Id.* at 2-3.

The key question is whether these allegations satisfy the sufficiency standards mandated by this court. Under Tenth Circuit precedent, an indictment is considered sufficient "if it sets forth the elements of the offense charged, puts the defendant on fair notice of the charges against which he must defend, and enables the defendant to assert a double jeopardy defense." *Todd,* 446 F.3d at 1067 (internal quotation marks omitted); *see* Fed.R.Crim.P. 7(c) (outlining general requirements of indictment).

In *United States v. Jackson,* 327 F.3d 273 (4th Cir.2003), the Fourth Circuit addressed a substantially similar challenge to an indictment. The defendant therein, **\*1093** Richard Jackson, was convicted by a federal jury of using a firearm during and in relation to kidnapping, sexually abusing, and murdering a woman in violation of 18 U.S.C. § 924(j), and was sentenced to death in accordance with the jury's recommendation. Jackson, like Barrett in this case, complained for the first time on appeal that the indictment in his case failed to "recite," as part of the § 924 charge, "all the elements of the underlying crime of kidnapping, as defined by 18 U.S.C. § 1201." 327 F.3d at 290. Two of the three panel members assumed, without deciding, that the first three prongs of the plain error test were satisfied, but rejected the claim on the grounds that the alleged error did not seriously affect the fairness, integrity, or public reputation of judicial proceedings. *Id.* at 305. The remaining panel member concurred in the result, but rejected the argument on the merits, stating:

Established rules of pleading in an indictment do not require that each term or fact be fully defined, so long as the defendant is provided fair notice of the elements of the offense with which he is charged and sufficient detail so that he can plead an acquittal or a guilty verdict as a bar to a subsequent prosecution for the same offense. (citations omitted). But while it is true that an indictment must include all the elements of an offense, these elements may employ the statutory

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

language defining the offense. (citations omitted).

In this case, Jackson was charged with the offense set forth in 18 U.S.C. § 924(j)(1), coupled with the fact that the violation involved an aggravating factor to justify the imposition of the death penalty. The crime is charged simply by alleging all the elements of the murder together with a sufficient disclosure of an aggravating factor to inform the defendant of the crime charged. One aggravating factor identified in Jackson's indictment is the commission of the crime of kidnapping, as specified by 18 U.S.C. § 1201.

Jackson does not dispute that the indictment fairly describes a violation of § 924(j)(1) and of 18 U.S.C. § 1111(a), defining first-degree murder. Nor can he dispute the fact that the indictment alleges that the death resulting from the charged offense occurred during the commission of a felony, i.e., kidnapping as specified in 18 U.S.C. § 1201(a)(2). His only complaint is that the elements of kidnapping are not also set forth. But kidnapping is not the offense with which Jackson was charged. Rather, the fact that death occurred during a kidnapping is only an element of the aggravated offense with which he was charged. The reference to kidnapping together with a specific reference to the statutory definition of the crime adequately informs Jackson of the particular element of the aggravated crime, that an aggravating factor existed. (citation omitted).

*Id.* at 290.

[5] We find the concurring panel member's reasoning persuasive and applicable to Barrett's case. Barrett does not dispute that the superseding indictment sets forth each of the essential elements of the § 924 charges alleged in Counts 1 and 2. Further, Counts 1 and 2 of the superseding indictment clearly gave Barrett fair notice of the charges he had to defend against, and likewise were sufficient to enable him to assert a double jeopardy defense

(and he does not argue otherwise). It is true that neither Count 1 nor Count 2 listed the essential elements of the underlying crimes (i.e., the four drug-trafficking crimes identified in Count 1 and the crime of violence identified in Count 2). But, like the defendant in *Jackson,* Barrett was not directly charged with those underlying **\*1094** offenses. Thus, the identification of each of the underlying crimes, "together with [the] specific reference[s] to the statutory definition[s] of th[os]e crime[s] adequately inform[ed]" Barrett of the crimes he was being charged with, enabled him to prepare a defense to those crimes, and provided sufficient information to allow him, if necessary, to mount a double jeopardy defense.<sup>FN6</sup> 327 F.3d at 290.

> FN6. Even if we were to assume, for purposes of argument, that the superseding indictment's failure to allege all of the elements of the underlying offenses in Counts 1 and 2 satisfied the first three prongs of the plain error test, we would not "notice the forfeited error because, given the overwhelming nature of the evidence against [Barrett]" and the fact the petit jury in his case was instructed as to, and specifically found the existence of, the elements of the underlying offenses in Counts 1 and 2, "the alleged error ... did not seriously affect[ ] the fairness, integrity, or public reputation of judicial proceedings." 327 F.3d at 305 (internal quotation marks omitted).

As for Barrett's second sufficiency-related argument, it is unnecessary for a criminal defendant charged with a § 924(c) offense to be separately charged with and convicted of the underlying offense. *E.g., United States v. Zhou,* 428 F.3d 361, 378 n. 15 (2d Cir.2005) (citing cases from various circuits); *United States v. Frye,* 402 F.3d 1123, 1128 (11th Cir.2005). Thus, contrary to Barrett's assertions, the district court was under no obligation to instruct the jury that it was necessary to convict Barrett of the underlying offenses alleged in Counts 1 and 2, or for the jury to have convicted him of

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

such (although the jury, in the course of finding Barrett guilty of the § 924 charges, necessarily had to have found that Barrett committed at least one underlying offense with respect to each Count 1 and 2). *See United States v. McKissick,* 204 F.3d 1282, 1292 (10th Cir.2000) (holding that, "in order to establish a violation of § 924(c), the Government ha[s] the burden to prove," in pertinent part, the commission of the underlying offense).

Similarly, it is unnecessary for a defendant charged with violating 21 U.S.C. § 848(e)(1)(B), i.e., the charge alleged in Count 3 of the superseding indictment in this case, to be separately charged with and convicted of a predicate drug-trafficking crime. To be sure, an essential element of a § 848(e)(1)(B) violation is that the killing of the state law enforcement officer occurred "during the commission of, in furtherance of, or while [the defendant was] attempting to avoid apprehension, prosecution or service of a prison sentence for ... a felony violation of" Subchapters I or II of Chapter 13 (Drug Abuse Prevention and Control) of Title 21. 21 U.S.C. § 848(e)(1)(B). However, it is clear that Congress intended for § 848(e)(1)(B) to establish a substantive offense separate from any such predicate offense. *United States v. NJB,* 104 F.3d 630, 633 (4th Cir.1997); *United States v. Villarreal,* 963 F.2d 725, 728 (5th Cir.1992). Therefore, we find no persuasive reason why a violation of § 848(e)(1)(B) cannot be charged independently of the defendant being charged with or convicted of a predicate offense.

Finally, we note that although Barrett cites to the Supreme Court's decision in *Ring v. Arizona,* 536 U.S. 584, 122 S.Ct. 2428, 153 L.Ed.2d 556 (2002) in support of his arguments, that decision has no bearing on the issues he raises. In *Ring,* the Court held that an aggravating factor necessary for imposition of the death penalty has to be found by a jury and cannot be determined by a sentencing judge. 536 U.S. at 609, 122 S.Ct. 2428. To be sure, the circuit courts considering the issue have unanimously concluded that the holding in *Ring* applies with

equal force in the context of a Fifth Amendment challenge to the lack of statutory aggravating factors in an indictment charging a death-eligible **\*1095** crime under the Federal Death Penalty Act (FDPA). *See United States v. Brown,* 441 F.3d 1330, 1367 (11th Cir.2006); *United States v. Allen,* 406 F.3d 940, 942-43 (8th Cir.2005) (en banc); *United States v. Robinson,* 367 F.3d 278, 284 (5th Cir.2004); *United States v. Higgs,* 353 F.3d 281, 297-98 (4th Cir.2003). Here, however, that requirement was clearly satisfied, and it is not otherwise apparent how *Ring* is relevant to Barrett's assertion that it was necessary for Counts 1 and 2 of the superseding indictment to specifically allege the elements of the underlying offenses identified therein.

*b) Multiplicity*

Barrett next contends that the indictment was multiplicitous. Aplt. Br. at 41. According to Barrett, "all counts [in the indictment] [we]re based on the same conduct, firearms and drugs, and for killing the same person." *Id.* at 42. Because Barrett did not raise this issue below, it is subject to review only for plain error. *United States v. McCullough,* 457 F.3d 1150, 1162 (10th Cir.2006).

[6][7] "Multiplicity refers to multiple counts of an indictment which cover the same criminal behavior." *United States v. Johnson,* 130 F.3d 1420, 1424 (10th Cir.1997). Although "multiplicity is not fatal to an indictment," *id.* (internal quotation marks omitted), multiplicitous counts which may result in multiplicitous convictions are considered "improper because they allow multiple punishments for a single criminal offense." *United States v. Jenkins,* 313 F.3d 549, 557 (10th Cir.2002). "[M]ultiplicitous sentences violate the Double Jeopardy Clause." *United States v. Morris,* 247 F.3d 1080, 1083 n. 2 (10th Cir.2001).

[8] "The test [for multiplicity] is whether the individual acts [alleged in the counts at issue] are prohibited, or the course of [conduct] which they constitute." *United States v. Graham,* 305 F.3d 1094,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

1100 (10th Cir.2002) (third alteration in original) (internal quotation marks omitted). "If the former, then each act is punishable separately. If the latter, there can be but one penalty." *Id.* (internal quotation marks omitted). Where multiplicitous convictions are found, "the only remedy ... is ... to vacate one of the underlying convictions as well as the ... sentence based upon it." *Rutledge v. United States,* 517 U.S. 292, 301-02, 116 S.Ct. 1241, 134 L.Ed.2d 419 (1996) (internal quotation marks omitted).

[9] The question we face here is whether the three counts alleged in the superseding indictment were based on a single "unit of prosecution." As noted, Count 1 charged Barrett with using and carrying a firearm during and in relation to several drug-trafficking crimes, resulting in the death of Eales, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). To sustain its burden of proof against Barrett on this charge, the government was required to prove that (1) Barrett committed one or more of the predicate drug-trafficking offenses, (2) during and in relation to the predicate offense(s) Barrett knowingly used and carried a firearm, (3) the firearm played an integral role in the predicate offense(s) and (4) in the course of using the firearm Barrett killed Eales. ROA, Vol. 3, Doc. 240, Instruction No. 7. Count 2 charged Barrett with using and carrying a firearm during and in relation to a crime of violence, i.e., the killing of a state law enforcement officer engaged in or on account of the performance of such officer's duties, in violation of 18 U.S.C. § 924(c)(1)(A) and (j). To sustain its burden of proof against Barrett on this charge, the government was required to prove that (1) Barrett committed the predicate offense, (2) during and in relation to the commission of the predicate offense, **\*1096** Barrett knowingly used or carried, or in furtherance of such offense possessed a firearm, (3) the firearm played an integral part in the predicate offense, and (4) during the commission of the predicate offense Barrett caused the death of Eales with the firearm. *Id.* Finally, Count 3 charged Barrett with intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in

the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). To sustain its burden of proof against Barrett on this charge, the government was required to prove, in pertinent part, that Barrett intentionally killed Eales, a state law enforcement officer engaged in or on account of his official duties. *Id.,* Instruction No. 15.

Applying Tenth Circuit precedent, we conclude that Counts 1 and 2 were not multiplicitous as to each other. It is true that both counts were based on Barrett's commission of several underlying offenses with a single, continuous use of a firearm. In *United States v. Sturmoski,* 971 F.2d 452 (10th Cir.1992), however, we held that multiple § 924(c) counts are permissible so long as the offenses underlying each § 924(c) count do not constitute a single offense for double jeopardy purposes. *Id.* at 461. Applying that principle here, it is clear that Congress intended to permit multiple convictions and sentences for drug-trafficking crimes, such as the four underlying such crimes listed in Count 1, and the underlying crime listed in Count 2, i.e., intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). Indeed, Barrett does not seriously dispute otherwise. Because the crimes underlying Count 1 are distinct from the crime underlying Count 2, the two § 924 counts are in turn considered distinct.

