IN  THE  UNITED  STATES  DISTRICT  COURT  FOR  THE
EASTERN  DISTRICT  OF  OKLAHOMA



**FILED**

**SEP 1 1 2006**

WILLIAM D. GUTHRIE
Clerk, U.S. District Court
By_____
Deputy Clerk

Kenneth Eugene Barrett,

                    Plaintiff,

vs.

Johnny Philpot, Sheriff of
Sequoyah County, Oklahoma;

and

Travis Gabbert, Deputy/Jailor,
Micheal Hendricks, Deputy/Jailor,
Shane McHale, Deputy/Jailor,
Sequoyah County Jail, Sequoyah
County, Oklahoma;

and

John Buddy Hamilton, Supervising/Commanding Officer
Tactical Team, Oklahoma Highway Patrol, Troop C

and

John Doe #1, Oklahoma Highway Patrol Officer,
Oklahoma Highway Patrol, Troop C

and

Gary Philpot, Chief Of Police,
City of Sallisaw, Oklahoma.

                    Defendants.

Case No. #05-CIV-329-FHS-SPS

AMENDED   COMPLAINT

JURY   TRIAL   DEMAND

## PRELIMINARY   STATEMENT

Kenneth Eguene brings this action against the named and unnamed defendants pursuant to 28 U.S.C. § 1331, the First, Fourth, Fifth, Eighth and Fourteenth Amendments to the Constitution of the United States, and relief is sought under 42 U.S.C. § 1983, to seek redress, remedy and vindicate deprivations under color of law of Plaintiff's

1.

Rights, Privileges, and Immunities secured to him under the Constitution of the United States.  Because the aount in controversy is greater than $75,000, and because there is diversity of state citizenship between the plaintiff and each and all of the defendants.  Plaintiff seeks money damages to redress, remedy and vindicate the deprivations of his Constitutional and other Rights under law.  Further' plaintiff seeks an award of appropriate attorney fees, as set forth under the Prisoner Litigation Reform Act and 42 U.S.C. §1988, as well as for all fees and cost incurred in this action.

## JURISDICTIONAL  STATEMENT

1.    This action is brought, and this Court has jurisdiction of all Counts of this action pursuant to 28 U.S.C. §§ 1331(a), 1343, and the First, Fifth, Sixth, Eighth and Fourteenth Amendments to the Constitution of the United States.

2.    Certain designated Counts of this Action, the amount in controversy is greater than $75,000.00, our brought relying upon this Court's diversity of citizenship jurisdiction pursuant to 28 U.S.C. 1332(a)(1).

3.    This Amended Complaint supersedes plaintiff's Original Complaint filed the 9th day of August, 2005.  See **Purkey v. CCA,** 339 F.Supp.2d 1145, 1147 (2004).

4.    All of the actions, omissions and events complained of herein took place within the venue of this Court.

## IDENTIFICATION OF THE PARTIES

1.    Defendant Johnny Philpot is the Sheriff of Seqouyah County, Oklahoma for all purposes relevant to this action.  Further he was responsible for the actions of his employees, deputies/jailers at the Sequoyah County Detention Center.  Hereinafter he will be referred to as "Sheriff Philpot".  Sheriff Philpot is a resident of the state of Oklahoma.

2.    Travis Gabber was a Deputy Sheriff/Jailor at the Sequoyah County Detention Center at all times relevant to this action.  Hereinafter he will be referred to as "Defendant Gabber".  Defendant Gabber is a resident of the state of Oklahoma.

2.

3.     Micheal Hendricks was a deputy sheriff/jailor at all times relevant to this action at the Sequoyah County jail.  Hereinafter he will be referred to as "Defendant Hendricks."  He is a resident of the State of Oklahoma.

4.     Shane McHale was a deputy sheriff/jailor at all times relevant to this action at the Sequoyah County Jail.  Hereinafter he will be referred to as "Defendant McHale".  He is a resident of the State of Oklahoma.

5.     All of the foregoing defendants with the exception of Defendant Hendricks can be issued summons at:

Sequoyah County Jail
119 South Oak Street
Sallisaw, Oklahoma 74955

Defendant Hendricks is presently the Chief of Police of Vian City, Oklahoma and can be served at:

Vian City Police Station
Highway 64
Vian, Oklahoma 74962

6.     John Buddy Hamilton is a State Trooper with the Oklahoma Highway Patrol and was so situated at all times to this action, He was the Supervising Officer of the Tactical and Response Team that raided plaintiff's home the night of September 24th, 1999.  He was in control of all pursuances that night, having ultimate control and was responsible for all events and occurances germane to taking custody of the plaintiff on September 24th, 1999.  Hereinafter he will be referred to as "Defendant Hamilton".  He is a resident of the State of Oklahoma.

7.     John Doe #1 is a State Trooper with the Oklahoma Highway Patrol, he is a white male, approximately fourty-five (45) to fifty (50) years of age, and approximately 6'1" and weighed two hundred and thirty (230) pounds.  His rank is unknown.  Hereinafter he will be referred to as Defendant John doe #1.  He is a resident of the State of Oklahoma to the best of plaintiff's knowledge.

8.     Defendant Hamilton and John Doe #1 can be issued summons at:

3.

Oklahoma Highway Patrol
Troop C
651 North 43rd Street East
Muskogee, Oklahoma 74403

9.   Gary Philpot was the Chief of Police of Sallisaw, Oklahoma for all purposes relevant to this action anent conditions of confinement and treatment plaintiff was subject to during times he was held at the Sallisaw City Jail.  Hereinafter he will be referred to as "Chief of Police Philpot".  He is a resident of the State of Oklahoma.  He can be issued summons at:

Sallisaw City Jail
101 West Chickasaw
Sallisaw, Oklahoma 74955

10.   Kenneth Eugene Barrett is the plaintiff in this action, hereinafter referred to as either "Mr. Barrett" or "Barrett", is currently serving a Federal Sentence, and is being housed by the United States Bureau of Prisons at the United States Penitentiary in Terre Haute, Indiana.  At all times relevant to this action Barrett was either a pretrial detainee at the Sallisaw City Jail and/or the Sequoyah County Detention Center, or in the capacity of a citizen being taken into custody by the named and unnamed defendants.

11.   At all times relevant to this action the named and unnamed defendants were acting under color of state law.  They are sued in the individual capacities therein.

<u>Mr. Barrett Has Availed Himself Of All Administrative Remedies</u>
<u>Prior To Bringing This Action Satisfying Requirements Under 42 U.S.C. § 1997(e)</u>

1.   Prior to bring this action Barrett sought resort to administrative remedies anent all claims listed herein Counts (3) thr (  ).  Through efforts to avail himself of all available administrative remedies with be listed and identified through the subsequent numbered paragraphs.

2.   Barrett sought to avail himself of all available administrative remedies regaring conditions of confinement at the Sallisaw City Jail, as well as to being

4.

unlawfully punitively held at the Sallisaw City Jail at the direction of Defendant Sheriff Philpot and the Chief of Police Philpot. Chief Of Police Philpot told Barrett that no administrative grievance process was available at the Sallisaw City Jail, and in fact Mocked Barrett for asking for grievance forms to seek redress of his conditions of confinement including denial of medical care and other issues of confinement, whereas Chief of Police Philpot told Barrett, "you are a cop killer and now you want a grievance to complain about your treatment here. You are lucky to be alive, if I had my way, you would't be," Chief Philpot told Barrett.

3.    Barrett availed himself of all administrative processes at the Sequoyah County Detention Center regarding all issues presented in this action anent conditions of confinement which including excessive force, unconstitutional conditions of confinement, denial of medical treatment and denial of access to the courts. The method Barrett used to avail himself of all administrative processes was a form used by the jail for multi purposes. The jail form listed different available options such as medical, classification, grievance and/or others. Barrett filed an abundant number of grievances utilizing this form, although because the jail denied Barrett photocopying of legal materials and/or grievances he does not have copies of these documents.

4.    After filing numerous grievances seeking redress for being denied exerice for a four year period while at the jail different jail personnel including defendants Thomas and McHale told Barrett that he was wasting his time filing those grievances because Sheriff Philpot thought they were a joke anyway, and never answered them, and just threw them away.

FIRST CAUSE OF ACTION
DEFENDANTS HAMILTON AND PHILPOT ACTIONS THE NIGHT OF SEPTEMBER 24th, 1999
WERE PROSCRIBED UNDER THE FOURTH AND EIGHTH AMENDMENTS WHEN THEY SUBJECT BARRETT TO A
SAVAGE AND BRUTAL BEATING DURING HIS ARREST AND DID NOT INTERCEDE WHEN THEIR
SUBORDINATES CONTINUOUSLY BEAT BARRETT FOR ALMOST NINTY MINUTES

5.

1.   At appropriately 12:30 a.m. the 24th day of September, 1999 my home became under attack by what I was later to learn was the Tactical Drug Enforcement Unit being Supervised and Commanded by Defendant Hamilton of the Oklahoma Highway Patrol, who set and established operations for the raid on Barrett's Home.

