FILED
**United States Court of Appeals**
**Tenth Circuit**

**November 7, 2016**

**Elisabeth A. Shumaker**
**Clerk of Court**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
————————————————

|  |  |
|---|---|
| In re: KENNETH EUGENE BARRETT,<br><br>Movant. | No. 16-7035<br>(D.C. No. 6:09-CV-00105-JHP)<br>(E.D. Okla.) |

————————————————

**ORDER**
————————————————

Before **KELLY**, **HARTZ**, and **MATHESON**, Circuit Judges.
————————————————

**HARTZ**, Circuit Judge.
————————————————

A federal jury convicted Defendant Kenneth Eugene Barrett of three capital offenses arising out of a shootout when law-enforcement officers came to his home to serve arrest and search warrants. We affirmed the convictions and his death sentence on direct appeal. *See United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) (*Barrett I*). The district court then denied relief on his motion under 28 U.S.C. § 2255. On appeal we affirmed the denial except that we reversed and remanded for further proceedings on a claim of ineffective assistance of counsel at the trial's penalty phase. *See United States v. Barrett*, 797 F.3d 1207, 1211-12 (10th Cir. 2015) (*Barrett II*), *cert. denied*, *Barrett v. United States*, 2016 WL 1046930 (Oct. 3, 2016).

Defendant now seeks authorization to file a second § 2255 motion challenging his convictions on the basis of "a Single Claim, namely, that the continuous,

pervasive egregious prosecutorial and police misconduct in this case including altering, fabricating and destroying evidence, misrepresentation of the facts by omission and commission through lying, perjury, suborning perjury, planting evidence, witness intimidation and presentation of and reliance on junk science is a violation of due process." Mot. for Pre-Filing Authority, at 1-2. In his reply to the government's response to his motion for authorization he states that "[t]he heart of the claim presented here is the declaration of confidential informant, Charles Sanders," Reply at 3, in which Sanders makes assertions contrary to his trial testimony and to statements allegedly made by him in support of the search warrant for Defendant's home.

The statutory provision Defendant invokes in support of authorization requires him to make a prima facie showing that his proposed § 2255 motion contains "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found [him] guilty of the [challenged] offense[s]." 28 U.S.C. § 2255(h)(1); *see also id.* § 2244(b)(3)(C). We hold that he has not met that standard. His conviction is still well supported by eyewitness accounts of law-enforcement officers, the testimony of multiple acquaintances of Defendant, and physical evidence at the scene of the crime.

## I. BACKGROUND

The following excerpt from this court's opinion on appeal from the denial of Defendant's first § 2255 motion describes the events underlying his convictions:

In January 1999 a warrant was issued for Defendant's arrest for failure to appear at a state criminal trial on drug charges. That September an agent for Oklahoma's District 27 Drug Task Force learned from a confidential informant that Defendant had methamphetamine at his residence. The confidential informant also told the agent that Defendant had promised to kill any officer who came to arrest him and that he was operating his drug business at night because of his belief that law enforcement could not execute a search warrant at night. The agent obtained a no-knock, day-or-night search warrant for Defendant's residence. Viewing the execution of the two warrants as high-risk, he obtained assistance from the Oklahoma Highway Patrol Tactical Team (the Tact Team).

On the evening of September 23 three troopers surveilled Defendant's residence in a white, unmarked Ford Bronco. Travis Crawford, Defendant's cousin, was with him at the time. According to Crawford, Defendant saw a white vehicle pass by and recognized it as belonging to law enforcement, but he said that he did not care and that he "was going out in a blaze of glory."

. . .

Shortly after midnight on September 24 the Tact Team met with members of the Task Force, who planned to follow two minutes after the Tact Team. The Tact Team then began to execute its plan. The lead Bronco approaching from the east was driven by Trooper John Hamilton with Trooper David "Rocky" Eales as passenger. Its emergency lights were not on. [A] second Bronco and [a] patrol car followed closely behind. The patrol car and perhaps the second Bronco had emergency lights on. As the vehicles drove toward the residence, the lead Bronco began receiving gunfire at "approximately head level, middle of the windshield." The gunfire intensified as the vehicle drew closer. Hamilton was struck in the face with glass or bullet fragments.

. . .

The lead Bronco continued to receive gunfire until it reached the residence. The driver, Hamilton, ducked between the bucket seats. The passenger, Eales, exited and was shot three times while attempting to get behind the Bronco. Hamilton threw a "flashbang" stun grenade out the window, which temporarily stopped the gunfire. He exited the Bronco and was shot in the shoulder as he moved toward Eales, who was lying face-down. Trooper Ricky Manion joined him behind the

3

vehicle.  Hamilton saw Defendant standing in his doorway holding a rifle, and Manion saw him entering the house.  Hamilton fired two shots at Defendant that missed, but Manion shot him through a window and hit his legs.  Defendant was dragged out to the front yard.  He tried to move his hand toward the front of his body, where he had a pistol in his waistband, but he was subdued and the gun removed.

Eales was fatally wounded.  An autopsy indicated that one of the three bullets entered his upper back, broke four ribs, and perforated his left lung and aorta.

Later investigation showed that 18 bullets struck the lead Bronco and that Defendant probably fired 19 shots from a Colt Sporter .223 rifle (there were 72 rounds remaining in a set of three magazines taped together to hold 90 rounds, and one could have been in the chamber to start).  A search of the premises revealed several firearms, including two that were loaded, and various items used to manufacture methamphetamine.  A later search of Defendant's clothes at a police laboratory revealed $2120.10 in cash and plastic bags holding red phosphorus, an ingredient for manufacturing methamphetamine.