We further conclude that Count 3 is not multiplicitous as to either Count 1 or 2. In particular, it is clear from examining the language of § 924, the statute under which Counts 1 and 2 were charged, and 21 U.S.C. § 848(e)(1)(B), the statute under which Count 3 was charged, that Congress intended to permit multiple convictions and sentences for violations of these distinct statutes. In other words, nothing suggests that Congress intended that a conviction under § 848(e)(1)(B) would prohibit a simultaneous conviction under § 924(c), even though the two convictions may be based on the same general act of using a firearm to intentionally kill a

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

state law enforcement officer engaged in the performance of his or her official duties. That is because § 848(e)(1)(B) is focused on criminalizing the intentional killing of state law enforcement officers under certain circumstances, while § 924(c) is focused on criminalizing the use of firearms in connection with certain offenses. *E.g., United States v. Amaya-Portillo,* 423 F.3d 427, 437 (4th Cir.2005) (noting that the purpose of § 924(c) is to punish criminals who use firearms during and in relation to certain crimes); *United States v. McCullah,* 76 F.3d 1087, 1105 (10th Cir.1996) ("Congress has clearly expressed its intention that the § 848(e) punishment be cumulative with any other applicable punishment").

*c) Misjoinder*

Barrett also contends the indictment "improperly joined offenses." Aplt. Br. at 42. Rule 8(a) of the Federal Rules of Criminal Procedure governs the joinder of offenses and provides:

The indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged-whether felonies or misdemeanors or both-are of the same or similar character, or are based on the **\*1097** same act or transaction, or are connected with or constitute parts of a common scheme or plan.

Generally speaking, "the alleged misjoinder of offenses under Rule 8 is a question of law subject to de novo review." *United States v. Johnson,* 130 F.3d 1420, 1427 (10th Cir.1997). Here, however, Barrett did not assert any misjoinder issues below. Thus, the arguments he now presents regarding misjoinder are subject to review only for plain error. *See United States v. Carter,* 481 F.3d 601, 606-07 (8th Cir.2007) (applying plain error standard where defendant moved for a severance prior to trial, but did not renew his motion during trial).

[10] We reject Barrett's misjoinder arguments as wholly lacking in merit. Generally speaking, "we construe Rule 8 broadly to allow liberal joinder to enhance the efficiency of the judicial system." *Johnson,* 130 F.3d at 1427. In Barrett's case, it is clear that the three counts alleged in the superseding indictment fall readily within the scope of Rule 8(a) because they "are based on the same act or transaction...." More specifically, all three counts arise out of the shooting incident that occurred on September 24, 1999, when the Tact Team attempted to serve the search warrant on Barrett's property and Barrett responded by firing multiple gunshots at Tact Team members, resulting in the death of Trooper Eales.

Even if there was doubt as to the proper joinder of the three claims, Barrett has failed to make the requisite "strong showing of prejudice...." *Johnson,* 130 F.3d at 1427. On this point, Barrett asserts he was prejudiced "because his association with drugs and firearms would necessarily be highly inflammatory in the minds of the jurors, especially when a killing occurs." Aplt. Br. at 43. In other words, Barrett suggests that the "jury [wa]s likely to ... infer a criminal disposition on [his] part" due to his involvement with drugs and firearms. *Id.* at 42. Barrett also suggests that jury confusion likely resulted from "the numerous counts and the fact that the Counts were even brought under two death penalty schemes requiring different application of aggravating factors." *Id.* We have previously held, however, that "[n]either a mere allegation that defendant would have a better chance of acquittal in a separate trial, nor a complaint of the 'spillover effect' ... is sufficient to warrant severance." *United States v. Wiseman,* 172 F.3d 1196, 1211 (10th Cir.1999) (internal quotation marks omitted). Further, the fact that the counts involved "different application of aggravating factors" is irrelevant to the Rule 8(a) analysis and, in any event, it is apparent from the verdicts that the jury was able to independently assess the proper penalty for the counts of conviction because it rejected the death penalty in connection with Counts 1 and 2, but chose to impose the death penalty for Count 3.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

*3. Admission of improper victim impact evidence*

Barrett contends that the district court erred in admitting what he describes as improper victim impact evidence. More specifically, Barrett complains that certain portions of the testimony of William DeWeese (a friend of Eales), Gene Hise (a fellow Oklahoma State trooper), Eales' widow, Eales' sister, and Eales' mother was improper because it "failed to focus on the characteristics of ... Barrett." Aplt. Br. at 46. Further, Barrett complains that his Sixth Amendment right to confrontation was violated when Eales' widow was permitted to describe to the jury a drawing made by her young son and to read to the jury an essay written by her young daughter. *Id.* at 52. Finally, Barrett summarily objects to the admission of four photographs of the victim, arguing they **\*1098** were "emotional and highly prejudicial." *Id.* at 51.

It is true, as noted by Barrett in his opening brief, that he filed a motion in limine "Regarding Victim Impact Evidence." ROA, Vol. 2, Doc. 202 at 1. That motion, however, objected only to the admission of testimony from friends of the victim. In other words, the motion argued that only the family of the victim could offer victim impact testimony. Thus, the motion did not include all of the arguments Barrett now seeks to assert on appeal. As a result, any additional issues not raised and preserved by subsequent objection are subject to review only for plain error.

[11] To the extent that Barrett is suggesting that all second-stage evidence must focus on the "characteristics" of the capital defendant, he is clearly wrong. In *Payne v. Tennessee,* 501 U.S. 808, 111 S.Ct. 2597, 115 L.Ed.2d 720 (1991), the Supreme Court noted that it had long "required that [a] capital defendant be treated as a uniquely individual human being," but emphasized that it had "never held or even suggested ... that the defendant, entitled as he was to individualized consideration, was to receive that consideration wholly apart from the crime which he had committed," i.e., without allowing the sentencing authority to consider victim impact evidence. *Id.* at 822, 111 S.Ct. 2597 (internal quotation marks omitted). Continuing, the Court stated that victim impact evidence "is designed to show ... each victim's uniqueness as an individual human being," *id.* at 823, 111 S.Ct. 2597 (internal quotation marks omitted), "is simply another form or method of informing the sentencing authority about the specific harm caused by the crime in question," and thus, "[i]n the majority of cases, ... serves entirely legitimate purposes." *Id.* at 825, 111 S.Ct. 2597. Ultimately, the Court overruled its prior precedent and held that it was constitutionally permissible for a state (or in this case the federal government) to "conclude that for the jury to assess meaningfully the defendant's moral culpability and blameworthiness, it should have before it at the sentencing phase evidence of the specific harm caused by the defendant," including evidence of how "the victim [wa]s an individual whose death represent[ed] a unique loss to society and in particular to his family." *Id.* (internal quotation marks omitted). In other words, the Court held, "[a] State may legitimately conclude that evidence *about the victim* and about the impact of the murder on the victim's family is relevant to the jury's decision as to whether or not the death penalty should be imposed." *Id.* at 827, 111 S.Ct. 2597 (emphasis added); *see also id.* at 830, 111 S.Ct. 2597 ("A State may decide ... that the jury should see a quick glimpse of the life petitioner chose to extinguish, ... to remind the jury that the person whose life was taken was a unique human being.") (internal quotation marks omitted) (O'Connor, J., concurring).

Although Barrett argues that Congress has expressly limited victim impact evidence in federal death penalty cases to evidence " 'concerning the effect of the offense on the victim and the victim's family,' " Aplt. Br. at 45, he is again mistaken. The statute Barrett cites to, 18 U.S.C. § 3593(a), describes the type of written notice that the government must file if it "believes that the circumstances of the offense [at issue] are such that a sentence of death is justified," and provides that such notice must "set [ ] forth the aggravating factor or factors

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

that the government ... proposes to prove as justifying a sentence of death." 18 U.S.C. § 3593(a)(2). In turn, the statute states:

The factors for which notice is provided under this subsection may include factors concerning the effect of the offense on the victim and the victim's family, and may include oral testimony, a victim **\*1099** impact statement that identifies the victim of the offense and the extent and scope of the injury and loss suffered by the victim and the victim's family, and any other relevant information.

*Id.* § 3593(a). Two features of this statutory language are important to note. First, it expressly indicates that a victim impact statement may identify the victim and outline the extent and scope of the injury and loss suffered by the victim and his family. Second, and perhaps more importantly, the use of the phrases "may include" and "any other relevant information" clearly suggests that Congress intended to permit the admission of any other relevant evidence, including, as authorized by *Payne,* evidence giving the jury a glimpse of the victim's personality and the life he led. Indeed, this court and others have expressly approved the admission of such evidence. *See United States v. Barnette,* 211 F.3d 803, 818 (4th Cir.2000) (affirming that victim impact evidence providing a "quick glimpse of the life" of the victim is admissible in a federal death penalty case); *United States v. McVeigh,* 153 F.3d 1166, 1219 (10th Cir.1998) (rejecting objection to admission of evidence "about the professional and personal histories of victims who perished in the bombing, including reflections on the admirable qualities of the deceased," noting that "the unique qualities of a murdered individual and his or her life accomplishments constitute the core impact evidence describing a victim's 'uniqueness as an individual human being' allowed by *Payne* ").

Applying these principles to the facts presented here, we conclude that the victim impact testimony now objected to by Barrett was relevant and properly admitted by the district court to show Eales' uniqueness as an individual human being. This in-

cludes:

• testimony from William DeWeese, a longtime friend of Eales, describing his time with Eales in the Marine Corp, his travels with Eales, the connection between their two families, and the impact Eales had on his life;

• testimony from Nancy Stalcup, Eales' sister, about Eales' "beautiful blue eyes," the last time she saw Eales, and the positive impact Eales had on her young son;

• testimony from Bobbi Eales, Eales' mother, the bulk of which briefly described the impact that Eales' death had on her and her family members;

• testimony from Gene Hise, a fellow Oklahoma Highway Patrol trooper, briefly describing the personal and professional characteristics of Eales, and briefly describing the impact that Eales' death had on him; and

• testimony from Kelli Eales, Eales' widow, briefly describing her relationship and life with Eales, and the impact that Eales' death had on her and her children.

In our view, this evidence fell within the scope of the type of victim impact evidence envisioned by *Payne,* and was not "so unduly prejudicial that it render[ed] the trial fundamentally unfair" in violation of Barrett's due process rights. 501 U.S. at 825, 111 S.Ct. 2597. Thus, we conclude there was no error, let alone plain error, arising from the admission of this victim impact testimony.

Barrett also challenges the district court's decision to allow Kelli Eales to (a) describe to the jury a picture her son, who was two years old at the time of the murder, drew picturing Eales on top of the family's house watching over them, and (b) read a short essay written by her daughter, who was six years old at the time of the murder, stating, in part: "other kids go through their entire life not having a good father. I am thankful that my dad showed me how to love in six and a half **\*1100** short years to last

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

me my whole life." According to Barrett, this evidence constituted hearsay and its admission violated his Sixth Amendment right to confrontation. Because Barrett did not raise these claims below, they are subject to review only for plain error.