2.   A gun fight ensued and Barrett was shot six times in his legs and hips through the east window of his bedroom where he fell and laid bleedings.  Shortly thereafter he heard a significant explosion which turned out to be a concussion gernade blowing the front door off the house.  Numerous individuals ran into the bedroom dressed in camo attire.  Defendant Hamilton who was dressed in green camo's was screaming while holding a gun trained on Barrett, "get up you son-of-a-bitch, get up. Get you god damn ass up boy, or I am going to blow your fucking head off."  Barrett had absolutely no idea who this guy was, nor any of the others who stormed into his home that morning of September 24th.

3.   "I can't get up, I am shot," Barrett told Hamilton which infuriated him and at that point Hamilton put up his gun, grabbed Barrett by his hair with both hands and started pulling him straight up, causing Barrett significant pain, whereas Barrett thought the defendant was going to break his neck.  Hamilton started dragging Barrett out of the house by the head of his hair, running his head into anything that got in the way and all the while screaming at Barrett that, "I told you to get up you son-of-a-bith."  Barrett thought his neck was going to break because Hamilton was twisting his neck and slamming his head into the steps as he was being dragged out of the house.  After getting to the middle of the yard Hamilton slammed Barrett's head into the ground acouple of time while he was handcuffing him behind his back. Barrett had made absolutely no effort to resist Hamilton or provoke the violence being used against him by Hamilton.  Almost immediately after bing handcuffed Sheriff Philpot and several other people in Philpot's group came into the yard.

4.   Blood was spewing from my nose and mouth which I was choking on and I tried to turn over on my side and spit, at this point Sheriff Philpot grabbed me

6.

by the back of my head by the hair and started shouting at me, "you look at me boy when I am talking to you, you hear me! I should of killed you when I had the chance years ago, you were a little punk then and you are the same now," Philpot said. Hitting me in the face with his meglite flashlight numerous times and jecking up on my neck, lifting me up by the hair on the back of my head he told me, "Boy' if you don't die here, which I think you will, you are going to rot in my jail and you are going to wish to hell you had died here. So either way, you are fucked you son-of-a-bitch," Philpot told Barrett. Finally Philpot left, after beating Barrett profusely with his flashlight, where Barrett had did nothing to incite or provoke the savage beating he had received at the hands of Sheriff Philpot.

5. Barrett laid in the yard without any aid or treatment what-so-ever for almost ninty minutes waiting for an ambulance to be called. During this time different law enforcement officers would come over to Barrett and kick him in different places including the groan area, his gun shot legs and hips or in the face and head making remarks such as, "die you piece of shit, you are going to burn for this if you don't die here and now and we should of killed you a long time ago you motherfucker." Some of the other law enforcement officers who were present during this time and involved in the fragrant beatings were: Hise, Hipe, Greinger, Daurst, Manion, McBride, Pettingill, Pole and Oliver. These were all Hamilton and Philpot's subordinates whereas they did not try to intercede and prevent the continuous beatings inflicted by these other officers.

6. Because of the beatings Barrett was subject to by Hamilton, Philpot and their subordinates he suffered severe injuries and pain including by not limited to: Swollen and bruised testicles and penis, his left eye socket was broken, resulting in disfigurement with permanent knots logged in the eye socket. Because of the stomping and kicking Barrett was subject to by the unidentified officers while he laid in the yard for an hour and a half both hands were swollen, brusied and permanently subject to acking. In his lower right leg he has a permanent knot from being kicked so many times in that

7.

area that the bone was literally chipped.  Almost all of Barrett's front teeth were loosened because of being both kicked and beat in the face, as well he had two teeth surgically removed on the bottom because they were so severely cracked.  Further' there was bruising and swelling to almost every part of his body, including his head which sustain numerous and uncountable knots, to his ribs, his back, neck and legs as well.  He had been savagely, brutally and unmercifully beaten for over an hour and a half - it is impossible for him to readily list the injuries he sustained in any comprehensive fashion.

7.   Almost two hours after being shot and beaten Barrett arrived at the Sallisaw Memorial Hospital.  See Exhibit (1)(attached hereto)(Encounter Record).  Because of the serious life threatening injuries sustained from both the gun shot wounds and beatings as well Barrett was transferred to St. Francis Hospital Tulsa, Oklahoma.  See Exhibit (2)(hereto attached)(Emergency Medical service - Narrative).

8.   Mr. Barrett requests that he be granted compensatory damages collectively and severaly from Defendants Hamilton and Sheriff Philpot in the amount of $1,000,000.00, and  punitive damages in the amount of $1,500,000.00.

9.   Mr. Barrett also requests that this Court require that these same defendants pay Barrett reasonable attorney fess and all other cost incurred in this action.

## SECOND CAUSE OF ACTION

DEFENDANTS HAMILTON AND JOHN DOE #1 PERFORMED AN ILLEGAL AND ABUSIVE CAVITY SEARCH
ON BARRETT WHICH WAS CONDUCTED IN A PUBLIC MANNER AND USING EXCESSIVE FORCE
WHICH WAS PROSCRIBED UNDER THE FOURTH, EIGHTH AND FOURTEENTH AMENDMENTS,
WHICH RESULTED IN EXCRUCIATING PAIN AND PERMANENT DAMAGE.

1.   After arriving at St. Francis Hospital and being taken to the emerency room Barrett was approached by three Oklahoma State Highway Patrol Officers while he laid in the emerency room with several medical personnel working on him and with numerous other law enforcement personnel surrounding him as well.  One of the three Highway

Patrol Officers', John Doe #1 informed Barrett that they were their to perform a cavity search by Order of their supervising officer Hamilton.  Barrett who laid on a emerency room gurney nude with a sheet partially covering him while being treated for the numerous gun shot wounds to his legs and hips really was not in any condition to either physically or mentally protest what John Doe #1 was threatening to do.  Before he could msuter a protest one of the emerency room nurses who was working on Barrett told the three officers that, "you are not doing a cavity search of this guy until we are finish working on him, and without hiding her irritation told the three officers to go away and leave him alone.  "Looky here lady, John Doe #1 was telling the nurse, this here is a cop killer and whether you like it or not or for that matter God himself we are doing the cavity search here and now so just get out of the way."

4.   You guys' cannot do a cavity search without a warrant, you know as well as I do Barrett manage to protest, whereas John Doe #1 told him that Hamilton told us to do a cavity search for weapons and drugs and you can do this the easy way or the hard, I really don't give a fuck which, he said.

5.   All three officers had rubber gloves on and John Doe told one of them to hold Barrett down, which he almost literally laid across Barrett's chest, whereas the second officer grabbed Barrett underneather each leg at the knees and pulled back with excruc-iating pain to the gun shot wounds.  While Barrett's legs are being pulled back and he is held down at the waste John Doe literally rammed his fist into Barrett anus while spreading his buttocks apart.  Barrett could feel his anus being ripped apart and torn with excruciating pain and screamed out telling John doe to stop, but John Doe continued to jam his fist into Barrett's anus as deeply as he could and nothing Barrett screamed out detered the brutal intrusion.

6.   The brutal assult lasted anywhere from fifteen to thirty seconds while others in the emerency room looked on, and in fact mocked Barrett and laughed at him during the assult.  Certain law enforcement personnel remarked during the assult indistinguish-

9.

comments laced with laughter and mockery.

7.     Because of the brutality and savagery of the assult Barrett suffered not only excruciating pain and anguish for weeks afterwards, but as well as bleeding by the physical injuries sustained.

8.     Because of the brutality of the assult fecal matter was jammed into Barrett's intestinal and colorectal track prohibiting him from bowel movements for almost two weeks after the cavity search.  Becasue Barrett could not manage a bowel movement for almost two weeks after the assult he was taken to Sequoyah Memorial Hospital where he was treated for the fecal matter being jammed into his intestinal and colorectal track.  See Exhibit (3) hereto attached (Sequoyah Memorial Hospital Record, 10/03/99).

9.     Mr. Barrett request that he be granted compensatory damages jointly and severally from Defendants Hamilton and John Doe #1 in the amount of $25,000.00 and punitive damages in the amount of $500,000.00.

10.     Mr. Barrett also request that this Court require that these same defendants pay Barrett reasonable attorney fees and all other cost incurred in this action.

<u>THIRD CAUSE OF ACTION</u>

DEFENDANTS SHERIFF PHILPOT, CHIEF OF POLICE PHILPOT AND HENDRICKS SUBJECT BARRETT TO EXCESSIVE FORCE ON TWO DIFFERENT OCCASIONS, TO PUNITIVE SEGREGATION WITHOUT REQUIRED TENETS OF DUE PROCESS AND TO UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT AS PROSCRIBED UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS

1.     Early in December 2000 Sheriff Philpot came to the North Unit at the Sequoyah County Jail and had me placed in handcuffs because I allegedly was being insolent to one of his staff concerning what we were being feed for lunch.  After the defendant placed Barrett in handcuffs behind his back he began to beat him without provacation.  Hitting him in the side of the face with his closed fist and kicking him in the groan, Barrett did not try to resist in any fashion.  Inmate Justin Scrapper was present and witnessed the beating Barrett suffered.  In fact Scrapper contacted

10.