*Barrett II*, 797 F.3d at 1211-12 (citations omitted).

Defendant was initially prosecuted by the state.  After his first state trial ended with a hung jury, he was convicted of manslaughter and assault and battery with a deadly weapon.  *See Barrett I*, 496 F.3d at 1086.  Defendant was then prosecuted federally and convicted of three offenses:  using and carrying a firearm during and in relation to drug-trafficking crimes, resulting in the death of a state law-enforcement officer, *see* 18 U.S.C. § 924(c)(1)(A), (j); using and carrying a firearm during and in relation to the killing of a state law-enforcement officer engaged in or on account of the performance of official duties, *see id.*; and intentionally killing, during the commission of a drug-trafficking crime, a state law-enforcement officer engaged in the performance of his official duties, *see* 21 U.S.C. § 848(e)(1)(B).  *See Barrett I*,

496 F.3d at 1082. He was sentenced to life imprisonment without the possibility of parole on the two § 924(c) convictions and to death on the § 848(e) offense. *See id.* We affirmed his convictions and sentences on direct appeal. *See id.*

Defendant's initial motion for relief under § 2255 failed in all respects but one. On appeal from the denial of the motion, we reversed and remanded his death sentence "for the district court to hold an evidentiary hearing on whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial." *Barrett II*, 797 F.3d at 1232. Proceedings in the district court were abated pending disposition of a petition for certiorari in the United States Supreme Court, *see Barrett v. United States*, E.D. Okla. No. 09-CIV-105-JHP, Doc. 237 (Order filed Dec. 17, 2015); which was recently denied.

## II. SCOPE OF § 2255(h)(1) INQUIRY

In determining whether to authorize the filing of a second § 2255 motion, our concern is not with the merits of Defendant's claim of prosecutorial misconduct but solely with whether he has proffered "newly discovered evidence that, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found [him] guilty of the [challenged] offense[s]." 28 U.S.C. § 2255(h)(1); *see Case v. Hatch*, 731 F.3d 1015, 1028-30 (10th Cir. 2013). In our review, "we must consider all the evidence, old and new, incriminating and exculpatory, without regard to whether it would

necessarily be admitted under rules of admissibility that would govern at trial." *United States v. Williams*, 790 F.3d 1059, 1077 (10th Cir.) (internal quotation marks omitted), *cert. denied*, 136 S. Ct. 604 (2015).[1] In particular, "[t]he legality of a search and admissibility of any seized evidence is not relevant to our analysis under . . . [§] 2255(h)(1)." *Id.* at 1081 n.17.[2] Defendant's challenges to the validity of the arrest and search warrants executed on the night of the shooting are therefore immaterial.

Defendant suggests that the alleged invalidity of the warrants undermined the executing officers' authority and thus is relevant to his innocence because he was charged with killing a law-enforcement officer "engaged in, or on account of, the performance of such officer's official duties." 21 U.S.C. § 848(e)(1)(B). But executing warrants is undeniably a part of an officer's official duties. Defendant cites no authority for the proposition that killing an officer executing a warrant does not violate the federal law under which he was prosecuted if the warrant is later found to be invalid. And we have held that improper service of a summons (by an IRS agent) "would not mean that . . . [the agent] was somehow acting *outside* his official duties" when assaulted by the defendant, in violation of 18 U.S.C. § 111.

---

[1] In contrast, when considering authorization for a second-or-successive claim under § 2254 because of new evidence, *see* 28 U.S.C. § 2244(b)(2)(B), our inquiry "does not encompass new facts that became available only after trial and that are not rooted in constitutional errors occurring during trial." *Case*, 731 F.3d at 1038.

[2] This is also in contrast to the treatment of habeas claims under § 2244(b)(2)(B), which requires a link between the prisoner's constitutional claims and the evidence demonstrating his innocence. *See Case*, 731 F.3d at 1034, 1038.

6

*United States v. Young*, 614 F.2d 243, 244 (10th Cir. 1980) (citing holding in *United States v. Heliczer*, 373 F.2d 241 (2d Cir. 1967), "that an agent who has made an arrest does not lose his official capacity . . . simply because the arrest be subsequently adjudged unlawful" (internal quotation marks omitted)).  Thus, Defendant's warrant-related arguments are irrelevant to whether we should authorize his second § 2255 motion.

Also irrelevant are Defendant's complaints about various misconduct of law-enforcement officers in the execution of the warrants.  He does not demonstrate any connection between his allegations—that Oklahoma Highway Patrol (OHP) personnel unreasonably relied on dubious warrants, used excessive force against him after he was shot, and delayed his medical treatment after the incident—and his alleged innocence of the crimes for which he was convicted.  Equally irrelevant are his allegations that OHP officers engaged in intimidating conduct during the state trials that preceded his federal prosecution.  Those allegations are not tied to anything that occurred during his federal prosecution.