We conclude that Barrett has fallen far short of establishing plain error in connection with this claim. To begin with, he overlooks the fact that the Federal Rules of Evidence do not apply to the penalty phase of a federal capital trial. *See* 18 U.S.C. § 3593(c) ("Information is admissible [during the penalty phase] regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury"); *United States v. Brown,* 441 F.3d 1330, 1360-61 (11th Cir.2006); *United States v. Johnson,* 223 F.3d 665, 674 (7th Cir.2000). Further, Barrett has failed to establish that these two items of challenged evidence were unfairly prejudicial, confused the issues, or misled the jury. Thus, it is clear that the district court did not violate the Federal Rules of Evidence in admitting the challenged testimony from Kelli Eales.

As for Barrett's Sixth Amendment claim, "[i]t is far from clear that the Confrontation Clause applies to a capital sentencing proceeding." *United States v. Higgs,* 353 F.3d 281, 324 (4th Cir.2003) (concluding that plain error did not occur as a result of admission of alleged hearsay evidence during penalty phase of federal death penalty trial); *see United States v. Brown,* 441 F.3d 1330, 1361 n. 12 (11th Cir.2006) (declining to determine whether Confrontation Clause applies to the penalty phase of a federal capital trial, and noting the lack of clarity on this issue). Thus, "even if the introduction of [Eales' testimony] during the sentencing proceeding was error," it cannot be said "that the error was plain since it ... remains unclear whether the Confrontation Clause applies in this circumstance." *Higgs,* 353 F.3d at 324. Moreover, even if the error were plain, Barrett has made no attempt to establish

how the challenged evidence affected his substantial rights, or to demonstrate how the error seriously affected the fairness, integrity or public reputation of the judicial proceedings.

Barrett complains in passing that the following sentence from a note written by Eales' daughter was not read to the jury, but nevertheless was briefly projected onto a screen for the jury to read: "I wish Kenneth Barrett could just gone to jail with my dad rather than shooting my dad because now he's in jail and I don't have my dad." [FN7] Although Barrett contemporaneously objected to this incident, the district court overruled the objection, concluding that "the likelihood of the [ ] [jury] having read it [wa]s remote." ROA, Vol. 55, at 4685. On appeal, Barrett makes no attempt to challenge the district court's factual finding that it was unlikely that the jury read the sentence, does not identify what statutory or constitutional right, if any, was potentially implicated by this incident, and does not explain how he was prejudiced thereby. Accordingly, we conclude the district court did not abuse its discretion in overruling Barrett's objection. *See United States v. Nash,* 482 F.3d 1209, 1217 (10th Cir.2007) (applying abuse of discretion standard of review to district **\*1101** court's refusal to grant a motion for mistrial).

> FN7. The note was written by Eales' daughter at the same time her mother, Kelli Eales, was preparing her own victim impact statement. The district court, without objection from Barrett, allowed Kelli Eales to read to the jury the bulk of that note, except for the sentence now objected to by Barrett.

Lastly, Barrett challenges the admission of four photographs of the victim on the grounds that they were "emotional and highly prejudicial." [FN8] Aplt. Br. at 51. A review of the record on appeal indicates that Barrett asserted no objection below to two of the four photographs, and thus our review of his appellate challenge to the admission of those photographs is only for plain error. Although Barrett as-

serted timely objections to the remaining two photographs, he did so on a basis other than the one now asserted on appeal. Thus, we likewise apply plain error review to his appellate challenge to the admission of those photographs. Ultimately, we are not persuaded that the district court committed any error, let alone plain error, in admitting these four photographs. In particular, we conclude that the four photographs fell firmly within the scope of victim impact evidence as defined by the Supreme Court in *Payne,* and in no way rendered the sentencing phase of Barrett's trial fundamentally unfair.

> FN8. The four photographs included: Exhibit 309, a photograph of Eales with his daughter and newborn son in a hospital room; Exhibit 312, a photograph of Eales with his two children on a family outing; Exhibit 316, a photograph of Eales in his patrol car; and Exhibit 318, a photograph of Eales' and his family at Christmas.

*4. Juror misconduct*

On October 5, 2005, the sixth day of the first-stage proceedings, the district court informed the parties it had received a report from government counsel and the clerk of the court "that juror 85, during the lunch break, somewhere in the smoking area outside of the handicapped entrance area made contact with Billy Poe of the Oklahoma Highway Patrol." ROA, Vol. 38 at 1265. More specifically, the district court noted it had been reported that Juror 85 "shook [Poe's] hand and indicated as if he had known Mr. Poe in the past," even though "[t]he questionnaire that juror 85 filled out show[ed] no [such] indication." *Id.* at 1265-66. The district court proceeded to conduct an *in camera* hearing during which it and defense counsel questioned Juror 85 about the incident. Juror 85 testified he had worked with Poe's mother many years before and thus knew Poe as a child, but had only seen Poe one time since Poe became an adult, with that incident occurring approximately fifteen to twenty years prior to the trial. Juror 85 further testified that he did not recall

Poe's name being mentioned during voir dire, and did not know prior to the hearing that Poe was involved in the case. As for his contact with Poe, Juror 85 testified that he simply recognized Poe, said "Billy Poe," and then shook Poe's hand. *Id.* at 1269-70. Juror 85 testified that he did not discuss the case with Poe, and had not discussed with the other jurors his relationship with Poe. Finally, Juror 85 testified that there was nothing about his relationship with Poe that would keep him from being fair and impartial to both parties in the case. At the conclusion of the hearing, the district court stated it was "satisfied" with "Juror 85's explanation of the situation," and thus rejected defense counsel's request to remove Juror 85. *Id.* at 1273.

Barrett complains on appeal that juror misconduct occurred during trial that resulted in the deprivation of his Fifth, Sixth, and Eighth Amendment rights. According to Barrett, the brief encounter between Juror 85 and Trooper Poe placed the impartiality of Juror 85 in doubt and should have resulted in the dismissal of Juror 85. Further, Barrett suggests that this incident, together with another incident of alleged juror misconduct, placed into question whether "the jury selection process **\*1102** was ... carried out properly." FN9 Aplt. Br. at 53. Ultimately, Barrett contends that the district court should have, but failed to, grant him a new trial as a result of the incident involving Juror 85.

> FN9. The other incident of alleged juror misconduct referred to by Barrett involved Juror 46, who was an alternate. During the trial, government counsel informed the district court that Trooper Robert Darst, who was scheduled to be a witness, informed the government's witness coordinator that he had had some limited contact with Juror 46. ROA, Vol. 37 at 1025. The district court conducted an in camera hearing, during which Darst testified that he saw Juror 46 at a deer festival in Antlers, Oklahoma, and that Juror 46, after greeting him, asked him, "Aren't you going to that trial?" *Id.,*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

Vol. 38 at 1189. Darst further testified that Juror 46 said "something to the effect that the driver of the vehicle had been on the stand and he would see me here." *Id.* at 1190. At the conclusion of the hearing, the district court excused Juror 46 from further service. *Id.* at 1199.

Federal Rule of Criminal Procedure 24(c)(1) authorizes district courts to replace "any jurors who are unable to perform or who are disqualified from performing their duties." "[T]he decision whether to excuse a juror rests on whether the juror can remain impartial, a matter of fact uniquely within the observation of the trial court." *McVeigh,* 153 F.3d at 1185. Thus, we apply an abuse of discretion standard to such decisions, giving " 'due deference to jurors' declarations of impartiality and the trial court's credibility determination that those declarations are sincere.' " *United States v. Black,* 369 F.3d 1171, 1176 (10th Cir.2004) (quoting *McVeigh,* 153 F.3d at 1184).

The Supreme Court has held that "[i]n a criminal case, any private communication, contact, or tampering directly or indirectly, with a juror during a trial about the matter pending before the jury is, for obvious reasons, deemed presumptively prejudicial...." *Remmer v. United States,* 347 U.S. 227, 229, 74 S.Ct. 450, 98 L.Ed. 654 (1954). We have qualified this presumption of prejudice, however, by requiring a showing by the defendant that the communication or contact was "about the matter pending before the jury." *United States v. Brooks,* 161 F.3d 1240, 1246 (10th Cir.1998) (internal quotation marks omitted). In addition, we have held that "[t]he defendant must ... demonstrate 'that an unauthorized contact created actual juror bias; courts should not presume that a contact was prejudicial.' " *United States v. Robertson,* 473 F.3d 1289, 1294 (10th Cir.2007) (quoting *United States v. Frost,* 125 F.3d 346, 377 (6th Cir.1997)). "Otherwise, a *Remmer* hearing would be required 'based on each of the multiple ordinary incidental contacts between non-sequestered jurors and virtu-

ally any other person during the course of a trial.' " *Id.* (quoting *Brooks,* 161 F.3d at 1246).

[12] Applying these principles to the facts presented here, we readily conclude that the district court did not abuse its discretion in refusing to discharge Juror 85. As noted, Juror 85 testified that he simply greeted Poe by first saying his name and then shaking his hand, and that no discussion of any substance, let alone about the case against Barrett, occurred. Juror 85 further testified that his contact with Poe would not interfere with his ability to be fair and impartial. The district court expressly found Juror 85's testimony credible, and Barrett has not seriously challenged, and indeed cannot successfully challenge, this determination. In light of Juror 85's testimony, it was thus proper for the district court to conclude that no actual bias existed on the part of Juror 85, and in turn to refuse to remove Juror 85 from the panel.

*5. Batson challenge*

Barrett contends the government, by striking the last of only two African-Americans**1103** in the sixty-four person venire, failed to exercise its peremptory challenges in a race-neutral manner and thus violated the prohibition announced in *Batson v. Kentucky,* 476 U.S. 79, 86, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), against "[p]urposeful racial discrimination in selection of the venire...." For the reasons discussed below, we conclude that Barrett has failed to establish that the government violated *Batson.*

During voir dire, the district court seated a panel of sixty-four prospective jurors. After the challenges for cause were completed, only two African-American jurors remained. The parties were then required to each exercise twenty-three peremptory challenges to reduce the total number of jurors to eighteen (twelve regular jurors and six alternates). The government used its tenth peremptory challenge to remove one of the two African-American jurors, Juror 3. Later, the government exercised its

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

twenty-second peremptory challenge to strike Juror 134, the second and remaining African-American juror. Barrett's counsel objected at that point, citing *Batson* and arguing that it was necessary for the government to offer a race-neutral reason for striking Juror 134. Government counsel responded:

Your Honor, first, this method of selection requires us to kick 23 people. We are now into a grading system such that we have to kick people off that are acceptable to us otherwise. And I p[o]lled all four and we are down to a relative few at our table and we have all, in terms of our rating, indicated that this juror is the one that should go next. We only have one more strike after this one, Your Honor. Our assessment includes these features: The degree to which the juror was attentive, bold, decisive, intelligent, patient, sincere and honest. The more unlike the defendant, the better for us. We also look, Your Honor, at how the juror reacted to us and to the defense during questioning, their probable attitude toward the government, whether they were bored, unhappy, or nervous. We look at dress and demeanor as an indicator of respect for the Court and jury service and, in a nutshell, we look for those we are likely to be receptive to our witnesses's testimony, evidence and presentation. And I am reminded, too, Your Honor, that the first African American juror that we struck slept through a portion-well, he accept [sic] certainly through the reading of the indictment here, but slumbered through other portions of the Court's instructions.

Tr. at 154-55. When asked by the district court if the government's juror rating system was disclosable, government counsel responded:

I think they are work product, but I will tell the Court that essentially what we did is that we each rated each of the prospective jurors based on their questionaires [sic], their death penalty qualification, and then we amplified that somewhat by what happened today [during the voir dire process].

*Id.* at 161. Thereafter, the district court summarily overruled Barrett's *Batson* objection and completed the voir dire process. *Id.* at 162.