Barrett's parents by phone shortly after the beating and told them what had occurred. They in turn called Barrett's trial attorney who came to see Barrett the following day who will attest to the bruising and swelling Barrett suffered because of the beating which was totally unprovoked. It is noteworthy that Defendant Philpot has paid damages for his numerous unprovoked attacks on other inmates which will be thoroughly documented through discovery proceedings herein.

2.     Defendant Philpot after severely beating Barrett dragged here by the handcuffs to the visiting room and had him handcuffed, still behind his back to the fence that separated the visiting room and the walkway outside. Barrett's arms were stretched behind him and handcuffed placing tremendous pressure on both shoulders, as he tried to stand without bending and putting more pressure on his shoulders. The defendant told Barrett, "we'll see how you like that you son-of-a-bitch. You want to cause problems in my jail you are going to pay for it." Barrett was forced to remain handcuffed in that position for over three hours, and at one point he was forced to urinate on himself even though he had yelled repeatedly to jail personnel to let him use the bathroom. Two of the jail personnel Barrett had asked to please allow him to use the bathroom and to be let loose told him that, "we cannot do anything, because Sheriff Philpot ordered that you not be let down until he said that you be let down, and if we do anything contrary to his orders he will fire are asses," they said. When Barrett was finally let down both of his shoulders were totally numb, he could not feel anything in either his neck or upper arm areas and to this day his shoulders will sometimes acke with excruciating pain.

**The Second Assult**

3.     After finding that Barrett needed to be placed on a bland diet the applicable medical personnel at the jail had Barrett placed on a bland diet. See Exhibit (4) hereto attached(Order by Dr. Brenneman, M.D.). Because Barrett was being feed peanut butter and jelly for all meals by the food dietican, who was the jail administrator,

11.

Lelonie Lethecer he complained to her about this matter and she showed a total indifference to such Barrett became aggravated and threw a peanutbutter and jelly snadwich up against the wall in the visiting area where special diets ate their meals. She orderd Barrett to clean up the mess and when he refused to do so she called Sheriff Philpot who came down to the visiting area. The defendant told Barrett to clean up the mess or he is going to wish to hell he had of. Barrett persisted in his refusal to clean up the mess in defiance of the defendants orders.

4.   Sheriff Philpot left and returned with a jail deputy, defendant Hendricks who told Barrett that he was ordering him to put on a strait jacket. Barrett told both Hendricks and Sheriff Philpot that they could not punish him without first holding some kind of disciplinary hearing. He told them that even they knew that. Hendricks and Philpot forced Barrett to put the strait jacket on and they then placed handcuffs through the back part of the strait jacket and and hooked Barrett to the visiting area fence with two pair of handcuffs attached to the strait jacket. Barrett was left handcuffed to the chain link fence for five to six hours, urinating himself on two different occasions, because jail personnel, including Hendricks refused his request to use the bathroom. Barrett was as well denied any water to drink during this time period.

5.   Approximately six hours later Sheriff Philpot came after Barrett with another deputy sheriff and while wearing the strait jacket they transferred Barrett to the Sallisaw City Jail. When Barrett asked the defendant what he thought he was doing taking him out of the County Jail to the City Jail, the defendant said, "I told you that I was going to make you wish you had cleaned that mess up, now I am."

**Punitive Segregation Without Tenets Of Due Process and Constitutionally proscribed Conditions of Segregation Confinement**

6.   The defendant and Barrett was met at the City Jail by the Chief of Police, defendant Gary ~~Johnny~~ Philpot who gave Barrett a waffle size mattress and a blanket, without and thing else placed Barrett in a cell with only a concrete slab for a bed, a sink

12.

and toilet.  Barrett was denied toilet paper and/or any other basic hygiene items such as soap, tooth paste, tooth brush, comb and ect.  In fact Defendant Chief of Police Philpot went so far as to deny Barrett so much as a book to read, legal materials and writing utensils.  Barrett remained in solitary confinement without so much as a disciplinary write up or disciplinary hearing of any kind.  He remained in solitary confinement for ten days, without a shower, visits, phone calls of mail.  He was provided meals.  Further he was denied clean clothing and or bedding during this same time period.

7.   After being in solitary confinement for ten days Sheriff Philpot came to Barrett's cell and asked him if he had learned his lesson yet.  After Barrett assured him that in fact he had learn his lesson Sheriff Philpot transferred him back to the Sequoyah  County Jail.

8.   After arriving back at the Sequoyah County Jail Barrett filed a grievance anent the beating and handcuffing he suffered under Sheriff Philpot, as well regarding being subject to punitive segregation without due process of law and concerning the unconstitutional conditions of that confinement at Sallisaw City Jail at Order of Sheriff Philpot.  No response was ever received from that grievance.

9.   Mr. Barrett request he be granted compensatory damages from Defendant Sheriff Philpot in the amount of $50,000.00 and punitive damages in the amount of $100,000.00 for being subject to the beating received by defendant Sheriff Philpot and for being subject to being hadcuffed to the fence for hours without due process.

10.   Mr. Barrett request that he be granted compensatory damages jointly and severally from Defendants Sheriff Philpot and Chief of Police Philpot in the amount of $25,000.00 and punitive damages in the amount of $25,000.00 for them subjecting him to solitary confinement without required tenets of due process and in subjecting him to unconstitutional conditions of confinement in that solitary confinement.

11.   Mr. Barrett also request that this Court require that these same defendants

13.

pay Barrett reasonable attorney fees and all other cost incurred in this action.

<u>FOURTH CAUSE OF ACTION</u>

DEFENDANTS SHERIFF PHILPOT AND CHIEF OF POLICE PHILPOT INTERRED WITH AND DENIED BARRETT MEDICALLY ORDERED TREATMENT IN VIOLATION OF THE EIGHTH AMENDMENT; AND DEFENDANT CHIEF OF POLICE PHILPOT CONTRAVENE THE EIGHTH AND FOURTEENTH AMENDMENTS WHEN HE SUBJECT BARRETT TO UNCONSTITUTIONAL CONDITIONS OF CONFINEMENT

1.    After being shot six (6) times through both legs and one of his hips and then savagely beaten September 24th, 1999 Barrett was placed in an ambulance for transportation to the hospital.  When being placed in the rear of the ambulance Sheriff Philpot, Chief of Police Philpot and Park Ranger Philpot, and others including Highway Patrol Officer Gary james climed in the ambulance with Barrett.  The three Philpot(s) ordered the ambulance attended, the EMS Personnel out of the ambulance and when she refused to leave the ambulance the Philpot renewed their order with greater fervor. She complied leaving Barrett without medical attention.

2.    Due to the traumatical seriousness of the wounds inflicted and combination of the beatings suffered Sequoyah Memorial Hospital ordered that Barrett be immediately transferred to St. Francis Hospital in Tulsa, Oklahoma.  See Exhibit (5) hereto attached (Transfer Certificate and Assessment Form for Surgical Consultation).  The gun shot wounds Barrett had sustained are as follows: a) one bullet entered Barrett's right hip and buttock area which is still lodged there to date; b) a second bullet went in Barrett's right hip and back out through the hip; c) a third bullet entered the back of Barrett's right leg at the knee area and existed out the front in the same area; d) a fourth bullet entered at approximately the same area as the third bullet did and existed at approximately the same area; e) a fifth bullet entered the left leg from the back at approximately the knee area and existed at approximately the same area in front; and f) the sixth bullet entered the left leg at approximately the same level as the fifth did but he remained in the knee of the left leg.  After being treated in

14.

the emergency room at St. Francis Barrett was taken to a hospital room where a tude remained in his nose and I.V. drip in his arm.  After only a few hours of being placed in the hospital room he was woken by several Oklahoma Highway Patrol Officers and was told that he needed to get up.  What do you mean get up, Barrett asked, I can hardly move at all let alone get up, Barrett told the Officers.  Taking the tube out of Barrett's nose, the handcuffs off of his wrist which one was handcuffed to the hospital bed and literally pulling Barrett up they gave him a walker and told him, "Now Walk".  Barrett persistently told them that he could verily move, let alone walk.  One of the officers grabbed the walker from the front and started pulling on it forcing Barrett to move, and the only way he could move was by dragging his legs and/or little jumping movements which causing excruciating pain.  After twenty or twenty-five feet of this torment of dragging his legs and doing the excruciating little leaps of being dragged by the cop in front of the walker the cops told the doctor; "See, Barrett is fine, he can walk as well as any of us so you can discharge him."  This manuvnering of Barrett by the Highway Patrol Officers was clear to anyone watching and yet the doctor allowed these officers to coerce him into releasing Barrett.