### III.  MATTERS ASSUMED BUT NOT DECIDED

Before assessing the motion for authorization, we note two issues that we are not resolving.  First, we assume without deciding that evidence can be "newly discovered" under § 2255(h)(1) even if Defendant was not diligent in discovering it.  Some courts have observed that § 2255(h)(1) does not have an explicit diligence requirement while 28 U.S.C. § 2244(b)(2)(B)(i) requires that "the factual predicate for the claim could not have been discovered previously through the exercise of due

diligence." *See United States v. MacDonald*, 641 F.3d 596, 610 & n.7 (4th Cir. 2011); *United States v. Lopez*, 577 F.3d 1053, 1061 & n.6 (9th Cir. 2009). But a diligence requirement in § 2244(b)(2)(B)(i) needed to be expressly stated because the provision does not use the term of art *newly discovered evidence*, which is commonly understood to include a diligence requirement. *See, e.g.*, *United States v. Jordan*, 806 F.3d 1244, 1252 (10th Cir. 2015) (construing the term *newly discovered evidence* in Fed. R. Crim. P. 33(a), (b)(1)), *cert. denied*, 136 S. Ct. 1700 (2016); *see also* Restatement (Second) of Judgments § 74 (relief from judgment requires reasonable diligence in discovering the ground for relief). At least one circuit has expressly read a diligence requirement into § 2255(h)(1). *See Herrera-Gomez v. United States*, 755 F.3d 142, 147-48 (2d Cir. 2014). We leave resolution of the issue for another day. Even affording Defendant the benefit of all the evidence he contends is newly discovered, regardless of any lack of diligence on his part in failing to obtain it sooner, he still has not made the showing necessary to warrant authorization of his proposed § 2255 motion.

Second, we need not resolve whether the "evidence as a whole" that we consider under § 2255(h)(1) includes posttrial evidence that is not newly discovered. We have no precedent directly addressing the matter. Again, however, we can leave the issue to a future panel of this court. Defendant's newly discovered evidence, even buttressed with all the other trial and posttrial evidence to which he refers, is not

8

sufficient to meet the innocence standard in § 2255(h)(1).[3]  We therefore deny

authorization without deciding whether a defendant may rely on previously

discovered posttrial evidence to bolster a request for authorization based on other

newly discovered evidence.

## IV.  DEFENDANT'S SHOWING

At the outset it is important to emphasize two points to put Defendant's

allegations in context.  First, Defendant has never contended, now or at his trial, that

someone other than he shot Trooper Eales.  The core of his defense is that he did not

know he was shooting at law-enforcement officers and, secondarily, that there was

insufficient evidence of his manufacture and distribution of methamphetamine to

support the search warrant for his home and the drug element of two of his offenses.

Second, much of the evidence Defendant now relies on, particularly in seeking to

undermine the testimony of various officers and experts presented by the prosecution,

was available to his trial counsel—who evidently considered some of it not worth

raising to impeach the witnesses.  And, of course, the evidence that was used in this

way did not persuade the jury to reject the prosecution's case.

## A.  Confidential Informant Sanders

---

[3] One apparent error should be quickly disposed of.  At times it seems that the government objects to Defendant's arguments based on the weakness of the evidence against him at trial.  But the original trial evidence is obviously included in the reference to "old" evidence in *Williams*, 790 F.3d at 1077; it would be absurdly prejudicial *to the government* if it were not.  The defendant is supposed to explain why his new evidence establishes his innocence notwithstanding the strength (or because of the weakness) of the case against him at trial.

Defendant states that the heart of his motion for authorization is the newly obtained recantation of confidential informant Sanders. We assume the recantation is "newly discovered." In his reply to the government's response to his motion for authorization, Defendant states that his investigator "attempted to interview Mr. Sanders in a timely manner before the original § 2255 filing and was turned away." Reply at 6.

In light of the evidence as a whole, however, Sanders's declaration falls far short of a prima facie showing of "clear and convincing evidence that no reasonable factfinder would have found [Defendant] guilty of the offense[s] of conviction," as required by § 2255(h)(1). Postconviction recantations are to be viewed with "extreme suspicion" and "ha[ve] long been disfavored as the basis for a claim of innocence." *Case*, 731 F.3d at 1041-42 (internal quotation marks omitted). And in any event the recantation is quite limited in scope; and the testimony from other witnesses, as well as physical evidence, independently substantiates the gist of the recanted testimony.

Because the recantation relates to unlawful drug activity at Defendant's residence, we begin with a summary of the trial evidence relevant to that activity. Sanders testified that he obtained methamphetamine from Defendant on more than five occasions in the three or four months leading up to the shooting. He also testified that he converted pseudoephedrine for use in the methamphetamine manufacturing process and had it delivered to Defendant. Other witnesses provided further detail about Defendant's manufacturing and distributing methamphetamine.

Randy Turman testified that he obtained methamphetamine from Defendant by paying in cash, trading for it, or working off the debt.  He said he learned the basics of methamphetamine manufacture by watching Defendant make the drug at his home; on occasion he purchased ephedrine pills at Defendant's request for use in the process.  He saw Defendant manufacture methamphetamine within three or four months of the murder.  Other witnesses who obtained methamphetamine from Defendant were Karen Real, who also saw Defendant sell drugs to others inside and outside his home, and Randall Weaver.

Physical evidence corroborated this testimony regarding the manufacture of methamphetamine at Defendant's residence.  According to expert testimony at trial, the three primary ingredients in a typical clandestine methamphetamine lab in Oklahoma at the relevant time were red phosphorus, ephedrine or pseudoephedrine, and iodine.  Some 51 grams of red phosphorus was found on Defendant's person.  In one pants pocket was a pill bottle containing a baggie with 15 grams, a paper filter with 2.8 grams, and two moist filters with residue.  In another pocket was a Ziploc bag with 33 grams.  Defendant's clothing was removed as he was transported to the hospital and these items were later sent to a lab for testing.  The red phosphorus in the bags contained traces of methamphetamine, indicating it had been used in the manufacturing process.  (Red phosphorus is not consumed in the process.  It acts as a catalyst and can be reused.)  The red phosphorous on the filters contained traces of phenyl acetone, a byproduct of the methamphetamine manufacturing process.  A search of Defendant's residence uncovered a bag containing 1426 pseudoephedrine

tablets secreted in the ceiling, and two bottles of iodine with a net weight of 144.3 grams hidden inside a camera.  In addition, officers found a cup with 72 pills containing nicotinamide, a substance used to cut methamphetamine.  Finally, the search of Defendant's property also "resulted in the seizure of a variety of materials related to the production and use of methamphetamine (e.g., coffee filters, hypodermic needles, digital scales, . . . plastic tubing, toluene)." *Barrett I*, 496 F.3d 1079, 1085.