The following morning, prior to the parties' opening statements, government counsel briefly revisited the *Batson* issue and offered the following additional explanation for the government's decision to strike Juror 134:

If the Court please, I'd like to amplify one thing. There was a *Batson* challenge, and one of the reasons we are reluctant sometimes, Your Honor, to more fully explicate our reasoning, is that jury selection had not yet then been complete. But I want to state for the record that our selection process had **\*1104** narrowed that choice down to jurors numbers 44, 55, and 134. In our contemplation and as rationale, Your Honor, we recalled first that with regard to the juror who was ultimately struck, that we had to repeatedly ask him to speak up, both at the individual voir dire [i.e., the death qualification process] and then at the general voir dire. I frankly feared that I had alienated him by asking him to speak up, and honestly did not hear a substantial number of his responses with regard to our questioning. Important to our decision, though, is that juror number 44 reflected that his cousin is a DEA chemist who is going to testify in this case, although he testified appropriately and responded appropriately that he would be able to fairly consider that statement, our conclusion was that he certainly would not be, at least at first blush, adverse to that testimony. Number 55, Your Honor, interacts with law enforcement officers in his security and surveillance job, and we note also that he is apparently Native American, at least he works for a Native American casino. In our decision, also, we elected to keep number 24, despite his reported illness. I just wanted to state that as amplification for the previous justification. We accepted the Court's ruling and believed it well-founded at the time, and still do.

*Id.* at 175-76.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

*Batson* challenges are analyzed by trial courts under the three-step, "burden-shifting framework recently clarified by the Supreme Court in *Johnson v. California,* 545 U.S. 162, 125 S.Ct. 2410, 162 L.Ed.2d 129 (2005)." *United States v. Nelson,* 450 F.3d 1201, 1207 (10th Cir.2006). "Under this framework, the party challenging a peremptory strike of a prospective juror must make out a prima facie case by showing that the totality of the relevant facts gives rise to an inference of discriminatory purpose." *Id.* (internal quotation marks omitted). If the defendant succeeds in making out a prima facie case, "the 'burden shifts to the [government] to explain adequately the racial exclusion' by offering permissible race-neutral justifications for the strikes." *Johnson,* 545 U.S. at 168, 125 S.Ct. 2410 (quoting *Batson,* 476 U.S. at 94, 106 S.Ct. 1712). Finally, if the government tenders a race-neutral explanation, " 'the trial court must then decide ... whether the opponent of the strike has proved purposeful racial discrimination.' " *Id.* (quoting *Purkett v. Elem,* 514 U.S. 765, 767, 115 S.Ct. 1769, 131 L.Ed.2d 834 (1995) (per curiam)).

In *United States v. Johnson,* 941 F.2d 1102, 1108 (10th Cir.1991), we stated that "the first issue of whether a prima facie case of discrimination exists becomes moot whenever the prosecutor offers a race-neutral explanation for his peremptory challenges and the trial court rules on the ultimate factual issue of whether the prosecutor intentionally discriminated." Because the district court in this case proceeded, albeit summarily, through each of the three steps of the *Batson* framework, we will, consistent with our decision in *Johnson,* focus solely on the last two steps of that framework.[FN10]

> FN10. We note, in passing, that we have not consistently applied our holding in *Johnson,* and at times have revisited the question of whether the defendant successfully made out a prima facie case of discrimination. *E.g., United States v. Abdush-Shakur,* 465 F.3d 458, 469-70 (10th Cir.2006) (concluding that the govern-

ment's striking of "two out of three minority panel members [was] sufficient to satisfy ... defendant's prima facie *Batson* claim"); *United States v. Johnson,* 4 F.3d 904, 912-14 (10th Cir.1993) (concluding that government's striking two of three black members of jury was sufficient to establish prima facie case). Here, we will simply assume, without deciding, that Barrett, who himself was Caucasian, established a prima facie case of discrimination based upon the government's striking of the only two African-American jurors among the sixty-four potential jurors.

**\*1105** Turning first to the government's proffered reasons for striking the two African-American jurors, we review de novo whether those explanations were race neutral. *Nelson,* 450 F.3d at 1207. A race-neutral explanation is simply any explanation, no matter how implausible, that is "based on something other than the race of the juror." *Hernandez v. New York,* 500 U.S. 352, 360, 111 S.Ct. 1859, 114 L.Ed.2d 395 (1991). The proffered reason need not be "persuasive, or even plausible," so long as it is facially valid. *Purkett,* 514 U.S. at 768, 115 S.Ct. 1769.

[13] We readily conclude that the government offered race-neutral reasons for striking both Juror 134 (the second African-American juror), as well as Juror 3 (the first African-American juror). In particular, the government indicated that it had, taking into account juror attentiveness, decisiveness, intelligence, patience, honesty, and other non-race-based factors, developed a system pursuant to which it rated each of the sixty-four prospective jurors, and that Juror 134 was simply next in line to be struck under its overall ratings of the potential jurors. Aside from its rating system rationale, the government also expressed two related concerns regarding Juror 134: during the death-qualification process, the government had to ask Juror 134 to speak up, and, despite doing so, government counsel was unable to hear some of Juror 134's answers during that

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

process. As for Juror 3, the government again pointed to its rating system, but also noted that Juror 3 had slept through a portion of the voir dire proceedings.

Having concluded that the government offered race-neutral reasons for striking both Juror 134 and Juror 3, we turn to the ultimate question of whether Barrett successfully proved purposeful racial discrimination. "This final step involves evaluating the persuasiveness of the justification[s] proffered by the prosecutor...." *Rice v. Collins,* 546 U.S. 333, 126 S.Ct. 969, 163 L.Ed.2d 824 (2006) (internal quotation marks omitted). "The district court's answer to the ultimate question of discriminatory intent represents a finding of fact of the sort accorded great deference on appeal, because such a finding largely turns on the trial court's evaluation of the prosecutor's credibility." *Nelson,* 450 F.3d at 1207 (internal quotation marks omitted).

After carefully examining the record, we are unable to conclude that the district court clearly erred in implicitly finding that the government did not engage in purposeful racial discrimination. A key fact in support of our decision is that Barrett, in response to the government's proffered rationale, simply stated that he "st[oo]d by ... [his *Batson*] objection." Tr. at 161; *see id.* at 176 ("We have nothing further on the record ... for argument."). In other words, Barrett made no attempt to attack or otherwise undercut the government's rationale, and instead rested on the basic facts he pointed to in initially asserting his *Batson* objection, i.e., the striking of the two African-American members of the venire.[FN11] Thus, although the government's explanation of its juror rating system was abridged, nothing in Barrett's response could reasonably have **\*1106** caused the district court to ask the government for a more detailed explanation of its system or to seriously question the government's assertion that the details of its rating system were protected by the work-product privilege. Nor, we note, did Barrett offer the district court any reason to question the other reasons offered by the government

for striking Juror 134 and Juror 3: its inability to understand all of Juror 134's answers; its concern that its request for Juror 134 to "speak up" may have alienated Juror 134; and Juror 3's having slept through portions of the voir dire process. We therefore conclude that the district court had no reasonable basis for questioning the government's credibility in offering its race-neutral reasons for striking Juror 134 and Juror 3, and we ultimately agree with the district court that Barrett failed to meet his burden of establishing intentional racial discrimination on the part of the government.

> FN11. We note that the Sixth Circuit has held that "[i]f a defendant fails to rebut a race-neutral explanation at the time it was made, the district court's ruling on the [defendant's *Batson* ] objection is reviewed only for plain error." *United States v. Jackson,* 347 F.3d 598, 605 (6th Cir.2003). We find it unnecessary to decide whether to adopt a similar rule because, even applying the standard of review more favorable to Barrett, his *Batson* claim fails.

*6. Constitutionality of federal death penalty scheme*

Barrett contends that the federal death penalty scheme under which he was sentenced to death "is unconstitutional and violated [his] right to due process; his 6th Amendment right to a jury trial ...; and violates the 8th Amendment prohibition against cruel and unusual punishment." Aplt. Br. at 56. In particular, Barrett contends, albeit in conclusory fashion, that: (a) the penalty phase process of weighing aggravating and mitigating factors violates the Sixth Amendment; (b) "[t]he federal scheme unconstitutional[ly] delegates legislative authority, as it contemplates the unrestrained definition of, and utilization by the Government of 'non-statutory' aggravating factors," *id.* at 57; (c) "[t]he statute fails to require proportional review," *id.;* (d) "[t]he statute allows a relaxed evidentiary standard in violation of *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

(1976)," *id.;* (e) "[t]he statute allows for consideration of impermissibly vague aggravating factors," *id.;* and (f) "[i]t does not narrow the class of persons eligible for the death penalty." *Id.* at 58.

Before directly addressing Barrett's arguments, we note that at the time Barrett was indicted and tried, there were two separate, though substantially similar, federal schemes in place for imposition of the death penalty. The first of those was set forth in the FDPA, 18 U.S.C. §§ 3591-98. That statutory scheme applied to Counts 1 and 2 of the superseding indictment in this case. The second was set forth in 21 U.S.C. §§ 848(g)-(p) and applied only to defendants charged with violating § 848. This scheme applied to Count 3 of the superseding indictment. In March 2006, not long after Barrett was sentenced in this case, Congress repealed the death penalty provisions of § 848, effectively rendering the FDPA applicable to all federal death-eligible offenses.

[14] In his appellate brief, Barrett appears to refer exclusively to the FDPA in making his various constitutional arguments. Obviously, however, he lacks standing to challenge the FDPA because he was not sentenced to death under that Act. *See City of Los Angeles v. Lyons,* 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983) (noting that, to have standing, a party "must show that he has sustained or is immediately in danger of sustaining some direct injury as the result of the challenged official conduct") (internal quotation marks omitted). Out of an abundance of caution, and because Barrett challenged the constitutionality of both the FDPA and § 848 in the district court, we will assume, for purposes of this appeal, that he intended to attack the constitutionality of the death penalty provisions set forth in 21 U.S.C. §§ 848(g)-(p) and under which he was sentenced to death in connection**\*1107** with his conviction for Count 3 of the superseding indictment.

*a) Section 848's scheme for weighing of aggravating and mitigating factors*

Barrett, effectively seeking to extend the Supreme Court's decision in *Ring,* argues that § 848 violates the Sixth Amendment because it does not require the jury to apply the reasonable doubt standard in weighing the aggravating and mitigating factors. According to Barrett, "[t]here is simply no functional difference between 'finding' and 'weighing,' " and thus "[t]he determination of whether aggravating circumstances outweigh mitigating circumstances is a factual determination which could lead to an increase to the ultimate penalty-death." ROA, Vol. 1, Doc. 78 at 9. Barrett first raised this issue in his motion to declare the federal death penalty scheme unconstitutional.[FN12] *Id.* Thus, we review the issue de novo. *United States v. Jones,* 468 F.3d 704, 709 (10th Cir.2006) ("when the [district] court's decision rests on an issue of law, ... we review de novo.").

> FN12. In his appellate brief, Barrett cites to *Ring* and generally alleges that the federal death penalty scheme is violative of the Sixth Amendment, but does not otherwise flesh out his argument. Because, however, he submitted a more detailed argument on this point to the district court, we have proceeded to analyze that argument on the merits.