3.    Defendant Hamilton who had suffered a superficial bullet glaze to one shoulder and some bullet fragments to one eye was hospitalized for three days.

**Chief of Police Philpot Interferred with and denied Barrett Medical Ordered Treatment and Subject Barrett To Unconstitutional Conditions of Confinement**

4.    After being placed in a wheel-chair and taken from the Tulsa, Oklahoma Hopsital he was transferred to the Sallisaw City Jail, where he was literally carried into the jail by the transporting officers because Barrett was unable to walk.  Arriving at the jail and being met by Chief of Police Philpot Barrett was sit down on the floor of the jail booking area.  Chief of Plice Philpot told the other officers that they would book Barrett into the jail, which was because of the enormous brusing and swellingto Barrett's face, head and neck from the beatings he was subject to.

15.

5.   Defendant Philpot and a jailer picked Barrett up and carried him to a cell and deposited him on the floor like a sack of potatos where he laid for sereval hours until he found the strength to crawl to the concrete slab in the cell which was the cell's bed.  Before being deposited in the cell by Philpot, Barrett told the Chief of Police that he was in excruciating pain and that the doctor at St. Francis said that he was prescribing medication for him, and had ordered that he be provided a wheel chair.  "You're getting any of that here, the chief of police told Barrett, and if you cannot walk, then crawl, because we care not going to provide you with a god damn wheel chair Philpot reiterated.  Later this same date the chief of police did have Barrett a matress and blanket brought to him.

6.   Because of the significant gun shot wounds Barrett had suffered he was not capable of walking to retrieve his meals which were always provided to him through a slot in the cell door.  So if Barrett wanted to eat he had to crawl down from the concrete slab and then crawl to the cell door and retrieve the trays and then crawl back to the concrete slab to eat them, and then repeat this process in giving the trays back to jail staff after each meal.  In fact because he was not capable of walking Barrett was forced to crawl to the toilet and/or sink and then manage to clime up on those to use the bathroom or wash himself.  The Cheif Of Police had refused to provide Barrett with soap or a towel for washing himself, or basic hygiene items such as soap, shampoo, deodorant, tooth paste, tooth brush and/or anything else such as a comb.  In fact Barrett was not allowed visitation, phone calls and/or writing utensils, or books, magazines and/or any reading materials at all, including a bible which he had requested from one of the jailors.  The jailor who Barrett requested the bible from informed him that per se orders of Cheif of Police Philpot that he was not to be allowed anything beyond what the Cheif of Police had already provided him.

7.   Without so much as being allowed to shower or comb his hair Barrett was taken to the Sequoyah Memorial Hospital for dressing change and treatment.  See Exhibit

16.

(6) hereto attached (Sequoyah Memorial Hospital Encounter Record). The doctor asked Barrett when the last time th dressing had been changed and Barrett told him that the bandages had not been changed since he was treated for the gun shot wounds at Tulsa. The doctor said that these must be changed daily, as the infection was already setting in and he prescribed Davrvocet for pain. Being return to the City Jail Barrett asked defendant Philpot if he could please have acouple of the darvocet because his legs were hurting him really bad. Depositing Barrett back on the floor of the cell Philpot kinda laughed to himself and said, "I told you before, that you have everything that you are getting in my jail, now just crawl back up on your little concrete slab and shut the fuck up." "I want some greivances, this is wrong," Barrett told Philpot. "You are a cop killer and now you want a grievance to complain about your treatment here. You are lucky to be alive, if I have my you wouldn't be," Philpot told Barrett.

8. Three days later, Chief Philpot and a jailer came after Barrett and told him that they were going to give him a shower. They picked Barrett up and carried him to a shower and half sit and half laid Barrett down in the shower and told him to get out of his cloths, which Barrett wrestled with. Then they told him to tear off his bandages. After he complied with these orders the Cheif of Police turned on the shower as Barrett half sit and half laid on the shower floor. Wash yourself Philpot told Barrett in a mocking jesture because Barrett was not given a bar of soap or anything to wash himself with, including his hair which was awful dirty. Turning off the shower Philpot threw a towel at Barrett and told him to get his ass dried off, and then Philpot help Barrett apply new bandages to the gun shot wounds without applying any antibiotic salve or ointment first. Again Barrett requested the prescribed Darvocet and again Philpot refused.

4. After dressing himself the best he could and being denied so much as to comb his hair Barrett was picked up and carried out to be transferred to the Seqouyah County Courthouse for arraignment. Philpot and other officers had to literally carry Barrett

17.

into the courthouse and then support him during the arraignment hearing.  After the
hearing Barrett was carried back out of the courthouse and then transferred back to
the Sallisaw City Jail.  Chief of Police Philot and Sherrif Philpot then carried
Barrett to the booking area of the jail and proceeded to book Barrett, and this is
when they also took the required booking picture.  See Exhibit (7) hereto attached.

### Defendant Sheriff Philpot Interferred With and/or Denied Barrett Medical Treatment That Had Been Medically Ordered

10.   After booking at the Sallisaw City Jail Sheriff Philpot accomplied by
a deputy transferred Barrett to the Sequoyah County Jail.  During transfer Barrett
advised Sheriff Philpot of the prescribed medication he had been ordered, i.e.
Darvocet, but had not received at Sallisaw City Jail.  Further Barrett advised Sheriff
Philpot that that doctor had also ordered that his bandages be changed daily by medi-
cal personal with appropriate creams which he had not received while at the Sallisaw
City Jail.  Sheriff Philpot for some reason found humor in all of this because he
merely laughed telling Barrett that, "I told you, didn't I that you were going to rot
in my jail and that is exactly what I meant.  You do not have anything coming while
you are in my jail."  Arriving at the Sequoyah County Jail defendant Gabbert and another
jailer picked Barrett up and carried him to the North Unit and laid him on the floor
of the unit.  All of the 12 beds were occupied and when Barrett asked defendant Gabbert
where  he was going to sleep and about a matress and blanket, Gabbert just laughed
and told Barrett, "you can sleep where you are, with what you have, because that is
all that you are getting."

11.   Barrett continued to experience severe and excruciating pain because of the
untreated bullet wounds and from the bullets that remained in his hip and knee.  See
Exhibit (8) hereto attached (Sequoyah Memorial Hospital Imaging Report).  In fact
Barrett was not able to walk or manage to fully support his own weight for two months
after being shot.

18.

12.    Through October 99 and April 2003 Barrett was seen at Sequoyah Memorial Hospital for chronic rash(s) to his legs, face, stomach, groan area, neck and other body areas.  Some of these rashs' reached three (3) inches in diameter.  He was treated with antibiotics and creams.  On almost every trip to Sequoyah Memorial Hospital the treating medical personnel told Barrett that more than likely the probable culprit of the chronic rash was the bullets in his hip and knee.

13.    The treatment provided was not working and the rash intensified to Barrett's stomach, hips, between fingers and buttocks.  See Exhibit (9) hereto attached (Progress Notes/Formedic).

14.    Because of the excruciating pain and repositioning of the bullet in Barrett's knee Dr. Woods at Sequoyah Memorial Hospital removed it.

15.    In April 2000 Barrett was seen by a dermatologist, Dr. Brenneman in Muskogee, Oklahoma.  After reviewing Barrett's medical history anent the chronic rash Dr. Brenneman determined that their was an extremely high probability that the culprit of the chronic and painful rash was the reamining bullet in Barrett's hip.  Dr. Brenneman made this determination or diagnosis considering that Barrett did not suffer this chronic rash until after the shooting.

16.    In July 2000 Dr. Brenneman ordered that the bullet in Barrett's hip to be surgically removed because the rash was becoming increasingly worse and would only become far more detrimental with time.  See Exhibit (9).  After this order was rendered Barrett spoke with Sheriff Philpot at the County Jail regarding Dr. Brenneman's Order for removal of the bullet and the defendant told Barrett that, "you are in my custody, and that isn't happening.  You jsut need to live with the consequences of being a cop killer."

17.    Because Sheriff Philpot refused to comply with Dr. Brenneman's medical orders Barrett's trial attorney sought and received an order from the court to compel Sheriff Philpot into compliance with Dr. Brenneman's order.  See Exhibit (10) attached

hereto (Okla.District Court Records/p.6 of 19, 4/24/06). The Court Ordered Sheriff Philpot to transport Barrett to a State Facility for consultation and removal of the bullet. Id. Sheriff Philpot remained refactory to the medical treatment ordered by Dr. Brennemand and the court as well.

18.    Dr. Cambell, D.O., Director of Emergency Department Sequoyah Memorial Hospital sent the Sequoyah County District Attorney corrspondence anent the surgerical order for removal of the bullet from Barrett's hip. See Exhibit (11) hereto attached (Correspondence by Dr. Cambell, D.O.). Sheriff Philpot remained obstinates to the continuing efforts to compel his compliance with the medical orders concerning the surgical removal of the bullet still in Barrett's hip causing his significant pain and spreading rash throughout his body.