With this background we can see the limited import of Sanders's recantation. Defendant's proposed § 2255 motion describes the portion of Sanders's testimony that he recanted.

> Sanders testified against [Defendant], claiming to have been at his residence a "couple of days" before the issuance of the search warrant and to have observed a drug transaction.  [Sanders] testified he did not know that he was the informant on the search warrant at the time it was procured by [Agent] Johnson, but learned of it later.  On cross-examination, Mr. Sanders testified that when he went out to [Defendant's] house shortly before the raid, he saw guns but did not do or see any drugs other than a joint that he, his nephew and [Defendant] smoked.  He testified that he had told DTF Agent Johnson.  After a break called by the AUSA Michael Littlefield, Sanders reversed course on re-direct and said that he was uncertain of the times he had been to [Defendant's] and that he had observed drug activity.  He admitted, when questioned, that Agent Johnson was more likely than he to know the dates.  Mr. Sanders admitted that Mr. Littlefield had talked to him during the break about the dates he was at [Defendant's].  He testified, however, that they did not discuss the nature of his testimony.

Proposed § 2255 motion at 20-21 (citations omitted).  The pertinent portion of Sanders's declaration relates what happened during the break:

> 12.  In the middle of my testimony, Mr. Littlefield asked to stop the trial, to take a break, a recess I think they call it.

13. Mr. Sperling [co-counsel to AUSA Littlefield] came to my holding cell and Mr. Littlefield said I can't be testifying the way I was, which was telling the truth, although I don't recall exactly what I was testifying about at the time. He said that instead I should be saying "I don't recall." Mr. Sperling spoke up and said to Mr. Littlefield that I needed to be truthful, but Mr. Littlefield said to me "no," that we had a deal, and that I needed to say that I didn't recall, which is what I said on the witness stand when the trial resumed. They had me lying on the witness stand.

Proposed § 2255 motion, Ex. 21, at 3-4. In short, the recantation does not concern Sanders's trial testimony that he had purchased methamphetamine from Defendant repeatedly during the three or four months before the murder or that he had assisted in Defendant's manufacture of methamphetamine. It concerns only whether he had seen a drug transaction a few days before the murder. Although the declaration may call into question the factual basis for the search warrant obtained by Agent Johnson, the validity of the warrant, as we have explained, is irrelevant to our innocence inquiry. And the declaration has little impact on the proof that Defendant killed a law-enforcement officer while committing a drug offense, as required for two of Defendant's convictions. That allegation was amply supported by the testimony and physical evidence described above. In particular, the presence of the red phosphorus on his person is compelling evidence of contemporary methamphetamine manufacture.

Sanders's declaration also discusses Littlefield's pretrial efforts to get him to testify. But that discussion does not concern the *content* of his testimony, just whether he would testify at all.[4]

---

[4] Sanders also testified about matters unrelated to drugs. On direct examination he recounted Defendant's talking about the warrant for his arrest and referring to it as the reason he was reluctant to leave his cabin. When asked what Defendant had said "in relation to what he expected law enforcement to do because of the warrant," Sanders testified that Defendant told him "that if the police ever came to his house that he would shoot the first police that came through his door." Trial Tr. at 2515.

These points were supported by other witnesses who knew Defendant. Randy Turman testified that he never saw Defendant leave his property and that Defendant was aware of the warrant and expected law enforcement to come to his home to execute it. When asked what Defendant "sa[id] that he was intending to do if the laws came to his place," Turman replied that Defendant declared "[t]here was going to be a shootout" and "he was going to take out as many as he could before they got him." *Id.* at 412-13. Cindy Crawford testified that Defendant stayed at home because of the warrant; that Defendant said there was a chance law enforcement would come to his home and "that's why . . . he had protection"; and that Defendant boasted if "Police, or anyone, [came to his home] that he would go out in a blaze of glory." *Id.* at 3068-69. Karen Real testified that Defendant said "if they [cops] ever come out he would shoot them" (although she did not believe him at the time). *Id.* at 3106-07. Finally, Brandi Price testified that when discussing the warrant, Defendant told her and some friends that if they were there when law enforcement showed up they were to "either grab a gun or hit the floor" and that "[h]e was going to open fire on them and . . . [t]ake as many of them bastards with him as he could." *Id.* at 3492-93. Defendant's cousin, Travis Crawford, also testified to the same effect, but he recanted in a declaration submitted with Defendant's first § 2255 motion.

In addition, several eyewitnesses provided testimony showing that Defendant must have known that he was shooting at law-enforcement officers. *See Barrett I*, 496 F.3d at 1113-14. We concluded on Defendant's direct appeal that the "evidence was more than sufficient to allow the jury to reasonably find that [Defendant] knew that [Trooper] Eales and the other persons approaching his residence were law enforcement officers and that he intended to kill Eales." *Id.* at 1115. We address that evidence further below, in connection with Defendant's allegations regarding the conduct of the state officers executing the warrant.