The Fifth Circuit recently rejected a similar argument asserted against the FDPA by a federal capital defendant:

The *Apprendi/ Ring* rule does not extend to the ultimate decision whether to impose the death penalty. Capital defendants have no constitutional right to a jury at sentencing. *See Proffitt v. Florida,* 428 U.S. 242, 252, 96 S.Ct. 2960, 49 L.Ed.2d 913 (1976) (plurality opinion). Indeed, the Supreme Court has explicitly held that judges may do the weighing of aggravating and mitigating circumstances consistent with the Constitution. *See Clemons v. Mississippi,* 494 U.S. 738, 745, 110 S.Ct. 1441, 108 L.Ed.2d 725 (1990). The Court's *Apprendi* line of cases reveals that the reasonable doubt standard is appurtenant to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

the right to jury trial. (footnote omitted). Since the Constitution does not require a jury to do the weighing, we cannot conclude that the showing required must be proof beyond a reasonable doubt.

Moreover, the *Apprendi/ Ring* rule should not apply here because the jury's decision that the aggravating factors outweigh the mitigating factors is not a finding of fact. Instead, it is a "highly subjective," "largely moral judgment" "regarding the punishment that a particular person deserves...." *Caldwell v. Mississippi,* 472 U.S. 320, 340 n. 7, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985). In death cases, "the sentence imposed at the penalty stage ... reflect[s] a reasoned moral response to the defendant's background, character, and crime." *Penry v. Lynaugh,* 492 U.S. 302, 319, 109 S.Ct. 2934, 106 L.Ed.2d 256 (1989) (emphasis in original). The *Apprendi/ Ring* rule applies by its terms only to findings of fact, not to moral judgments. *See Ring,* 536 U.S. at 602, 122 S.Ct. 2428.

The Supreme Court's reasoning in *Kansas v. Marsh,* 548 U.S. 163, 126 S.Ct. 2516, 165 L.Ed.2d 429 (2006), supports our conclusion. In *Marsh,* the Court construed a previous decision, *Walton v. Arizona,* 497 U.S. 639, 110 S.Ct. 3047, 111 L.Ed.2d 511 (1990), as holding "that a state death penalty statute may place the burden on the defendant to prove that mitigating circumstances outweigh aggravating circumstances." *Marsh,* 126 S.Ct. at 2524. Additionally, in a concurring **\*1108** opinion in *Marsh,* Justice Scalia recognized that the Constitution does not require a reasonable doubt standard as to the weighing process: "[T]he State could, as Marsh freely admits, [adopt a] scheme requiring the State to prove by a mere preponderance of the evidence that the aggravators outweigh the mitigators." *Id.* at 2532 n. 2. No member of the *Marsh* Court disagreed. Accordingly, we hold that the Sixth Amendment does not require a jury to be instructed that it must find that the aggravating factors outweigh

the mitigating factors beyond a reasonable doubt.

*United States v. Fields,* 483 F.3d 313, 346 (5th Cir.2007). Although not binding on us, we find this decision highly persuasive. Accordingly, we reject Barrett's argument for the same reasons stated by the Fifth Circuit in *Fields.*

b) *Section 848's allowance of non-statutory aggravating factors*

Section 848(n) lists specific aggravating factors that may be pled by the prosecution. 21 U.S.C. §§ 848 (n)(1)-(12). In addition to these specific "statutory" aggravating factors, § 848 authorizes the jury to consider "any other aggravating factors" for which the government provided the defendant timely notice. 21 U.S.C. §§ 848(h)(1)(B) and (n). Thus, § 848 allows the use by the prosecution of so-called "non-statutory" aggravating factors.

As noted, Barrett contends that § 848 "unconstitutional[ly] delegates legislative authority" by allowing prosecutors to define and rely on non-statutory aggravating factors. *Id.* at 57. Because Barrett did not present this issue to the district court, it is reviewed on appeal only for plain error.

"The nondelegation doctrine arises from the constitutional principle of separation of powers, specifically Article 1, § 1, which provides that 'all legislative Powers herein granted shall be vested in a Congress of the United States.' " *United States v. Jones,* 132 F.3d 232, 239 (5th Cir.1998) (citing *Touby v. United States,* 500 U.S. 160, 165, 111 S.Ct. 1752, 114 L.Ed.2d 219 (1991), and *United States v. Mistretta,* 488 U.S. 361, 371, 109 S.Ct. 647, 102 L.Ed.2d 714 (1989)). "Under the nondelegation doctrine, Congress may not constitutionally delegate its legislative power to another branch of government." *Id.* (citing *Mistretta,* 488 U.S. at 372, 109 S.Ct. 647). "Congress, however, may seek assistance, within limits, from coordinate branches of government." *Id.* "So long as Congress formulates

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

'an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform, such legislative action is not a forbidden delegation of legislative power.' " *Id.* (quoting *Mistretta,* 488 U.S. at 372, 109 S.Ct. 647).

Barrett's argument is foreclosed by our decision in *McCullah.* There, we held, in the context of an identical challenge asserted by a defendant to the death penalty scheme set forth in § 848, that "prosecutorial discretion to promulgate non-statutory aggravating factors falls squarely within the permissible delegation of power to the Executive Branch." 76 F.3d at 1106 ("The prosecutorial discretion to promulgate non-statutory aggravating factors falls squarely within the permissible delegation of power to the Executive Branch."). Thus, Barrett's arguments regarding non-statutory aggravating factors do not establish plain error.

*c) Proportionality*

Barrett next complains, in conclusory fashion, that § 848 "fails to require proportional review." Aplt. Br. at 57. Because Barrett did not raise this issue in the district court, it is subject to review on appeal only for plain error.

**\*1109** We readily reject Barrett's claim. In *Pulley v. Harris,* 465 U.S. 37, 43, 104 S.Ct. 871, 79 L.Ed.2d 29 (1984), the Supreme Court held that the Eighth Amendment does not require state courts to conduct proportionality review of a death sentence. Although Barrett cites to *Pulley,* he makes no attempt to distinguish § 848's scheme from the state death penalty scheme at issue in *Pulley,* or to otherwise explain why proportionality review should be constitutionally required under § 848's scheme. Thus, we conclude he has failed to establish plain error.

*d) The "relaxed" evidentiary standard*

Barrett complains, again in conclusory fashion, that § 848 "allows a relaxed evidentiary standard in violation of *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976)." Aplt. Br. at 57. Because Barrett did not raise this issue in the district court, it is subject to review only for plain error.

Presumably, the "relaxed evidentiary standard" that Barrett refers to is the following provision in § 848 (j): "[a]ny other information relevant to [the] mitigating or aggravating factors may be presented by either the Government or the defendant, regardless of its admissibility under the rules governing admission of evidence at criminal trials, except that information may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice." 21 U.S.C. § 848(j).

Although not directly on point, the Second, Fourth, Fifth, and Eighth Circuits have expressly rejected claims that a nearly identical provision of the FDPA, 18 U.S.C. § 3593(c), is unconstitutional. *United States v. Fulks,* 454 F.3d 410, 437-38 (4th Cir.2006); *United States v. Lee,* 374 F.3d 637, 648-49 (8th Cir.2004); *United States v. Fell,* 360 F.3d 135, 143-46 (2d Cir.2004), *United States v. Webster,* 162 F.3d 308, 354 (5th Cir.1998). In doing so, the Fourth Circuit noted that "[t]he Evidence Rules do not set forth the constitutional parameters of admissible evidence, nor does a criminal defendant have a constitutional right to have the [Evidence Rules] in place." *Fulks,* 454 F.3d at 438 (internal quotation marks omitted). Instead, the Fourth Circuit noted, "the FDPA provides a capital defendant with constitutionally sufficient evidentiary protections" because, "[e]ven without the protections of the Evidence Rules, it remains for the [district] court, in the exercise of its judgment and discretion, to ensure that unconstitutional evidence otherwise admissible under applicable evidentiary rules is excluded from trial." *Id.* (internal quotation marks omitted). Similarly, the Second Circuit noted that the FDPA's evidentiary standard is "both constitutionally permissible and relevant to the determination of whether the death penalty should be imposed in a given case." *Fell,* 360 F.3d at 144. Indeed, the Second Circuit noted, "the FDPA does not

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

undermine heightened reliability," but rather "promotes it." *Id.* (internal quotation marks omitted).

Although these cases are not binding on us, we find them persuasive and thus apply their reasoning in rejecting Barrett's challenge to § 848(j). In doing so, we note that Barrett has not cited any of these cases, let alone attempted to undermine the reasoning contained therein. Lastly, although Barrett cites to the Supreme Court's decision in *Woodson,* he fails to explain, and it is not readily apparent, how that decision has any relevance to § 848(j)'s so-called relaxed evidentiary standard. Although the Court in *Woodson* emphasized that it is constitutionally problematic for a jury in the sentencing phase of a capital case to be provided "unguided and unchecked ... discretion," 428 U.S. at 302, 96 S.Ct. 2978, the sentencing phase evidentiary standard employed by the FDPA clearly does not afford the jury any **\*1110** such unbridled discretion. Thus, Barrett has fallen far short of establishing plain error arising out of this issue.

*e) Allowance of impermissibly vague aggravating factors*

Barrett contends, again in conclusory fashion, that § 848 "allows for consideration of impermissibly vague aggravating factors." Aplt. Br. at 57. Because Barrett did not raise this issue below, it is reviewed on appeal only for plain error.

Although it is not entirely clear, Barrett is presumably again referring to § 848's allowance of non-statutory aggravating factors. For the reasons already discussed, it is clear that § 848's general allowance of non-statutory aggravating factors is constitutionally permissible. Further, a defendant always retains the right to challenge, as impermissibly vague, any particular non-statutory aggravating factor alleged by the prosecution in his case. Finally, Barrett has failed to explain how this alleged deficiency in § 848's sentencing scheme prejudiced him. Thus, he has failed to establish plain error.

*f) Failure to narrow the class of persons eligible for death penalty*

Finally, Barrett complains that § 848 fails to "narrow the class of persons eligible for the death penalty." Aplt. Br. at 58. Barrett arguably presented this issue to the district court in his motion to declare the federal death penalty scheme unconstitutional. ROA, Vol. 1, Doc. 78 at 2 (arguing that the federal death penalty scheme "fails to provide a reliable and consistent means of selecting the small sub-class of murderers who are constitutionally death eligible"). Thus, we review the issue de novo. *Jones,* 468 F.3d at 709 ("when the [district] court's decision rests on an issue of law, ... we review de novo.").

We readily conclude that this claim lacks merit. To be sentenced to death under § 848, a defendant must be found guilty of having committed one of the qualifying crimes enumerated in § 848(e)(1)(A) or (B). In addition, a jury must find beyond a reasonable doubt that the defendant committed the offense of conviction with one of the listed culpable mental states. 21 U.S.C. §§ 848(k) and (n)(1). Further, the jury must find beyond a reasonable doubt the existence of at least one other statutory aggravating factor. 21 U.S.C. § 848(k). Finally, a jury, considering both aggravating and mitigating factors, must determine that the death penalty is appropriate. *Id.* Thus, § 848 clearly narrows the class of persons eligible for the death penalty.

*7. Constitutionality of the "intent to kill" aggravating factor*

Barrett contends that the inclusion of the "intent to kill" aggravating factor during the penalty phase proceedings violated his constitutional rights because it first served as an eligibility factor and was then included in the weighing process. According to Barrett, the inclusion of this factor "in weighing the aggravation against the mitigation clearly resulted in an 'artificially inflated' view of the aggravating evidence and impermissibly skewed the weigh-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

ing process toward death." Aplt. Br. at 60. Because Barrett did not raise this argument below, it is subject to review only for plain error.