19.    Because of the spreading infection caused by the remaining bullet in Barrett's hip he was suffering knots on the left side of his neck and knots to his hands. See Exhibit (12) attached hereto (Sequoyah Memorial Hospital/Encounter Record, 01-02-03). The emergency room physician prescribed massive doses of antibiotics in treatment for ten (10) days. Id.

20.    Because of the chronic and persistent spreading and pain caused by the bullet left in Barrett hip that Sheriff Philpot remained obstinate to medical orders to have surgically removed, resulted in effecting Barrett's daily activities in all aspects.

21.    Mr. Barrett request that he be granted compensatory damages from Defendants Sheriff Philpot and Chief of Police Philpot jointly and severally in the amount of $150,000.00 and punitive damages in the amount of $150,000.00.

22.    Mr. Barrett also request that this Court require that these same defendants pay Barrett reasonable attorney fees and all other cost incurred in this action.

## FIFTH CAUSE OF ACTION

DEFENDANTS SHERIFF PHIPLOT, GABBERT, HENDRICKS AND McHALE DENIED BARRETT

20.

EXERCISE AND RECREATION FOR A FOUR YEAR PERIOD, AND SUBJECT HIM TO
MUTUALLY AGGRAVATING CONDITIONS OF CONFINEMENT RISING TO CONSTITUTIONAL PROSCRIPTIONS
UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS

1.   Through-out October 1999 and December 2000 Barrett was confined in the North Unit of the Sequoyah County Jail.  When Defendant Gabbert help carry Barrett to the North Unit and sit him on the floor of the unit without so much as a mattress or blanket all of the twevle (12) bunks in the unit were occupied.  Barrett asked defendant Gabbert if he could please have a mattress and bedding and was told that, "you are not getting shit in this jail boy'".  Another inmate, Timmey Ward not only gave Barrett his matress, but as well his bunk also.

2.   The following day Barrett again asked this defendant, Gabbert is he could have a blanket and mattress, as well as get a wheel chair because he could not walk and was being forced to crawl to retrieve trays and to use the bathroom.  In fact he told this defendant that he had been forced that same day to shower sitting on the pan of the shower because their was no handicap shower in the area that the North Unit used to shower.  The defendant found a significant amount of humor in all of this, what he construed as crying to Barrett and chuckling to himself told Barrett, "you are going to fry boy, you are going to fry."  Barrett sought redress for these issues through the grievance procedures but never received a response back from defendant Philpot anent the same.

3.   The North Unit had twevle (12) bunks as mentioned above with a narrow isle and toilet area.  Through the fifteen months Barrett was confined in the North Unit it often housed up to eighteen (18) prisoners with six of those sleeping on the floor.  Some of thos forced to reside on the floor were in close proximity with the toilet area.  The average population of the North Unit Barrett's entire time housed there was between fourteen (14) and eighteen (18) prisoners.  Because of the significant overcrowding under the deplorable conditions of confinement the propensity for viol-

21.

ence tremendous and occurred on a persistent and regular basis. Barrett filed grievances concerning the overcrowding and violence he was forced to dwell under in the North Unit, but Defendant Sheriff Philpot remained obstinate to this grievance, as he did with all other grievances seeking redress of issues of confinement Barrett sought remedy for through his office.

4.   The North Unit had almost a total lack of ventilation, with very little heating during the winter where the temperatures would drop down inside the unit into the fourties. Prisoners were only afforded one (1) blanket and no beeding beyond the single blanket. The Unit was infested with cock-roaches and vermin, with mice permeating any and all of the prisoners' property, including commissary food items that were stored on the floor. Whereas prisoners had no other storage areas than to leave personal items on the unit floor. The unit was extremely dimmly lite, windowless and was similar to living in a crowded cave under deporable conditions. Becasue of these and other mutually aggravating conditions of confinement Seqouyah County had been fined $500,000.00 by the State Inspectors for their refusal to address them same.

5.   Throughout Barrett's fifteen (15) months in the North Unit he had requested and been summarily denied exercise and recreation by Defendants Sheriff Philpot, Gabbert, Hendricks and McHale. Barrett filed numerous grievance regarding the denial of exercise and recreation, in combination with the other mutually aggravating conditions of confinement without response to any of them by Defendant Sheriff Philpot.

6.   On numerous occasions Barrett requested exercise and recreation from defendants Gabbert, Hendricks, McHale and Sheriff Philpot, and after filing a grievance in redress of this request for exercise and recreation one particular occasion defendan Gabbert came to the unit and confiscated Barrett's bible, books, magazines, letters and personal pictures. When Barrett personally complained to defendant Gabbert about the confiscation of his personal property the defendant told him in no uncertain terms that, "Keep on filing those f----ing grievances and causing problems and it will get alot worse then this." Defendant Hendricks would make sarcastic remarks layered with

expletives when Barrett sought exercise and recreation.  In fact this defendant was one of the jail staff who denied Barrett use of the bathroom while he was in restaints of the strait jacket and handcuffed to the fence in December 2000.

7.    As stated in the paragraph three (3) because of the overcrowding of this Unit and the mutually aggravating conditions of confinement violence was common place. In fact Sheriff Philpot often took matters into his own hands without seeking resort to an actually disciplinary procedures, which is thoroughly evident by the number of prisoners Defendant Sheriff Philpot would handcuff and take out of the unit and severely beat, as he did during Christmas of 1999.  One of the two prisoners falling prey to Defendant Philpot's 'Good Ole Boy' corporal punishment was 'LeRoy Smith'.  Shortly after the Christmas 99 beatings or Sheriff Philpot's self imposed disciplinary action he severely beat other prisoners in january 2000 he believed to be trouble makers in the North Unit.  The Federal Bureau of Investigation lodged an investigation after receiving significant complains concerning the defendant's summary beatings of jail inmates.

**The MakeShift Unit**

8.    Defendant Sheriff Philpot ahd Barrett moved to a MakeShift Unit after he was transferred back from the Sallisaw City Jail regarding the punitive punishment after be handcuffed to the fence and restraint in the strait jacket.  The MakeShift Unit had a wooden frame in front and had five (5) bunks, plus a toilet and sink.  This Unit was infested with cock-roaches and vermin as well, without adequate ventilation and absent windows.  Barrett was housed in this unit from December 2000 thr October 2003.  The unit as previously noted had five bunks, although at any given time held nine (9) to (11) eleven prisoners, who slept on the floor of the unit.  Barrett filed grievances in redress of the crowded conditions, as well as the other mutually aggravating conditions of confinement.  Defendant Sherrif Philpot  did not respond to any of these grievances.

23.

9.   Through December 2000 and October 2003 Barrett persistently requested exercise and recreation from the defendants, including defendant McHale.  This defendant would consistently tell Barrett, "you are not getting any exercise  and recreation here so you just as well stop crying about it.  Keep filing your grievances that you just as well wipe your ass with because no one here is going to give you exerice and recreation."

10.   Mr. Barrett request that he be granted $50,000.00 compensatory damages from Defendants Philpot, Gabbert, Hendricks and McHale jointly and severally, as well as Punitive damages in the amount of $75,000.00.

11.   Mr. Barrett also request that this Court require that these same defendants pay Barrett reasonable attorney fees and all other cost incurred in this action.

SIXTH CAUSE OF ACTION

DEFENDANT TRAVIS GABBERT SUBJECT BARRETT TO UNLAWFUL SEIZURE OF HIS PERSONAL PROPERTY IN RETALIATION FOR BARRETT SEEKING REDRESS THROUGH THE SEQUOYAH COUNTY JAIL GRIEVANCE PROCEDURES

1.   After filing a grievance in December 2000 seeking redress through the Sequoyah County Jail grievance procedures Defendant Travis Gabbert did unlawfully confiscate from Barrett his bible, magazines, letters and personal pictures, as stated in paragraph (6) of the Fifth Cause of Action.  The defendant perspicuously told Barrett that the taking was in reprisal for the filing of grievances and making problems concerning being denied exercise and recreation.

2.   Mr. Barrett request that he be granted $5,000.00 in compensatory damages for this unlawful retalitory taking, and $5,000.00 in punitive damages against Defendant Travis Gabbert.

3.   Mr. Barrett also request that this Court require that this same defendant pay Barrett reasonable attorney fees and all other cost incurred in this action.

SEVENTH CAUSE OF ACTION

24.

IN PROSCRIPTION OF THE FIRST, FIFTH AND SIXTH AMENDMENTS DEFENDANT SHERIFF PHILPOT
DENIED BARRETT ACCESS TO THE COURTS' THROUGHOUT HIS FOUR AND A HALF YEAR
CONFINEMENT AT THE SEQUOYAH COUNTY JAIL

1.  Barrett throughout his four and a half year confinement at the Sequoyah
County Jail requested access to legal materials, access to a law library and/or
someone trained in law to seek redress through the courts' anent Cause of Actions
Three (3) thr Seven (7) listed herein.  Sheriff Philpot persistently denied Barrett
access to legal materials  to seek redress of alleged constitutionally proscribed
conditions of confinement, as well as to vindicate himself of Cause of Action One (1)
and Two (2) lsited herein. Sheriff Philpot reiterated on many occasions telling
Barrett and other prisoners as well that they were not entitled to legal materials
and/or anyone trained in law because they were represented by counsel in their criminal
proceedings.