In sum, Sanders's recantation has little impact on the strength of the prosecution's case. Its limited scope leaves much of his testimony unaffected, and the key allegations against Defendant were further supported by testimony from other witnesses and by physical evidence. In terms of § 2255(h)(1), Defendant does not make a prima facie showing that Sanders's declaration, "viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that no reasonable factfinder would have found [Defendant] guilty of the [challenged] offense[s]."

## B.  Agent Clint Johnson

Clint Johnson was the Drug Task Force Agent who obtained the search warrant for Defendant's home. We need not address the merits of much of what Defendant alleges about Agent Johnson (and his superior, Allen Franklin Lloyd, who did not testify at trial) because it challenges only (1) the search warrant obtained for Defendant's home and (2) the good faith of the officers who planned the execution of the warrant. As explained above, neither of those issues is relevant to our inquiry under § 2255(h)(1). There remain, however, two issues to address.

### 1.  Allegedly planting evidence (red phosphorus in pill bottle)

Defendant claims that Agent Johnson may have planted some of the red phosphorus attributed to Defendant that supported the government's allegation of methamphetamine manufacture and sale. Noting that some (unspecified) quantity of red phosphorus was found in Agent Johnson's car after he left the Task Force, some seven years after the murder, Defendant suggests this "newly discovered evidence of

Johnson's possession of the precursor raises the specter of [his] having planted the same," providing false evidentiary support for the drug-related charges against him. Proposed § 2255 motion at 53. This is rank speculation. We agree with the government that:

> a single discovery of phosphorus in 2006 does not establish, by any evidentiary standard, a pattern of behavior by Johnson or a motive for planting evidence during a 1999 homicide investigation, years before the federal government pursued a drug charge. And even if it did, it would not clearly and convincingly show that Johnson did so here, or that [Defendant] was innocent of murdering Trooper Eales.

Resp. at 12.

Defendant attempts to bolster his evidence-planting theory by casting doubt on the provenance of the 15 grams of red phosphorus found in a baggie inside the pill bottle discovered in Defendant's clothing when searched at the crime lab after his arrest. He claims no witness testified about the pill bottle and the baggie during the state homicide trials and insists its appearance at the federal trial is so suspect "that any juror who knew of [Agent Johnson's] misconduct alleged here would undoubtedly have believed that the red phosphorus [in the baggie] was planted." Proposed § 2255 motion at 54. But drug manufacture and distribution were not elements of any of the charges against Defendant in the state trials. There was no reason to present evidence of the baggie or bottle.

Moreover, Defendant offers nothing to suggest either motive or opportunity for Johnson's alleged planting of the baggie. It would have been obvious to Johnson that Defendant faced very serious charges (at least attempted murder) from the

16

shootings, and Johnson could not have known how much evidence of drug manufacture or trafficking would be found in the residence. It is beyond speculation that Johnson could have anticipated the state-court acquittals and the materiality of the red phosphorus to the federal prosecution. This was not a street-level bust where planting drugs would clearly make a difference. As for opportunity, when Johnson arrived at the scene after the shooting, he went directly to assist in Eales's emergency treatment and removal by ambulance and then accompanied the ambulance to the hospital. Meanwhile, Trooper Hash, who initially had custody of Defendant at the scene, turned him over to the Sequoyah County Sheriff. When the ambulance to take Defendant to the hospital arrived, the sheriff and a deputy removed Defendant's clothes in the ambulance; the deputy placed them in a biohazard bag, which he handed to an Oklahoma State Bureau of Investigation criminologist near the crime scene. Johnson thus had no access to Defendant before Defendant's clothes were removed, and there is no evidence that he had access to the clothes after they were removed and later taken to the crime lab.

Finally, we note that the baggie with red phosphorus in the pill bottle was not essential to Defendant's conviction on the drug-related federal charges. The 33 grams of red phosphorus found in the Ziploc bag, and all the other physical evidence and testimony recounted earlier, supported the government's case of methamphetamine manufacture at Defendant's home. Even without the questioned baggie a reasonable jury would hardly have been compelled to acquit Defendant.

### 2. Trial testimony

17

Agent Johnson also testified at trial regarding the execution of the search and arrest warrants. He explained that he thought that execution of the warrants was high risk because of reports over the previous six months that Defendant had been making methamphetamine and had threatened to kill law-enforcement officers who came to his home. And he stated that as his vehicle approached the scene after the shooting was over, he could see flashing red and blue lights (lending some support to other evidence that Defendant knew he was firing on law enforcement during the shootout). Yet Defendant does not specifically direct his attacks at any of this testimony. All he says is that "Johnson w[as] testifying falsely at trial" and that the evidence of Agent Johnson's misconduct "would have been admissible to impeach" him. Proposed § 2255 motion at 88. Such nonspecific and perfunctory statements cast no doubt on the verdict since Johnson's testimony was cumulative and insignificant in light of much other evidence on these matters.

## C. AUSA Michael Littlefield

Defendant claims AUSA Michael Littlefield conspired with Agent Johnson to violate his constitutional rights. He cites evidence that the two worked together on a number of cases and that Johnson had helped Littlefield avoid a DUI arrest. Defendant frames the alleged conspiracy in broad terms, but the focus of this claim is Littlefield's reliance on Johnson's confidential informant Charles Sanders to bolster the case against Defendant at trial, which we have already addressed. Conspiratorial acts of Littlefield and Johnson may be important in establishing a constitutional violation on which a § 2255 claim could be based, but they add nothing to the

factual-innocence claim that this court must now resolve. Likewise, evidence of bullying behavior by Littlefield is at most relevant only to bolster Defendant's claim that Littlefield bullied Sanders into committing perjury. But we have already rejected Defendant's claim based on Sanders's recantation (even accepting its truth); and the alleged bullying is not itself evidence exculpating Defendant of anything. The bullying allegation adds nothing helpful to Defendant.