The death penalty scheme applicable to Count 3 at the time of trial set forth twelve statutory aggravating factors. 21 U.S.C. § 848(n)(1)-(12) (2005). The first of those statutory aggravating factors concerned the mental state of the defendant at the time of the offense.[FN13] For a defendant to **\*1111** become "death eligible" under this scheme, the jury, during the second-stage proceedings, had to find the existence of (1) this first statutory aggravating factor, i.e., that the defendant committed the offense of conviction with one of the listed culpable mental states, and (2) at least one other statutory aggravating factor. 21 U.S.C. § 848(k) (2005). If a defendant became "death eligible" in this manner, the jury was then directed to "consider whether the aggravating factors found to exist sufficiently outweigh[ed] any mitigating factor or factors found to exist, or in the absence of mitigating factors, whether the aggravating factors [we]re themselves sufficient to justify a sentence of death." *Id.*

> FN13. More specifically, this aggravator asked whether the defendant "(A) intentionally killed the victim; (B) intentionally inflicted serious bodily injury which resulted in the death of the victim; (C) intentionally engaged in conduct intending that the victim be killed or that lethal force be employed against the victim, which resulted in the death of the victim; [or] (D) intentionally engaged in conduct which-(i) the defendant knew would create a grave risk of death to a person, other than one of the participants in the offense; and (ii) resulted in the death of the victim." 21 U.S.C. § 848(n)(1)(A)-(D).

[15] Contrary to Barrett's assertions, this scheme did not result in the first statutory aggravating factor, defendant's culpable mental state, "artificially inflating" the aggravating evidence or "impermissibly skew[ing] the weighing process to-

ward death." To begin with, Barrett does not dispute that a defendant's culpable mental state is a valid aggravating factor for a jury to consider in deciding whether death is an appropriate sentence. Thus, his case is immediately distinguished from the only Supreme Court case he cites in his brief, *Stringer v. Black,* 503 U.S. 222, 232, 112 S.Ct. 1130, 117 L.Ed.2d 367 (1992) (indicating that the weighing process may be impermissibly skewed if the sentencing jury considers an invalid factor). To be sure, the jury's finding of the existence of one of the culpable mental states serves two purposes, i.e., to narrow the class of defendants eligible for the death penalty and to assist the jury in determining whether a sentence of death is justified. That does not mean, however, that the jury would or could have given this aggravator extra "weight" during the weighing process. To the contrary, the district court in Barrett's case expressly instructed the jury, as it was effectively required to under the statute then in existence, that it was to evaluate all of the aggravating and mitigating factors and decide whether they were unanimously persuaded that the aggravating factors "sufficiently outweigh[ed] any mitigating factors to justify a sentence of death." ROA, Vol. 59 at 5322. The district court further instructed the jury that weighing was "not a mechanical process" "determined by raw numbers," but rather required the jury to consider "the quality and value of the factors." *Id.* at 5323. In short, as the district court instructed the jury, the weighing process called for each juror's "careful, considered and mature judgment," *id.* at 5324, in determining "the appropriateness of sentencing [Barrett] to death." *Id.* at 5323.

In conclusion, Barrett has failed to establish any error, let alone plain error, resulting from the manner in which the jury was instructed to utilize the mental culpability aggravating factor in determining the appropriate sentence with respect to Count 3. *Cf. Jones v. United States,* 527 U.S. 373, 399-400, 119 S.Ct. 2090, 144 L.Ed.2d 370 (1999) (concluding that "any risk that the weighing process would be skewed" by arguably duplicative aggravating

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

factors "was eliminated by the District Court's instruction that the jury 'should not simply count the number of aggravating and mitigating factors and reach a decision based on which number is greater [but rather] should consider the weight and value of each factor.' ").

**\*1112** *8. Sufficiency of evidence of Barrett's intent to kill*

Barrett contends that "[t]here was insufficient evidence that [he] had the intent to kill, or the intent to kill a law enforcement officer, thereby rendering [his] convictions and sentences invalid." Aplt. Br. at 63. Barrett first raised this issue during trial by moving, at the close of the government's evidence and again at the close of all evidence, for judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29.

"In evaluating whether the evidence is sufficient to support the jury's verdict, we review the record de novo and ask only whether, taking the evidence-both direct and circumstantial, together with the reasonable inferences to be drawn therefrom-in the light most favorable to the government, a reasonable jury could find [Defendant] guilty beyond a reasonable doubt." *United States v. Ramirez,* 479 F.3d 1229, 1249 (10th Cir.2007) (internal quotation marks omitted). "We evaluate the sufficiency of the evidence by considering the collective inferences to be drawn from the evidence as a whole." *Id.* at 1249-50 (internal quotation marks omitted).

Counts 1 and 2 of the superseding indictment charged Barrett with violating 18 U.S.C. §§ 924(c)(1)(A) and (j). Count 1 charged Barrett with using and carrying a firearm during and in relation to a drug trafficking crime, resulting in death, while Count 2 charged Barrett with using and carrying a firearm during and in relation to a crime of violence, i.e., the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties, and possessing a firearm in furtherance of such crime of violence.

The key difference between the two crimes in terms of proof was that, in order to find Barrett guilty of Count 2, the jury had to find he committed the underlying crime of violence, and therefore necessarily had to find that Barrett intentionally killed "any Federal, State, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties...." ROA, Vol. 1, Doc. 240, Instruction No. 14. In contrast, the jury, in order to find Barrett guilty of Count 1, merely had to prove that he "directly caused the death of David Eales through the use of a firearm." *Id.,* Instruction No. 7. In other words, Barrett's intent to kill Eales was an element of Count 2, but not of Count 1.

Barrett's intent was also an essential element of Count 3 of the superseding indictment. Count 3 directly charged Barrett with committing the underlying crime of violence alleged in Count 2, i.e., intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). To convict Barrett of that offense, the government had to prove, as it did with respect to Count 2, that Barrett intentionally killed Eales. *Id.,* Instruction No. 14.

The district court instructed the jury, without objection from Barrett, that the word " '[i]ntentionally' means that a person desires to cause the consequences of their act or believes that the consequences are substantially certain to flow from it." *Id.,* Instruction No. 15. Further, the district court instructed the jury, again without objection from Barrett, that "[i]n determining the issue of what ... a person intended at a particular time," it could "consider any statements made or acts done by that person and all other facts and circumstances received in evidence which m[ight] aid in [its] determination of that person's knowledge or intent." *Id.,* Instruction No. 19.

[16] Reviewing the trial transcript in light of these instructions, we conclude the **\*1113** evidence presented by the government was more than sufficient to allow the jury to reasonably find that Bar-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

rett intentionally killed Eales. Barrett had been aware for some time of the outstanding warrant for his arrest, and anticipated that law enforcement officials would come to his house to arrest him at some point. Tr. at 400-01. Despite that awareness, or perhaps because of it, Barrett exhibited a defiant attitude towards law enforcement officials. On the front gate leading to his residence, Barrett had installed a sign reading: "Keep Out. I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot." *Id.* at 399. Further, in the months and weeks leading up to the date of the shooting, Barrett regularly told friends and family that if law enforcement officers came to his house, "[t]here was going to be a shootout," *id.* at 412, "he would shoot the first police that came through his door," *id.* at 2515, and "he was going to take out as many [law enforcement officers] as he could before they got him." *Id.* at 412-13; *see id.* at 3068-69, 3106, 3493. Indeed, on the evening of September 23, 1999, Barrett observed three of the Tact Team members drive by his residence in an unmarked vehicle, and subsequently stated to his cousin, Travis Crawford, that he knew the vehicle belonged to law enforcement officials, that he didn't "give a fuck" if they came back to serve the arrest warrant, and that "he was going out in a blaze of glory" if they did so. *Id.* at 466.

Barrett's conduct in the months, weeks, and days leading up to the shooting incident suggests his threats were far from idle. Barrett possessed multiple firearms at his residence, including five rifles, three shotguns, and two pistols. *Id.* at 401, 1862-63, 1882-83, 1888, 1895, 1899-1901. During the day, Barrett typically kept a rifle nearby. *Id.* at 461-62, 3086, 3493-94. He also carried a nine millimeter pistol in his pants at all times. *Id.* at 409-10, 3106, 3496.

As for the night of the shooting incident, the evidence presented at trial was more than sufficient to have allowed the jury to reasonably find that Barrett knew it was law enforcement officials who were approaching his residence en masse. At the time the Tact Team approached Barrett's property, there was a full moon and no clouds in the sky. *Id.* at 993. The two lead Tact Team vehicles that approached Barrett's residence from the east were white Ford Broncos. *Id.* at 984. Although the Broncos were unmarked, Barrett had observed one of these vehicles on the afternoon prior to the shooting (it was used in the drive-by performed by Tact Team members), and suspected that it belonged to law enforcement officials. Further, although the lead Bronco did not exhibit any flashing lights (because Barrett began shooting at it before the two officers inside had an opportunity to turn on the lights), *id.* at 610, the second Bronco did. *Id.* at 732. More specifically, the second Bronco had a flashing strobe-type light on the sun visor and "wig-wag" headlights, all of which had been activated. *Id.* at 732, 1094. The third vehicle to enter Barrett's property, immediately following the two lead Broncos, was a marked Oklahoma Highway Patrol car with its emergency lights activated (including a standard light bar on top and "wig-wag" headlights).[FN14] *Id.* at 760, 987, **\*1114** 991. The lights from this third vehicle were described by witnesses as sufficient to illuminate the scene in front of Barrett's residence. *Id.* at 1101 (testimony from Trooper Steve Hash, the driver of the second Bronco, that he observed red and blue strobe lights reflecting off of Trooper Eales as he got out of the lead Bronco), 1158-59 (indicating the lights of marked unit lit up the whole area), 1343 (indicating that light bar on top of marked unit was very visible), 1496 (indicating that red and blue lights from marked unit were reflecting off the shards of glass coming from the lead Bronco), 1797-98 (indicating that lights from marked unit illuminated a wide area around the vehicle).

> FN14. The testimony was conflicting as to when, precisely, the lights of this marked vehicle were activated. Tr. at 772 (indicating that lights were not activated prior to when Barrett began shooting), 987 (indicating that lights were activated prior to any shots being fired), 1154 (same),

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

1263-64 (same). It is clear, nevertheless, that a substantial portion of the shots fired by Barrett occurred after the lights of this vehicle were activated.

Finally, and perhaps most significantly, Barrett's conduct in shooting at the officers that night clearly would have allowed the jury to reasonably find that he intended to kill one or more of those officers, including Eales. Barrett began shooting at the lead vehicle, a Ford Bronco driven by Trooper Hamilton, as soon as the vehicle cleared a ditch that ran between Barrett's house and a property to the east. *Id.* at 537. According to Hamilton, Barrett's shots were hitting in the middle of the windshield of the Bronco, at approximately "head level." *Id.* As Hamilton continued driving the Bronco westward towards Barrett's residence, the gunfire intensified and the windshield of the Bronco began to disappear. *Id.* at 539. The gunfire continued after Hamilton stopped the Bronco near the edge of the front porch of Barrett's residence. *Id.* at 540. Eales, who was a passenger in the lead Bronco driven by Hamilton, opened the passenger side door (which was closest to the front porch of Barrett's house), got out, and began heading towards the rear of the Bronco (presumably to obtain cover). As he did so, Eales was struck by three separate rounds of gunfire from Barrett. *Id.* at 1687 (testimony from pathologist opining that Eales' wounds were sustained while facing away from Barrett). One round struck the handgun that Eales carried on his right hip and then ricocheted and struck Eales' right elbow. *Id.* at 1661. A second round [FN15] struck Eales' left flank region, entering approximately twenty-five inches from the top of Eales' head, down from the area on the back of his left arm pit where the skin is folded. *Id.* at 1605. A third, and fatal, round entered Eales' chest on the left side of his upper back. *Id.* at 1611. After shooting Eales, Barrett continued firing rounds at the Tact Team members, stopping only after he himself was shot in the legs by a Tact Team member. *Id.* at 545, 548. Even after being shot and dragged outside of his residence by Tact Team members, Barrett made

movements as if reaching for a pistol he had concealed in the waistband of his jeans. *Id.* at 1113. Subsequent investigation of the crime scene by law enforcement officials revealed that Barrett used a Colt Sporter .223 rifle, equipped with three loaded magazines taped together (with a total of ninety-one rounds of ammunition), to fire at least nineteen shots at Tact Team members, including the three shots that hit Eales. *Id.* at 1884, 3256. The Colt Sporter rifle had a lethal range of approximately 541 to 595 yards, and was capable of penetrating the metal of an automobile. *Id.* at 3573, 3586. At the time Barrett fired the three shots that wounded Eales, he was no more than ten to fifteen feet away from Eales. *Id.* at 4304-05.