2.  Barrett filed numerous grievances seeking redress for being denied access
to legal materials and/or someone trained in the law to help seek redress for the
Seven Causes of Actions listed herein, but was summarily denied by Defendant Sheriff
Philpot.

3.  On numerous occasions Barrett requested photocopying of legal documents for
filing with the courts', including but not limited to grievances he filed anent the
causes of action lsited herein, three (3) thr seven (7), and was denied.  Defendant
Sheriff Philpot persistently told Barrett and other prisoners that photocopying of
either grievances and/or any other legal documents was not allowed at his jail.  Further'
he stated that Barrett and other prisoners had legal representation in their criminal
proceedings and thereby he did not have to provide photocopying of legal documents
and/or grievances.  Barrett filed numerous grievances for being denied photocopying
of grievances he prepared for filing at the Sequoyah County Jail and of other legal
documents he needed for filing with the court.  Defendant Sheriff Philpot never replied

or returned any of the grievances Barrett filed anent being denied photocopying, or any other grievance regarding being denied access to legal materials and/or someone trained in the law to help aid him in seeking redress on the Cause of Actions lsited herein One (1) thr Seven (7).

4.   Mr. Barrett request that the Court grant him $150.000.00 compensatory damages for Defendant Sheriff Philpot denying him access to legal materials and/or someone trained in law during his four and a half year confinement at the Sequoyah County Jail, and $150,000.00 punitve damages.

5.   Mr. Barrett also request that this Court require that this same defendant pay Barrett reasonable attorney fees and all other cost incurred in this action.

## EQUITABLE TOLLING ON ALL CAUSE OF ACTIONS LSITED HEREIN

1.   Barrett was denied access to all legal materials and/or someone trained in the law to help him prepare and file litigation seeking redress for all Seven Cause of Actions listed herein while at the Sequoyah County Jail.

2.   Barrett was transferred to the Oklahoma State Penitentiary from the Sequoyah County Jail.  He was held in segregation, H/Unit during the brief six month confinement the Oklahoma State Penitentiary.  During that time he did not have access to legal materials other than by the 'Paging System and/or Exact Cite System', as it is best known.  He requested but did not receive help from anyone trained in the law to aid him in his legal endeavors lsited herein and anent a sentence modification as well.

3.   Barrett was transferred to the Muskogee County Jail, Muskogee, Oklahoma and confined their from October 2004 thr February 2006 where he was again denied all access to legal materials and/or photocopying of legal documents.  Litigation has been separatedly filed in the United States District Court for the Eastern District of Oklahoma anent being denied access to the courts' while confined at the Muskogee County Jail.

4.   Barrett was transferred to the United States Penitentiary Terre Haute,

Indiana from the Muskogee County Jail and although is still being denied access to Oklahoma State Legal Materials he does have someone vested with legal knowledge aiding him in prosecuting this action.

5.   Because Barrett is being denied access to Oklahoma Statutes and/or law materials and books he does not have access to the statute of limitations anent the claims presented through Cause of Actions One (1) thr Seven (7) listed herein.   But because of the denial of access to legal materials during Barrett's four and a half year confinement at Sequoyah County Jail, during his six month confinement in the segregation unit at the Oklahoma State Penitentiary and his twenty-six month confine-ment at the Muskogee County Jail where he was summarily denied access to all legal materials and/or someone trained in the law the statute of limitations on all claims presented herein should not be accrued until February 2006 for the foregoing reasons.

RESPECTFULLY SUBMITTED,

_Kenneth Eugene Barrett_

Kenneth Eugene Barrett #04342-063
United States Penitentiary
P.O. Box 12015
Terre Haute, Indiana 47801

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned, Kenneth Eugene Barrett does attest under penalty of perjury that the foregoing is true and correct to the best of his knowledge and beliefs, and is sworn to under 28 U.S.C. § 1746.

_Kenneth Eugene Barrett_

Kenneth Eugene Barrett
Affiant

## DECLARATION OF MAILING UNDER PENALTY OF PERJURY

The undersigned, Kenneth Eguene Barrett does attest under penalty of perjury

27.

that he mailed the foregoing Amended Complaint and attached Exhibits by attaching sufficient first class postage, prepaid to the same, addressed to: William B. Guthrie, Clerk, United States District Court, P.O. Box 607, Muskogee, Oklahoma 74401 this 5th day of September, 2006.  Further' this declaration is made under penalty of perjury pursuant to 28 U.S.C. § 1746.

Kenneth Eugene Barrett
Affiant

28.

CERTIFICATE  OF  MAILING

This is to certify tht on the 5th day of September, 2006 that I mailed a

true and correct copy of the foregoing Amended Complaint and Attachments via, the

United States Mail, First Class Postage Prepaid and addressed to:

Chris J. Collins
Attorney At Law
429 NE 50th, Second Floor
Oklahoma City, OK 73105

Sworn to under penalty of perjury under 28 U.S.C. § 1746.

Kenneth Eugene Barrett
Plaintiff/Pro Se

iii

EX 1

| | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| S S E S S M E N T | | | | | | | | | | | | | |
| | | HT | WT | LMP | TETANUS | | | | TIME | T | P | R | B/P |

DSa

☐ OTHER

DIAGNOSIS(ES)

TREATMENT

93.57

NURSE _____

☐ O2

☐ PULSE O

☐ ♥ MONIT

OCT-01-1999  15:52    DAFFIN INC.

**Oklahoma • Emergency Medical Services • Narrative**     Use Blue/Black Ink - Press Firmly

| SERVICE NAME Life Star EMS | | SERVICE # 243  a1533 | TODAY'S DATE 0 9 2 4 9 9 |
|---|---|---|---|

INCIDENT LOCATION 648 SE → St. Francis

| PATIENT LAST NAME Barrett | FIRST Kenneth | M.I. | PHONE | AGE 38 | DATE OF BIRTH 0 6 29 6 1 |
|---|---|---|---|---|---|

STREET ADDRESS | | | | SOCIAL SECURITY NUMBER | GENDER m

Exhibit (2)

| | STATE | ZIP CODE | INSURANCE CODE # | MILEAGE |
|---|---|---|---|---|
| | | | MEDICAID # | IN 179 |
| or NAME) | | PHONE | MEDICARE # | DEST 93 |
| STREET | | | GROUP INSURANCE # | |
| CITY | STATE | ZIP CODE | OTHER INSURANCE # | SCENE 67  OUT 67 |

**CHIEF COMPLAINT**  Multiple GSW → Transfer to ↑ level of care

**CURRENT MEDICATIONS**  ○ NONE KNOWN  Unknown

**ALLERGIES (MEDS)**  ○ NONE KNOWN  Unknown

**PAST MEDICAL HISTORY**  ○ NONE KNOWN  ○ MI  ○ CHF  ○ COPD  ○ ↑ BP  ○ DIABETES  ○ CANCER  ○ OTHER ____  Unknown

**NARRATIVE**  Dispatched C-1 to transport 38 Y/O ♂ from 648 to St. Francis in Tulsa. 4A pt found lying supine in bed. Pt transferred to cot → unit. P's V/s were obtained. Transport time delayed 2° to waiting for OHP officer to accompany pt to Tulsa. Pt AAO x  HEENT - Pt has multiple abrasion on face. Pt does have contusion above ⓁL eye. Pt does have small amount of blood in nose & mouth — Chest symmetrical in movement, lungs CTAB — Abd - Soft & non-tender to palp Pelvis — unstable 2° bullets at ___ pt also has ___ IV ___ AC & 18g angiocath IV of D5 @ TKO

○ Narrative 1 of ____

| TIME | P | R | B/P | RHYTHM | TREATMENT | CREW MEMBER | RESPONSE/COMMENTS |
|---|---|---|---|---|---|---|---|
| 0525 | 110 | 44 | 154/84 | Reg | | 1 | 92% ___ |
| | 110 | 26 | 144/78 | Reg | PO, IV monitor | 1 | 91% 4 ___ |
| | | | | | | | 99% ___ |

1998 ⟨⟩ EMS DATA SYSTEMS, INC.

Signature of Person Receiving Patient    04:50   9/24/99   Date/Time

Medical Control Physician    Date/Time

This is to certify that I am refusing treatment/transport. I have been informed of the risk(s) involved, and hereby release the ambulance service, its attendants, and its affiliates, from all responsibility which may result from this action.