## D.  Oklahoma Highway Patrol (OHP) Officers

Much of Defendant's criticism of the conduct of OHP officers is irrelevant to our inquiry under § 2255(h)(1), because it does not relate to his guilt or innocence. Thus, we do not address his claims that officers beat him after the shooting and interfered with his medical treatment, or his claim that some officers engaged in intimidation tactics at his earlier state criminal proceedings. We discuss the merits of only the innocence argument.

### 1.  Investigator Paul Gordon

OHP internal-affairs Investigator Paul Gordon expressed the opinion that because of the flawed manner in which the officers approached Defendant's home, he would not have known he was shooting at law-enforcement officers. (Gordon's criticism of the execution of the warrants is otherwise irrelevant to our innocence inquiry, as is his complaint of official hostility toward him after he issued his critical report.). He wrote:

> OHP [Officers] failed to follow the handbook protocol, at the very least, in this regard:  the Broncos [in which the lead members of the team arrived at the scene] were unmarked and the troopers did not activate their emergency lights to warn [Defendant] he was dealing with the police. . . .  Under the circumstances admitted to me and observed by me, *[Defendant] would not have known the incoming vehicles were law enforcement.*

Gordon Declaration, Ex. 18 at 9 (par. 23) (emphasis added).  But his underlying assumption—the lack of emergency lights—was contrary to substantial evidence at trial.  As we said on Defendant's direct appeal:

> [A]lthough the lead Bronco did not exhibit any flashing lights (because [Defendant] began shooting at it before the two officers inside had an opportunity to turn on the lights), the second Bronco did.  More specifically, the second Bronco had a flashing strobe-type light on the sun visor and "wig-wag" headlights, all of which had been activated.  The third vehicle to enter [Defendant's] property, immediately following the two lead Broncos, was a marked Oklahoma Highway Patrol car with its emergency lights activated (including a standard light bar on top and "wig-wag" headlights).

*Barrett*, 496 F.3d at 1113 (citations omitted); *see also id.* n.14 (noting that while testimony was conflicting as to precisely when the lights of the marked patrol car were activated, "[i]t is clear, nevertheless, that a substantial portion of the shots fired by [Defendant] occurred after the lights of this vehicle were activated").  We went on to say, "[Defendant's] conduct in shooting at the officers that night clearly would have allowed the jury to reasonably find that he intended to kill one or more of th[e] officers, including Eales."  *Id.* at 1114 (recounting conduct during the shooting reflecting Defendant's intent to kill officers); *see also id.* at 1113 (discussing additional evidence relevant to Defendant's intent, including his awareness of the outstanding warrant and his threats of violence should law enforcement attempt to

serve it).  Gordon's critique may be helpful to Defendant, but Defendant again fails even to approach a prima facie case that Gordon's opinion would persuade, much less clearly and convincingly compel, a jury to acquit Defendant.

### 2.  OHP Troopers

Defendant's § 2255 motion contains a hodgepodge of allegations under the heading "Trooper by trooper, they lied and misled the jury."  Proposed § 2255 motion at 66.  Some OHP troopers gave statements to police officials, testified at the state trials, and testified at the federal trial.  Defendant alleges that their testimony "relat[ing] to the question of notice and self-defense" changed over time and "[t]he evolution of that testimony makes clear that the OHP's interest was not in the truth but in securing a verdict of death."  *Id.*  As the government points out, however, "inconsistent statements made over the course of multiple investigations and trials" are matters "[Defendant] could have identified long ago."  Resp. at 14.  In some instances, trial counsel did bring out the inconsistencies before the jury, but to no demonstrable effect; in other instances, counsel evidently deemed them not worth pursuing.  This reinforces our assessment that the few minor inconsistencies identified here are too insignificant to play a material role in the innocence inquiry under § 2255(h)(1).

Defendant points to testimony on two occasions by Agent Ben Rosser (who interviewed officers shortly after the shooting):  (1) "At the [state] preliminary hearing, Agent Rosser testified that when he arrived on the scene [after the shooting] the only emergency lights on were on Trooper Hash's marked unit"; (2) "At the first

[state] trial Agent Rosser admitted that he had listened to the Troopers' testimony at the preliminary hearing and the first trial and in 'many many' instances, that the testimony concerning emergency lighting differed from the sworn statements given under oath to [Investigator] Paul Gordon." Proposed § 2255 motion at 66. But Defendant fails to explain the relevance of what Rosser saw after the shooting or how any inconsistency (he does not identify what the "many many" instances were) was material to the verdict.[5]

Defendant accuses Trooper John Hamilton of telling two lies. First, he says: "Hamilton maintained that he had damaged the push guards on the [lead] Bronco by hitting a post at the driveway. It was a lie. Agent Rosser testified [at the state preliminary hearing] the push guards were bent at the same height as the porch [on Defendant's home]." *Id.* at 67. But the height of the porch is hardly conclusive. And although Defendant notes the dispute at trial about where the Bronco was when shooting began, he does not explain how that dispute would be resolved by determining where the Bronco was damaged; all agree that ultimately the Bronco ended up at or near the porch. The second allegation is based on a misreading of the record. Defendant asserts that Hamilton initially stated in investigative interviews that he did not shoot his gun and admitted he did so only when confronted with a ballistics report confirming that fact. But in the interviews Hamilton did not deny shooting his weapon. In one, he was asked but his answer on the recording was

---

[5] Here, and elsewhere, Defendant improperly refers to testimony in state proceedings for which he has not provided a transcript.

inaudible.  In the other, he seems to indicate that he had used his sidearm.  *See* Ex. 47 at 45 ("The only firearm that HAMILTON had immediately available and in use during the time that he was receiving gun fire was his Sig Sauer sidearm.").  In any event, Defendant does not explain the relevance of these statements to his guilt or why Hamilton would intentionally provide false information on these matters.