> FN15. The pathologist was unable to determine in what order the three wounds were sustained.

In sum, although Barrett's defense during the first-stage proceedings was that he was unaware that the persons entering his property were law enforcement officials, and that he was simply reacting in defense **\*1115** of himself and his son, the above-described evidence was more than sufficient to allow the jury to reasonably find that Barrett knew that Eales and the other persons approaching his residence were law enforcement officers and that he intended to kill Eales.[FN16] We therefore conclude the district court properly denied Barrett's motions for judgment of acquittal.

> FN16. In reaching this conclusion, we do not mean to suggest that knowledge of the victim's status as a law enforcement officer is an essential element of the crime. Rather, we simply note, under the unique facts of this case, that Barrett's knowledge of Eales' status as a law enforcement officer was relevant to the issue of Barrett's intent to kill because Barrett had previously expressed his resolve to shoot any police officers who came to his residence.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

*9. Government's failure to produce names and addresses of key witnesses*

On September 9, 2005 (a Friday), the government filed a sealed motion seeking to delay the production to Barrett of approximately seven witness names. [FN17] On September 12, 2005 (the following Monday), the district court issued a minute order setting the government's motion for a sealed ex parte hearing the next day, September 13, 2005. On September 13, 2005, the government advised the district court that it had "spoken with defense counsel as to the sealed motion to withhold identity of certain witnesses, and that hopefully the matter ha[d] been resolved." Dist. Ct. Docket Sheet at 34 (entry for 9/13/2005). The government further requested until the following day, September 14, 2005, "to advise the court fully of the arrangements to disclose the names and allow defense counsel an opportunity to interview said witnesses." *Id.* at 34-35. On September 14, 2005, the government advised the district court "that it ha[d] reached an agreement with defendant as to disclosure of final witnesses." *Id.* at 35 (entry for 9/14/2005). More specifically, the government indicated it had agreed to provide Barrett with the names, addresses, and other pertinent information for the witnesses at issue by September 19, 2005 (a Monday), and to make those witnesses available to be interviewed by defense counsel on September 22, 2005 (a Thursday). *Id.* In addition, the government indicated there were "two incarcerated witnesses" that would be made "available to defendant when they [we]re writted" to the district court. *Id.* Defense counsel advised the district court that they agreed with these procedures. *Id.* It is unclear from the record whether defense counsel actually interviewed some or all of these witnesses prior to trial. In any event, the government ultimately presented all seven of these witnesses during its case in chief, without objection from Barrett.

> FN17. The seven witnesses included Randy Turman, Travis Crawford, Cindy Crawford, Randy Weaver, Charles Monk Saunders, Karen Real, and Brandi Price, all of whom were friends of Barrett.

Barrett now complains on appeal, however, that the testimony of these seven witnesses "was used to establish the drug offenses, the intent to kill a law enforcement officer, and aggravating factors," and that the government's "failure" to timely provide him the names of those witnesses "amounted to an ambush, thereby denying [him] the opportunity to investigate and prepare cross-examination, as well as present a defense." Aplt. Br. at 65. In support of this contention, Barrett points to 18 U.S.C. § 3432, and argues that the timing of the government's production of the seven witness names was in violation of this statute. Because there is no indication in the record that Barrett asserted these arguments**\*1116** below, his arguments are reviewed for plain error.

Section 3432 of Title 18 provides:

A person charged with treason or other capital offense shall at least three entire days before commencement of trial be furnished with a copy of the indictment and a list of the veniremen, and of the witnesses to be produced on the trial for proving the indictment, stating the place of abode of each venireman and witness, except that such list of the veniremen and witnesses need not be furnished if the court finds by a preponderance of the evidence that providing the list may jeopardize the life or safety of any person.

18 U.S.C. § 3432. The purpose of the statute has been variously described as "to inform the defendant of the testimony which he will have to meet, and to enable him to prepare his defense," *United States v. Chandler,* 996 F.2d 1073, 1098 n. 6 (11th Cir.1993), "to eliminate any element of surprise," *United States v. Greene,* 497 F.2d 1068, 1082 (7th Cir.1974), and "to prevent trial by ambush where a defendant's life is at stake." *Fulks,* 454 F.3d at 422.

Barrett argues that the government's disclosure of the seven witness names was untimely because it did not occur "at least three entire days before com-

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

mencement of trial," as required by § 3432. According to Barrett, the trial in his case "commenced" on September 12, 2005, when the district court began a week-long process of qualifying prospective jurors. Thus, he argues, the government's disclosure of the seven witness names on September 19, 2005, was necessarily untimely because it did not occur more than three days prior to the commencement of trial.

To date, neither the Supreme Court nor any federal circuit court has interpreted the meaning of the phrase "commencement of trial," as used in § 3432. *See United States v. O'Driscoll,* 229 F.Supp.2d 370, 374 (M.D.Pa.2002) (concluding that "commencement of trial," for purposes of § 3432, refers to beginning of voir dire). The Supreme Court has, however, generally held that in a felony criminal proceeding, the trial commences at least from the time when voir dire begins. *Gomez v. United States,* 490 U.S. 858, 872-73, 109 S.Ct. 2237, 104 L.Ed.2d 923 (1989) (citing *Lewis v. United States,* 146 U.S. 370, 374, 13 S.Ct. 136, 36 L.Ed. 1011 (1892)).

Although Barrett attempts to equate voir dire with the jury qualification proceedings conducted by the district court, it is apparent from the record that the two processes in this case were distinct. According to the record, the district court conducted its jury qualification proceedings over the course of five days, from September 12 through 16, 2005. On each of those five days, the district court, in the presence of the parties, interviewed ten prospective jurors in the morning and ten more prospective jurors in the afternoon. At the conclusion of the five days, the district court had qualified approximately eighty-three prospective jurors and excused the remainder. The following week, on Tuesday, September 20, 2005, the district court conducted a final pretrial conference, during which the parties announced ready for trial, and the district court outlined how voir dire proceedings would be conducted. Dist. Ct. Docket Sheet at 37 (Entry for 9/20/2005). The following Monday, September 26,

2005, the voir dire proceedings began. *Id.* at 39 (Entry for 9/26/2005). The district court, using a randomized list of the eighty-three prospective jurors it had qualified, called sixty-four jurors to the box. *Id.* at 32 (Entry for 9/09/2005). The parties were allowed to conduct "general voir dire questioning," and then were each given "23 peremptory challenges." *Id.* At the conclusion of the voir dire proceedings that day, the district court and parties had **\*1117** selected a total of eighteen petit jurors (twelve regular jurors and six alternates). *Id.* at 32, 40. The opening statements of the parties were given the following day, Tuesday, September 27, 2005, and the government then began presenting its case-in-chief. *Id.* at 40-41. In sum, the five-day jury qualification process was intended simply to create a large pool of prospective jurors for the subsequent voir dire proceedings, and nothing in the record on appeal suggests that either the district court or the parties considered the jury qualification process as the "commencement of the trial."

[17] Even assuming, for purposes of argument, that the jury qualification process conducted in this case could be considered the "commencement of the trial" for purposes of § 3432, Barrett has failed to establish plain error arising out of the government's purported untimely disclosure of the seven witness names. For the reasons already described, any error resulting from the timing of the government's disclosure could not reasonably be described as "plain." Further, Barrett has fallen far short of establishing that he was substantially prejudiced by the error. As noted, defense counsel expressly acquiesced in the disclosure schedule proposed by the government and at no time thereafter complained about the timing of the disclosure, requested additional time to question the seven witnesses, or objected to the testimony of these witnesses at trial as being in violation of § 3432. Indeed, defense counsel expressly announced, on the Tuesday prior to the beginning of trial, that they were ready for trial. Lastly, Barrett has failed to establish how the alleged error seriously affected the fairness, integrity, or public reputation of these judicial proceedings.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Accordingly, we conclude that Barrett's claim fails to rise to the level of plain error. *See United States v. Lee,* 374 F.3d 637, 652 (8th Cir.2004) (concluding that defendant had failed to establish plain error arising out of government's disclosure of two witnesses less than 48 hours prior to their appearance at trial).[FN18]

> FN18. A few older circuit cases can arguably be read as suggesting that violations of § 3432 always result in reversible error, plain or otherwise. *E.g., United States v. Crowell,* 442 F.2d 346, 348 (5th Cir.1971) (" Section 3432 is mandatory, and a defendant indicted for a capital offense must be given the benefits of its provisions, ... and the failure to allow defendant its benefits would be plain error."); *Amsler v. United States,* 381 F.2d 37, 45 (9th Cir.1967) ("Section 3432 is mandatory and defendants indicted for a capital offense must be given the benefit of its provisions."). To the extent that was the intent of these courts, it seems to be clearly inconsistent with the Supreme Court's directive that only in "rare cases" will an error be deemed "structural" and "thus require[ ] automatic reversal." *Washington v. Recuenco,* 548U.S. 212, 126 S.Ct. 2546, 2551, 165 L.Ed.2d 466 (2006). Moreover, such a rule would make no sense in situations, such as presented here, where the defendant not only failed to make any argument in the district court, but was also effectively afforded adequate time to interview the government witnesses at issue and prepare for trial.

*10. District court's failure to dismiss indictment*

Barrett contends the district court erred in failing to dismiss the indictment on double jeopardy grounds, as well as on the basis of collateral estoppel and the statute of limitations. Because Barrett timely raised these issues in a pretrial motion to dismiss the su-

perseding indictment, we review them de novo. *See United States v. Cordoba,* 71 F.3d 1543, 1545 (10th Cir.1995) (reviewing district court's denial of motion to dismiss indictment on double jeopardy grounds de novo).

[18] "The Fifth Amendment's Double Jeopardy Clause states that '[n]o person **\*1118** shall ... be subject for the same offence to be twice put in jeopardy of life or limb.' " *United States v. Long,* 324 F.3d 475, 478 (7th Cir.2003) (quoting U.S. Const. amend. V). "The Supreme Court has interpreted the clause as prohibiting not only multiple punishments for the same crime, but also multiple prosecutions as well." *Id.* (citing *United States v. Dixon,* 509 U.S. 688, 695-96, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993)). "One significant limitation exists, however, to the protection afforded by the Double Jeopardy Clause." *Id.* "It is known as the dual sovereignty doctrine, under which courts recognize that the Clause is no bar to serial prosecution and punishment undertaken by separate sovereign entities." *Id.* (citing *Heath v. Alabama,* 474 U.S. 82, 88, 106 S.Ct. 433, 88 L.Ed.2d 387 (1985)). The Supreme Court has explained that the doctrine "is founded on the common-law conception of crime as an offense against the sovereignty of the government," and "[w]hen a defendant in a single act violates the 'peace and dignity' of two sovereigns by breaking the laws of each, he has committed two distinct 'offences.' " *Heath,* 474 U.S. at 88, 106 S.Ct. 433. In other words, the "doctrine is best understood ... *not* as an exception to double jeopardy, but rather as a manifestation of the maxim that where a defendant violates the law of two sovereigns, he commits separate offenses." *United States v. Angleton,* 314 F.3d 767, 771 (5th Cir.2002) (italics in original).