Patient Signature    Date/Time

CREW MEMBER # 1  Brandie Johnson EMT-I

From City Jail

Exhibit 3

# SEQUOYAH MEMORIAL HOSPITAL

Sequoyah County / City of Sallisaw Hospital Authority
P.O. Box 505     213 East Redwood Street
Sallisaw, Oklahoma  74955-0505
Phone 918-774-1119    FAX 918-774-1135

## MEDICAL IMAGING REPORT

**PATIENT:**  Barrett, Kenneth                    **AGE:** 38
**DATE:**     10-3-99                             **ROOM #:** ER
**FAMILY PHYSICIAN:**                             **E.R./N.A.**  Campbell
**EXAMINATION:**   C-Spine & Abdomen              **I.D. NUMBER #:** 20762

**REPORT:**                                       **CLINICAL FINDINGS:** Numbness to both hands while laying down.

#20762          10-03-99

CERVICAL SPINE - THREE VIEWS

CLINICAL INFORMATION:  Numbness to both hands while lying down.

Cervical alignment is normal.  The disc space heights are maintained.  There are on fractures or other abnormalities identified.

IMPRESSION:  Normal exam.

KUB

CLINICAL INFORMATION:  Constipation.

The bowel gas pattern is non-specific.  There is fecal material in the colon.  There is no small bowel distention.  There are no discreet fluid collection, soft tissue masses or pathological calcifications.  There are wire sutures in the left upper quadrant and inferior pelvis.

IMPRESSION:  Non-specific abdomen.

Neil E. Crow, Jr., M.D.
Radiologist

NEC/grs
d. & t. 10-05-99

N Crow MD

SMENT

Patient's Request/Refusal/Consent to Transfer:
I acknowledge that my medical condition has been evaluated and explained to me by the Emergency Department physician or other qualified medical person and/or my attending physician who has recommended .......

## I.  Transfer Request: _____
....and offered to me further medical examination and treatment. The potential benefits of such further medical examination and treatment as well as the potential risks associated with transfer to another facility have been explained to me and I fully understand them. In spite if this understanding, I refuse to consent to the further medical examination and treatment which has been offered to me, and request transfer to the service of
Dr. _____ at _____

## II.  Transfer Refusal: _____
..... that I be transferred to the service of Dr_____ at _____
The potential benefits of such transfer, the potential risks associated with transfer, and the probable risks of not being transferred have been explained to me and I fully understand them. Even though Dr._____ believes it is in my best interest to be transferred. I refuse to be transferred and I request instead to continue receiving treatment at _____
_____

## III.  Transfer Consent: _____ ✓ _Parks_ at _St Francis_ _____
...... that I be transferred to the service of Dr.
The potential benefits of such transfer, the potential risks associated with such transfer, and the probable risks of not being transferred have been explained to me and I fully understand them. With this knowledge and understanding, I agree and consent to be transferred.

Relationship to patient                                          Date and time

## Provider Certification:
I have examined the patient and explained the following risks and benefits of being transferred/refusing transfer to the patient:

_____
_____
_____

Based on these reasonable risks and benefits to the patient and/or the unborn child(ren), and based upon the information available at the time of the patient's examination, I certify that the medical benefits reasonably to be expected from the provisions of appropriate medical treatment at another medical facility outweigh the increased risks, if any, to the individual's medical condition from effecting the transfer.

_____     _____ 92499 _____
                                    Date

## Patient Condition:
1. ___✓___ The patient has been stabilized such that within reasonable medical probability, no material deterioration of the patient's condition of the unborn child(ren) is likely to result from transfer.
2. _____ The patient's condition has not stabilized.
3. _____ The patient is in labor.

## Transfer Requirements:
1. ___✓___ The receiving facility, ___St Francis___ has available space and qualified personal for treatment and has agreed to accept transfer and to provide appropriate medical treatment as acknowledged by:

**Exhibit (6)**

## MEMORIAL HOSPIT...
...y/County Trust Authority
P.O. Box 505
213 E. Redwood
Sallisaw, OK 74955

165507

### ENCOUNTER RECORD

Date 9-27-9(  Time 15:5
Name Barrett Kenneth
Date of Birth 6-29-61   Age 38   Sex M
Mailing Address RR2 Box 936
Vian

| PRIVATE PHYSICIAN | E.D. PHYSICIAN Wood | PT. # 3297 | ADMIT # 25149 | ER ☑ OP ☐ CL ☐ | SSN: 309809952 |
|---|---|---|---|---|---|

| RESPONSIBLE PARTY USH | | NEXT OF KIN Gelene Dotson | | PHONE # 7756 9 |
|---|---|---|---|---|

Brought by: Sheriff Dept

MODE OF ARRIVAL: ☑ WALKED  ☐ STRETCHER  ☐ WHEEL CHAIR  ☐ CARRIED
BROUGHT BY: ☐ SELF  ☐ FRIEND  ☐ FAMILY  ☐ AMBULANCE

CC: needs dressing change on both legs + Buttocks for wounds from gun shots.

DRUG ALLERGIES: NKA

CURRENT MEDICATIONS: Darvocet.

| | TIME | BY | TX OR RX RESPONSE |
|---|---|---|---|
| | 1600 | | dressing remov... Bactroban appl... + areas redressed. |

| HT | WT | LMP | TETANUS Current |
|---|---|---|---|

| TIME | T | P | R | B/P |
|---|---|---|---|---|
| 1600 | 978 | 96 | 18 | 110/ |

HISTORY: gunshot wounds. ↑ fluids to ...

### PHYSICIANS EVALUATION

| CHECK IF NORMAL | GENERAL CONDITION |
|---|---|
| ☐ HEENT | |
| ☐ NECK | |
| ☐ CHEST | |
| ☐ HEART | |
| ☐ ABD/AORTA | |
| ☐ PELVIC/RECTAL/GENIT. | |
| ☐ EXTREM | |
| ☐ DERM | |
| ☐ NEURO. | |
| ☐ OTHER | |

**CHECK TO ORDER**
- OLD RECORDS
- CBC
- CHEM 7
- UA
- CHEM 20
- CARDIAC ENZYMES
- CHEM 27
- PREG TEST
- DRUG SCREEN
- CXR
- X RAY
- EKG
- OTHER
- OTHER
- ☐ O2
- ☐ PULSE OX
- ☐ MONITO...

DIAGNOSIS(ES)

TREATMENT:
(1) Dressing change   890.0
(2) Bactroban         93.57
(3) Refer 570 OCD...

PHYSICIAN W.T. Wood   DATE 9-27-99   NURSE





F1312



# SEQUOYAH MEMORIAL HOSPITAL

Sequoyah County / City of Sallisaw Hospital Authority
P.O. Box 505     213 East Redwood Street
Sallisaw, Oklahoma  74955-0505
Phone 918-774-1119    FAX  918-774-1135

## MEDICAL IMAGING REPORT

| | |
|---|---|
| **PATIENT:** Barrett, Kenneth | **AGE:** 38 |
| **DATE:** 9-24-99 | **ROOM #:** ER |
| **FAMILY PHYSICIAN:** | **E.R./N.A.** Callery |
| **EXAMINATION:** AP Both Femers | **I.D. NUMBER #:** 20762 |

**REPORT:**                                    **CLINICAL FINDINGS:**  Gunshot wounds

   # 20762            10-20-99


   HISTORY:    Gunshot wounds.

   VIEWS OF THE RIGHT FEMUR

   There is a metallic density foreign body consistent with a
   large caliber bullet which appears to be within the soft
   tissues lateral to the neck of the right femur.  No other
   findings are present.


   VIEWS OF THE LEFT FEMUR

   A single AP view is all that was returned.  There is a large
   caliber bullet overlying the distal femoral shaft.



                David G. Albers, M.D.
                Radiologist

   DGA/wjc
   d. & t.    10-20-99

## PROGRESS NOTES

**Formedic**

NAME Kenneth Barrett

DATE - TIME   HT   BMI   BP   PG#

CPT CODE   WT

EXHIBIT C9

...IES   NKA

MAY 2 3 2000   States TMC is not working. Got better with Preds. Ointces helped but after stopping Preds it would flair. Stomach, hips, between fingers buttocks are flaring.

L.P has increased — seems to be worse than before.

Mult. lesions on legs.

DX: ① Lichen Planus

Rx 2 —

6W

JUL 1 1 2000   Small imp & is now recurring. Possibly due to bullet in Rt hip — reaction to metal (? nickel). Needs to have the bullet removed.

PE Lichen planus is worsening on arms & legs.

DX: Lichen Planus poss. due to bullet in hip causing immunologic reaction.

Rx ① Prednisone 20 mg   3 x 3 days
2 x 4 "
1 x 5 days.

② Continue topical TMC .1% cream
③ Have bullet removed

RBrenneman MD



For acne patients who drive

Monodox provides proven efficacy with virtually no risk of CNS side effects.[1-6]

No warnings or precautions about operation of motor vehicles are noted.[7]

Reported incidences of photosensitivity with Monodox <5%.[**]
Virtually no risk of hyperpigmentation.