Next, Defendant complains about testimony from Trooper Raymond Greninger (who was in the second Bronco approaching Defendant's home) as to when the gunfire started.  Defendant states:

> Greninger told Agent Rosser that the gunfire began [when the lead Bronco was] at the front porch; thereafter, he advised [Investigator] Gordon that he 'drew a blank' from the ditch until they pulled up and heard gunfire.  In the first state trial, Greninger maintained his 'memory block' story; in the second state trial, he testified the gunfire began as the Bronco approached the house.  By the federal trial, Trooper Greninger again claims he had a memory block from the ditch to the stopping of [his] car.

Proposed § 2255 motion at 67-68 (citations omitted).  Defendant's point appears to be that he should have the benefit of Greninger's earlier statements indicating the lead Bronco was near the front porch when gunfire began.  But the jury heard from the driver of the lead Bronco, Trooper Hamilton, whose testimony was summarized in our *Barrett I* opinion:

> [Defendant] began shooting at the lead vehicle, a Ford Bronco driven by Trooper Hamilton, as soon as the vehicle cleared a ditch that ran between [Defendant's] house and a property to the east. . . .  As Hamilton continued driving the Bronco westward towards [Defendant's] residence, the gunfire intensified and the windshield of the Bronco began to disappear.  The gunfire continued after Hamilton stopped the Bronco near the edge of the front porch of [Defendant's] residence.

*Barrett I*, 496 F.3d at 1114 (citations omitted).  Even if Greninger's statements contradicted Hamilton's account, a reasonable jury would certainly not be required to accept those statements over the trial testimony of the lead Bronco's driver.

Defendant notes in one sentence that Trooper Gene Hise (driver of the fourth vehicle approaching Defendant's home) testified his headlights were off as he entered Defendant's property, although Hise had testified in state proceedings that they were on.  It is not evident what Defendant's point is.  Hise's testimony on this matter at the federal trial was, if anything, more favorable to Defendant, contrary to Defendant's theory that the officers lied to obtain a death sentence.

Defendant then focuses on Trooper Steven Hash's testimony about feeling a pill bottle in Defendant's pocket when he frisked him for weapons at the crime scene. Defendant notes that although Hash testified about this at the federal trial and the first state trial, he did not mention it during his internal interviews, at the second state trial, or at the preliminary hearing.  Defendant does not say, however, that Hash *was asked* and *denied* feeling the bottle on the latter occasions.  Moreover, the Sequoyah County Sheriff and his deputy testified about finding the pill bottle in Defendant's pocket and putting it back before Defendant's clothes were bagged as evidence.  In light of that testimony, and all the other (admittedly untainted) evidence of methamphetamine manufacture and sale by Defendant discussed earlier, a reasonable jury would hardly be compelled to find him innocent of the charges based on drug trafficking due to any inconsistency in Hash's testimony.

Defendant also alleges a discrepancy between Officer Danny Oliver's trial testimony and a handwritten statement he gave after the shooting.  Oliver was with Hash in the third vehicle approaching the scene.  At trial he testified he first heard gunfire when "[t]he first Bronco was already through the ditch and the second was nearly through."  *Id.* at 69 (internal quotation marks omitted).  But his earlier handwritten statement, for which Defendant provides neither a copy nor a citation to our record, purportedly said:  "As soon as the first vehicle stopped in front of the residence I heard automatic weapon fire and could see a great deal of gun smoke in front of the residence."  *Id.* at 68 (internal quotation marks omitted).  We are not persuaded that every reasonable juror would infer from the handwritten statement that all the officers must have lied at trial about when the gunfire began.

Finally, Defendant states that Lieutenant Kerry Pettingill testified inconsistently about whether his headlights were on or off as he drove his vehicle onto the drive of the adjacent property of Defendant's mother. But the alleged inconsistency is between Pettingill's testimony in the first and second *state* trials and is wholly irrelevant to Defendant's guilt.

In sum, Defendant's objections regarding minor discrepancies in testimony by OHP officers do not materially advance his case for innocence.

### 3.  Destruction of evidence

Defendant complains about the destruction of a partially recorded interview with a now-deceased trooper after the shootout.  It was ordered destroyed per official policy against recording officers immediately after an incident.  Defendant does no

more than speculate that "[b]ecause of the duplicity and timing of the destruction, *it is fair to say that there was exculpatory evidence on that tape*." *Id.* at 72 (emphasis added). There is no evidence that the taped interview would in fact have supported Defendant's claim of innocence.