[19] "In analyzing whether sequential prosecutions are undertaken by separate sovereign bodies, courts must determine whether the prosecuting 'entities draw their authority to punish the offender from distinct sources of power.' " *Long,* 324 F.3d at 478 (quoting *Heath,* 474 U.S. at 88, 106 S.Ct. 433). "A

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

496 F.3d 1079
**(Cite as: 496 F.3d 1079)**

classic application of the dual sovereignty doctrine is the case of successive prosecutions by a state and the federal government." *Id.* In *United States v. Lanza,* 260 U.S. 377, 384, 43 S.Ct. 141, 67 L.Ed. 314 (1922), the Supreme Court held that the Double Jeopardy Clause did not bar the federal prosecution of a criminal defendant who had previously been tried and convicted in state court for the same underlying conduct. In light of *Lanza* and its progeny, the United States, as a sovereign, " 'has the right to decide that a state prosecution has not vindicated a violation of the "peace and dignity" of the federal government.' " *Angleton,* 314 F.3d at 771 (quoting *Heath,* 474 U.S. at 93, 106 S.Ct. 433).

Barrett attempts to bypass the dual sovereignty doctrine by arguing that "[t]he voluntary and extensive integration of state and federal law enforcement officers and agencies created a 'single sovereign'...." Aplt. Br. at 73. Stated differently, Barrett argues that "[t]he federal prosecution was merely a tool for a[n] otherwise impermissible second State prosecution, and the actions of the governments obliterate the Dual Sovereign Doctrine in this case." *Id.*

Barrett's arguments, however, find no support in controlling precedent. Indeed, the Supreme Court in *Heath* held that in assessing the validity of the dual sovereignty doctrine in a particular case, the "crucial determination is whether the two entities that seek successively to prosecute a defendant for the same course of conduct can be termed separate sovereigns." 474 U.S. at 88, 106 S.Ct. 433. If the prosecuting sovereigns are separate, the Court held, "the circumstances of the case are irrelevant." *Id.* at 90, 106 S.Ct. 433. That is precisely the situation here. It is beyond dispute that the federal government and the State of Oklahoma are separate sovereigns. Thus, the alleged circumstance Barrett points to, i.e., evidence of law enforcement officials from both sovereigns acting together, is irrelevant and cannot override the dual sovereignty doctrine. **\*1119** *See Angleton,* 314 F.3d at 773 (noting that "[t]he dual sovereignty doctrine ... exists independently of any interaction between sovereigns").

Nor do Barrett's arguments justify application of the "sham prosecution" exception to the dual sovereignty doctrine. In *Bartkus v. Illinois,* 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959), "the Court suggested, in *dictum,* that there is an exception to the dual sovereignty doctrine where prosecution by one sovereign is used as a cover or tool for a successive prosecution by another sovereign." *Angleton,* 314 F.3d at 773 (citing *Bartkus,* 359 U.S. at 123-24, 79 S.Ct. 676). "In such a case, collusion between federal and state officials might blur their distinction such that the defendant is 'effectively prosecuted twice by the same sovereign.' " *Id.* (quoting *United States v. Harrison,* 918 F.2d 469, 474 (5th Cir.1990)). Importantly, however, "[t]he *Bartkus* Court's failure to identify a particular instance of a sham prosecution may mean that the exception does not exist." *Id.* at 773-74. "Indeed, the close interaction between federal and state authorities in *Bartkus,* which included the federal prosecutor's decision to 'instigate and guide' the successive state prosecution, suggests that the sham exception exists, if at all, only in the rarest of circumstances." *Id.* (citing *Bartkus,* 359 U.S. at 165, 79 S.Ct. 676 (Brennan, J., dissenting)); *see United States v. Figueroa-Soto,* 938 F.2d 1015, 1019 (9th Cir.1991) ("As a practical matter, ... under the criteria established by *Bartkus* itself it is extremely difficult and highly unusual to prove that a prosecution by one government is a tool, a sham or a cover for the other government."). In the instant case, Barrett does not come close to alleging, let alone proving, more substantial collusion between federal and state authorities than existed in *Bartkus.* Indeed, there is no indication that the federal government played a significant role in the earlier state prosecutions of Barrett, nor is there evidence that the State of Oklahoma or any officials thereof instigated or guided the current federal prosecution of Barrett.[FN19]

> [FN19.] In passing, Barrett asserts that, "[a]t the very least, this Court should reverse and remand to the district court for an evidentiary hearing on the issue of whether a *Bartkus* exception is present." Aplt. Br.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

at 74. Clearly, however, Barrett has failed to make a substantial threshold showing of the existence of circumstances justifying application of the exception.

To the extent Barrett questions the continued viability of the dual sovereignty doctrine (he made such an argument in his motion to dismiss filed with the district court, but has not clearly made such an argument on appeal), this court is bound to follow *Lanza* and its progeny until such time as the Supreme Court overrules it. *See United States v. Jackson,* 327 F.3d 273, 295 (4th Cir.2003) (reaching same conclusion); *Angleton,* 314 F.3d at 771.

Although Barrett also argues that his federal prosecution is prohibited by principles of collateral estoppel, that argument fails for substantially the same reason as his double jeopardy arguments, i.e., the federal government and the State of Oklahoma are separate sovereigns, and the federal government was not a party to the state prosecutions of Barrett. *See Ashe v. Swenson,* 397 U.S. 436, 443, 90 S.Ct. 1189, 25 L.Ed.2d 469 (1970) (holding that collateral estoppel prevents an issue of ultimate fact from being relitigated between the same parties); *Angleton,* 314 F.3d at 776 ("Collateral estoppel is inapplicable here, because the United States and Texas, as separate sovereigns, are not the 'same party.' ").

Finally, Barrett argues that "there is nothing [in this case] which justifies the **\*1120** federal charge of murder of a state officer on private property." Aplt. Br. at 76. It is unclear what principle Barrett is relying on, or what right, if any, he is asserting was violated. To the extent he is arguing that § 848(e)(1)(B), the statute Count 3 of the superseding indictment charged Barrett with violating, is unconstitutional or otherwise in excess of Congressional power, he is clearly wrong. As previously noted, that statute makes it a federal crime for "any person, during the commission of, in furtherance of, or while attempting to avoid apprehension, prosecution or service of a prison sentence for, a felony violation of" Subchapters I or II of Chapter 13 (Drug Abuse Prevention and Control) of Title 21, "who intentionally kills ... any Federal, State, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties...." An intentional killing in violation of this statute "is within the power of Congress because" it is intertwined with the commission of an underlying federal drug trafficking crime, which itself "impinges on interstate and [potentially] international trade and commerce over which the Congress has undoubted control." *United States v. Whiting,* 771 F.Supp. 476 (D.Mass.1991) (discussing 21 U.S.C. § 848(e)(1)(A)); *see Gonzales v. Raich,* 545 U.S. 1, 22, 125 S.Ct. 2195, 162 L.Ed.2d 1 (2005) (reaffirming that federal drug trafficking laws are within Congress's power to regulate interstate commerce).

*11. Government's failure to follow the Petite Policy*

Barrett contends the district court erred in refusing to dismiss the indictment due to what he describes as the government's failure to follow its own "Petite policy." Because Barrett timely raised this issue in a pretrial motion to dismiss the indictment, we review the issue de novo. *See generally United States v. Lewis,* 240 F.3d 866, 869 (10th Cir.2001).

[20] The Justice Department's Petite policy, so named after the decision in *Petite v. United States,* 361 U.S. 529, 80 S.Ct. 450, 4 L.Ed.2d 490 (1960) (recognizing the policy), "provides that following a state prosecution there should be no federal prosecution for the same transaction in the absence of compelling federal interests." *United States v. Thompson,* 579 F.2d 1184, 1185 (10th Cir.1978) (en banc). It was adopted by the Department of Justice following the Supreme Court's decision in *Bartkus,* in which the Court held that the Double Jeopardy Clause does not bar a state from prosecuting and convicting a defendant who previously has been tried for the same acts in federal court. *United States v. Wilson,* 413 F.3d 382, 388 n. 7 (3d Cir.2005). The policy has regularly appeared in the United States Attorneys' Manual since its adoption

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

by the Department. *See* Ellen S. Podgor, *Dep't of Justice Guidelines: Balance "Discretionary Justice,"* 13 Cornell J.L. & Pub. Pol'y 167, 179 (2004) (citing reference to policy in U.S. Attorneys' Manual § 9-2.031 (2003)); *Thompson,* 579 F.2d at 1185-86 (quoting from 1972 Manual discussing policy).

The problem for Barrett is that we have held, as have many other circuits, that the Petite policy "is merely a housekeeping provision of the Department" that, "at most," serves as "a guide for the use of the Attorney General and the United States Attorneys in the field," and thus does not confer any enforceable rights upon criminal defendants. *Thompson,* 579 F.2d at 1189; *e.g., United States v. Jackson,* 327 F.3d 273, 295 (4th Cir.2003) ("That the Department of Justice has developed an internal protocol for exercising discretion and channeling prosecutorial resources does not provide license for courts to police compliance with that protocol, and it is well established that the *Petite* policy and other internal prosecutorial protocols do not vest defendants with any personal **\*1121** rights."). Thus, it is clear that the district court did not err in refusing to dismiss the superseding indictment on the basis of an alleged violation of the Petite policy.

*12. Cumulative error*

[21][22] In his final issue on appeal, Barrett contends that "[e]ven if none of the [alleged] errors singly warrant relief, the cumulative effective of these errors deprived [him] of a fair trial and requires that his conviction and sentence be reversed." Aplt. Br. at 78. "A cumulative-error analysis aggregates all errors found to be harmless and analyzes whether their cumulative effect on the outcome of the trial is such that collectively they can no longer be determined to be harmless." *United States v. Toles,* 297 F.3d 959, 972 (10th Cir.2002) (internal quotation marks omitted). We "consider [ ] whether the defendant's substantial rights were affected by the cumulative effect of the harmless errors." *Id.* "Only actual errors are considered in de-

termining whether the defendant's right to a fair trial was violated." *Id.* "If any of the errors being aggregated are constitutional in nature, the cumulative error must be harmless beyond a reasonable doubt, in accordance with *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967)." *Id.*

Here, Barrett has failed to establish the existence of multiple non-reversible errors (i.e., harmless errors and plain errors failing to necessitate reversal). FN20 Thus, he cannot benefit from the cumulative error doctrine. *See Workman v. Mullin,* 342 F.3d 1100, 1116 (10th Cir.2003) (noting that cumulative error analysis requires at least two errors).

> FN20. To date, we have never addressed the question of how to, if at all, incorporate into the cumulative error analysis plain errors that do not, standing alone, necessitate reversal. Some circuits combine all non-reversible errors (i.e., harmless errors and plain errors failing to necessitate reversal) into their cumulative error analysis. *See, e.g., United States v. Baker,* 432 F.3d 1189, 1223 (11th Cir.2005). Other circuits, in contrast, appear to review separately any cumulative plain errors. *See United States v. Necoechea,* 986 F.2d 1273, 1283 (9th Cir.1993) ("we review the cumulative impact of the possible plain errors for plain error"). We find it unnecessary to resolve the question in this appeal, given that Barrett has failed to establish the existence of multiple non-reversible errors.

AFFIRMED.

C.A.10 (Okla.),2007.
U.S. v. Barrett
496 F.3d 1079

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.