(doxycycline monohydrate)
50 mg and 100 mg capsules

Clearing problems without causing them.

Please see insert for complete prescribing information.

APPROVED BY FORMEDIC'S PHYSICIAN ADVISORY BOARD PNLE®



| | | |
|---|---|---|
| | PERSONNEL FILES AND RE... | |
| 03/29/2001 | FILE RETURNED FROM SUPREME COURT AND TRANSCRIPTS ALSO | |
| 05/14/2001 | TRANSCRIPT-ORIGINAL- MOTION HEARING | |
| 05/24/2001 | DEPARTMENT OF PUBLIC SAFETY'S OBJECTION TO DEFENDANT | |
| | BARRETT'S MOTION FOR DISCOVERY OF PERSONNEL FILES | |
| 06/04/2001 | ORDER | |
| 06/04/2001 | CM: JCG ATTORNEYS PRESENT AGRUMENTS AS TO ISSUED OF | |
| | CONSULTING DOCTOR AS TO WHETHER THE BULLET FRAGMENT | |
| | SHOULD BE REMOVED COURT ORDERS DEFENDANT TO BE | |
| | TRANSPORTED TO A STATE FACILITY FOR CONSULTATION AND | |
| | POSSIBLE REMOVAL OF FRAGMENTS. 32-2 | |
| 09/06/2001 | PHARMACY BILLING | $19.20 |
| 09/18/2001 | PHARMACY BILLING | $19.20 |
| 09/24/2001 | PHARMACY BILLING | $19.20 |
| 12/20/2001 | ORDER CONCERNING DISCOVERY OF CERTAIN LAW ENFORCEMENT | |
| | PERSONNEL FILES AND RECORDS | |
| 12/20/2001 | ORDER CONCERNING DISCOVERY OF CERTAIN INVESTIGATIVE | |
| | REPORTS OF THE OKLAHOMA HIGHWAY PATROL | |
| 12/20/2001 | LETTER FROM ROSEANN SCHAYE, M.ED TO JUDGE | |
| 03/01/2002 | PHARMACY BILLING | $17.20 |
| 03/04/2002 | DELIVERY OF INVESTIGATIVE FILE UNDER SEAL | |
| 05/23/2002 | ORDER DIRECTING THE CLERK OF THIS COURT TO DELIVER A | |
| | COPY OF THE HIGHWAY PATROL'S INVESTIGATIVE REPORTS TO | |
| | COUNSEL FOR THE STATE AND COUNSEL FOR THE DEFENDANT | |
| 06/03/2002 | NOTICE OF INTENT TO OFFER EVIDENCE OF DNA PROFILE | |
| 06/03/2002 | NOTICE OF INTENT TO PRESENT TRANSCRIPT OF PRIOR | |
| | TESTIMONY | |
| 06/03/2002 | MOTION TO ENDORSE ADDITIONAL WITNESSES | |
| 06/03/2002 | NOTICE OF INTENT TO INTRODUCE EVIDENCE OF SEPARATE | |
| | CRIME AT TRIAL | |
| 06/03/2002 | PLAINTIFF'S DISCLOSURE OF TRIAL EVIDENCE | |
| 06/06/2002 | DELIVERY OF PERSONNEL FILES UNDER SEAL | |
| 06/06/2002 | ORDER | |
| 06/06/2002 | RECEIPT | |
| 06/17/2002 | DISTRICT COURT MOTION TO DISQUALIFY OFFICE OF THE | |
| | DISTRICT ATTORNEY | |
| 06/17/2002 | MOTION FOR HEARING ON MOTION TO SUPPRESS STATEMENTS AND | |
| | OTHER EVIDENCE | |
| 06/17/2002 | MOTION FOR DISCOVERY CONCERNING DEADLY FORCE POLICIES, | |
| | THE ALLEDGED THREAT MADE BY MR. BARRETT, THE IDENTITY | |
| | OF THE CONFIDENTIAL INFORMANT, AND FOR FURTHER | |
| | DISCOVERY CONCERNING ANY AND ALL OFFERS AND INDUCEMENTS | |
| | | |



| | | | | | | | |
|---|---|---|---|---|---|---|---|
| HP LaserJet 3100<br>Printer/Fax/Copier/Scanner | | | | | | SEND CONFIRMATION REPORT for<br>MAIL BOXES ETC   SAND SPRINGS OK<br>918 241 3297<br>Nov-14-01   12:39PM | |

| Job | Start Time | Usage | Phone Number or ID | Type | Pages | Mode | Status |
|---|---|---|---|---|---|---|---|
| 461 | 11/14 12:38PM | 0'25" | 4052713458 | Send.............. | 1/ 1 | EC144 | Completed..................................... |

Total    0'25"    Pages Sent: 1    Pages Printed: 0



**James D. Campbell, D.O.**
Emergency Medicine
Director of Emergency Department
Sequoyah Memorial Hospital
213 E. Redwood Dr.
Sallisaw, Oklahoma, 74955

11/5/01

To whom this concerns,

RE:  Kenneth Barrett

Mr. Barrett father approached me today requesting this letter to be sent to the District Attorneys office regarding Mr. Barrett's rash and existing bullet fragment in his rt. leg.

I feel that there certainly can exist in a high probability a casual relationship between the persistent rash on his lower extremities and the existing bullet fragment. Earlier this year, I have testified on Mr. Barrett's behalf to continue his examination via a qualified surgeon for the possibility of surgical removal of the bullet fragment. This procedure may in turn suppress the rash's chronicity if the bullet is truly the cause. On the other hand, without removing the bullet fragment, there may exist a potential for further progression of the rash, which may in turn become more serious and/or disfiguring.

Please contact me for any questions.

Sincerely,
Jas. Campbell, D.O.

# SEQUOYAH MEMORIAL HOSPITAL

City/County Trust Authority
P.O. Box 505
213 E. Redwood
Sallisaw, OK 74955

216415

## NCOUNTER RECORD

Exhibit
(12)

Date 1·2·03   Time 2006
Name barrett, kenneth
Date of Birth 6·29·61   Age 41   Sex m
Mailing Address rt 2 bx 93-6
, Vian

| VATE PHYSICIAN | E.D. PHYSICIAN Callery | PT. # 32947 | ADMIT # 320095 | ER ☐ OP ☐ CL ☐ | SSN: 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 | |
|---|---|---|---|---|---|---|
| PONSIBLE PARTY Cash | | | NEXT OF KIN dotson, gelene (m) | | | PHONE # 775-6969 |

| | DRUG ALLERGIES | TIME | BY | TX OR RX RESPONSE |
|---|---|---|---|---|
| MODE OF ARRIVAL ☑WALKED ☐STRETCHER ☐SELF ☐WHEEL CHAIR ☐CARRIED ☐FRIEND  BROUGHT BY Sheriff ☐FAMILY ☐AMBULANCE | nka | 2130 | SP | Kflx/500 p.o here → one now = pt |

CC: "Bullet pain in hip"
"knot on side of neck ® side"   CURRENT MEDICATIONS
"knot on hands (started 2 month)"   Ketoprofen
ago.   75
BID

| | | HT | WT | LMP | TETANUS | | TIME | T | P | R | B/P |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | 2025 | 97.7 | 78 | 16 | 130/80 |

HISTORY

CHECK IF NORMAL   GENERAL CONDITION

Plan → Keflex 500mg QID
—influenza?
4 Ketoprofen +   TID
recheck 10 day therapy

| CHECK IF NORMAL | | CHECK TO ORDER | |
|---|---|---|---|
| ☐ HEENT | | OLD RECORDS ☐ | |
| ☐ NECK | | CBC ☐ | |
| ☐ CHEST | | CHEM 7 ☐ | |
| ☐ HEART | | UA ☐ | |
| ☐ ABD/AORTA | | CHEM 20 ☐ | |
| ☐ PELVIC/RECTAL/GENIT. | | CARDIAC ENZYMES ☐ | |
| ☐ EXTREM | | CHEM 27 ☐ | |
| ☐ DERM | | PREG TEST ☐ | |
| ☐ NEURO. | | DRUG SCREEN ☐ | |
| ☐ OTHER | | CXR ☐ | |

DIAGNOSIS(ES)   X RAY ☐

TREATMENT   EKG ☐

OTHER ☐

OTHER ☐

PHYSICIAN _____   DATE 1-2-03   NURSE _____ LPN
CONDITION ON DISCHARGE   TIME 2135   MODE OF DISCHARGE
☐ GOOD ☐ POOR   ☑ DISCHARGE ☐ EXPIRED   ☑ WALKED ☐ STRETCHER ☐ WHEEL CHAIR   ☐ COBRA FORMS COMP. ☐ REPORT DICT. ☐ FAMILY CONSULT/☐ DR. CONSULT/ NOTIFIED
☐ FAIR ☐ CRITICAL

☐ O2
☐ PULSE OX
☐ ♥ MONITOR