### 4. Failure to preserve crime scene

Defendant's proposed § 2255 motion raises several alleged failures to preserve the crime scene. The principal one is the alleged movement of the lead Bronco from its location during the shooting. Defendant contends this undermines the testimony of government expert Iris Dalley about the trajectory of bullets fired by Defendant at the oncoming vehicle and supports his position "that the Bronco came barreling up to his porch, and he was shooting into headlights without knowing who he was shooting at." *Id.* at 72. But any uncertainty about the vehicle's position must be viewed in light of the eyewitness testimony of the vehicle's position and, more importantly, the testimony regarding the shooting itself. This is a far cry from the sort of physical evidence that can conclusively establish the inaccuracy of eyewitness testimony.

Likewise for Defendant's remaining crime-scene issues: (1) Dalley's alleged testing of a load bearing vest rather than a "turtle shell" vest worn by Eales in making trajectory calculations; (2) removal of one of the officers' weapons from the scene for 12 hours; (3) the movement on and off the scene of such items as the pin of a flashbang device and the ignition key of the lead Bronco; (4) the failure of state criminalists to collect all the bullet casings at the scene, analyze blood on the porch or fingerprints on the baggies of red phosphorus or the pill bottle containing one of

the baggies claimed to have been in Defendant's pockets, and calculate the trajectory of all shots to the lead Bronco and a shot likely fired by Trooper Hamilton into Defendant's cabin; and (5) an allegedly deficient determination of the number of shots that were fired and by whom.  Defendant objects generally that "[t]he failure to manage the crime scene in a scientifically responsible manner left the sequence of events, critical to [Defendant's] defense, in a muddle."  *Id.* at 77.  But he ignores the eyewitness accounts of what happened, and he points to nothing inconsistent with the officers' accounts.  His argument amounts to nothing more than that the corroboration of these accounts by physical evidence and expert testimony may not be as strong as the prosecution contended.  That is not a ground for relief under § 2255(h)(1).

**E.  Ballistics Expert Higgs**

Ballistics expert Terrance Higgs tied the bullet fragment that killed Eales to Defendant's .223 Colt H Bar Sporter rifle, "to the exclusion of all guns that are made or that will be made."  Trial Tr. at 3703-05.  Defendant challenges this finding in two ways.  First, he says that Higgs's testimony at the state trials was not as definitive as at the federal trial because at the state trials Higgs used a preponderance-of-the-evidence standard in testifying that the fragment matched Defendant's gun.  But he does not claim that if Higgs had testified at the federal trial in terms of a preponderance, no reasonable jury would have convicted him.  Such a claim would be absurd.

Defendant's second challenge concerns chain of custody. He claims that "the government did not and cannot establish an unbroken chain of custody," *id.* at 83, for the fragment between its removal during the autopsy and its testing by Higgs, and that "[w]ithout an unbroken chain from Eales' autopsy, no reasonable juror could find that it was [Defendant's] bullet that killed Trooper Eales," *id.* at 85. Such hyperbole is singularly unpersuasive. The evidence of chain of custody was solid, and Defendant's carping in his proposed § 2255 motion is based on a misreading of the record. He points to no evidence indicating tampering. Moreover, Defendant again ignores that the bullet fragment was merely physical evidence to corroborate eyewitness testimony. And there was no evidence, or even argument, at trial that anyone but Defendant shot Eales.

## F.  Reconstruction Expert Dalley

Finally, Defendant returns to his criticism of expert Iris Dalley. He suggests that another expert would testify that Dalley "lacked sufficient knowledge of ballistics, vehicle construction, and the necessity of using consistent, accurate terms of reference when reconstructing a scene to render reliable, credible opinions about a shooting scene involving a vehicle and did not follow widely accepted protocol used in shooting incident reconstruction." Proposed § 2255 motion at 86 (internal quotation marks omitted). He also alleges that near the time of her testimony in this case, Dalley was "chastised" by the Oklahoma Court of Criminal Appeals for "dress[ing] up her personal opinions in the guise of 'science.'" *Id.* at 86 (citing *Dunkle v. State*, 139 P.3d 228, 249-51 (Okla. Crim. App. 2006)).

28

But, as this court pointed out in reviewing Defendant's first § 2255 motion, Dalley was thoroughly and effectively cross-examined at trial (one of her lawyers thought her testimony turned out to be embarrassing for the government, *see Barrett II*, 797 F.3d at 1216), yet the jury convicted. Dalley's testimony was intended only as corroboration of the officers' eyewitness testimony. Defendant has not made a prima facie showing that any reasonable jury made aware of the alleged deficiencies in Dalley's testimony would have acquitted him.

## V.  CONCLUSION

In addressing Defendant's request for authorization, we have necessarily discussed his allegations in a serial manner. But we have also considered them cumulatively. And we must conclude that Defendant has not presented a prima facie case that in light of the evidence he presents, no reasonable factfinder could find him guilty of the charged offenses. There is too much evidence that a jury could credit concerning both the shooting and Defendant's manufacture and distribution of methamphetamine.

We therefore deny authorization to file the proposed second § 2255 motion. This decision is "not . . . appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari." 28 U.S.C. § 2244(b)(3)(E); *see In re Clark*, No. 16-5081, ___F.3d___, 2016 WL 5210887 at *3 (10th Cir. Sept. 21, 2016) (§ 2244(E) applies to denials of authorization under § 2255(h)). Defendant's motion to proceed in forma pauperis is denied as unnecessary "because there is no filing fee

for the motion for authorization." *In re Alvarado*, No. 10-4205, 2010 WL 9531122, at *2 (10th Cir. Dec. 2, 2010) (unpub.).

<div style="margin-left: 50%;">

Entered for the Court


Harris L Hartz
Circuit Judge

</div>